No. 24-70008

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### IRVING ALVIN DAVIS
*Petitioner-Appellant,*

**v.**

### ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,
*Respondent-Appellee*

---

**On Appeal from the United States District Court, Western District of Texas, El Paso Division, Case No. 3:14-cv-00121-KC**

---

### CORRECTED MOTION FOR CERTIFICATE OF APPEALABILITY AND CORRECTED BRIEF IN SUPPORT

---

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
*TScher@msn.com*

RICHARD D. ESPER
Attorney at Law
801 North El Paso St., Ste. 225
El Paso, TX 79902
Tel: (915) 544-3132
*Richardesperlaw@yahoo.com*

JOE A. SPENCER, JR.
Attorney at Law
1009 Montana Avenue
El Paso, TX 79902
Tel: (915) 532-5562
*joe@joespencerlaw.com*

## STATEMENT REGARDING ORAL ARGUMENT

This is a capital case with significant and nuanced constitutional claims, and an expansive record. Mr. Davis requests the opportunity to present oral argument and answer any questions this Court might have, which will aid this Court in resolving the case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT............................i

TABLE OF CONTENTS................................................... ii

TABLE OF AUTHORITIES...............................................iv

MOTION FOR CERTIFICATE OF APPEALABILITY ..................1

BRIEF IN SUPPORT OF MOTION FOR COA......................1

STATEMENT OF THE CASE ..........................................1

PROCEDURAL HISTORY ..............................................3

STANDARD OF REVIEW...............................................5

ARGUMENT ...........................................................6

I.   REASONABLE JURISTS COULD DEBATE WHETHER
     DAVIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY
     THE ADMISSION OF EVIDENCE OF HIS RELIGIOUS
     AFFILIATION AT HIS RESENTENCING PROCEEDING. ...............6

     A.   Introduction.................................................6

     B.   Relevant facts and procedural history ...........................8

     C.   Reasonable jurists could debate whether Davis's
          constitutional rights were violated by the admission of
          evidence of his religious affiliation ...............................15

          1.   First Amendment..................................15

          2.   Due process and Eighth Amendment ...................20

     D.   Reasonable jurists would debate whether Davis was
          prejudiced by the improper admission of the Satanism
          evidence..................................................21

     E.   Reasonable jurists could debate whether §2254(d) restricts
          relief......................................................26

F.      Davis's Eighth and Fourteenth Amendment/Due Process
        claims should be remanded. ...........................................................27

II.     REASONABLE JURISTS COULD DEBATE WHETHER
        DAVIS'S RESENTENCING COUNSEL WERE INEFFECTIVE ........28

        A.      Introduction ...........................................................................28

        B.      Reasonable jurists could debate the merits of Davis's
                *Strickland* claim. ...................................................................30

                1.      Truncated investigation .............................................35

                2.      Red flags missed .........................................................35

                3.      Reasonable jurists could debate whether Davis
                        received ineffective assistance of trial counsel. ....38

                a.      Deficient performance ................................................38

                b.      Prejudice .....................................................................41

                c.      Davis is entitled to a COA. ........................................47

                d.      Reasonable jurists could debate whether §2254(d)
                        restricts relief. ...........................................................49

CONCLUSION .................................................................................................53

CERTIFICATE OF COMPLIANCE ................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ................................................46

*Alliance for Good Government v. Coalition for Better Government,*
919 F.3d 291 (5th Cir. 2019)..........................................................28

*Andrew v. White*, 604 U.S. ___, ____, 2025 WL 247502 (U.S. Jan. 21,
2025) ..............................................................................20

*Andrus v. Texas,* 590 U.S. 806 (2020)...........................................41, 44, 47

*Barefoot v. Estelle*, 463 U.S. 880 (1983)...............................................5, 22

*Beck v. Alabama*, 447 U.S. 625 (1980) .................................................20

*Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228 (6th Cir. 2015) ....................19

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990) .........................................25

*Boring v. State*, 289 Ga. 429, 711 S.E.2d 634 (Ga. 2011) ...............................24

*Brecht v. Abrahamson,* 507 U.S. 619 (1993) ............................................15

*Brumfield v. Cain*, 576 U.S. 305 (2015).................................................51

*Buck v. Davis*, 580 U.S. 100 (2017) .....................................................5

*Cullen v. Pinholster*, 563 U.S. 170 (2010) ..............................................53

*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010)..............................4, 7, 14

*Davis v. State*, No. AP-74393, 2007 WL 1704071 (Tex. Crim. App.
June 13, 2007).................................................................3, 12

*Davis v. Texas*, 565 U.S. 830 (2011)......................................................4

*Dawson v. Delaware*, 503 U.S. 159 (1992).........................................2, 7, 15, 16, 21

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014)................................47, 48, 49

*Ex Parte Davis*, Nos. WR-61, 445-0, WR-61, 445-02 (Tex. Crim.
App. March 12, 2014) ...........................................................4

*Feiner v. New York*, 340 U.S. 315 (1951) ...............................................19

*Gardner v. Florida*, 430 U.S. 349 (1977) ...............................................20

*Gregg v. Georgia*, 428 U.S. 153 (1976).................................................20

*Harrington v. Richter*, 562 U.S. 86 (2011) .............................................27

*Hart v. State*, 688 S.W.3d 883 (Tex. Crim. App. 2024)..........................24

*Humphries v. Elliott Co.*, 760 F.3d 414 (5th Cir. 2014).........................28

*Johnson v. Williams*, 568 U.S. 289 (2013)...............................................27

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507 (2022)....................1, 6

*Lockett v. Ohio*, 438 U.S. 586 (1978).....................................................20

*Luna v. Lumpkin*, 832 F. App'x 849 (5th Cir. 2020).................40, 44, 45

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)......................................5, 6, 49

*Morse v. Frederick*, 551 U.S. 393 (2007) ...............................................19

*Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454 (3d. Cir. 2015)...........19

*Nelson v. Davis*, 952 F.3d 651 (5th Cir. 2020).........................................6

*Panetti v. Quarterman*, 551. U.S. 930 (2007) .......................................53

*Payne v. Tennessee*, 501 U.S. 808 (1991)...............................................20

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ...............................................20

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................53

*Schriro v. Landrigan*, 550 U.S. 465 (2007)............................................44

*Sears v. Upton*, 561 U.S. 945 (2010)......................................44, 46, 47

*Skipper v. South Carolina*, 476 U.S. 1 (1986).......................................46

*Slack v. McDaniel*, 529 U.S. 473 (2000)............................................5, 51

*Smith v. Cain*, 708 F.3d 628 (5th Cir. 2013) .........................................53

*Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005) .................................................47, 48

*State v. Stensrud,* 134 Wash.App. 1031, 2006 WL 2329474 (2006) ...............23, 26

*Strickland v. Washington*, 466 U.S. 668 (1984).................................................29, 39

*Tennard v. Dretke*, 542 U.S. 274 (2004).........................................................46, 50

*United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011)........................................24

*United States v. Williams*, 663 F. Supp. 3d 1085 (D. Ariz. 2023) .........................24

*Wiggins v. Smith*, 539 U.S. 510 (2003) .....................................................39, 41, 45

*Williams v. Taylor*, 529 U.S. 362 (2000).............................................................40

*Woodfox v. Cain*, 772 F.3d 358 (5th Cir. 2014) ...................................................27

*Woodson v. North Carolina,* 428 U.S. 280 (1976).................................................20

*Zant v. Stephens*, 462 U.S. 862 (1983) ............................................................14, 20

**Statutes**

28 U.S.C. §2253(c)..................................................................................................1

28 U.S.C. §2254 .....................................................................................................4

28 U.S.C. §2254(d)(1)...........................................................................................50

28 U.S.C. §2254(d)(2)...........................................................................................51

28 U.S.C. §2254(e)(1) ...........................................................................................51

28 U.S.C. §28 U.S.C. 2253(c)..................................................................................5

**MOTION FOR CERTIFICATE OF APPEALABILITY**

Petitioner-Appellant Irving Alvin Davis moves the Court to grant a certificate of appealability ("COA") pursuant to 28 U.S.C. §2253(c) because he can make a substantial showing that his constitutional rights were violated and because the district court's resolution of putative procedural impediments to merits consideration is debatable. Davis requests a COA to appeal the district court's order denying his claim that (1) his death sentence violates the First, Fifth, Sixth, Eighth, and Fourteenth Amendments because his religious affiliation was improperly admitted at the resentencing; and (2) his resentencing counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment.

**BRIEF IN SUPPORT OF MOTION FOR COA**

This brief in support of Davis's motion seeking a COA is not intended as briefing on the merits of appellate issues created by the district court's judgment; rather, its purpose is to establish that Davis meets the threshold standard to proceed on appeal on the issues identified herein.

**STATEMENT OF THE CASE**

**I.**

The First Amendment's protection of an individual's rights to the free exercise of religion and the freedom of association extends to religions "of all kinds," *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 524 (2022), even unpopular or

misunderstood ones. An individual's First Amendment rights are not extinguished if one is accused of a crime, and a defendant's religious beliefs may not be used against him except under very limited circumstances. *See Dawson v. Delaware*, 503 U.S. 159 (1992). Those circumstances are not present here.

The Church of Satan is a recognized religious organization that neither advocates nor endorses violence or illegal activities. Briefly prior to his 2008 resentencing, Davis joined the Church of Satan and had a variety of personal items in his jail cell in connection with his religious affiliation. Despite the fact that Davis was not a member of the Church of Satan at the time of the offense, and notwithstanding the fact that the state has never suggested that Davis committed the crime because he was motivated or inspired by the Church of Satan or its religious tenets, the state was allowed to present evidence of Davis's affiliation with the Church of Satan—*in 2008*—to prove his bad character and his future dangerousness. This type of constitutionally-protected evidence has no place at a capital trial. The state courts' reasoning, taken to its logical conclusion, means that evidence that a capital defendant's religious affiliations, *no matter what religion*, could be introduced at a capital sentencing as evidence of future dangerousness or bad character simply because "some people" have committed violence in the names of these religions. This is an absurd result.

## II.

Despite the opportunity to have a second chance to convince a jury to sentence Davis to life, resentencing counsel conducted virtually no mitigation investigation. Counsel waited nearly six months after appointment—on literally the eve of the commencement of jury selection—to speak with Davis's family members, to seek the appointment of a fact investigator (not a mitigation specialist), and to seek the appointment of a mental health expert. Whereas the state amassed new evidence to present at Davis's resentencing, Davis's counsel remained listless, overlooking or ignoring glaring red flags, many of which were contained in discovery provided by the *prosecution*. The resulting prejudice was a jury that knew next to nothing about Davis's life of neglect and abandonment, and even worse, they were never told of Davis's long and documented history of physical, emotional, and sexual abuse or his long and documented history of suicide attempts and self-mutilation, including cutting and extinguishing lit cigarettes on his arm.

## PROCEDURAL HISTORY

Davis was tried in 2002 in El Paso, Texas, for murder in the course of aggravated sexual assault when he was barely 18 years old. Davis was found guilty and sentenced to death. The Texas Court of Criminal Appeals ("TCCA") affirmed his conviction but remanding for a resentencing. *Davis v. State*, No. AP-74393, 2007 WL 1704071 (Tex. Crim. App. June 13, 2007).

Resentencing was held in 2002, and Davis was again sentenced to death. The TCCA affirmed, *Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010), *cert. denied*, 565 U.S. 830 (2011).

Davis filed a state habeas application in 2004 after his trial and first sentencing, ROA.5179-5213, and a second petition in 2010 following his resentencing. ROA.3487-90; 3499-3582. In 2013, the state court held a 1-day evidentiary hearing on the petition and thereafter denied relief, adopting the state's proposed findings of fact and conclusions of law without alteration. ROA.3222-71. The TCCA denied state habeas relief. *Ex Parte Davis*, Nos. WR-61, 445-0, WR-61, 445-02 (Tex. Crim. App. March 12, 2014) (per curiam).

Davis timely filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 in the United States District Court for the Western District of Texas, ROA.65-208, a petition later corrected and/or amended on several occasions. ROA.210-40; 506-80;1197-1276; 1867-1966. He later moved for, and was granted, a stay to exhaust certain claims, ROA.2164-77, 2224-29. Davis filed a new petition in state court, ROA.3636-79, which the TCCA dismissed. ROA.2238-40. Davis sought reconsideration but that, too, was denied over the dissent of Judge Newell. ROA.2246.

Subsequently, the district court lifted its stay, ROA.2262-63, and Davis filed his final consolidated petition. ROA.2300-2426. After the Respondent answered and

Davis replied, the district court denied relief and a COA. ROA.2838-2970. A timely motion to alter or amend judgment, pursuant to Fed. R. Civ. P. 59(e), was filed and subsequently denied. ROA.2972-89; 3020-28. A timely Notice of Appeal followed. ROA.3029-30.

## STANDARD OF REVIEW

Federal habeas appeals require the issuance of a COA, which obliges the applicant to demonstrate a "substantial showing of the denial of a constitutional right." 28 U.S.C. §28 U.S.C. 2253(c). This requirement serves "to prevent frivolous appeals." *Barefoot v. Estelle*, 463 U.S. 880, 892 (1983). A COA should issue if, for a claim decided on the merits, "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or if the Court "could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For claims denied on procedural grounds, a COA should issue if "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A COA determination is a "threshold" inquiry that "is not coextensive with a merits analysis." *Buck v. Davis*, 580 U.S. 100, 115 (2017). This "threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims"; "[i]n fact, the statute forbids it." *Miller-El,* 537 U.S. at 336. Hence, a

petitioner need not show that "the appeal will succeed"; nor should a court decline a COA because the court "believes the applicant will not demonstrate an entitlement to relief." *Miller-El,* 537 U.S. at 337. The COA "standard is less burdensome in capital cases, as in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (internal quotations omitted).

## ARGUMENT

I.  **REASONABLE JURISTS COULD DEBATE WHETHER DAVIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE ADMISSION OF EVIDENCE OF HIS RELIGIOUS AFFILIATION AT HIS RESENTENCING PROCEEDING.**

A.  **Introduction**

The First Amendment protects "religious beliefs ***of all kinds*** . . ." *Kennedy v. Bremerton School Dist*., 597 U.S. 507, 524 (2022) (emphasis added). The Church of Satan is a recognized religious organization that neither advocates nor endorses violence or illegal activities.[1] Rather, it promotes a mixture of secular humanism and Western esotericism, performed through symbolic rituals intended to invoke a cathartic response. ROA.15468-69.[2] But because Davis had temporarily joined the

---

[1] The official website for the Church of Satan itself states that it does not condone illegal activity.
*See* https://churchofsatan.com/free-satanic-bible-is-unsatanic/

[2] Citations in this application will be to the electronic ROA as supplemented.

Church of Satan prior to his resentencing, and because the state undoubtedly knew the jury would find his religious beliefs morally reprehensible, the state devoted nearly one-third of its testimony at Davis's resentencing proceeding (aside from that presented to prove the crime itself) to his religious affiliation as evidence of bad character and purported future dangerousness.

The trial court allowed this evidence based on the testimony of a single prosecution witness that "some" individuals had committed acts of violence in the name of Satan, even though there was no evidence whatsoever that the Church of Satan "had committed any unlawful or violent acts, or had even endorsed such acts[.]" *Dawson v. Delaware*, 503 U.S. 159, 166–67 (1992). On appeal, the TCCA held that the admission of the religious affiliation evidence did not violate Davis's First Amendment rights to the freedoms of religion and association, noting that "some members of the Satanic religion advocate violence[.]" *Davis v. State*, 329 S.W.3d 798, 805 (Tex. Crim. App. 2010). However, in a conclusion essentially parroting the standard for the granting of a COA in this Court, the TCCA wrote "[i]t was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment." *Id*. at 805-06.

The federal district court deferred to the TCCA, determining in a conclusory three-sentence paragraph that it "reasonably found" no First Amendment violation

under *Dawson* because the evidence "was relevant to Davis's future dangerousness." ROA.2947. It also summarily concluded that the TCCA's decision was not based on an unreasonable determination of the facts. ROA.2947-48.

Under the state court's reasoning, evidence that a capital defendant practices Christianity, Catholicism, Judaism, Buddhism, Islam, or Hinduism could be introduced at a capital sentencing as evidence of future dangerousness simply because "some people" have committed violence in the names of these religions. The decisions below set an extremely dangerous precedent, chill the fundamental constitutional rights to the free exercise of religion and association, and offend due process.

## B.    Relevant facts and procedural history

The state's theory relating to Davis's future dangerousness at his resentencing was that his religious affiliation demonstrated that he had "bad character"[3] and a probability that he would be a continuing threat to society. It argued that proof of Davis's religious affiliation was admissible, as long as it could demonstrate that Davis's religious group had engaged in or approved of violent activities. ROA.13832-33. Because Davis was a member of the Church of Satan at the time of his resentencing, the prosecution proposed to prove that Satanism is just such a

---

[3] *See* ROA.4418 (State's Brief on Direct Appeal, *Davis v. State*, TCCA No. AP-74,393 at 23).

religion. It is undisputed that Davis, who now considers himself a Buddhist, did not belong to the Church of Satan and had no affiliation with Satanism either at the time of the crime or during his first trial.

The defense objected to the admission of any evidence regarding Davis's religious affiliation on First, Eighth, and Fourteenth Amendment grounds. During a pretrial hearing, State's "expert" Donald Vaughn Haley testified[4] that:

- "members of the satanic religion" advocate violence. ROA.15367-68;

- based on Haley's literalist and amateur reading of the Satanic Bible, authored by the Church of Satan's founder Anton Lavey, Satanists may perform human sacrifice in specific circumstances, including to "get[] rid of an undesirable individual, undesirable, obnoxious individual." ROA.15368;

- there were "over 10" cases in which "Satanists" either killed or mutilated an individual. ROA.15371.

While Haley claimed the culprits in these cases committed violence "in the name of Satan," the state presented no evidence that they were members of the Church of Satan, or that the Church had endorsed the acts committed by these individuals. When defense counsel attempted to ask Haley whether the Church of

---

[4] Haley, a former employee of the Virginia corrections system and various law enforcement offices, was employed, at the time of Davis's trial, as a community college teacher. ROA.15365, 66. He supplemented his income by lecturing policemen, firemen, and constables in El Paso, Texas, about Satanism, ROA.15366. He possessed no degree in religion or psychology, and took no courses in Satanic practices. ROA.15369. He had never previously testified as an expert or written any scholarly work on Satanism. ROA.15367.

Satan had "sanctioned" any of the killings, the trial court sustained the state's objection and prohibited counsel from pursuing this line of questioning. ROA.15374.

At the end of the hearing, defense counsel again sought to raise the issue of "whether or not the church of Satan had ever sanctioned any of these bad acts," but the trial court admonished him "not [to] argue with me anymore." ROA.15375. Counsel objected to the admission of Haley's testimony and of any evidence of Davis's religious affiliation based on Haley's lack of qualifications, the relevance of his testimony, and on First Amendment and due process grounds. ROA.15375 Counsel also filed a written objection based on grounds including the Sixth, Eighth, and Fourteenth Amendments. ROA.5963-64. The trial court qualified Haley as an expert "in the area of the satanic religion and to its religious philosophies." ROA.15374, 15459.

Before the jury, and over defense objection, ROA.15418, the State introduced numerous items found in Davis's cell including: various books related to Satanism, including *The Satanic Bible*, and various writings and drawings. ROA.15419-22. The court also required Davis to display to the jury a tattoo of a pentagram on his chest. ROA.15427. A prison officer acknowledged that *none* of the materials collected from Davis's cell constituted contraband. ROA.15422.

The State also called a future dangerousness expert, Dr. Gripon, to provide an assessment based on a hypothetical defendant, who, among other things, "marks his body with a pentagram, becomes a satanist." ROA.15441. Dr. Gripon testified that although adherence to Satanism did not have "predictive value, per se" for future dangerousness, Satanism did "not fall into that category" of religions providing "a support system to someone" and "would be a positive issue." ROA.15456-57. Rather, Satanism is "extreme" and "you would always worry . . . about people who end up kind of on the periphery of something that extreme." *Id*.

Donald Haley testified before the jury that the Satanic Bible is demonstrative of the "philosophies" of Satanists, and that according to the book, Satanists may perform a "human sacrifice" in certain circumstances. ROA.15460. These include "to dispose of a totally obnoxious and deserving individual," including "[a]nyone who has unjustly wronged you or who has gone out of his way to hurt you to deliberately cause trouble and hardship for you or those dear to you." *Id*. On cross- examination, Haley acknowledged that his understanding of this text was based on him "reading these things literally." ROA.15462. Although it is undisputed that there was no connection between Davis's affiliation with the Church of Satan and the crime for which he was convicted, Haley improperly attempted to draw a connection between the two. For example, when asked what it meant to "destroy a person" based on his "literalist" and uneducated reading of the Satanic Bible, he

answered, "Well, you could turn around, hit them in the heart so much that it ruptures it. You could bash their head against a pole till they bleed out. <u>You can cut their fingertips out</u>." ROA.15462-63 (emphasis added).[5]

Defense expert Dr. Gordon Melton, a religious historian with a Ph.D. in the history of literature of religion and an ordained Methodist minister, ROA.15467, 15469, testified that the term "Satanism" covers various phenomena in American religion. ROA.15467. One such phenomenon includes individuals who claim to be in contact with Satan and have "the-devil-made-me-do-it syndrome." ROA.15469. On the opposite end of the spectrum is the form of Satanism established post-World War II by Anton LaVey and his Church of Satan, as well as other formalized groups that splintered off from LaVey, such as the Temple of Set. ROA.15467-68. Haley testified that the Church of Satan blends "*secular humanism and what we call western esotericism, or the occult*," ROA.15468 (emphasis added), performed through symbolic rituals that invoke a cathartic response. ROA.15468-69. For example, instead of literally harming an individual through a violent act, the Satanic Bible instructs that if someone is causing harm, a ritual may be performed to curse the person symbolically, which focuses your "emotional energy" and results in a "cathartic release" of anger. ROA.15469. This ritual does "[n]ot physically or

---

[5] The victim in this case had been found with her face "black and swollen, *and her fingertips had been cut off*." *Davis v. State*, No. AP-74393, 2007 WL 1704071 at *1 (Tex. Crim. App. June 13, 2007) (emphasis added).

directly" hurt anyone and "explicitly forbids taking blood" from another person. ROA.15469-70. There was "nothing" violent in the Satanic Bible or other texts associated with the Church of Satan, ROA.15477-78; 15542, followers of LaVey and the Church of Satan do not actually believe Satan exists, and they do not pray or call out to Satan as a higher being. ROA.15471-72.

During closing argument, the prosecution repeatedly argued that Davis's religious affiliation and beliefs reflected negatively on his character and supported a finding of future dangerousness. For example, the prosecution argued that a Buddhist Bible was not found among Davis's belongings, only a Satanic one. ROA 15592. It belittled Davis's change of religion from Buddhism to Satanism, ROA15593, argued that "satanism was extreme," and that if it is "enough for you, so be it." ROA.15607, 15610.

The harangue continued:

> MS. HAMILTON: This journal says every satanist has a right – the right of self-preservation. That's what it says in there. There's no life-for-a-life stuff in any of this satanism stuff. It's not there. It's not there. But he got up there and told you, well, satanism is nothing. You know, it's not real. It's just symbolic, right. **Four hours of explanations and excuses and he doesn't believe in Satan? He doesn't worship Satan?**
>
> Well, here's The Satanic Bible, Satanic Rituals. Let me get The Satanic Bible because that's got the part where he dedicates his life to Satan and his soul. **"I, Irving Davis, pledge my life and soul to Satan forever." That sound like somebody who doesn't believe in Satan? That**

**sound like somebody who doesn't worship Satan? That sounds like somebody who carves a pentagram into their chest but he's going to turn around and leave it tomorrow? Come one.** That he was a Buddhist before and now he's a satanist and this somehow makes him more educated. **I don't know about you, Buddhists, I think, are real peaceful people. Pretty sure. They don't go around raping and killing little girls**. . . . "

ROA.15607 (emphasis added). The prosecution continued:

> You know what? I don't need to get into a debate with you all about satanism and what it is and what it isn't. Look at his writings. It will tell you the nine satanic rules of the earth. **It's horrible. They advocate vengeance. They advocate destruction of an enemy.** And Ladies and Gentlemen, I'm not talking, oh, I ignore you, you're destroyed. Please. **It all speaks for itself and it's all in there**. It's there with his writings. It's there with his disturbing artwork.

ROA.15610 (emphasis added).

On direct appeal, Davis argued that admission of the Satanism evidence violated the First and Fourteenth Amendments, along with Texas Rules of Evidence 401 and 403. ROA.4110. Davis also relied on *Zant v. Stephens*, 462 U.S. 862 (1983), a case invoking the Supreme Court's jurisprudence on the Eighth Amendment and due process. ROA.4114-15. Relying on Haley's literalist reading of the Satanic Bible and his testimony that "various people had committed murder and mutilation 'in the name of Satan,'" the TCCA found no First Amendment violation and also rejected Davis's arguments under the Rules of Evidence. *Davis v. State*, 329 S.W.3d at 805–

06. However, the TCCA did not address Davis's due process arguments or his arguments based on *Zant v. Stephens*.

In his federal habeas petition, Davis argued that the admission of evidence of his religious affiliation violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ROA.2397-2410. He also argued that the TCCA's arrived at objectively unreasonably facts in light of the record. ROA.2407-08.

The district court found the TCCA "reasonably found that there was no First Amendment violation," but if there was error it was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). ROA.2947. And while the district court did conclude that the TCCA's decision was not based on an unreasonable determination of the facts, it did so in a summary fashion without explaining its conclusion. ROA.2948. The district court did not address Davis's arguments that admission of the Satanism evidence violated due process or the Eighth Amendment. ROA.2947-48.

**C.     Reasonable Jurists Could Debate Whether Davis's Constitutional Rights Were Violated By The Admission Of Evidence Of His Religious Affiliation.**

**1.     First Amendment**

"[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs." *Dawson v. Delaware*, 503 U.S. 159,

163–64 (1992). *Dawson* held that admission of evidence of Dawson's membership in the Aryan Brotherhood during his capital sentencing proceeding violated his First Amendment rights "[b]ecause the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, [and] the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Id*. at 166. The Court found it particularly significant that there were "differences among the various offshoots of the Aryan Brotherhood," and the evidence in the record pertained only to the California chapter of the Aryan Brotherhood, and not the particular Delaware chapter of which Dawson was a member. *Dawson*, 503 U.S. at 164-165. The Court noted that "the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id*. at 166. Because Dawson's membership in the Aryan Brotherhood had no other relevance to the sentencing proceeding, the Court was "left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 167.

Reasonable jurists could debate whether the admission of Davis's post-crime membership in the Church of Satan violated his First Amendment rights to the freedom of religion and association. Under *Dawson*, "to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in

the organization." *Davis*, 329 S.W.3d at 805. In Davis's case, both the state court and the federal district court found no First Amendment violation based solely on Haley's literalist reading of the Satanic Bible and his testimony that "some" people had committed violence in the name of Satan. However, the State presented no evidence that the Church of Satan committed any violent or illegal activities or endorsed any such activities. Similar to *Dawson*—where evidence of the violent activities of the Aryan Brotherhood's California chapter was insufficient to establish that the Delaware chapter engaged in similar activities—evidence that "some" people committed violence in the name of Satan did not establish that the Church of Satan committed or endorsed violence or illegal acts. In fact, the only evidence in the record regarding the Church of Satan's position on violence is that the Church prohibits taking blood from another person, ROA.15469-70, and advocates *against* violence. ROA.15542.

The trial court's decision sets an extremely dangerous precedent for the free exercise of religion and freedom of association. Most religions, including the major Abrahamic faiths, have offshoots and branches whose texts may be misinterpreted, especially if read literally and without guidance from religious scholars.[6] To argue

---

[6] For example, the Bible, Matthew 10:34, attributes the following quote to Jesus: "Do not suppose that I have come to bring peace to the earth. I did not come to bring peace, but a sword." While religious scholars uniformly agree that Jesus advocated nonviolence, under a literalist reading, this statement could easily be misinterpreted as a call to violence.

that a person possesses "bad character" and/or may be dangerous simply because he practices Christianity, Judaism, Buddhism, Islam, or Hinduism, and because "some" people may have committed violence in the names of these religions, makes a complete mockery of the First Amendment.[7]

---

[7] History abounds with examples of violence committed in the name of major religions. For example, during the Crusades, Christian armies conducted pogroms against Jews and "heretical" Christians, pushed Muslims out of the Iberian Peninsula and North Africa, and conquered Palestine. *See* Biblical Archaeological Society, *What Were the Crusades and How Did They Impact Jerusalem?*, November 3, 2024, available at *https://www.biblicalarchaeology.org/daily/biblical-sites-places/jerusalem/what-were-the-crusades-and-how-did-they-impact-jerusalem/* (last visited January 14, 2025). A more recent example is the wave of violence committed by anti-abortion activists often framed as a "means of honoring their religious convictions." *The Violent History of the Anti-Abortion Movement*, Southern Poverty Law Center, June 13, 2024, available at *https://www.splcenter.org/anti-abortion-movement/violent-history* (last visited January 14, 2025).

Jewish extremist groups and individuals have committed religiously-motivated acts of violence. *US removes ultranationalist Israeli group from 'terror' list*, Al Jazeera, May 20, 2022, available at *https://www.aljazeera.com/news/2022/5/20/us-removes-ultranationalist-israeli-group-from-terror-list* (last visited January 15, 2025).

The terrorist attacks of September 11, 2001, were associated with Al Qaeda, an Islamic terrorist organization. *See https://www.state.gov/foreign-terrorist-organizations/* (last visit January 15, 2015).

And despite the prosecution's closing argument in Davis's trial that Buddhists "are real peaceful people" and "don't go around raping and killing little girls," there have been many religiously-motivated acts of violence committed by Buddhist extremists. In Myanmar, for example, Buddhist nationalists have committed horrific atrocities against the Rohingya Muslim community. *See https://www.state.gov/burma-genocide/* (last visited January 15, 2025).

In other contexts, federal courts have recognized that the First Amendment prohibits "the so-called 'heckler's veto,' *i.e.*, 'allowing the public, with the government's help, to shout down unpopular ideas that stir anger.'" *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d. Cir. 2015) (quoting *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013)). *See also Feiner v. New York*, 340 U.S. 315, 320 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker[.]"). Thus, the First Amendment fully protects speech, including religious speech, that others may find so offensive that it invokes anger or even a violent reaction. *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 234 (6th Cir. 2015). *Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001). "After all, much . . . religious speech might be perceived as offensive to some." *Morse v. Frederick*, 551 U.S. 393, 409 (2007) (Alito, J., concurring).

If unpopular speech may not be shut down by a "heckler's veto," surely a man cannot be sentenced to death based on his constitutionally protected religious beliefs that others may find reprehensible, particularly when those religious beliefs played no part in the crime itself.

## 2. Due process and Eighth Amendment

Reasonable jurors could also debate whether Davis's constitutional rights to due process and to be free from cruel and unusual punishment were violated by the admission of the Satanism evidence.

An individual may not be sentenced to death based on "conduct that is constitutionally protected." *Zant*, 462 U.S. at 885; *Romano v. Oklahoma*, 512 U.S. 1, 10–11 (1994). This principle, first announced in *Zant*, flows logically from the Supreme Court's death penalty jurisprudence rooted in the Eighth and Fourteenth Amendments. *Zant*, at 884-45 (citing *Gregg*,[8] *Lockett*,[9] *Beck*,[10] *Woodson*,[11] and *Gardner*[12] ). The Supreme Court has also held that if a death sentence is based on evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). *Accord Andrew v. White*, 604 U.S. ___, ____, 2025 WL 247502 at *5 (U.S. Jan. 21, 2025) ("the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair").

---

[8] *See Gregg v. Georgia,* 428 U.S. 153 (1976).
[9] *See Lockett v. Ohio,* 438 U.S. 586 (1978).
[10] *See Beck v. Alabama,* 447 U.S. 625 (1980).
[11] *See Woodson v. North Carolina,* 428 U.S. 280 (1976).
[12] *See Gardner v. Florida,* 430 U.S. 349 (1977).

As discussed above, Davis was sentenced to death on the basis of his constitutionally protected religious beliefs and practices. Moreover, whether the admission of this evidence prejudiced Davis is a debatable question. *See infra,* Section D.

### D. Reasonable jurists would debate whether Davis was prejudiced by the improper admission of the Satanism evidence

At the COA stage, Davis does not have to satisfy *Brecht*'s harmlessness standard; he need only show that reasonable jurists could debate the district court's findings concerning prejudice and whether Davis has made a substantial showing of the denial of a constitutional right.

The Satanism evidence was unquestionably prejudicial and had a substantial and injurious effect or influence on the verdict. The Court need only look at the prosecutor's closing argument as evidence of the prejudice. As noted earlier, the prosecutor repeatedly emphasized that Davis's religious affiliation and beliefs reflected negatively on his character and supported a finding of future dangerousness. The tenor, content, and extensive nature of the prosecutor's arguments were hardly narrowly tailored to fit the prosecution's claim that Davis's religious beliefs were only "relevant to Davis's future dangerousness," as the district court concluded. ROA.2947. It could not be clearer that the Satanism evidence "was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

Additionally, the district court's conclusion that Davis was not prejudiced because he "had the opportunity" to present rebuttal testimony and to testify himself concerning his religious beliefs is as circular as it is debatable. ROA.2947. Davis was entitled to refute the evidence that the trial court allowed the state to present. This does not mean that the evidence was not improperly admitted or that its admission did not prejudice Davis; in fact, there is zero indication in this record that the defense succeeded in neutralizing the Satanism expert's impact because the jury did find future dangerousness and did return a death verdict. The district court's reliance on *Barefoot v. Estelle*, 463 U.S. 880 (1983), to buttress its conclusion that Davis was not prejudiced is misplaced. ROA.2947. The section of *Barefoot* relied on by the district court merely stands for the unremarkable proposition that evidentiary codes anticipate that relevant expert testimony would be admissible and subject to cross-examination and contrary evidence by the opposing party. *Barefoot*, 463 U.S. at 898. In any event, *Barefoot* is not a harmless error case, and concerned a prosecutor's use of relevant and proper expert testimony by a qualified expert, variables absent here.

Prejudice is further established because state "expert" Haley improperly attempted to connect Satanism to the crime, even though it is undisputed that Davis joined the Church of Satan *years after* the crime occurred: when asked what it meant to "destroy a person" based on his "literalist" and uneducated reading of the Satanic

Bible, Haley answered, "Well, you could turn around, hit them in the heart so much that it ruptures it. You could bash their head against a pole till they bleed out. <u>You can cut their fingertips out</u>." ROA.15462-63 (emphasis added). There can be no doubt what this was meant to convey.

In a case where the state attempted to show that the crime was motived by the defendant's purported ties to Satanism, one court, in reversing the defendant's murder conviction, observed:

> Like gang affiliation evidence, evidence of a defendant's ties to Satanism is both highly prejudicial and implicates constitutional rights of freedom of association and freedom of expression. Satanism is essentially synonymous with evil character. . . . We cannot think of evidence that carries a greater danger of unfair prejudice than evidence of a person's association with Satanism, especially where, as here, there is no evidence that a defendant ever acted on his Satanic beliefs to cause harm in the past.

*State v. Stensrud*, 134 Wash.App. 1031, 2006 WL 2329474 at *14 (2006). The *Stensrud* Court also rejected the state's argument that the Satanism evidence was harmless because the defendant "presented character witnesses to rebut [its] the evidence of his ties to Satanism." *Id*. at *19. This argument was "flawed" because the defendant's presentation of evidence refuting the Satanism evidence "cannot serve to legitimize evidence that should not have been admitted in the first instance." *Id*. Likewise, that Davis challenged the Satanism evidence that the state was allowed

to present does not "legitimize" the prosecution's use of the evidence in the first instance.

In *Boring v. State*, 289 Ga. 429, 711 S.E.2d 634 (Ga. 2011), the Georgia Supreme Court reversed a defendant's conviction for malice murder due to the state's improper use of Satanism and similar "gothic" beliefs. Because there was no connection between the defendant's religious beliefs and the crime itself, the Georgia Supreme Court concluded that it was left "with the feeling that the [evidence in question] was employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 434-35 (quoting *Dawson v. Delaware*, 503 U.S. 159, 167 (1992)).

Courts have found that other types of evidence that deal with violence, crime, or the objectification of women, are also unduly prejudicial. *E.g.*, *United States v. Williams*, 663 F. Supp. 3d 1085, 1134 (D. Ariz. 2023) ("highly inflammatory nature of the rap video and songs"); *Hart v. State*, 688 S.W.3d 883, 894 (Tex. Crim. App. 2024) (rap videos glorifying criminal activity and violence were "inherently prejudicial"); *United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (admission of a rap video containing explicit lyrics dealing with drugs, sex, profanity, degradation of women, firearms, and violence was error and "heavily prejudicial").

Finally, the district court's conclusion that Davis was not prejudiced because the jury could reasonably conclude he was a future danger based on the facts of the crime "alone" is more than debatable. ROA.2947. Future danger is not the only sentencing factor, and prejudice cannot be so cabined; the Satanism evidence also impacted important issues like character and morality. *See Blystone v. Pennsylvania*, 494 U.S. 299, 322 (1990) (Brennan, J., dissenting) (Texas special questions "require the jury to do more than find facts supporting a legislatively defined aggravating circumstance. Instead, by focusing on the deliberateness of the defendant's actions and his future dangerousness, the questions compel the jury to make a moral judgment about the severity of the crime and the defendant's culpability"). Indeed, the state acknowledged wanting to establish Davis's "bad character" through this evidence.[13]

Aside from heavy reliance on Davis's religious affiliation, the state's case for death lacked much of the future dangerousness evidence that often forms the core of a capital prosecution such as a long and violent criminal history or careful premeditation. Instead, it was forced to rely on vague teenage incidents and minor childhood transgressions like shoplifting, smoking marijuana, and passing through school grounds while suspended, along with testimony of a former neighbor that

---

[13] *See* ROA.4418 (State's Brief on Direct Appeal, *Davis v. State*, TCCA No. AP-74,393).

Davis "was an angry young man, just not at all friendly." ROA.15393. **But just as importantly**, this evidence went to Davis's character and morality as a whole. The state unquestionably hoped that the jurors would view Satanism as "synonymous with evil character," *Stensrud*, 2006 WL 2329474 at *14; it even reminded the jurors that Buddhists are "real peaceful people" who "don't go around raping and killing little girls" in an attempt to draw a direct contrast to people like Davis, who are followers of Satanism and have bad character. ROA.15607. This goes far beyond merely establishing future dangerousness, and the tentacles of this prejudicial inflammatory evidence reached into all aspects of the prosecution's case for death.

### E. Reasonable jurists could debate whether §2254(d) restricts relief.

Although Davis does not have to satisfy §2254(d) at this stage, reasonable jurists could find that §2254(d) is satisfied based on the evidence in the state court record. In addition to the foregoing arguments, Davis adds the following:

**First**: with respect to §2254(d)(1), as discussed above, the state court allowed evidence of Davis's affiliation with the Church of Satan because "some" people had committed violence in the "name of Satan." There was no evidence that the Church of Satan committed or endorsed violent or illegal acts, and reasonable jurists could debate whether the state court decision contradicts or unreasonably applies *Dawson*.

**Second**, with respect to §2254(d)(2), reasonable jurists could find that the state court decision was based on an unreasonable determination of the facts in finding

the Satanism evidence was relevant to future dangerousness, because there is no evidence in the record that the Church of Satan has engaged in or condones violence. While the district court concluded that there was no unreasonable fact finding by the TCCA, ROA.2948, it did so in a summary fashion. Davis submits that the Court should review this issue *de novo.*

**Third**: Davis submits that §2254(d) does not apply to his due process and Eighth Amendment arguments because the TCCA failed to address them. While there is a presumption that the TCCA adjudicated these issues, *see Harrington v. Richter*, 562 U.S. 86 (2011), the presumption is rebuttable. *Johnson v. Williams*, 568 U.S. 289, 298-302 (2013). The TCCA's decision was not a summary disposition or an unexplained order but rather a reasoned fully-explained opinion. When there is not a clear implicit ruling, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100. " '[A] federal claim [that] is rejected as a result of sheer inadvertence,' would not be afforded the *Richter* presumption." *Woodfox v. Cain*, 772 F.3d 358, 370 (5th Cir. 2014) (quoting *Johnson*, 568 U.S. at 303). This is the situation in Davis's case, and these claims can be reviewed *de novo.*

## F.    Davis's Eighth and Fourteenth Amendment/Due Process claims should be remanded.

Davis challenged the introduction of the Satanism evidence under not just First Amendment grounds, but also on Eighth Amendment and Fourteenth

Amendment/Due Process grounds. However, these challenges were not addressed by the state or federal court. Thus, there is no decision for this Court to review much less defer to. *See, e.g. Humphries v. Elliott Co.*, 760 F.3d 414, 418 (5th Cir. 2014) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below") (citation omitted). This Court should remand these issues for the district court to decide in the first instance. *See generally Alliance for Good Government v. Coalition for Better Government*, 919 F.3d 291, 298 (5th Cir. 2019) (where district court failed to even attempt to address a specific matter concerning attorneys' fees, issue is remanded to district court to address it).

## II. REASONABLE JURISTS COULD DEBATE WHETHER DAVIS'S RESENTENCING COUNSEL WERE INEFFECTIVE

### A. Introduction

Despite having the rare opportunity to have a "second bite" at convincing a jury to sentence Davis to life, counsel—one of whom was also involved in the original trial where Davis received a death sentence—failed to take advantage of this second chance. Lead counsel Macias was appointed in August 2007 yet, without any reasonable tactic or strategy, waited for *months*—until the eve of the commencement of voir dire—to seek the appointment of an investigator (not even a mitigation specialist) and a mental health expert. Without any reasonable tactical or strategic reason, counsel waited until the eve of voir dire to begin speaking with Mr. Davis's

family members. Without a reasonable tactical or strategic reason, counsel failed to follow up on numerous red flags that would have caused competent counsel to investigate further.

Counsel's antipathy to marshaling a mitigation case is even more unreasonable because they knew that the state's case was not going to be a "do-over" of the first proceeding; it was now armed with Satanism evidence it did not have the first time around. In contrast to the defense, the prosecution continued to investigate its case, notifying the defense of an ever-growing list of extraneous offenses it intended to present; by the time of trial the state's list had ballooned to 65 extraneous offenses, some of which allegedly occurred during Davis's incarceration. ROA.5910-16. In other words, while the state changed its tactics to accommodate new information, the defense remained frozen in time and made at best a torpid attempt to formulate a mitigation case that was different from the unsuccessful first trial.

The jury that sentenced Irving Davis hardly knew him due to his trial counsel's prejudicially deficient performance in failing to investigate and present a wealth of compelling and documented mitigation. *See Strickland v. Washington*, 466 U.S. 668 (1984). This Court should certify Davis's *Strickland* claim for appeal.

**B.  Reasonable jurists could debate the merits of Davis's *Strickland* claim.**

The evidence Davis's counsel, Francisco Macias and Ruben Morales, presented to the jury barely scratched the surface of Davis's torturous life circumstances. Although counsel did present various witnesses to the jury, a review of their testimony reveals that, with the exception of Davis's mother and Davis's own testimony, the remaining witnesses were merely asked, in a perfunctory manner, whether Davis was peaceful, had ever been aggressive, and/or whether Davis posed a future danger; each of these witnesses' exceedingly brief testimony comprised just a few pages of transcript. *See* ROA.15497; 15497-99; 15499-500; 15501-02; 15502-03; 15504; 15505; 15506-07; 15507-08.[14] Even the testimony of Davis's mother, who provided more information about her son's background than did the other witnesses, comprised less than 20 transcript pages. ROA.15533-37.

Davis's federal habeas set out a detailed accounting of his life from birth to the time of the crime. ROA.2340-2372. Except for some information that the district court refused to consider because it had not been presented in state court during Davis's initial habeas proceedings, ROA.2929,[15] the vast majority of information

---

[14] Five of these witnesses also testified at Davis's first penalty phase to essentially the same brief testimony.

[15] The district court determined that a number of exhibits proffered by Davis were not previously considered by the state courts and therefore it refused to consider them in assessing the reasonableness of the state courts' denial of his ineffectiveness claim. ROA.2929-30. Although Davis disagreed with that position, ROA.2796, he

forming the basis of Davis's ineffectiveness claim was part of the state habeas proceedings. In fact, as detailed below, many of the "red flags" that should have alerted competent counsel to investigate further came from discovery that the state itself filed in court months before testimony commenced.

From birth, Irving Davis was shuttled around from state to state; born in North Carolina, ROA.2339-40,[16] he was uprooted by his father, Buddy, who was in the military, and the family moved first to Texas, ROA.2342, then to Virginia, ROA.2342, then to California, ROA.2346, then back to Texas, ROA.2350, then back to North Carolina, ROA.2353, and then back again to Texas shortly before the crime in question occurred when Irving was barely 18-years old. ROA.2367. At some of these locations, Irving's mother, Carol, would abandon her children, leaving them in Buddy's care. On one occasion, when Carol had left her children with Buddy, Buddy began seeing another woman who later accused him of sexually assaulting

---

is not relying on that evidence in this application. In his initial state habeas proceeding, Davis submitted a number of affidavits containing extensive information about Davis's upbringing, including one from Vince Gonzales, an expert mitigation specialist, ROA.3583-93, one from his mother, Carol Davis, ROA.3595-3602, one from Carl Fuller, Davis's half-brother. ROA.3617-3623, and one from Dr. James Schutte, a psychologist who testified at trial solely on the dangerousness issue. ROA.3625-26. At the state habeas hearing, the state did not object to the introduction into evidence of all of the affidavits attached to Davis's state habeas petition. ROA.1700

[16] The same night that Carol Davis was giving birth to Irving and his twin brother, Oscar, Davis's father was home raping Davis's half-brother, Carl. ROA.2341.

her; he was acquitted of rape at a court-martial but found guilty of indecency and was demoted. ROA.2348.

As the family shuttled from place to place, Irving's life worsened as Buddy's drunken rages became more frequent and more severe. While they were living in Virginia, Buddy became increasingly violent towards Irving and his siblings due to uncontrollable alcoholism, and he soon recommenced sexually abusing his half-brother Carl; Carl also observed Buddy raping Carol. ROA.2344-45. When the family moved to California (Irving was entering 2nd grade), the violence and chaos intensified as Buddy's sadistic abuse continued unabated. For example, Buddy would regularly force Irving and Oscar, just second-graders at the time, to spend hours on their knees picking pieces of lint from the rug with tweezers while screaming at them and calling them "fucking pukes." ROA.2346. Buddy would also mercilessly beat Irving, sometimes with a belt with a silver buckle, until Buddy would tire out; if Irving tried to disassociate from the beatings by not displaying emotion, Buddy's beatings would only worsen until his son broke down in tears. ROA.2347.

The physical abuse wrought on Irving by his father did not go unnoticed by the authorities or by law enforcement. For example, when Irving was in the third grade and living in California, he came to school with red marks on his face, back, and bottom. ROA. 2349. An anonymous complaint was filed with the local child

protective services agency but despite the case worker's observation that Irving had red marks on his face, the abuse allegation against was deemed "unsubstantiated." ROA. 2349. Subsequent reports were made in California of physical abuse involving the children, ROA.2349, as well as in North Carolina. ROA.2356. Carol would later obtain several restraining orders against Buddy ROA.2349, 2363.

The summer after Irving completed 4th grade the family moved to North Carolina and Irving was sexually abused for the first time by a neighbor claiming to be a pastor. ROA.2353. He was also sexually abused by Buddy, a fact he disclosed to court-appointed and defense psychiatrists in 2008, in advance of his resentencing. ROA.2355.[17]

Irving attempted suicide for the first time when he was 11 years old by attempting to hang himself with a belt in the school bathroom. ROA.2362. Several years later, after he was sexually abused by a family friend, Irving tried again to hang himself, this time with a jump rope. ROA.2365. He attempted suicide on at least four more occasions by the age of 16, ROA.2365; 2368, began cutting himself by slashing his arms deeply with knives and razor blades, ROA.2366, and held burning cigarettes against his flesh until they extinguished. ROA.2366.

---

[17] In 2006, more than a year and a half before Davis's resentencing, Buddy was convicted in North Carolina of sexually abusing his niece's 7-year-old son. ROA.2369. He was sentenced to 16-20 months in prison and was required to register as an aggravated sex offender. ROA.2370.

Prison and other medical records from before Davis's resentencing reveal a wealth of information about Davis's mental health. For example, a 2005 prison medical record noted that Davis said he wanted to die and that he looks/acts "very depressed." ROA.2370. A 2006 mental health triage report noted that Davis had been flagged by the prison as a suicide risk; Davis had told the interviewer that he had attempted suicide at age 11 and that he had been molested. ROA. 2371.

Prior to the resentencing, Davis disclosed to Dr. Arthur Ramirez, a court-appointed psychiatrist evaluating Davis for competency, that he had no desire to live, that he had seen a psychiatrist as a teenager, that he had a history of cutting his arm with a knife, that he had experienced no warmth or empathy during his developmental years, and that he had been abused sexually, emotionally, and physically. ROA.2371. Davis also disclosed to Dr. Ramirez a history of sexual abuse, including a rape by a male. ROA.2372.

Davis disclosed similar information to Dr. James Schutte, a defense expert who evaluated Davis on February 15, 2008—after voir dire had already commenced. ROA.3625. As Dr. Schutte explained in his statement submitted to the state habeas court, Davis "reported a history of childhood sexual abuse and a history of depression and visual hallucinations," and while his "evaluation did yield psychologically significant information, it was limited in scope by the lack of access I had to the Defendant." ROA.3625.

Dr. Schutte was never able to complete his evaluation of Davis because counsel waited so long to seek his appointment and "there was insufficient time for subsequent sessions prior to trial." ROA.3625. Accordingly, counsel severely curtailed Dr. Schutte's testimony, limiting it to only hypothetical future dangerousness issues, and directed him to say nothing about the ample mitigation that he believed may exist; indeed, counsel instructed Dr. Schutte not to even admit he had personally evaluated Davis. ROA.3625.

### 1. Truncated investigation

Counsel never hired a mitigation expert or mitigation investigator; rather, they sought the appointment of Sam Streep, who was the fact investigator for the first trial. Streep was appointed on or around January 8, 2008, ROA.1714-15; 1766-67, at the time of voir dire. Counsel undertook no investigation of any sort in Davis's case between 2002, when Davis was originally tried, and 2007, when the resentencing was ordered. ROA.1796-97. Nor did Streep. ROA.1798. Attorney Morales, the self-described point person with Davis's local family members, ROA.1716-17, acknowledged that his first billing entry for talking to family was on January 8, 2008, the day before voir dire commenced. ROA.1717.

### 2. Red flags missed

Counsel were aware of—but ignored—numerous red flags; many of these red flags were contained in documentation provided to the defense by the prosecution

or in reports submitted by the appointed mental health experts. For example, counsel were aware that:

- Davis had attempted suicide on numerous occasions and was a "cutter," that is, someone who engaged in self-mutilation. ROA.1520;1776;

- CPS intervened in the family at least once. ROA.1776-77;

- Before trial, Davis reported childhood physical and sexual abuse by multiple individuals to a defense expert, ROA.3625-26 (Dr. Schutte) and to a court-appointed competency expert (Dr. Ramirez) (ROA.1521-22, 2371-72; Davis specified to Dr. Ramirez that "he was sexually abused periodically from the ages of five through age eighteen" by a "family member", a "neighbor," and a "friend." ROA.1521. He also related that "his father was extremely physically abusive" as well as "extremely emotionally abusive." ROA.1521.

- An older women sexually abused Davis for several years starting around when he was around 15 and up until he turned 18 and was "too old for her." Counsel acknowledged at the state habeas evidentiary hearing that this "relationship" could be "termed sexual abuse." ROA.1737;

- Davis reported to medical correctional staff in 2006—years before his resentencing—that "I want to die, the sooner the better, I am looking forward to it" and that staff reported that Davis "looks/acts very depressed" and that a "psych visit will be made today." ROA.5401; this document was part of a larger discovery disclosure by the state on December 5, 2007. ROA.5398;

- Davis was diagnosed on May 13, 2005, with "major depressive disorder, recurrent," which was first observed as early as 2004. ROA.5417; this document was part of the State's pre-trial discovery disclosure; documents note the same diagnosis on November 11, 2005, ROA.5403), and on March 5, 2006, ROA.5473;

- On July 15, 2002, prison officials noted that Davis was suicidal, on 15-minute watch, suffering from depression, and was pending a special mental health clinic appointment. ROA.5493;

- Davis had been prescribed Pamelor, an anti-depressant, in early 2003, again noted in documents provided to defense counsel by the state. ROA.5413;

- Davis had been diagnosed with "major depressive disorder, recurrent" on May 13, 2005, again noted in documents provided to defense counsel by the state. ROA.5417;

- Davis had been prescribed the anti-depressant Wellbutrin in 2004 and remained on it for years, also noted in state-provided documents. ROA.5349; 5442;

- Davis reported to mental health services on December 22, 2003, that he felt "unhappy," was pondering waiving his appeals, and described "two suicide attempts from before he came to prison . . . " ROA.5499;

- Davis reported to mental health services on August 15, 2002, that he requested counseling because of depression and that he had lost 10 pounds in 2 weeks. ROA.5560;

- Davis reported to mental health officials on July 19, 2002, a history of suicide attempts including in the 6th grade, and also that he has burned himself with cigarettes to "punish self." ROA.5571;

- Davis reported to mental health officials on July 19, 2002, that he had been beaten by his father until he left at around 13 years old. ROA.5571;

- Davis reported to mental health officials on July 18, 2002, a history of mental illness and that he was a Buddhist. ROA.5590; on that same day he also reported treatment for mental illness in June 2000, and that he was presently taking medications including Doxepin and Prozac. ROA.5591;

- Davis reported to corrections personnel a history of 4 suicide attempts, one at age 12 by hanging, at age 15 by cutting his wrists, and at ages 17 and 18 by overdosing on sleeping pills. ROA.5271;

- Correctional personnel note, in a July 18, 2002, report, that Davis has "cigarette burns and knife cuts on left forearm." ROA.5727.

### 3. Reasonable jurists could debate whether Davis received ineffective assistance of trial counsel.

The district court found some new evidence submitted in federal habeas barred from consideration. *See supra* n.15. Even if this is correct, reasonable jurists would debate whether Davis received ineffective assistance of counsel based on the state court record alone.

### a. Deficient performance

The state court record undisputedly establishes that (1) counsel did not hire a mitigation investigator, and the only investigator they had was not hired until the time of jury selection and about a month before the presentation of evidence, (2) no investigation was done in between the first trial and resentencing trial; in fact, no one from the defense team even kept in touch with Davis during that time, and (3) red flags abounded to put counsel on notice of potential areas of investigation. Counsel's strategy was to humanize Davis and "talk[] about his background and his upbringing, obviously." ROA.1747-48. Nevertheless, counsel ignored the numerous red flags and failed to follow up on information they were aware of or had access to.

The district court's rejection of this claim was based largely on the fact that Davis "testified in his behalf and had free rein to go in the direction he wanted" in terms of mitigation. ROA.2932. The district court noted, for example, that Davis "could have expanded" on his father's abuse and cruelty. ROA.2932. This is fundamentally flawed reasoning because it suggests that if a capital defendant decides to testify on his behalf at the penalty phase, counsel are absolved of their duty to conduct a reasonable mitigation investigation. However, *Strickland* and its progeny require counsel to conduct a reasonable investigation *before* making any tactical decisions about what mitigating evidence to present. *Strickland*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). The district court's reasoning puts the cart before the horse, allowing counsel to forgo a reasonable investigation simply because their client expresses a desire to testify, and permits counsel to delegate the formulation and implementation of the penalty phase investigation to their client. Reasonable jurists would debate whether this is contrary to and/or an unreasonable application of *Strickland* and its progeny.

The district court also conflated the deficiency and prejudice prongs by focusing on Davis's penalty phase testimony and the aggravating evidence rather than the uncontradicted facts in the state court record regarding trial counsel's truncated investigation. Counsel had a duty to conduct a constitutionally adequate mitigation investigation regardless of Davis's decision to testify or of the strength of

aggravating evidence. *See, e.g., Luna v. Lumpkin*, 832 F. App'x 849, 852 (5th Cir. 2020) (assuming, without deciding that "Luna's counsel fell below the constitutional minimum in failing to investigate and present all mitigating evidence," even though Luna testified in the penalty phase that there was no mitigating evidence "whatsoever").

Furthermore, reasonable jurists could debate whether counsels' decision to limit their investigation was strategic. Counsel testified at the state habeas hearing that they "didn't always know whether [Davis] was going to get up on the stand," and that he didn't decide until the "particular day" of his testimony or "the night before." ROA.1733, 17854. Thus, Davis's decision to testify was not part of a "long-standing-well-developed defensive strategy" that counsel considered "all long" as a justification for limiting the scope of their investigation. ROA.1754-55. And even if Davis's last-minute decision to testify made the defense presentation of mitigating evidence more difficult, this does not excuse the failure to reasonably investigate in the first place. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (failure to uncover and present voluminous mitigating evidence not justified as a "tactical decision" to focus on Williams' voluntary confessions because "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."). Relying on Davis's decision to testify is "more a *post hoc* rationalization of counsel's conduct than an accurate description of their

deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-27. Counsel offered no other justifications for failing to investigate red flags or to follow up on mitigating information available to them. *See Andrus v. Texas*, 590 U.S. 806, 816-17 (2020) (finding deficient performance where "counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses here"). That counsels' decision to limit their investigation was not strategic is further supported by the fact that counsel did in fact "put on a halfhearted mitigation case." *Wiggins*, 5239 U.S. at 512.

### b.   Prejudice

A wealth of available mitigating evidence was never presented to Davis's jury, and there is more than a reasonable probability of a different outcome had the jury been apprised of it. The extensive list of categories of mitigation that Davis presented in his state habeas application included detailed evidence of a (1) long and documented history of mental, physical, and sexual abuse, at the hands of his father and family "friends," (2) long and documented history of cutting and other self-mutilation such as extinguishing lit cigarettes on his forearm, (3) long and documented history of depression for which he was medicated in the jail following his initial conviction, (4) long and documented history of sexual abuse of his brother by their father, (5) long and documented history of parental neglect, abandonment, and alcoholism, (6) long and documented history of child protective service/law

enforcement involvement with the family, and (7) long and documented criminal history of his father, including his court-martial for raping a woman. Respondent acknowledged below that evidence in the state court record "detailed" Davis's dysfunctional and traumatic upbringing, including "the mental, physical, and sexual abuse Davis and his siblings experienced mainly at the hands of Davis's father." R.2653.

A declaration signed by mitigation specialist Vince Gonzales, submitted in connection with Davis's state habeas proceeding and whose admission into evidence the State did not oppose, provides further detail about the sort of documented information that Davis's jury could have, but did not, know about. Gonzales conducted multiple interviews with members of Davis's family, spoke with investigator Streep, and reviewed a wealth of documents. ROA.3587. His conclusions comport with the other information presented in habeas but not to the jury, namely that Davis is "the product of a profoundly dysfunctional family" where both parents were alcoholics and never lived long in one place. ROA.3590. Irving's "mental and emotional disconnection from normalcy" began with a difficult birth but was "mainly brought about by the brutality of his childhood." ROA.3590. His adolescent and teen years were marked by periods of "uninterrupted instability," "intermittent absences of his father," and "regular physical, sexual, and emotional abuse to which he was subjected when his father was present, and neglect by an

exhausted, abused, and clinically depressed mother when his father was away." ROA.3590. Gonzales recounted two instances (one in North Carolina and one in California) where child protective services was called and investigations conducted. ROA.3590. The pressures of his circumstances "led Irving to engage in acts of self-mutilation as a teenager, cutting his body with razor blades, and in turn to multiple suicide attempts by the same means." ROA.3590. Gonzales also recounted Buddy's criminal history, which included the court-martial for the rape of a neighbor as well as a 2006 conviction for "indecent liberty on a minor" for which he served prison time and required his registration as a sex offender. ROA.3590-91.

Reasonable jurists would debate whether this new evidence could have convinced a single juror to vote for life. The jury deliberated on Davis's sentence for approximately 2 days; during deliberations, the jury asked multiple times for a transcript of Davis's testimony and specifically asked to see his testimony regarding "[t]he relationship with his father." ROA.5974. Given the jury's interest in Davis's relationship with his father, there is more than a reasonable probability that at least one juror would have been persuaded by evidence that the "whoopings" Davis testified to were only the tip of the iceberg, and that his father subjected him to tortuous physical and sexual abuse for years.

Additionally, the prosecution argued that Davis was a future danger in part because he was a "sexual deviant" because he had a sexual relationship with an older

woman when he was a minor. ROA.15591, 15592, 15609. Had counsel conducted an adequate mitigation investigation they would easily have discovered that this "relationship" was part of a pattern in which Davis was victimized and sexually abused by multiple adults since childhood—hardly a reason to sentence him to death.[18] There is a reasonable probability that this information would have made a difference to at least one juror, especially given the sexual nature of the crime for which Davis was convicted. *See*, *e.g.*, *Sears v. Upton,* 561 U.S. 945 (2010) (remanding for reconsideration of *Strickland* prejudice where trial counsel failed to uncover evidence that would have rebutted the prosecution's arguments in the penalty phase); *Andrus*, 590 U.S. at 819 (same).

Furthermore, that Davis's counsel presented *some* mitigation evidence does not preclude a finding of prejudice. *See Sears*, 561 U.S. at 955 ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.")

Reasonable jurists could debate the district court's analysis of *Strickland*'s prejudice prong. Relying on *Luna v. Lumpkin*, 832 F. App'x 849 (5th Cir. 2020) and *Schriro v. Landrigan*, 550 U.S. 465 (2007), the court found Davis's penalty phase

---

[18] Prior to the resentencing, Davis disclosed this history of sexual abuse by adults (other than his father) to both Dr. Schutte and Dr. Ramirez. ROA.3625-26; 1521. Counsel thus would hardly have had to do much digging to discover this.

testimony was fatal to a prejudice finding because "he did not blame his family circumstances for his behavior" and "asked the jury to give him a death sentence." ROA.2932. However, *Luna* and *Landrigan* address prejudice after a full consideration of the merits and thus are not controlling in the COA context, in which full consideration of the merits is prohibited. Moreover, both cases are clearly distinguishable from Davis's case.

In *Luna*, the petitioner testified in the penalty phase that there was no mitigation evidence "whatsoever," that he could not "rehabilitate" in prison, and that future incarceration would only make him "worse." *Luna*, 832 F. App'x at 851. No such testimony was provided in this case; on the contrary, Davis testified, albeit in limited fashion, about some of the physical abuse he received from his father. In *Landrigan*, the petitioner specifically instructed counsel not to offer *any* mitigating evidence, which he affirmed in an on-the-record colloquy before the sentencing court. 550 U.S. at 475-476. That did not occur here; on the contrary, Davis's counsel did "put on a halfhearted mitigation case." *Wiggins*, at 512.

Perhaps more significantly, the district court found the mitigating evidence presented in state habeas would not have made a difference because Davis "did not blame" his background for his behavior. ROA.2932. In other words, the district court assumed the jury would not be persuaded by the new mitigating evidence because, according to Davis, it had no direct relationship to the crime. The court essentially

applied a causal-nexus test to the new mitigating evidence, a test the Supreme Court invalidated decades ago. *See*, *e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (mitigating evidence includes evidence that does "not relate specifically to petitioner's culpability for the crime he committed"); *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (invalidating the Fifth Circuit's "constitutional relevance" test requiring a nexus between mitigation and the crime); *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007) (mitigation includes anything that "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").

The district court's prejudice analysis also "placed undue reliance on the assumed reasonableness of counsel's mitigation theory" of personal responsibility. *Sears v. Upton*, 561 U.S. at 953. The district court noted that "[t]rying to explain his actions as the product of a horrific childhood and dysfunctional family—thereby diverting attention away from personal responsibility—would have undermined what Davis hope to achieve at trial." ROA.2932. In *Sears*, the Supreme Court found the state court's analysis of *Strickland* prejudice was flawed because it focused on counsel's mitigation theory "in the abstract," without analyzing "whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears." *Sears*, at 953. The Supreme Court found the "reasonableness" of counsel's mitigation theory "beside the point," because "Sears

might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not." *Id*. Here, as in *Sears*, the purported "reasonableness" of counsels' decision to focus on Davis's "personal responsibility" does not preclude a finding of prejudice had counsel conducted a constitutionally adequate mitigation investigation before arriving at that particular theory. *Id*.

Finally, in assessing prejudice, the district court placed undue weight on the aggravated nature of the crime and the victim's injuries. ROA.2933. However, aggravated crime facts do not, on their own, defeat a prejudice argument. *See Escamilla v. Stephens*, 749 F.3d 380, 393 (5th Cir. 2014) ("disturbing facts of the crime alone do not defeat [a *Strickland*] prejudice argument"); *Smith v. Dretke,* 422 F.3d 269, 271-72 (5th Cir. 2005) (detailing the petitioner's "week-long crime spree" and ultimately granting a COA on his ineffective-assistance-of-trial-counsel claim). *See also Andrus*, 590 U.S at 824, n. 7 (noting that while the dissent "train[ed] its attention on the aggravating evidence," "[a] proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence ..., along with the mitigation evidence introduced during [the] penalty phase trial") (quoting *Sears*, 561 U.S. 956)).

### c.    Davis is entitled to a COA.

This Court has granted a COA on penalty-phase IAC claims in similar circumstances. In *Escamilla*, this Court found that reasonable jurists could debate

whether counsel conducted an adequate investigation, even though counsel had interviewed some of the defendant's family members, utilized experts, and put on a limited mitigation case focusing on how he was impacted by his mother's death. The state habeas court relied on the fact that some of the defendant's family members were difficult to communicate with and expressly denied the existence of some of the mitigating evidence later uncovered by post-conviction counsel. However, this Court found a COA was warranted because trial counsel ignored multiple "red flags" regarding the defendant's troubled childhood, failed to hire a mitigation specialist, and did not have the defendant evaluated by a mental health expert until after jury selection had begun. *Escamilla*, 749 F.3d at 392. This Court further found that reasonable jurists could debate whether counsel's decision to focus on the defendant and his family as "sympathetic figures" was a tactical strategy, "because counsel's investigation debatably fell below a reasonable standard of performance." *Id*. at 393. As to prejudice, this Court found that "counsel's failure to present the true nature of the petitioner's disadvantaged upbringing debatably establishes prejudice"—despite the "disturbing facts" of the crime. *Id.*

Similarly, in *Smith v. Dretke*, this Court granted a COA despite the fact that trial counsel conducted "extensive interviews" with Smith's family, because counsel failed to follow up on available information regarding Smith's severe substance abuse history and disadvantaged background. *Smith*, 422 F.3d at 277-284.

Here, similar to *Escamilla*, counsel failed to hire a mitigation investigator and did not begin their mitigation investigation until the day before voir dire began. They ignored and failed to follow up on multiple obvious red flags regarding Davis's dysfunctional childhood and the abuse he suffered at the hands of multiple individuals. As in *Escamilla* and *Smith*, counsel had available information which "would have led a reasonable attorney to investigate further." *Escamilla*, at 391. And as in *Escamilla*, reasonable jurists would debate whether Davis was prejudiced by counsel's inadequate investigation, despite the fact that counsel presented *some* limited mitigating evidence, because the "true nature" of Davis's horrific childhood could have convinced at least one juror to vote for life, regardless of the aggravated nature of the crime. *Escamilla*, at 393.

### d. Reasonable jurists could debate whether §2254(d) restricts relief.

Davis need not demonstrate at the COA stage that his claim can overcome the relitigation bar under §2254(d), only that reasonable jurists could debate the district court's decision. *See Miller-El*, at 341-343. As this claim was exhausted in state court, §2254(d) applies but reasonable jurists could debate whether the claim satisfies (d)(1) and (d)(2) based on the state court record.

**§ 2254(d)(1):** As discussed above, the decision below is predicated on the assumption that a capital defendant's choice to testify absolves counsel of the duty to conduct a constitutionally adequate investigation *prior* to forming any decisions

about what mitigating evidence to present to the jury. This suggests that trial counsel can delegate decisions regarding both the *scope* of investigation and what mitigating evidence to present before counsel have conducted a reasonable investigation.

Regarding *Strickland* prejudice, the decision below assumes that the aggravated nature of crime automatically defeats a prejudice finding, applies an unconstitutional causal-nexus test regarding the new mitigating evidence uncovered by post-conviction counsel, and relies excessively on the purported "reasonableness" of counsel's mitigation theory without assessing whether Davis was prejudiced by counsel's inadequate investigation.

Reasonable jurists would debate whether these assumptions are contrary to or involve an unreasonable application of *Strickland* and its progeny, and other clearly established federal law, including Supreme Court precedents invalidating a causal-nexus test for mitigating evidence. *See*, *e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 285 (2004).

**§2254(d)(2):** Alternatively, reasonable jurists could debate whether the state court decision was based on an unreasonable determination of the facts based on the state court record.

First, the district court erred in conflating the requirements of §2254(d)(2) and §2254(e)(1). ROA.2934 ("Davis has failed to meet his burden of rebutting the state court's factual finding that his counsel provided constitutionally effective assistance

by clear and convincing evidence."). The Supreme Court has not "defined the precise relationship between §2254(d)(2) and §2254(e)(1)." *Brumfield v. Cain*, 576 U.S. 305, 322 (2015) (internal citations and quotation marks omitted). In any event, at the COA stage, this Court may only consider whether the issues are "adequate to deserve encouragement to proceed further," *Slack v. McDaniel*, 529 U.S. at 484, and full consideration of the facts is prohibited. Under this standard, reasonable jurists could debate whether the state court decision was based on an unreasonable determination of the facts.

As noted by the district court, the state court found Davis's claims of suicide attempts, self-mutilation, sexual abuse, and parental neglect were either overstated or not credible. ROA.2931-32. Reasonable jurists would debate these determinations in light of trial counsel's undisputed testimony at the state habeas evidentiary hearing that: (1) they were aware of Davis's suicide attempts and self-mutilation (yet neglected to investigate or develop this information) (ROA.1776); (2) they were aware that when he was a minor, Davis was in a sexual relationship with an older woman which counsel acknowledged could be "termed sexual abuse" (ROA.1737); (3) had they been aware that Davis's father had been convicted of raping a 7 year-old-boy prior to the resentencing trial, and that Davis's half-brother Carl had been sexually abused by their father for years, they would have conducted further investigation regarding whether Davis was sexually abused (ROA.1779); and (4)

they were aware that CPS had investigated the family at least once but did not investigate the CPS involvement (ROA.1777). In addition, there was uncontradicted evidence that Davis told both Dr. Schutte and Dr. Ramirez that he had been sexually abused by multiple individuals. ROA.3625-26; 1521.

Second, the state court found that although trial counsel did not hire a mitigation investigator, the fact investigator from the first trial, Sam Streep, had been the investigator on the case "for a number of years." ROA.3236. The state court relied on this finding to reject Davis's argument that counsel did not begin their penalty phase investigation in a timely manner. ROA.3236-37. However, reasonable jurists would debate this finding, as trial counsel expressly testified at the state habeas evidentiary hearing that neither Streep nor any other member of the defense team had been in contact with Davis or investigated the case at all between the first trial and the resentencing trial, and that Streep was not hired until January 8, one day before the beginning of voir dire and approximately one month before the presentation of evidence. ROA.1766, 1797.[19]

Finally, as noted *supra* at n.15, Davis proffered additional evidence[20] to the federal habeas court in support of his ineffectiveness claim that had not been

---

[19] In actuality, counsel did not move for Streep's appointment until January 14, 2008, and the court appointed Streep that same day. ROA.5907.
[20] That evidence included additional declarations from family and neighbors, prison records, police reports, CPS records, and expert psychological and neuropsychological reports. ROA.1330-1693.

presented to the state court; for this reason the court refused to consider it. However, once the §2254(d) hurdle is cleared, a federal court reviews the merits of a claim *de novo* and can consider new evidence submitted in federal habeas. *See Panetti v. Quarterman*, 551. U.S. 930, 953 (2007); *Rompilla v. Beard,* 545 U.S. 374, 390, (2005). As part of its *de novo* review, a district court can consider evidence outside of the state court record, and the evidentiary limitations of *Cullen v. Pinholster,* 563 U.S. 170 (2010), are inapplicable. *See Smith v. Cain,* 708 F.3d 628 (5th Cir. 2013) (federal district court did not err in granting an evidentiary hearing after finding *Pinholster*'s evidentiary restrictions were "inapplicable" because §2254(d)(1) was satisfied).

## CONCLUSION

This Court should grant a COA and certify the above claims for appeal.

Respectfully submitted,

/s/ Todd G. Scher
TODD G. SCHER
Florida Bar No. 0899741
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
Fax: (754) 263-4147
Email: *TScher@msn.com*

/s/ Joe A. Spencer, Jr.
JOE A. SPENCER, JR.
Attorney at Law
1009 Montana
El Paso, TX 79902

/s/ Richard D. Esper
RICHARD D. ESPER
Attorney at Law
801 North El Paso Street, Ste. 225
El Paso, TX 79902

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed today, April 23, 2025, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notification for this case, including all opposing counsel.

By: _/s/ Todd G. Scher_____
TODD G. SCHER

**CERTIFICATE OF COMPLIANCE**

I certify that (1) this document was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this document is 12,492 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

By: _/s/ Todd G. Scher_____
TODD G. SCHER