Iɴ ᴛʜᴇ
# United States Court of Appeals for the Fifth Circuit

IRVING ALVIN DAVIS,

*Petitioner–Appellant,*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent–Appellee.*

On Appeal from the United States District Court
for the Western District of Texas, El Paso Division,
USDC No. 3:14-CV-121

## RESPONSE IN OPPOSITION TO MOTION FOR A CERTIFICATE OF APPEALABILITY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

CRAIG W. COSPER
Assistant Attorney General
   *Counsel of Record*
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
craig.cosper@oag.texas.gov

*Counsel for Respondent–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Respondent–Appellee*
Eric Guerrero, Director
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent–Appellee*
Craig Cosper, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
Irving Alvin Davis

*Counsel for Petitioner–Appellant*
Todd G. Scher
Richard Dennis Esper
Joe A. Spencer, Jr.

s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2)(C), oral argument should be denied because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS……………….….…………i

STATEMENT REGARDING ORAL ARGUMENT…………….…..……ii

TABLE OF CONTENTS…………….………………………….………iii

TABLE OF AUTHORITIES…………………………………….....v

INTRODUCTION……………………………………………..……1

STATEMENT OF THE ISSUES………………………………………1

STATEMENT OF THE CASE………………………………………...1

   I.  Procedural History………………………………………………1

   II. Statement of Facts……………………………………………3

      A. Evidence at guilt-innocence………………………………3

      B. Evidence at punishment……………………………………5

         1. The State's Evidence……………………………………5

         2. The Defense's Evidence…………………………………9

SUMMARY OF THE ARGUMENT……………………………………17

STANDARD OF REVIEW……………………………………………18

ARGUMENT

   I.  The District Court's Rejection of Davis's Satanism Claim Is
     Not Debatable ..................................................................19

      A. Background ..............................................................19

B. Reasonable jurists would not debate the district court's conclusion that the state court reasonably rejected Davis's claim that his First Amendment rights were violated by the admission of evidence concerning Satanism ...................... 22

C. Reasonable jurists would not debate whether the admission of the Satanism evidence violated the Eighth Amendment or due process ....................................... 29

D. Reasonable jurists would not debate that the district court's determination that any error was harmless ................. 30

E. Reasonable jurists would not debate the district court's application of § 2254 (d) ............................................. 35

II. The District Court's Rejection of Davis's Ineffective Assistance Claim Is Not Debatable ................................. 37

A. Standard of review ................................................. 37

B. Background and state court determination ............................ 39

C. Reasonable jurists would not debate the district court's denial of his ineffective assistance claim .................................. 46

CONCLUSION ........................................................ 55

CERTIFICATE OF SERVICE ................................................ 56

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ 57

CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS ........................................................ 57

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Autry v. McKaskle,* 727 F.2d 358 (5th Cir. 1984) ................................... 48

*Barefoot v. Estelle*, 463 U.S. 880 (1983).................................................. 32

*Barrientes v. Johnson,* 221 F.3d 741 (5th Cir. 2000) ........................ 18, 30

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)........................................ 24

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)........................................... 30

*Brown v. Davenport*, 596 U.S. 118 (2022) ................................. 22, 30, 34

*Buck v. Davis*, 580 U.S. 100 (2017)......................................................... 18

*Burt v. Titlow*, 571 U.S. 12 (2013) .......................................................... 38

*Casarez v. State*, 913 S.W.2d 468 (Tex. Crim. App. 1994) ..................... 19

*Coleman v. Thompson*, 501 U.S. 722 (1991)........................................... 35

*Cullen v. Pinholster*, 563 U.S. 170 (2011).............................................. 38

*Dawson v. Delaware*, 503 U.S. 159 (1992)....................................Passim

*Dunn v. Reeves*, 594 U.S. 731 (2021) ............................................... 36, 38

*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) ....................... 35

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997) ............................... 23, 24

*Gonzales v. Davis*, 924 F.3d 236 (5th Cir. 2019) .................................... 18

*Harrington v. Richter*, 562 U.S. 86 (2011)................................. 18, 35, 38

*Jimenez v. Guerrero*, 133 F.4th 483 (5th Cir. 2025).............................. 36

*Johnson v. Williams*, 568 U.S. 289 (2013)........................................ 36, 37

*Kinsel v. Cain*, 647 F.3d 265 (5th Cir. 2011) .......................................... 53

*Kotteakos v. United States*, 328 U.S. 750 (1946) ................................... 30

*Luna v. Lumpkin*, 832 F. App'x 849 (5th Cir. 2020) ........................ 49, 50

*Mason v. State*, 905 S.W.2d 570 (Tex. Crim. App. 1995) ................. 19, 20

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................... 18

*Neal v. Vannoy*, 78 F.4th 775 (5th Cir. 2023) ......................................... 52

*O'Brien v. Dretke*, 156 F. App'x 724 (5th Cir. 2005) ............................... 30

*Payne v. Tennessee*, 501 U.S. 808 (1991) ................................................ 29

*Ramirez v. Davis*, 780 F. App'x 110 (5th Cir. 2019) .............................. 48

*Roberts v. Dretke*, 356 F.3d 632 (5th Cir. 2004) ..................................... 48

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ...................................... 47, 50

*Slack v. McDaniel*, 529 U.S. 473 (2000) ................................................. 18

*Story v. Collins*, 920 F.2d 1247 (5th Cir. 1991) ...................................... 31

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................... 37, 38

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006) .............................. 51

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................ 38

*Zant v. Stephens*, 462 U.S. 862 (1983) ................................................... 29

**Statutes**

Anti-Terrorism and Effective Death Penalty Act of 1996
    (AEDPA) ................................................................. Passim

28 U.S.C. § 2254 ..................................................... 38, 52, 54

**Rules**

Fed. R. App. Proc. 32 ............................................................. 57

Fed. R. App. Proc. 34 .............................................................. ii

**Constitutional Provisions**

U.S. Const. amend. I.................................................................Passim

U.S. Const. amend. VIII........................................................Passim

**INTRODUCTION**

Petitioner–Appellant Irving Alvin Davis was convicted of capital murder and sentenced to death for the rape and murder of 15-year-old Melissa Medina. Davis filed a federal habeas petition that raised numerous claims challenging his conviction and sentence. The district court denied all the claims and a certificate of appealability (COA). Davis now seeks a COA from this Court. *See generally* Mot. for COA (Mot.). Because no reasonable jurist could disagree with the lower court's decision, this Court should deny a COA.

**STATEMENT OF THE ISSUES**

1.     Could reasonable jurists debate the denial of Davis's claim that the admission of evidence of his affiliation with Satanism violated his constitutional rights?

2.     Could reasonable jurists debate the denial of Davis's claim of ineffective assistance of trial counsel (IATC)?

**STATEMENT OF THE CASE**

**I.     Procedural History**

Davis was convicted and sentenced to death for capital murder. ROA.4689–90, 4993, 5015–21. The Texas Court of Criminal Appeals

(CCA) affirmed Davis's conviction but reversed his sentence. ROA.4587–4606. Davis was retried on punishment in 2008 and again sentenced to death. ROA.5971–72, 5979–80. The CCA affirmed Davis's sentence. ROA.4607–47. The Supreme Court denied Davis a writ of certiorari. ROA.4674.

Davis filed a state habeas application pertaining to his first trial, followed by a second habeas application after his punishment retrial. ROA.6046–62, 6082–120, 6697–780, 7159–62. The trial court held an evidentiary hearing on the second state habeas application and issued findings of fact and conclusions of law recommending that Davis be denied relief on both applications. ROA.6213–30, 6236, 7049–98. The CCA denied habeas relief based on the trial court's findings and conclusions and its own review. ROA.6023–25.

In 2015, Davis filed an initial federal habeas petition, followed by multiple amended petitions. ROA.354–84, 506–80, 1197–1275, 1867–965. In 2018, Davis then filed a motion to stay and abate his federal habeas proceedings so he could exhaust certain claims in state court. ROA.2164–78. The court granted the motion. ROA.2224–29.

Davis then filed a subsequent state habeas application in the CCA, ROA.3275–319, 3636–80, but the CCA dismissed the application as an abuse of the writ without considering the merits of the claims. ROA.3339–41. The district court subsequently lifted the stay and reopened the case. ROA.2262–63.

Upon return to federal court, Davis filed an amended petition for federal habeas relief. ROA.2300–426. The district court denied relief, holding many of Davis's claims were procedurally barred from federal review and meritless, while the remainder were reasonably rejected by the CCA. ROA.2838–971. Davis timely filed a motion to alter or amend the judgment, ROA.2972–89, which was denied. ROA.3020–28. Davis appealed and filed his motion for a COA in this Court. Respondent–Appellee, the Director, submits this opposition.

## II. Statement of Facts

### A. Evidence at guilt-innocence

In its first opinion on direct appeal, the CCA summarized the facts of the case as follows:

> The evidence at trial showed that on the night of June 3, 2001, Medina, [Davis], and some friends gathered at the house of Amy Romero and her brother, Ben Romero. Amy testified she knew Medina well, but had known [Davis] for

only two months. During the evening, [Davis] told Amy that Medina "had a nice butt." Amy asked [Davis] to "leave [Medina] alone," but he refused her request. The group talked and drank alcohol until approximately 12:20 a.m.

The group then left the Romeros' house to walk Medina home. Half-way there, Medina told the group she would walk the rest of the way home by herself. She often used a short-cut across an elementary-school campus. [Davis] decided to walk her the rest of the way home.

When [Davis] returned to the Romero house around 2:00 a.m., Ben noticed scratches on [Davis's] neck.

Alejandro Betancourt testified that he worked in the maintenance department of the Anthony Independent School District. On the morning of June 4, 2001, he and a co-worker discovered Medina's body on the school grounds. Her face was black and swollen, and her fingertips had been cut off.

When first questioned by the police, [Davis] stated that while he was walking Medina home, a gray car pulled up, she got in it, and the car drove off. He claimed he received the scratches on his neck during a fight with his brother days earlier. However, after speaking with his mother, [Davis] admitted to police that he strangled Medina. He claimed that while on the school grounds, he and Medina began to have consensual sex, but she asked him to stop because she liked someone else. [Davis] told police that Medina said she would "cry rape" if he told anyone they had intercourse. He claimed that he then "lost it" and strangled her. He also said he cut off Medina's fingertips because she had scratched him and his DNA was under her fingernails.

Dr. Corrine Stern, the medical examiner, performed an autopsy on Medina's body. With respect to sexual assault, Stern testified that Medina had many injuries to her vaginal area, which appeared to be caused around the time of her

death, including "mucosal abrasions." In her opinion those injuries were consistent with penile penetration, and she believed that Medina had been sexually assaulted close to or at the time of her death. She also testified that Medina suffered blunt-force trauma to her head, which resulted in a subarachnoid hemorrhage in her brain. She also found that Medina was strangled and had numerous abrasions on her torso, including a particularly severe blow to the chest that ruptured her pulmonary artery and filled her pericardial sac with blood.

ROA.4589–90.

## B. Evidence at punishment

The federal district court summarized the punishment phase evidence from Davis's punishment retrial as follows:

### 1. The State's Evidence

At Davis's punishment retrial, the State re-introduced the evidence pertaining to Davis's guilt for murdering Medina—including his confession.

Dr. Stern, the Chief Medical Examiner for El Paso, described the injuries inflicted on Medina. [ROA.15208–18]. She explained that Medina had suffered multiple abrasions to her face; blunt-force trauma to her head, which resulted in severe internal head injuries, including a subarachnoid hemorrhage in her brain; multiple abrasions to her torso, including a large abrasion that was consistent with being struck with a pipe-shaped object; a particularly severe blow to the chest that bruised her heart and ruptured her pulmonary artery and filled her pericardial sac with blood; and strangulation. [ROA.15208–13, 15215–18, 15706, 16286–92]. She further explained that she performed a speculum examination of Medina's "vagina, and in the mid-upper

vaginal vault, or the opening of the vagina, she had multiple abrasions of the mucosa with surrounding erythema. Erythema is just a fancy word for redness." [ROA.15214]. She opined that Medina's vaginal injuries were consistent with penile penetration and that Medina had been sexually assaulted prior to her death. [ROA.15215].

Defense counsel challenged Dr. Stern's opinion that Medina was sexually assaulted and elicited testimony from her that, while she believed Medina's serious and painful vaginal injuries were not likely the result of consensual sex, she could not be certain those injuries had not been caused by consensual sex. . . . [ROA.15218, 15224].

The State then presented five witnesses who testified about Davis's propensity to violence.

Carlos Ramirez—who was present at the Romero's party on the evening of June 3, 2001—testified that Davis had "clotheslined" him by abruptly putting his arm around his chest to stop him. [ROA.15241–42]. And later—after Ramirez told Davis he did not appreciate unwanted roughhousing—Davis held his head down while he was tying his shoes. [ROA.15242, 15244].

Megan Ryan—a former schoolmate from Jacksonville, North Carolina—said that on January 24, 1996, she saw Davis chase his twin brother, Oscar, around the house with a big kitchen knife and pin him on the ground with that knife. [ROA.15349].

Michelle Marinelli—another person who knew Davis in North Carolina—said he saw Davis throw a bar stool in anger at a dance club and later called her a "bitch." [ROA.15350–51].

Mary Cramer Segovia—a prior acquaintance from North Carolina—said she once observed a knife on the floor—

which Davis picked up and claimed as his—while she was dancing with friends at a nightclub. [ROA.15388–89, 15392].

Patricia Ann Trott—a former neighbor from North Carolina—testified she saw a law-enforcement officer speaking with Davis at his house and afterwards, when Davis was talking to a friend on his porch, Davis pointedly looked at Trott and said, "But I'll take care of her." [ROA.15393–94]. On another occasion, when Trott was driving up the street, Davis, who appeared angry, began to cross the street very slowly in front of her, as if deliberately trying to stop her from passing, and leaned down and said something to her as she passed. [ROA.15393–95].

The State next presented evidence that Davis was on probation for theft in North Carolina when he sexually assaulted and killed Medina. [ROA.15386–87, 15569, 15844–49]. It established that Officer Nelson Negron, a former school-resource officer at Jacksonville High School, arrested Davis for criminal trespass in 1997 because Davis—who had previously been suspended from school—was not permitted to be on school grounds. [ROA.15398–99]. It showed that Officer Negron assisted when his partner, Officer Clifton McQueen, arrested Davis for possession of marijuana in 1998. [ROA.15397–98]. It presented evidence establishing that Officer McQueen, also a former school-resource officer, was present when Davis was suspended from school later that year. [ROA.15400–02].

The State then offered evidence—including books, writings, and drawings—found in Davis's death-row prison cell which suggested Davis was involved with Satanism. [ROA.15419–22, 16299–349, 16356–59]. It also submitted violent drawings by Davis of women with slashed throats, bound and gagged, and covered in blood. [ROA.15420–22, 15425, 16285, 16352–55, 16360–61].

Dr. Edward Gripon—the State's expert witness in the field of forensic psychiatry—testified he reviewed "collateral information" on Davis—including his offense report, prior testimony at his suppression hearing, school record, artwork, and telephone conversations. [ROA.15431–32]. Dr. Gripon then listened as the prosecutor outlined a hypothetical question which summarized the evidence against Davis in this case. [ROA.15440–44]. Dr. Gripon opined on the issue of future-dangerousness that the hypothetical person described by the prosecutor "would be likely to continue to pose a continued threat." [ROA.15444]. Dr. Gripon explained he mostly based his opinion on Davis's history of antisocial behavior and escalating violence. . . . [ROA.15444].

Donald Vaughn Haley—the Director of Criminal Justice at Tidewater Community College in Virginia Beach, Virginia—testified he had studied Satanism for nineteen years and had consulted with law enforcement agencies—including the Federal Bureau of Investigations on one occasion—about the subject. [ROA.15458–59, 15463, 15465]. Although he had never testified in court as an expert on Satanism, he was allowed by the trial court—over the objection of Davis's counsel—"to testify as an expert in the area of satanism" in this case. [ROA.15460]. He read a passage from *The Satanic Bible* by Anton LaVey—the founder of the Church of Satan—which suggested human sacrifice could be used "to dispose of a totally obnoxious and deserving individual," meaning "[a]nyone who had unjustly wronged you or has gone out of his way to hurt you." [ROA.15460]. He said *The Satanic Bible* commands that when a person, by his "reprehensible" behavior, "cries out to be destroyed, it is truly your moral obligation to indulge [ ] their wish." [ROA.15460]. He claimed Rule Eleven of LaVey's Eleven Satanic Rules of the Earth—"When walking in open territory, bother no one. If someone bothers you, ask him to stop. If he does not stop, destroy him"—shows that if a person "annoys you, [you may] treat him cruelly." [ROA.15461]. And if the person does not stop his annoying behavior, you may "destroy" him.

8

[ROA.15461]. On cross-examination, Haley asserted the brutal way Davis murdered Medina was consistent with the term "destroy," and that "destroy" meant "to die." [ROA.15462–63].

> Q. They die? Okay. And so what you're doing is you're reading these things literally, right?

> A. Yes, sir.

> Q. How are you supposed to destroy a person? Would you explain it to the Ladies and Gentlemen of the Jury?

> A. Well, you could turn around, hit them in the heart so much that it ruptures. You could bash their head against a pole till they bleed out. You can cut their fingertips out. I think that would be an adequate description of being destroyed.

[ROA.15462–63].

Davis's counsel deftly cross-examined Haley. [ROA.15461–66]. They obtained Haley's admission that he was reading Rule Eleven of LaVey's Eleven Satanic Rules of the Earth "literally." [ROA.15462]. They established that Haley had never published in the area of Satanism, had interviewed only three Satanists, and was, at best, minimally qualified to give opinions on Satanism or the Church of Satan. [ROA.15463–66].

## 2. The Defense's Evidence

The defense called a witness to counter Haley's testimony on Satanism.

John Gordon Melton—the director for the Institute for the Study of American Religion in Santa Barbara, California,

an expert in religious studies, and a religious historian with training on cults and new religions—was qualified as an expert on American religions including Satanism. [ROA.15467]. He testified about the origin of the Church of Satan in the United States with its founder—a former circus performer named Anton LaVey—and its nature and rituals. [ROA.15467–71].

Q. So a lot of satanism is just ritual.

A. Well, certainly in LaVey's satanism he's drawing upon psychological studies that suggest that rituals have many purposes far beyond their stated purpose. And so he was drawing on that kind of psychological tradition to say rituals are important.

. . . .

Q. . . . And what is meant by human sacrifice?

A. In the satanic system LaVey was opposing the idea of turning the other cheek. If someone is doing you harm, as is [sic] opposing you, putting you down, then you react to that. And in choosing a proper human sacrifice, which is the title of this chapter [of *The Satanic Bible*], you select someone who was trying to hurt you, either is hurting you, or is trying to hurt you as a proper object or sacrifice.

Q. And how do you — how do you destroy this person?

A. You curse them. You go through a ritual, and you symbolically curse them.

Q. Symbolically curse them. Explain that to me. How do I symbolically curse one of my enemies?

A. In the back part of the book . . . you have some basic outlines for rituals. And one of the rituals is called a ritual of destruction. So you go through the ritual preparation. Rituals are — magical rituals are designed to focus your will, your intention. So you go through magical ritual, and you pronounce a curse on the person who you want to destroy. And you put all your emotional energy into it and then after it's over, you've done it. And you drop that and go on to something else, so it's kind of a cathartic response to the person. You don't actually touch him, or you don't actually respond to him. If you did — you know, LaVey was at this for 30 years. If he was doing anything other than symbolically dealing with people who didn't like him, he would have ended his life in jail, and his members likewise. So it's laid out fairly simply through here that you destroy someone by pronouncing a curse on him.

[ROA.15469]. He explained LaVey formed the Church of Satan to counter Christianity and Catholicism, which he deemed hypocritical. [ROA.15469]. He further claimed followers of Satanism should not take the passages in *The Satanic Bible* literally, and opined LaVey's Eleven Satanic Rules of the Earth and Nine Satanic Statements were non-violent in nature. [ROA.15473, 15477–78]. But he conceded an individual reading *The Satanic Bible* could take the words literally. [ROA.15473]. He also conceded people had been killed "[i]n the name of satanism." [ROA.15473].

The defense provided character testimony from twelve lay witnesses—including childhood and adult friends, a schoolteacher, and family members. [ROA.15491–508]. These

witnesses opined Davis was peaceful, non-violent, not aggressive, and would not pose a future danger to society. [ROA.15491–508].

Dr. James William Schutte—a licensed psychologist—testified that clinical method risk assessments—such as the one provided by Dr. Gripon—were highly inaccurate. [ROA.15520–21, 15524].

. . . .

Dr. Schutte opined that "there is *not* a probability" a hypothetical individual like Davis—who had attained the age of twenty-five and did not have any factors added to his base rate—"would commit acts of violence in prison." [ROA.15524]. Dr. Schulte also reported that in a "study of 136 capital murderers in Texas prisons [in the early 2000s], none of that group of 136 committed a murder while in prison." [ROA.15532].

Davis's mother—Carol Davis—testified that Davis's father, Oscar Davis III, was in the military and "[h]e was gone a lot." [ROA.15533].

> We were stationed at Cherry Point, North Carolina, for about three years. And then he went overseas to Korea for a year. We left North Carolina. We went to . . . Virginia, Virginia Beach, and we were there . . . for maybe six, seven years. And then after that we went to 29 Palms, California, for three years. And in between each one there was duty that he had to go overseas for a year. So we were like basically left one year with me and the children by ourselves.

[ROA.15533]. She added that she had "not been with him" since she obtained a restraining order in May of 1995. [ROA.15533–34]. She claimed that she did not have a "good

relationship" with her husband, and there was always extra hostility when he returned home from a deployment. [ROA.15533]. She described her husband as a drinker who physically and verbally abused her—and treated his children like they were in the military. [ROA.15534].

> If the children would get in trouble, or they didn't do anything to his specifics, being a military person, they would have to stand in front of him and they would have to listen to him lecture them about what was right and what was wrong. And I had enough. I couldn't put them through that anymore. When he retired I told him that it wasn't going to work anymore so he left. And I filed for a restraining order to keep him away from myself and my children.

[ROA.15534]. She believed that not having a father present affected the boys and she claimed the children still loved their father and talked to him when they wanted. [ROA.15534–35]. She explained that Davis dropped out of high school just before he turned eighteen, and the family moved to Anthony, Texas, because he got into legal trouble and was being harassed by some other kids. [ROA.15535]. She believed that Davis had potential and good qualities, and she did not believe he was a future danger. [ROA.15536–37].

Davis was the last to testify. He explained he grew up a Baptist but switched to Buddhism in 1999. [ROA.15539, 15555]. He claimed two events led him to Satanism: the first was his anger over the way Buddhists were treated by the Chinese in Tibet and the second was his desire to look into the myth of the war in heaven. [ROA.15555]. He maintained he did not believe in Satan as a deity:

> I see Satan as the spirit of rebellion, because without rebellion we wouldn't have done anything. If you — the original satanists were the

Illuminati, Bernini, Galileo, people that went against the Church to tell people — man, the truth about what's going on, to say that earth wasn't the center of our universe, of our galaxy, but the sun was, because the Church said the earth was created by God, and we're descendants of the universe, everything revolves around us. And the scientists said, no, that's not true. So they were attempting to explain through science, through logic, the way our world worked. And that's what the original satanists were at the beginning. It comes from the Islamic shaitan, which means adversary, so Satan is the spirit of rebellion.

[ROA.15543]. He claimed Satanism did not advocate violence. [ROA.15542]. He explained *The Satanic Bible* lays out various spells: compassion spells, destruction spells, and lust spells. [ROA.15563]. He maintained he used his "spells for compassion." [ROA.15563]. He said Rule Eleven of the Satanic Rules of the Earth provided "[w]hen walking into open territory, bother no one. If someone bothers you, ask him to stop. If he does not stop, destroy him." [ROA.15563]. He said "destroy" in this context did not mean you actually hurt another, but you could defend yourself "through your words." [ROA.15564]. He also discussed his artwork, poetry, and life philosophy at length. [ROA.15538–65].

Davis testified about his childhood, home life, and his father's abuse. [ROA.15565–69]. He described how his father gave Davis and his twin brother, Oscar Davis, "whoopings." [ROA.15565]. He said they would "have to strip down and he'd hit us on our bare bottoms with a belt. Other times he would just be cruel." [ROA.15565]. He claimed they were always punished together, especially when their father was drunk, because he could not tell them apart. [ROA.15566]. He alleged his father also kicked his older brother—Carl Fuller—out of the house when he was sixteen years old because Carl Fuller threatened his father after he hit his mother. [ROA.15566].

He claimed his father would hit his mother "only when he was drunk." [ROA.15566]. He said his father first started drinking periodically and then "more and more." [ROA.15566]. He maintained his father hit him "like a grown man." [ROA.15567].

Davis explained he dropped out of high school during his junior year at the age of seventeen because he "was weak." [ROA.15568].

> I couldn't get past everything that I had went through, and so it would consume me. At the time I was pretty much a junkie. I was doing drugs in school, doing drugs out of school. I'd party all day, party all night, and I just said, you know, I couldn't do it anymore. I just gave up on myself. I gave up on everything.

[ROA.15568].

Davis admitted he was placed on probation after his arrest for possession of marijuana and stolen items. [ROA.15569]. He claimed his mother made a deal for him to leave North Carolina and come to Anthony, Texas. [ROA.15569]. He said Anthony was "all right" because he was part of the only Black family in town, and he was a novelty. [ROA.15569].

Davis then described how he murdered Medina. [ROA.15569–72]. He explained that after a party where everyone was drinking beer and smoking marijuana, the crowd broke up and he decided to walk Medina home because he was interested in her. [ROA.15569–70]. At one point, he said he climbed over a fence and then helped Medina down. [ROA.15570]. He professed they were "kind of out of it." [ROA.15570]. He said he tried to "get with her" for "just sex," but Medina said she had a boyfriend. [ROA.15570]. Despite this, he alleged they started to kiss, he helped her undress, he

pulled his pants down, and they had sex. [ROA.15570]. During the sex, he claimed Medina "froze up" and told him they could not continue. [ROA.15570]. Davis said he asked what the problem was, and Medina said she did not want anyone to find out and that if anyone did, "I'm just going to say you raped me." [ROA.15571]. Davis said he started thinking he would go to jail if she accused him because no one would believe him and he "just snapped." [ROA.15571]. He remembered putting his hands around Medina's neck and strangling her while she fought back. [ROA.15571]. Even though Medina said, "it's fine, it's fine," he "wasn't trying to hear it anymore." [ROA.15571]. Davis maintained he walked around Anthony in a haze after he choked Medina and was "freaking out." [ROA.15571]. Then, he went back to the crime scene thinking Medina would be alive and gone, but she was still there and not moving. [ROA.15571]. He tried to clean up the crime scene and grab things to cover his tracks because he was guilty and did not want to go to jail. [ROA.15571]. He explained he cut Medina's fingertips off with some garden shears that he possibly got out of someone's car. [ROA.15571]. He declared, "[t]here was no rhyme or reason to the things I was doing. I just went on autopilot." [ROA.15572]. He ended up throwing everything away—Medina's pants, Medina's fingertips, and the shears—and went home. [ROA.15572]. He explained he got the idea of cutting off Melissa's fingertips from television because he understood DNA could get under fingernails. [ROA.15572].

The next morning, he said he saw Melissa's body on the news and knew that people were coming for him because he was the last person with her. [ROA.15572]. When the police arrived, he agreed to go to the station. [ROA.15572]. Davis admitted he initially lied to the detectives and said that another person picked up Medina, but then he told them everything. [ROA.15572–73]. He claimed he needed to tell them the truth for closure. [ROA.15573].

At the end of his testimony, Davis said it "killed him" to know he was a part of the Medina family's horror; "it was eating [him] up" that no one talks about her anymore; "to remember her is to remember everything I did"; and he stole from their family by taking their daughter. [ROA.15573]. He then said:

> I would ask you all to please, please remember her. I mean, I'm a piece of crap. I understand that. I'm not asking — I didn't come here looking for salvation. I came here looking for an execution. I'm not asking you all to spare my life. I'm asking you all to allow me to give up my life in spite of hers, based on the laws I live by. It's life for life. I took a life, mine should be taken in return."

[ROA.15573]. Davis added he could do nothing to make this right except give up his right to live. [ROA.15573–74].

ROA.2858–72.

## SUMMARY OF THE ARGUMENT

The district court entered a well-reasoned opinion and properly concluded Davis's claims were meritless. The district court's rejection of Davis's claims is not debatable. First, the district court properly held Davis's Satanism claim was meritless because the state court decision was not unreasonable, and even if it were, any error was harmless. Second, the district court properly held Davis's IATC claims failed because Davis had not shown deficient performance, prejudice, and an unreasonable state court decision.

## STANDARD OF REVIEW

A COA can only issue if Davis shows reasonable jurists could debate whether the court below should have resolved his claims in a different manner or that this Court should encourage him to further litigate his claims. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). This standard applies to both merits and procedural rulings. *Buck v. Davis*, 580 U.S. 100, 122 (2017). If the ruling was procedural, Cruz-Garcia must show both that the procedural ruling is debatable and that it is debatable he stated a valid claim. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court reviews findings of fact for clear error and conclusions of law de novo. *Gonzales v. Davis*, 924 F.3d 236, 242 (5th Cir. 2019). A district court's factual findings will not be disturbed unless they are implausible considering the whole record. *Id.* As to claims adjudicated on the merits by the state court, the COA determination is made with the deferential AEDPA scheme in mind. *Barrientes v. Johnson,* 221 F.3d 741, 772 (5th Cir. 2000); *see Harrington v. Richter*, 562 U.S. 86, 100 (2011).

# ARGUMENT

## I. The District Court's Rejection of Davis's Satanism Claim Is Not Debatable.

Davis first asks for a COA on his claim alleging that his constitutional rights were violated by the admission of evidence showing that he practiced Satanism. Mot.6–28. But no reasonable jurist would debate the district court's rejection of Davis's plainly meritless claim. Therefore, this Court should deny a COA.

### A. Background

Davis raised his claim concerning Satanism on direct appeal, and the CCA rejected the claim as follows:

> We first address [Davis's] constitutional claim. The First Amendment guarantees the freedoms of religion and association. *See Casarez v. State*, 913 S.W.2d 468, 476–78 (Tex. Crim. App. 1994); *Mason v. State*, 905 S.W.2d 570, 576 (Tex. Crim. App. 1995). It protects an individual's right to join groups and to associate with others holding similar beliefs. *Mason*, 905 S.W.2d at 576 (citing *Dawson v. Delaware*, 503 U.S. 159, 161 (1992)). However, the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because those beliefs and associations are protected by the First Amendment. *Id.* Such evidence may be admissible if it is shown to be relevant to the issues involved in the case. *Id.* at 576–77. Future dangerousness is an issue that is relevant to the sentencing stage of a capital-murder trial. *Id.* at 577.

In order to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. *Mason*, 905 S.W.2d at 577 (citing *Dawson*, 503 U.S. at 163–67). The [S]tate introduced TDCJ records showing that [Davis] had identified himself as a Satanist since 2005. Haley testified that some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in [Davis] cell discussed "rituals of destruction" for performing "human sacrifice" on "undesirable [and] obnoxious individual[s]," and that various people had committed murder and mutilation "in the name of Satan." Although Melton disagreed with Haley's definition of the term "destroy" and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of Satanism. It was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment.

ROA.4612–13 (footnote omitted).

During state habeas review, the trial court issued findings and conclusions again rejecting the claim. ROA.7058–61, 7095. Notably, the state habeas court found that the outcome of the proceeding would not have been different absent the Satanism evidence, which was only a small fraction of the total evidence presented at Davis's punishment retrial. ROA.7060–61. Indeed, the evidence of future dangerousness was "overwhelming." ROA.7061. Davis was also able to explore the issue of Satanism with the jurors during voir dire, and a majority of those who

served on the jury were either ambivalent about the subject or could set aside their opinions. ROA.7060. Additionally, Melton countered Haley's testimony by explaining that the practice of Satanism was mostly symbolic and did not advocate violence. ROA.7061. Further, the court found that Davis's writings and drawings showing "his allegiance to Satan," along with related literature and his pentagram tattoo "had probative value apart from any religious connotation" and would have admissible. ROA.7061. The State told the jury that it need not decide whether Satanism was good or evil but need only consider the violent and morally reprehensible content of Davis's writings and artwork. ROA.7061. His writings and drawings showed exhibited "a preoccupation with rape, violence (particularly towards women), and death." ROA.7061.

The trial court concluded that the claim was not cognizable in a habeas proceeding because it was raised and rejected on direct appeal. ROA.7095. But, in the alternative, the court concluded the claim was meritless and that any error was harmless. ROA.7095. The CCA adopted the trial court's findings and conclusions when it denied relief. ROA.6024–25.

The district court found the Satanism evidence was relevant to Davis's future dangerousness and the CCA's application of *Dawson* was reasonable. ROA.2497–98. Even if there were error, the district court concluded the evidence was harmless where Davis was able to combat the evidence and he "faced an insurmountable sum of aggravating evidence." ROA.2497–98. Thus, Davis could not show that no fairminded jurist could conclude the error was harmless, as required by *Brown v. Davenport*, 596 U.S. 118, 122, 134–37 (2022). ROA.2498.

**B.  Reasonable jurists would not debate the district court's conclusion that the state court reasonably rejected Davis's claim that his First Amendment rights were violated by the admission of evidence concerning Satanism.**

Davis first contends that reasonable jurists could debate the district court's rejection of his Satanism claim on First Amendment grounds. Mot.15–19. Davis's First Amendment claim pertains to the Supreme Court's decision in *Dawson*. Mot.15–17. There, during the punishment phase of a death penalty case, the prosecution introduced evidence of Dawson's association in the Aryan Brotherhood, including tattoos on his body that demonstrated his affiliation with that group. *Dawson*, 503 U.S. at 161–63. The Supreme Court held that the admission of evidence of

Dawson's membership in the Aryan Brotherhood violated his First Amendment rights. *Id.* at 167. The Court concluded that "the Constitution does not erect a per se barrier" to evidence of beliefs and associations protected by the First Amendment. *Id.* at 165. But because the evidence presented did not show that the Aryan Brotherhood had actually been involved in criminal activity, such as drugs and violent behavior, or that the evidence was tied to the murder of Dawson's victim, it was not relevant to demonstrate any aggravating factors. *Id.* at 165–67. Nonetheless, the Court made it clear that if the evidence was material to the punishment proceedings, "we would have a much different case." *Id.* at 165. Indeed, the Court stated that "[i]n many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.* at 166.

Subsequently, in *Fuller v. Johnson*, the Fifth Circuit faced a similar set of facts as the *Dawson* Court. 114 F.3d 491 (5th Cir. 1997). Fuller was found guilty of capital murder and, at the punishment phase of the trial, the prosecution introduced evidence that Fuller belonged to the Aryan Brotherhood. *Id.* at 495. Relying on *Dawson*, the Fifth Circuit found that Fuller's association with the Aryan Brotherhood was relevant because

the State also introduced evidence "that Fuller was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Id.* at 498. Because the admission of the evidence was relevant to future dangerousness, Fuller's First Amendment rights were not violated. *Id.*

Consequently, during punishment proceedings in a capital trial, the admission of evidence that otherwise is protected under the First Amendment is not unconstitutional if the evidence is relevant to punishment. It is enough if a defendant's beliefs and associations are "sufficiently related to the issues at sentencing." *Boyle v. Johnson*, 93 F.3d 180, 183–84 (5th Cir. 1996). Here, the evidence in question was relevant to future dangerousness. Davis's writings contained Satanic imagery and references, including lists of Satanic rules, statements and sins; one drawing from Davis showed a woman bound and gagged, and another showed a woman with a slashed throat; other writings revealed Davis pledging his allegiance to the Church of Satan and that he was a "blood sorcerer" who had taken up "vampirism"; Davis had an inverted pentagram on his chest; per Haley, *The Satanic Bible* instructed that a person who had "unjustly wronged" a Satanist was an appropriate

subject for human sacrifice; and Haley said that the "Eleven Satanic Rules of the Earth" permits a Satanist to treat an annoying person cruelly and potentially "destroy" that individual, which means to cause the person's death. ROA.7058–59. Also, the defense's expert Melton conceded that some forms of Satanism engage in destruction and that some people have been killed "in the name of [S]atanism." ROA.7060, 15472–73. Considering this evidence and the fact that Davis's crime involved a brutal murder of a young woman, the evidence was relevant. The state court reasonably found that there was no First Amendment violation.

Contrary to Davis's reading of the case, *Dawson* contains no requirement that the prosecution must show the Church of Satan *itself* had committed or officially endorsed violent or illegal acts. Melton acknowledged the Church of Satan itself was small, but there could be other followers of Satanism not officially connected to the church and some of them could read the texts literally. ROA.15473–74. The evidence showed followers of Satanism and its associated texts had engaged in violence. ROA.4610, 12–13, 15368, 15371–74, 15473.

Davis's argument misinterprets *Dawson*. Prior to the penalty phase in *Dawson*, the prosecution claimed it would present evidence tying Dawson to a gang associated with drugs, violence, and murder. 503 U.S. at 165. But when the evidence was finally presented, the prosecution only showed that "an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood." *Id.* The Court concluded that "the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id.* The Court also pointed out that "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim," and racism was irrelevant because Dawson's victim was white. *Id.* at 166. But the Court clearly left open the door to such evidence, stating:

> In many cases . . . associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that *endorses* the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. *Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances.* . . . Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on

Dawson's part, but on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible.

*Id.* at 166–67 (emphases added). Davis appears to narrowly construe *Dawson* to hold that the group to which a defendant belongs must itself be tied not only to violence but to the violence that occurred in *his* case, i.e., the murder of Medina. *Dawson* only held that this element was missing in Dawson's case, not that it is required. To the contrary, the Court clarified that "[o]ther evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances." *Id.* at 166. The fact that Davis adopted Satanism after he murdered Medina is immaterial. The State presented concrete evidence of Davis's preoccupation with violent imagery of women— particularly relevant here given what he did to Medina—and evidence of the association between Satanism and violence that arguably amounts to an "endorsement" and is hardly "abstract." Such specific aggravating evidence was missing in *Dawson*, which is why the Court found a constitutional violation. Davis also ignores that the *Dawson* Court found that the Aryan-Brotherhood evidence was not used to rebut any mitigating evidence Dawson offered, *id.* at 167–68, whereas the CCA

found that the State's evidence was relevant to rebut the defense's case that Davis had changed while in prison. ROA.4614–15.

Davis's claim that allowing evidence of Satanism in this case evidence sets a dangerous precedent for the free exercise of religion and freedom of association is also misplaced. Mot.18–20. Showing Davis's association with Satanism and its texts, along with his *own* accompanying preoccupation with violent imagery of women is nothing like arguing someone might be a future danger merely because they practice the same religion as some other person who committed a violent act in the past. And again, as the Supreme Court recognized, the Constitution does not create a per se bar to evidence of beliefs and associations protected by the First Amendment. *Dawson*, 503 U.S. at 165. The question is whether an individual possesses beliefs that are relevant to the case, like beliefs or practices that could make them a future danger, and that is an issue a jury can decide without chilling the lawful exercise of religion or freedom of association. Accordingly, reasonable jurists would not debate the district court's conclusion that the state court reasonably rejected Davis's claim.

**C. Reasonable jurists would not debate whether the admission of the Satanism evidence violated the Eighth Amendment or due process.**

As shown above, the Constitution allows for the evidence of otherwise protected religious beliefs and practices in criminal cases. *See supra*, Section I.B. Indeed, in *Dawson*, the Supreme Court rejected Dawson's argument, *see* Mot.20–21, based on *Zant v. Stephens*, 462 U.S. 862 (1983), that the Constitution forbids evidence of beliefs or activities protected by the First Amendment. *Dawson*, 503 U.S. at 164–65. By meeting the *Dawson* test, evidence of Davis's involvement with Satanism was not constitutionally foreclosed, so his Eighth Amendment claim also fails.

Davis also raises a due process claim. Mot.20–21. Davis's due process claim also fails because he does not show the admission of the Satanism evidence was so unduly prejudicial it rendered his trial fundamentally unfair. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (noting sentencing evidence may be so unduly prejudicial it renders the trial fundamentally unfair). As explained below, even if there was constitutional error, any error in this case was harmless and did not render Davis's trial fundamentally unfair. *See infra*, Section I.D.

## D. Reasonable jurists would not debate that the district court's determination that any error was harmless.

Next, Davis challenges the district court's determination that any error was harmless. Mot.21–26. Davis fails show the district's court's determination was debatable, especially when keeping AEDPA's deferential standard in mind. *Barrientes,* 221 F.3d at 772.

Davis cannot show a debatable claim of prejudice when considering AEDPA's requirements and *Brown*, 596 U.S. at 122, 134–37. First, Davis must meet the test from *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38 (1993). Under *Brecht*, federal habeas relief may not be granted for trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also O'Brien v. Dretke*, 156 F. App'x 724, 737–38 (5th Cir. 2005) (applying *Brecht* to a *Dawson* claim). Second, under *Brown*, Davis must show every reasonable jurist would agree the error was prejudicial. *Brown*, 596 U.S. at 135–36. Davis fails to show a debatable claim that every reasonable jurist would agree would find harm in this case.

Davis first points to the prosecution's references to Satanism during closing arguments. Mot.21. Contrary to Davis's assertions, the State did

not emphasize the issue to any great extent. In fact, the first prosecutor to argue, Mr. Locke, mentioned Satanism only once, ROA.15593, and the second prosecutor, Ms. Hamilton, discussed it more but told the jury she would not ask it to answer the future-dangerousness special issue "yes" based on Davis's artwork or Satanism but on all the evidence presented. ROA.15605. The portions of argument mentioning Satanism amount to a small fraction of the thirty-five pages of argument. ROA.15589–93, 15605–10. The evidence itself was a small part of the overall proceedings. ROA.7060–61. And as shown above, the evidence was admissible under *Dawson. See supra*, Section B. The prosecution arguing that the evidence indicated Davis was a future danger was a reasonable argument based on the evidence, and the jury was free to believe or disbelieve that Davis merely viewed it as symbolic.

Next, Davis takes issue with the district court's consideration of Davis's ability to offer rebuttal evidence and testify in determining there was no harm. Mot.22. Davis fails to show this was an invalid consideration, and this Court has considered such factors as part of the harm analysis. *Story v. Collins*, 920 F.2d 1247, 1255–56 (5th Cir. 1991) ("[petitioner's] attorney had ample opportunity to cross-examine [the

expert] on her testimony; and in light of [the expert's] professional status, education, and experience, [petitioner had] not shown that the admission of [the expert's] testimony rendered his trial fundamentally unfair"). Thus, the ability to challenge allegedly improper evidence is a proper consideration in deciding harm as the adversary process protects against unreliable evidence. *See Barefoot v. Estelle*, 463 U.S. 880, 901 (1983) ("We are unconvinced, however, at least as of now, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.").

Here, as the district court noted, defense counsel "deftly cross-examined Haley," highlighted that he read texts literally, and "established that Haley had never published in the area of Satanism, had interviewed only three Satanists, and was, at best, minimally qualified to give opinions on Satanism or the Church of Satan." ROA.2864. And right after Haley testified, the defense presented its expert, Melton, who countered Haley's testimony by stating the passages in *The Satanic Bible* are not to be taken literally, and the Satanic Rules are non-violent in nature. ROA.7060–61.

Further, when Davis testified at the end of the punishment phase, he was given the opportunity to explain his view of Satanism. He said the Church of Satan advocates against violence, Satan is not involved or worshipped as a deity, and the rituals and practices are symbolic. ROA.15542–43, 15545, 15563.

Given those facts, and the defense's ability to undermine the negative aspects of Satanism, Davis cannot show he suffered any harm, let alone an unfair trial by the admission of the evidence. Davis asserts that the Satanism evidence had a prejudicial effect on the jury's evaluation of his character and morality. Mot.25. But when considering Davis's ability to combat the evidence, combined with the horrific nature of the crime, the "overwhelming" evidence of future dangerousness, and all the other reasons cited by the state habeas court, the Satanism evidence had no substantial and injurious effect on the verdict. *See supra*, Section I.A; ROA.7060–61. Davis fails to make a debatable showing all reasonable jurists would disagree with the CCA's harm finding.

Davis also points to Haley's mention of cutting fingertips while discussing Satanism, Mot.23, but this brief exchange hardly adds any prejudicial value given the brutal facts of this crime. Moreover, absent

the testimony on Satanism, Davis's drawings and writings would have still been admissible and shown his depictions of violence against women. ROA.7058, 7061. If anything, the testimony from Melton and Davis about Satanism helped explain Davis's drawings depicting violence against women as only symbolic.

Davis cites to various cases to support his argument that the admission of the Satanism evidence was prejudicial. Mot.23–26. Because this is an AEDPA case and Davis must overcome § 2254(d)(1), Davis has to identify how the CCA's decision was contrary to clearly established Supreme Court precedent. Davis's citation to state court cases and cases from lower-level federal courts do not suffice. *See, e.g., Brown v. Davenport*, 596 U.S. 118, 136 (2022) ("It is not enough that the state-court decision offends lower federal court precedents."). Further, Davis fails to identify any case that addresses a capital sentencing proceeding, which as the Supreme Court recognized in *Dawson*, allows for consideration of a wide range or relevant material, including things like racial intolerance or subversive advocacy. *Dawson*, 503 U.S. at 164. That certain evidence might have been unduly prejudicial or harmful at the guilt stage in

particular cases is not evidence such evidence is not allowed where relevant during sentencing.

### E. Reasonable jurists would not debate the district court's application of § 2254(d).

Davis offers additional points to support his application for a COA. Mot.26–27. Regarding his claims that there was no evidence the Church of Satan itself committed or endorsed violence or illegal acts, they lack merit for the reasons addressed above. *See supra*, Section I.B.

As for his contention that the CCA overlooked his related due process and Eighth Amendment claims, it is also without merit. Indeed, the CCA was not required to specifically address every jot of evidence or argument that Davis raised. *Coleman v. Thompson*, 501 U.S. 722, 739 (1991) ("[W]e have no power to tell state courts how they must write their opinions."); *see also Ex parte Graves*, 70 S.W.3d 103, 120 n.3 (Tex. Crim. App. 2002) (Price, J., dissenting) ("we are not required to write an opinion explaining the reason or reasons we deny relief on applications of habeas corpus"). State courts are tasked with reviewing scores of appeals and habeas applications and their "[o]pinion-writing practices" are influenced by considerations other than avoiding scrutiny in federal court. *Richter*, 562 U.S. at 99. Indeed, "there are instances in which a state court may

simply regard a claim as too insubstantial to merit discussion." *Johnson v. Williams*, 568 U.S. 289, 299–300 (2013). As this Court recently noted, given the burdensome caseloads of state appellate courts, they need not discuss every single claim to obtain AEDPA deference, especially fleeting references to constitutional provisions or decisions. *Jimenez v. Guerrero*, 133 F.4th 483, 489 (5th Cir. 2025) (citing *Dunn v. Reeves*, 594 U.S. 731, 743 (2021)). The fact that the state court did not specifically respond to Davis's Eighth Amendment and due process claims is not surprising nor does it undermine its decision, especially when *Dawson* allows for the type of evidence at issue. *Dawson*, 503 U.S. at 164–67. Davis fails to show the CCA did not dispose of his related claims with its *Dawson* analysis. Davis's pure speculation that the CCA inadvertently overlooked his claims is insufficient to evade AEDPA deference. *Jimenez*, 133 F.4th at 489. In any event, Davis fails to show the state habeas court's harmless error analysis and reasoning would not also apply to his due process and Eighth Amendment claims. Thus, Davis fails to show any debatable claim as to whether the district court properly applied AEDPA deference.

Davis's request for a remand on those claims also is meritless given that the CCA (or the district court) need not specifically address the

claims at all, especially after finding the evidence constitutional under *Dawson. See Williams*, 568 U.S. at 299–300; Mot.28. Further, Davis fails to demonstrate any need for a remand given the CCA's harmless error analysis on state habeas review.

## II. The District Court's Rejection of Davis's Ineffective Assistance Claim Is Not Debatable.

Davis asks for a COA on his claim that trial counsel rendered ineffective assistance during his resentencing by failing to properly investigate and present mitigating evidence. Mot.28–53. But no reasonable jurist would debate the district court's rejection of Davis's plainly meritless claim. Therefore, this Court should deny a COA.

### A. Standard of review

Claims of ineffective assistance of counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Davis's claim that he was denied constitutionally effective assistance requires him to affirmatively prove counsel rendered deficient performance and their actions resulted in actual prejudice. *Id*. A failure to prove either deficient performance or prejudice will defeat an ineffectiveness claim. *Id*.

In applying AEDPA deference to an ineffectiveness claim, the "pivotal question is whether the state court's application of the

*Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard[,]" because "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Satisfying *Strickland*'s highly deferential standard is no small task, and "[e]stablishing that a state court's application of *Strickland* was unreasonable under [28 U.S.C.] § 2254(d) is all the more difficult." *Id.* at 105. Indeed, this Court "owe[s] deference to both [Davis's] counsel *and* the state court[,]" and may only grant relief if counsel "took an approach that no competent lawyer would have chosen." *Reeves*, 594 U.S. at 739 (citing *Burt v. Titlow*, 571 U.S. 12, 23–24 (2013)). "Or, in more concrete terms, a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision." *Id.* at 739–40 (cleaned up). Further, state court decisions should be examined based on the record before the state court at the time a decision was made under *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

## B. Background and state court determination

Davis raised his ineffective assistance claim during state habeas proceedings and the court rejected it with extensive findings and conclusions after conducting a hearing. Some of the findings are as follows:

- The record does not "affirmatively demonstrate" that trial counsel failed to investigate and present mitigating evidence, "including evidence of a seriously abusive and dysfunctional family life."

- The record does not "affirmatively demonstrate" that counsel were ineffective for not retaining the services of a mitigation specialist.

- Trial counsel interviewed other potential investigators but chose Sam Streep as the investigator because he had been the investigator for Davis's first trial in 2002, and Macias considered Streep to be an "excellent investigator . . . on par with any mitigation specialist." Further, Davis's claim that counsel failed to select an investigator until just after jury selection was incorrect because Streep had been on the case for a number of years.

- Davis did not attest in any affidavit or at the hearing that trial counsel failed to adequately interview family members, necessary witnesses, or consult with Davis, and any assertion to the contrary is not credible.

- The court found credible [trial counsel Ruben] Morales's testimony that he had a lot of contact with Davis prior to the trial, that he interviewed local family members, including Davis's mother, and that [trial counsel Francisco] Macias interviewed out-of-town witnesses. Also, Morales interviewed

Carol Davis five to fifteen times—although he could not recall the specifics of the conversations—and also spoke to Davis's twin brother Oscar.

- Macias interviewed Davis's grandmother, mother, brother, and cousin as part of the investigation.

- Morales learned that Davis's father had been a "mean drunk," and Davis testified at trial that his father became abusive when he was drunk. Counsel also learned that Davis's father had been verbally and "severely" physically abusive toward him, his siblings, and his mother. For instance, counsel learned that Davis's father had beaten Davis with a belt while he stood in the corner with his pants down. And the record reflects this evidence was presented at trial.

- The record reflects that Davis testified his father was physically abusive, particularly when he drank; that his father would force him and his siblings to strip down and receive "whoopings" on their "bare bottoms with a belt"; that his father "would just be cruel" and slam Davis's and his brother's heads together; that his father once stripped Carl of his clothes and beat him until he was screaming; and that his father once fought him "like a grown man" at age twelve following a wrestling incident.

- TDCJ records admitted at trial documented Davis's home stability to be poor due to the separation of his parents at an early age, and evidence that the family frequently moved was presented.

- There was not credible evidence that Davis was sexually abused by his father. Counsel questioned Davis and his family members "two or three times"—including his mother, grandmother, and uncle—about possible sexual abuse by his father. Although evidence showed the father had been strict, they denied any sexual abuse. Counsel also questioned Carol Davis about whether their father's requirement to strip for

beatings constituted a form a sexual abuse, and Carol said that the purpose was that the beatings would hurt more. Also, Davis testified at trial in lengthy narrative form and had the opportunity to say his father sexually abused him, but he did not. Davis did not provide an affidavit or testify at the evidentiary hearing that his father sexually abused him.

- Dr. Schutte's affidavit stated that Davis previously reported a history of sexual abuse as a child but did not identify the abuser or elaborate on the nature of the abuse, which does not establish that his father sexually abused him.

- Trial counsel were not ineffective for not investigating whether Davis's father had sexually assaulted a female neighbor; Davis never provided any testimony about this matter, and there was no evidence Davis was "fueled" to rape and murder Medina by knowledge of the allegation leveled against his father.

- The record does not affirmatively demonstrate that trial counsel were ineffective for failing to investigate and present evidence that CPS opened an investigation in California and North Carolina because Davis failed to present any evidence about the matter, let alone beneficial evidence.

- Counsel learned during the pretrial investigation that Davis had engaged in the practice of self-mutilation and had attempted suicide.

- Given the family's repeated denials that Davis had been sexually abused by his father, it was reasonable for trial counsel not to pursue an investigation into the father's alleged sexual abuse of Carl.

- Counsel were not ineffective for failing to investigate and present evidence that Davis's father had been supposedly convicted of indecent liberty with a child—not his own child––in North Carolina in 2006. Davis failed to show how evidence

of an indecency crime by his father committed long after Davis had been incarcerated for capital murder would have been admissible at retrial or would have benefitted his mitigation defense.

● The record reflects that counsel's mitigation strategy was to focus on humanizing Davis to the jury so that it would be more difficult to impose a death sentence. But counsel knew there was a strong likelihood Davis would take the stand and ask the jury to impose a death sentence because he expressed his intent to do so, and in fact did say that to the jury. Because Davis vacillated on whether he would do this, counsel had a number of contingency plans in place if Davis followed through with his request. Nonetheless, Davis's decision affected counsel's trial strategy of personal accountability and humanizing Davis.

● Counsel deemed their strategy to be legitimate and consulted with Davis about mitigation strategy. Counsel implored Davis not to take the stand and ask for a death sentence.

● Although counsel Macias stated that he usually takes the defendant's wishes into account when advising on mitigation strategy, he would not decline to conduct a mitigation investigation simply because the defendant dictated it. Macias agreed that an attorney has an obligation to conduct an investigation despite the defendant's wishes. And, Davis's dictates to the contrary, trial counsel conducted an independent investigation here.

● In jail-recorded telephone conversations while Davis was awaiting retrial, Davis said he grew up "spoiled," "didn't really want for anything," lived in nice homes, and went to good schools, which undercuts his allegation that he grew up in a seriously abusive and dysfunctional home. These same conversations indicate Davis hindered or attempted to hinder trial counsel's attempts to locate witnesses by instructing

counsel not to contact witnesses and threatening to file ineffective-assistance claims if they did not abide by his wishes. Thus, Davis may have been reluctant or uncooperative in pursuing a defense that did not focus on or was inconsistent with personal accountability.

- Consistent with counsel's theory, counsel stated during final argument that Davis's life should be spared because he accepted responsibility for his actions, "whereas most people make excuses, blame other people, disclaim responsibility, blame drugs or alcohol, or blame their upbringing." This was a legitimate trial strategy to pursue.

- Evidence mitigation specialist Vince Gonzales claims counsel failed to investigate and present—contact information for other witnesses, CPS records, and school records—was not provided to the habeas court. Thus, there was no way to determine if this evidence would have been beneficial.

- Carol Davis's affidavit is not credible, namely her attestations that she and Davis suffered extreme physical abuse; that she never learned the outcome of Davis's father's court-martial proceedings for alleged sexual assault of a neighbor; that she had little contact with counsel or the defense investigator; and that counsel failed to ask her about Davis's social, family, medical, or psychological history and failed to ask her about verbal, physical and sexual abuse.

- Oscar Davis's affidavit is not credible, specifically his attestations of detailed physical abuse, Davis's suicide attempts, the brevity of counsel's contact with him, that the defense never "delved" into their family history, and that his mother neglected him and Davis due to her alcoholism.

- Any allegation by Davis that his mother neglected him due to alcoholism is not credible.

- Veronica Davis's affidavit is not credible, specifically her attestations that counsel failed to investigate the family history or any history of domestic violence and failed to request various evidence from the family; that her father physically abused Davis; that Davis's twin brother Oscar had attempted suicide; and that aside from a fifteen to twenty-minute meeting with Macias, she did not speak to a member of the defense during their investigation.

- Carl Fuller's affidavit is not credible, specifically his attestations that his father abused his mother in the manner stated; that his father sexually abused him; that members of the defense team only met with him for a total of ten minutes before the first trial; and that he was never questioned about any history of abuse. Further, Carl did not state in his affidavit that he was willing and available to testify about any sexual abuse, and Davis failed to show how evidence that his father sexually abused Carl would have proven his father also sexually abused him or that such evidence would have benefitted his defense.

- After being appointed different attorneys on direct appeal, Davis specifically requested that Morales and Macias continue to represent him on direct appeal, which supports the finding that he was not dissatisfied with their defense strategy regarding mitigation.

- Trial counsel adequately investigated Davis's case prior to retrial, and Davis failed to prove deficient performance.

- "The record reflects that the [S]tate presented extensive evidence in aggravation of death, specifically, the brutal facts of the offense, [Davis's] disciplinary and criminal history, his writings and drawings exhibiting a preoccupation with rape, violence (particularly towards women), and death, and his conversion to Satanism while incarcerated."

- "In his confession and at trial, [Davis] attempted to blame Melissa for her own murder by claiming that she threatened to falsely accuse him of rape."

- "The record reflects that evidence of [Davis's] abusive childhood was admitted before (and rejected by) the jury."

- "This Court finds that the omitted mitigation evidence, if believed, was not that strong."

- "The record does not affirmatively demonstrate a reasonable probability that the complained-of omitted mitigation evidence would have tipped the scale in [Davis's] favor."

ROA.7062–81. The state court then concluded that trial counsel were not ineffective. ROA.7095–96.

After finding that twenty-five of Davis's exhibits were barred because they not considered by the state courts, the district court ruled that the CCA's rejection of the claim was not unreasonable. ROA.2929–34. It reasoned that the CCA reasonably found that portions of the offered evidence were untrue, not credible, overstated, or already known to the jury. ROA.2931–32. The court noted that Davis testified and could have expanded on his allegations, but doing so would have created an inconsistency with the trial strategy of taking personal responsibility. ROA.2932. Further, Davis asked the jury for a death sentence. ROA.2932–33. Given the horrific facts of the crime, the additional

evidence was unlikely to make a difference. ROA.2933–34. Ultimately, Davis failed to meet his burden under AEDPA. ROA.2934.

## C. Reasonable jurists would not debate the district court's denial of his ineffective assistance claim.

Davis's first argument about the district court's denial of his claim is that district court based its decision largely on the fact he testified and could have expanded on his allegations. Mot.39. That ignores the other reasoning about the veracity of the information offered and the conflict with counsel's strategy. ROA. 2931–32. Nowhere does the district court suggest that Davis's decision to testify relieved counsel of the responsibility to investigate. Rather, his decision to testify has bearing on the credibility of his current claims and how it impacted counsel's trial strategy. Indeed, trial counsel were forced to shape a trial strategy around Davis's testimony, including the possibility that he would ask for the death penalty, which he did. ROA.7074–76. The state habeas findings make clear that despite Davis's dictates to the contrary, counsel conducted an independent mitigation investigation, and trial counsel would not decline to do one merely because those were the client's wishes. ROA.7074–76. In fact, his attorney stated that although he represented Davis at his original trial, he conducted another investigation for the

retrial because some of Davis's circumstances had changed. ROA.7065. Thus, contrary to Davis's assertion, counsel did not abandon a mitigation investigation based on Davis's decision to testify about the aggravating evidence. Mot.39–40. Further, that Davis now presents evidence that was cumulative of the testimony at trial or found to be overstated, untrue, or incredible does not show his counsel's investigation was deficient. ROA.2931–32.

In addition to rejecting Davis's claim that counsel failed to conduct an adequate investigation, ROA.7062–80, 7095, the state habeas court noted that Davis tried to limit or hinder what mitigation evidence the defense could present. ROA.7076. Indeed, in jail phone calls, Davis indicated he wanted a new death sentence over life in prison without parole, so he instructed counsel not to contact witnesses and even threatened to file an ineffective assistance claim. ROA.6587, 6601, 6612–13, 6615. The limits Davis imposed preclude a finding of deficiency because a criminal defendant cannot instruct an attorney to act according to his wishes and then later claim that action was constitutionally deficient. *Schriro v. Landrigan*, 550 U.S. 465, 476–78 (2007) (not objectively unreasonable to find counsel not ineffective for failing to

present mitigating evidence because the defendant informed the trial court that he instructed his lawyer not to present mitigating evidence from his mother and the defendant repeatedly interrupted his trial counsel when counsel attempted to offer mitigating evidence); *Ramirez v. Davis*, 780 F. App'x 110, 120 (5th Cir. 2019) ("[O]ur caselaw makes clear 'that when a defendant blocks his attorney's efforts to defend him . . . he cannot later claim ineffective assistance of counsel.'" (quoting *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004))); *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can Autry block his lawyer's efforts and later claim the resulting performance was constitutionally deficient.").

As to prejudice, given the horrific nature of the crime and Davis's request for a death sentence, none of the evidence he offers shows a debatable claim when considered under AEDPA's deferential standard. Davis points to the fact that the jury deliberated for two days and once asked for Davis's testimony concerning his relationship with his father. Mot.43. There mere fact the jury took a few days to consider a life-and-death decision does not show a reasonable probability Davis's new evidence would have made a difference. Rather, it shows it the jury was

careful and took its time. And, as the district court noted, the allegations on sexual abuse were found to be untrue, and the jury was aware of physical abuse by Davis's father. ROA.2931–32. Further, much of his evidence was found to be overstated, unsupported by the record, and not credible. ROA.2922–25. Davis also asked for a death sentence and the crime was brutal. ROA.2932–34. When all these factors are considered, Davis fails to show a debatable ineffective assistance claim.

Davis's arguments take individual components of the district court's decision and analyzes them separately, but he shows no reason the claim is debatable given the cumulative impact of the horrific facts, his request for a death sentence, and the problems with the evidence presented. For instance, Davis begins by focusing on Davis's request for a death sentence and tries to distinguish the cases cited. Mot.44–45. But regardless of the fact the defense offered other mitigation evidence in this case, the fact remains Davis's request for a death sentence is a powerful factor here, especially when combined with the other circumstances of the case. *See Luna v. Lumpkin*, 832 F. App'x 849, 853 (5th Cir. 2020) (finding petitioner not prejudiced by counsel's failure to present mitigating evidence where petitioner testified and "told the jury he could

not rehabilitate, that the death penalty was appropriate, and that no mitigating evidence existed to compel a contrary conclusion"); *Landrigan*, 550 U.S. at 475–481 (rejecting an ineffective assistance claim where the defendant testified no mitigating evidence existed, instructed his attorney to present none, and told the sentencing court, "I think if you want to give me the death penalty, just bring it right on. I'm ready for it."). Indeed, in *Luna*, this Court stated: "That unusual feature of this case alone is likely enough to require us to defer to the state court's 'no prejudice' determination." 832 F. App'x at 853.

Davis goes on to assert that the district court applied a causal-nexus test to his mitigating evidence that contradicted Supreme Court precedent. Mot.45–46. But the district court did not apply such a test, it just recognized that when Davis testified, he did blame his circumstances on his family background and he himself asked for a death sentence. ROA.2932. Considering those facts in adjudicating Davis's ineffective sentence claims was not improper.

Moreover, the district court did not hold that the defense's personal responsibility strategy precluded a finding of prejudice has counsel conducted a constitutionally adequate mitigation investigation. Mot.46–

47; ROA.2932. But nothing cited by Davis prohibits the district court from considering the inconsistency between the trial strategy of personal responsibility and his current claim as one factor in the prejudice analysis, especially where the state habeas court had already found the offered mitigation evidence was unsupported and overstated and counsel conducted an adequate investigation. ROA.7062–81.

So too, the district court did not place undue weight on the facts of the crime and conclude the horrific facts on their own always defeat a prejudice argument. Mot.47. Rather, it clearly noted the facts of Davis's case, when weighed against the offered mitigation evidence, would not have persuaded a jury to return a life sentence in this case. ROA.2933.

Davis points to other cases where this Court has granted COA on ineffective assistance claims concerning mitigation, but none involve the mix of factors that this case has. Mot.47–49. Again, this case involves not only horrific facts, but a request by Davis for a death sentence, as well as evidence the CCA found was unsupported and incredible. ROA.2931–34. Thus, a COA is not warranted here. *See United States v. Hall*, 455 F.3d 508, 519–20 (5th Cir. 2006) (holding that where there are critical

distinctions between a prior grant of COA and the case on appeal, a COA is not warranted).

Davis then argues that reasonable jurists could debate whether the CCA's decision was contrary to 28 U.S.C. § 2254(d)(1) for all the reasons above. Mot.49–50. These arguments are meritless for the reasons already discussed.

Finally, Davis argues reasonable jurists could debate whether the state court decision was based on an unreasonable determination of the facts. Mot.50–52. First, he claims the district court erred by "conflating the requirements of §2254(d)(2) and §2254(e)(1)" because the Supreme Court has not decided the relationship between the statutes. Mot.50–51. That does not show error. To the contrary, it is actually in line with the prior decisions of this Court. *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023) ("Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)."). But no matter what provision one applies, Davis fails to show a debatable claim.

Contrary to Davis's assertion, just because counsel was aware of particular allegations or facts does not establish that the allegations he presented in his state habeas application were accurate or credible. For one, the state court considered conflicting affidavits and testimony when making its credibility determinations and found counsel was credible, while members of Davis's family were not. ROA.7062, 7064–80. "A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." *Kinsel v. Cain*, 647 F.3d 265, 270 n.17 (5th Cir. 2011) (quotation marks and citation omitted). Indeed, the state habeas court found counsel had asked Davis and his family members about sexual abuse and only the incident about an older woman was shared with him. ROA.7069–70, 7072–73. Meanwhile, affidavits from Davis's family offered during the state habeas proceedings were found not credible. ROA.7077–80. Further, although Davis offered speculative statements of how alleged evidence may have benefited him, he did not actually provide any evidence to the state court. ROA.7077. And, as the district noted, even though Davis had previously mentioned sexual abuse when interviewed, that does not establish it

actually occurred. ROA.7070–71. Accordingly, the CCA found counsel adequately investigated the case prior to the punishment retrial. ROA7080. In any event, the CCA found the allegations, even if believed, did not show prejudice. ROA.7081. Davis fails to prove any debatable claim that the state court's factual findings were unreasonable based on the state court record, or that there is clear and convincing evidence that overcomes the presumption of correctness under § 2254(e)(1).

Second, Davis appears to make the argument that the state court unreasonably found the defense's investigator had been on the case for years because there was no investigation between the first trial and the punishment retrial. Mot.52. Davis fails to show how investigation efforts on the first trial should not be considered when examining whether counsel provided ineffective assistance in the mitigation investigation.

Ultimately, because Davis failed to overcome the doubly deferential standard afforded to trial counsel's strategic decisions and the state court's rejection of this claim, and he fails to show the district court's rejection of the claim is debatable. Thus, Davis fails to show a debatable claim that warrants a COA.

# CONCLUSION

The Director requests that Davis's motion for a COA be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General
Texas Bar No. 24067554
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email:  craig.cosper@oag.texas.gov

*Attorneys for Respondent–Appellee*

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing Response in Opposition to Application for Certificate of Appealability has been served electronically to the following counsel for Petitioner-Appellant, on this the 30th day of April, 2025:

Todd G. Scher
1722 Sheridan Street, Suite 346
Hollywood, FL 33020

Richard Dennis Esper
801 N. El Paso Street
El Paso, TX 79902

Joe A. Spencer, Jr.
Law Office of Joe A. Spencer
1009 Montana Avenue
El Paso, TX 79902

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,518 words; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS

I do hereby certify that: (1) all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General