## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### IRVING ALVIN DAVIS
*Petitioner-Appellant,*

v.

### ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,
*Respondent-Appellee*

**On Appeal from the United States District Court, Western District of Texas, El Paso Division, Case No. 3:14-cv-00121-KC**

## REPLY TO RESPONSE TO CORRECTED MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT

TODD G. SCHER
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
*TScher@msn.com*

JOE A. SPENCER, JR.
Attorney at Law
1009 Montana Avenue
El Paso, TX 79902
Tel: (915) 532-5562
*joe@joespencerlaw.com*

RICHARD D. ESPER
Attorney at Law
801 North El Paso St., Ste. 225
El Paso, TX 79902
Tel: (915) 544-3132
*Richardesperlaw@yahoo.com*

# TABLE OF CONTENTS

Table of Contents ……………………………………………………  i

Table of Authorities ……………………………………………  ii

Argument in Reply to Standard of Review ………………………  1

Argument I:  Reasonable Jurists Could Debate Whether Davis's Constitutional Rights Were Violated by the Admission of Evidence of His Religious Affiliation At His Resentencing Proceeding ……………………………………  2

     A.  First Amendment arguments …………………………………..  3

     B.  Eighth Amendment and Due Process arguments ……………...  10

     C.  Harmless Error ………………………………………………...  11

Argument II:  Reasonable Jurists Could Debate Whether Davis's Resentencing Counsel Were Ineffective …………………………………………..  15

     A.  Deficient Performance ………………………………………  16

     B.  Prejudice …………………………………………………...  22

Conclusion …………………………………………………………  24

Certificate of Service ………………………………………………  26

Certificate of Compliance ……………………………………………  26

**TABLE OF AUTHORITIES**

*Andrew v. White,*
 145 S.Ct. 75 (2025) …………………………………………..  4

*Autry v. McKaskle,*
 727 F. 2d 358 (5th Cir. 1984)……………………………….  19

*Barefoot v. Estelle,*
 463 U.S. 880 (1983)…………………………………………...  13

*Barrientes v. Johnson,*
 221 F. 3d 741 (5th Cir. 2000) …………………………………  1

*Boyle v. Johnson,*
 93 F. 3d 180 (5th Cir. 1996)………………………………...  6

*Blystone v. Pennsylvania,*
 494 U.S. 299 (1990)………………………………………….  15

*Brecht v. Abrahamson,*
 507 U.S. 619 (1993)………………………………………….  11

*Brewer v. Aiken,*
 935 F. 2d 850 (7th Cir. 1991) …………………………………  21

*Brown v. Davenport,*
 596 U.S. 118 (2022)………………………………………….  11

*Davis v. State*,
 329 S.W.3d 798 (Tex. Crim. App. 2010)………………………..  9

*Dawson v. Delaware,*
 503 U.S. 159 (1992) …………………………………………..  3

*Escamilla v. Stephens,*
 749 F. 3d 380 (5th Cir. 2014)………………………………..  24

*Fowler v. United States,*
 563 U.S. 668 (2011)…………………………………………  1

*Fuller v. Johnson,*
     114 F. 3d 491 (5th Cir. 1997) …………………………………….     6

*Hoffman v. Westcott,*
     145 S.Ct. 797 (2025) (Mem.) …………………………………     2

*In re Johnson,*
     935 F. 3d 284 (5th Cir. 2019)……………………………………….     1

*Johnson v. Lumpkin,*
     74 F. 4th 334 (5th Cir. 2023)………………………………………...     1

*Kenley v. Armontrout,*
     937 F. 2d 1298 (8th Cir. 1991) ………………………………….     22

*Kimmelman v. Morrison,*
     477 U.S. 365 (1986)………………………………………………..     22

*Lockett v. Ohio,*
     438 U.S. 536 (1978) ……………………………………………..     16

*Luna v. Davis,*
     793 F. App'x 229 (5th Cir. 2019)…………………………………     22

*Luna v. Lumpkin,*
     832 F. App'x 849 (5th Cir. 2020)…………………………………     22

*Miller-El v. Cockrell,*
     537 U.S. 322 (2003)………………………………………………...     11

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
     584 U.S. 617 (2018) ……………………………………………..     2

*O'Neal v. Delo,*
     44 F. 3d 655 (8th Cir.),
          *cert. denied,* 516 U.S. 843 (1995) …………………………     7

*Pippin v. Dretke,*
     434 F. 3d 782 (5th Cir. 2005)…………………………………….     1

*Ramirez v. Davis,*
    780 F. Appx. 110 (5th Cir. 2019) …………………………... 19

*Ruiz v. Davis,*
    850 F. 3d 225 (5th Cir. 2017)……………………………… 1

*Schriro v. Landrigan,*
    550 U.S. 465 (2007) ……………………………………….. 19

*Slack v. McDaniel,*
    529 U.S. 473 (2000)………………………………………... 11

*Stevens v. Zant,*
    968 F. 2d 1076 (11th Cir. 1992) …………………………… 21

*Story v. Collins,*
    920 F. 3d 1247 (5th Cir. 1991)…………………………… 13

*Strickland v. Washington,*
    466 U.S. 668 (1984)………………………………………… 17

*Wiggins v. Smith,*
    539 U.S. 510 (2003)………………………………………… 18

*Williams v. Stephens,*
    761 F. 3d 561 (5th Cir. 2014)……………………………. 1

*Woodson v. North Carolina,*
    428 U.S. 280 (1976)………………………………………... 16

**ARGUMENT IN REPLY TO STANDARD OF REVIEW**

As will be addressed *infra*, the Director's arguments as to Davis's individual claims more resemble those appropriate to full merits briefing. Although it is true that "a COA determination is made with the [] deferential AEDPA scheme in mind" (Resp. at 18) (citing *Barrientes v. Johnson*, 221 F.3d 741, 772 (5ᵗʰ Cir. 2000)), this Court is precluded from resolving the ultimate merits of Davis's claim at this stage. *See Ruiz v. Davis*, 850 F.3d 225, 229 (5ᵗʰ Cir. 2017) ("We do not resolve the ultimate merits of Ruiz's claim; that road is forbidden to us on a motion for a COA"); *In re Johnson*, 935 F.3d 284, 290 (5ᵗʰ Cir. 2019) (on a COA motion, court is not authorized to "delve too deeply into the underlying merits of a claim"). Additionally, because this is a capital case, "'any doubt as to whether a COA should issue . . . must be resolved in favor of [Davis]," *Williams v. Stephens,* 761 F.3d 561, 566 (5ᵗʰ Cir. 2014) (quoting *Pippin v. Dretke*, 434 F.3d 782, 787 (5ᵗʰ Cir. 2005)), and because neither of the issues on which Davis is seeking a COA is "foreclosed by on-point binding precedent that 'fits like a glove,'" *Johnson v. Lumpkin*, 74 F. 4ᵗʰ 334, 341 (5ᵗʰ Cir. 2023) (quoting *Fowler v. United States*, 563 U.S. 668, 672 (2011)), a COA should issue on both issues Davis raises.

**ARGUMENT I: REASONABLE JURISTS COULD DEBATE WHETHER DAVIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE ADMISSION OF EVIDENCE OF HIS RELIGIOUS AFFILIATION AT HIS RESENTENCING PROCEEDING.**

> *"Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a refuge for religious freedom."*[1]

At Davis's resentencing trial, the prosecution introduced evidence that the religion of Satanism promoted violence and that because Davis then identified himself as believing in Satanism and belonging to a church affiliated with it, his religious affiliation was evidence of his future dangerousness for which the jury should sentence him to death. Indeed, the prosecution devoted more than a third of its testimony (other than that offered to prove the crime itself) to establishing that Davis was a Satanist. The prosecution did so without any evidence or argument that Davis was inspired or motivated by Satanism to commit the murder for which he was convicted, and in spite of the fact that **he was not a Satanist when he committed the offense.** Moreover, the prosecution argued that a death sentence was appropriate (and that Davis posed a future danger) on account of Davis's Satanic beliefs, even though it utterly failed to show that he had at any point belonged to a

---

[1] *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617, 649 (2018) (Gorsuch, J., concurring). *See also Hoffman v. Westcott*, 145 S.Ct. 797 (2025) (Mem.) (Gorsuch, J., dissenting from denial of certiorari) (discussing the "fundamental principle that courts have 'no license to declare . . . whether an adherent has 'correctly perceived' the commands of his religion'") (citations omitted).

faction of Satanism that actually practiced or espoused violence. The Director disputes none of these facts.

## A.     First Amendment arguments

The Director's contention that there was no First Amendment violation in this case essentially boils down to an argument that *Dawson v. Delaware*, 503 U.S. 159 (1992), does not say what it says. This is reason enough for a COA to issue. In *Dawson*, the Supreme Court held that admission of evidence of Dawson's membership in the Aryan Brotherhood violated his First Amendment rights "[b]ecause *the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts*, [and] the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Dawson*, 504 U.S. at 166 (emphasis added).

Despite this clear pronouncement, the Director seemingly insinuates that *Dawson* is not clearly established law on this issue, boldly asserting that "*Dawson* contains no requirement that the prosecution must show the Church of Satan itself had committed or officially endorsed violent or illegal acts" (Resp. at 25). The Director's argument only serves to highlight that Davis has satisfied the COA standard and is entitled to full appellate review of his claim. Jurists of reason would most certainly debate whether *Dawson* permits evidence of a defendant's membership in a group, even where there is no evidence that the group "had

committed any unlawful or violent acts, or had even endorsed such acts," and where it is not otherwise relevant to any other sentencing issue. *Dawson*, 504 U.S. at 166. *Accord Andrew v. White*, 145 S.Ct. 75, 82 (2025) ("To the extent that the Court of Appeals thought itself constrained by AEDPA to limit *Payne* to its facts, it was mistaken. General legal principles can constitute clearly established law for purposes of AEDPA as long as they are holdings of this Court"). The Director's argument is not only debatable but is also simply incorrect. [2]

The Director's argument that Davis's reliance on *Dawson* is misplaced is itself misplaced (Resp. at 26, 34). For example, the Director contends that no First Amendment violation can ever occur if the evidence is relevant to sentencing and that *Dawson* merely held that general evidence of the defendant's association with a purportedly violent group or religious group is sufficient without any evidence tying that evidence to the crime itself (Resp. at 27). But *Dawson* rejected the argument, pressed here by the Director, that a defendant's membership in a racist gang was relevant to assessment of his individual character, and it spotlighted the same error that occurred here in presenting evidence of other offshoots to invite the jury to infer that the beliefs of the defendant's group are identical. *Id*. at 163. And, just as in *Dawson*, the affiliation evidence in Davis's case was not tied in any way to the

---

[2]Notably, the Director made no such an argument in the district court (ROA.2708-14). Rather, he acknowledged that "Davis's First Amendment claim pertains to the Supreme Court's decision in *Dawson*" (ROA.2708).

murder, as Davis did not adopt it until years after the crime. *Id*. at 166. In *Dawson*, the Supreme Court noted that "one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible," *id*. at 167, and the same observation applies in Davis's case.

The Director misconstrues Davis's reading of *Dawson* as requiring evidence both that the group to which the defendant belongs commits or endorses violence, *and* that the defendant's membership in the group has a specific connection to the crime (Resp. at 27). But Davis made no such argument, and *Dawson* makes clear that this is a disjunctive test. The *Dawson* Court intimated that even if a group does not conduct or endorse violent activities, a defendant's membership in that group might still be relevant to sentencing if it is "tied in any way" to the offense. *Dawson*, 503 U.S. at 166. Since there was no such link in *Dawson*, evidence of the defendant's constitutionally protected association was introduced in that case in violation of the First Amendment. Here, as in *Dawson*, the Director does not point to any evidence that Davis's membership in the Church of Satan had any connection to the crime; in fact he concedes it did not.[3] Thus, the Director has failed to show that the Church of Satan evidence was admissible under either prong of *Dawson*.

---

[3] The Director has contended that "[t]he fact that Davis adopted Satanism after he murdered Medina is *immaterial*" (ROA.2714) (emphasis added). *See also* Resp. at 27.

The Director suggests that Davis's case is more like *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997), where this Court found no First Amendment violation, rather than like *Dawson*. (Resp. at 23-24). In *Fuller*, the prosecution introduced evidence that Fuller was a member of a gang, and that the gang he was a member of "routinely dealt in violence." *Id*. at 497. In Davis's case, the Director has acknowledged that Davis was not a member of a gang (ROA.2714), and, unlike in *Fuller*, in Davis's case the prosecution introduced no evidence that members of the specific religious offshoot of Satanism that Davis had joined had engaged in violence. As the Director acknowledges, the prosecution in *Fuller* "introduced evidence that Fuller was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Fuller*, 114 F.3d at 498. The Director does not deny that there is zero evidence in this case that the Church of Satan "committed unlawful or violent acts," let alone endorsed such acts. Accordingly, the Director's reliance on *Fuller* is unavailing as it is hardly precedent that "fits like a glove," *Johnson,* 74 F. 4th at 341, in order to justify denial of a COA.

The Director also relies on *Boyle v. Johnson*, 93 F.3d 180, 183–84 (5th Cir. 1996), as authority to deny a COA because, in the Director's view, it is enough if a defendant's association is "sufficiently related to the issues at sentencing." (Resp. at 24). However, *Boyle* is inapposite and its application to Davis's case is more than

debatable. At the outset, *Boyle* did not involve the type of highly prejudicial evidence of "Satanism" that the prosecution presented at Davis's sentencing but rather "evidence of [Boyle's] sexual habits and drawings." *Id*. at 183. Applying *Dawson*, the *Boyle* court found that evidence about Boyle's "obsess[ion] with sex" was relevant because he was "convicted for a murder which had a sexual component." *Id*. at 185. But in Davis's case, other than baldly declaring that "the evidence in question was relevant to future dangerousness" (Resp. at 24), the Director is unable to point to *any* evidence that Davis's temporary, post-offense membership in the Church of Satan was relevant to *any* issue at sentencing. Indeed, the Court in *Boyle* found that *Dawson* was distinguishable because there was a connection between evidence of Boyle's beliefs and the crime committed, a connection that was lacking in *Dawson* and is also indisputably lacking here. *Boyle,* 93 F.3d at 184-185. *Compare O'Neal v. Delo*, 44 F. 3d 655, 661 (8th Cir.) (finding evidence that defendant was a member of a racist group relevant and therefore admissible under Dawsin where "racial animus as a motive for [the] murder was an issue in the trial"), *cert. denied*, 516 U.S. 843 (1995)). *Boyle* hardly supports a determination that Davis's First Amendment claim is not worthy of encouragement on appeal by full merits briefing.

Next, the Director attempts to argue that certain drawings made by Davis— which the Director characterizes as depicting "violent imagery of women"—

somehow make Davis's Church of Satan membership more "relevant" to sentencing (Resp. at 24-25). This argument is a red herring based on a misconstruction of the record.

First, the district court did not rely on Davis's drawings as a reason for finding no First Amendment violation. Rather, it found that the TCCA reasonably found no First Amendment violation in light of the "combined evidence of Davis's Church of Satan involvement, Haley's literalist reading of The Satanic Bible, and Melton's concession that people had been killed in the name of Satanism to show that Satanism encouraged its adherents to engage in violence against those who they believed had wronged them" (ROA.2947). Because the district court did not rely on Davis's drawings, they have no bearing on whether reasonable jurists could debate its decision. Accordingly, this Court need not engage with the Director's argument in determining whether to issue a COA.

Second, even if the Director's argument could be considered at this stage, it utterly fails because the Director does not identify any evidence demonstrating a connection between Davis's drawings depicting women and his membership in the Church or Satan.[4] Indeed, the Director acknowledges the difference between these

---

[4] The state court referenced state's exhibits 276, 294-296, and 301 as "violent drawings" of women (ROA.7057). These drawings had no connection to the Church of Satan, and it is reasonably debatable as to whether they depict "violence." Rather, Davis testified that some of the drawings were commissioned by a friend and depicted consensual sexual activities between the friend and the friend's girlfriend

two categories of evidence in arguing that the Satanism evidence was not prejudicial. (Resp. at 33-34, arguing that "absent the testimony on Satanism, Davis's drawings and writings would have still been admissible and shown his depictions of violence against women."). Thus, even if Davis's drawings were properly admitted, they did nothing to demonstrate the relevance of his membership in the Church of Satan.

The Director then argues that the Church of Satan evidence "was relevant to rebut the defense's case that Davis had changed while in prison" (Resp. at 27-28). The district court did not incorporate this reasoning in its decision, so the Director's argument is immaterial to the issuance of a COA. But even if it could be considered, the Director's argument does nothing but underscore the debatability of Davis's claim. On this point, the CCA found that "evidence that appellant became a Satanist while in prison helped to rebut [the] defense argument" that "he's a good person now" and has "been trying to do the right things" since incarcerated. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). In other words, the CCA found Davis's constitutionally protected religious beliefs, based on his membership in a religious group that has no ties to violence, was relevant to show he was not a "good person."

---

(ROA.15558-59); another drawing of a skull and a razor, which symbolized strength, was for a friend's daughter who was into "goth" culture (ROA.15557); and another drawing depicted the lead female singer of a death metal band, based on an actual picture of her wearing "bondage gear" (ROA.15557-58).

Reasonable jurists would surely debate whether such a ruling comports with the First Amendment.

Immediately after signaling approval for a rule allowing evidence of a constitutionally protected association to show that a defendant is not a "good person," the Director dismisses Davis's concern that such a rule would set a dangerous precedent for First Amendment protections (Resp. at 28). Here, the Director once again conflates the evidence of Davis's membership in the Church of Satan with wholly unrelated evidence concerning his purported "preoccupation with violent imagery." *Id*. In doing so, the Director fails to meaningfully engage with Davis's actual argument—that the decisions below unlawfully permit the introduction of a defendant's constitutionally protected religious beliefs, simply because "some people" have committed violence in the name of the same religion.

## B.    Eighth Amendment and Due Process arguments

The Director addresses Davis's Eighth Amendment and Fourteenth Amendment Due Process arguments only in passing (Resp. at 29). He does not deny that the Eighth and Fourteenth Amendments may be implicated by the admission of evidence of a constitutionally protected practice. The Director's arguments concerning harmless error are unconvincing for the reasons set forth in the following section of this Reply, and while he opposes Davis's request for a remand on the

Eighth and Fourteenth Amendment issues, he concedes that neither the TCCA nor the district court specifically addressed them (Resp. at 36-37).

## C. Harmless Error

At the outset, Davis notes that the Director repeatedly argues Davis has failed to satisfy the prejudice/harmlessness standards under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and *Brown v. Davenport*, 596 U.S. 118 (2022) (Resp. at 22, 30, 34). However, this standard applies only when assessing whether a federal habeas petitioner has satisfied §2254(d). A COA should issue if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or if the Court "could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

In arguing that the district court's harmless error analysis is not debatable, the Director mischaracterizes the record and grossly understates the importance of the Satanism evidence presented by the prosecution. For example, the Director asserts that the prosecution mentioned Satanism during only "a small fraction" of closing argument. (Resp. at 31). In reality, one of the prosecutors mentioned "Satan" or "Satanism" a total of 23 times during her argument (ROA.15606-10). State witness Haley's testimony spanned some 32 pages of transcript (ROA.15459-66). Indeed,

the prosecution devoted more than a third of its testimony (other than that offered to prove the crime itself) to establishing that Davis was a Satanist.

But the significance of the Satanism evidence is demonstrated not only by the *quantity* of arguments the prosecution made about Satanism, but by the *quality* of the arguments. Importantly, the prosecution twice suggested to the jurors that Davis's affiliation with the Church of Satan could be "enough" for them to answer yes to the future dangerousness question (ROA.15607, 15610). And during one of these instances, the prosecution referenced Dr. Gripon's testimony that Satanism was "extreme" and was something the jurors could "look at" in answering the future dangerousness question, adding "Maybe that's enough for you." (ROA.15607). Citing ROA.15605, the Director argues that prosecutor Hamilton "told the jury she would not ask it to answer the future-dangerousness special issue "yes" based on Davis's artwork or Satanism but on all the evidence presented (Resp. at 31). No such argument appears on the pages comprising that part of the record. In any event, the Director's statement ignores Hamilton's actual argument. While she did urge the jurors to look at all of the evidence, she most assuredly argued that "[i]f satanism is enough for you, so be it. You decide. But the answer to that question [about future dangerousness] is yes, Ladies and Gentlemen. Beyond a reasonable doubt the answer to that question is yes" (ROA.15610). Reasonable jurists would certainly debate whether Davis was harmed by the evidence of his religious association when

the jury was explicitly told it could find Davis a future danger based solely on that evidence.

The Director's disingenuous argument that Davis's ability to cross-examine and rebut Haley's testimony regarding the tenets of the Church of Satan does not preclude a finding that reasonable jurists would debate district court's harm analysis (Resp. at 32-33).[5] It also overlooks the fact that, prior to trial, Davis moved *in limine* to bar the State from presenting any evidence about Satanism. Davis should be entitled to refute the evidence that the trial court allowed the State to present over his objection. This does not mean that the evidence was not improperly admitted nor that its admission did not violate Davis's constitutional rights. Trial counsel are

---

[5] The Director relies on *Story v. Collins*, 920 F.2d 1247 (5th Cir. 1991), and *Barefoot v. Estelle*, 463 U.S. 880 (1983), in support of his argument on harmlessness, but neither case is relevant to the issue presented here—whether a defendant was prejudiced by the admission of evidence of a constitutionally protected practice that had absolutely no relevance to sentencing. At issue in *Barefoot*, among others, was whether the use of psychiatric testimony with respect to a defendant's future dangerousness should be barred at capital sentencing proceedings. The Supreme Court rejected this bald prohibition. The passage quoted by the Director (Resp. at 32), merely stands for the unremarkable proposition that state and federal evidence codes anticipate that relevant expert testimony would be admissible and subject to cross-examination and contrary evidence by the opposing party. *Id*. at 898. *Barefoot v. Estelle* is not a harmless error case. While the other case mentioned by the Respondent, *Story v. Collins*, 920 F. 2d 1247 (5th Cir. 1991), does address a routine claim about whether a trial expert's testimony was properly admitted at a criminal trial, *id*. at 1255-56, it is not a capital case, nor does it present the type of issues involving the First, Eighth, and Fourteenth Amendments that Davis has raised. It is also an appeal that had been briefed on the merits, unlike the present posture of Davis's case.

not obligated to forego cross-examination of a prosecution witness in some sort of protest against the trial court's ruling that the evidence in question was admissible; nor does cross-examination somehow "waive" a defendant's right to later argue that the admission of the evidence resulted in a violation of the United States Constitution or that it had a substantial or injurious effect on the trial's outcome. In Davis's case, the prosecution made his affiliation with Satanism a central part of its case for death, and its introduction had a substantial and injurious effect on the outcome.

The Director references the state trial court's "determination" that "Davis was able to explore the issue of Satanism with the jurors during voir dire, and a majority of those who served on the jury were either ambivalent about the subject or could set aside their opinions" (Resp. at 20-21) (citing ROA.7060). First of all, this "determination" was actually contained in proposed findings supplied to the trial court by the prosecution (ROA.6868) ("After your review of the relevant court documents, should you be of the opinion that the writ application be denied, the State has enclosed Findings of Fact, Conclusions of Law, and a Recommendation Denying Relief for your signature"). *Compare* ROA.6880 with ROA.7060. Second, this "determination" was neither discussed nor relied upon by either the Director in answering Davis's habeas petition or by district court in rejecting Davis's claim. Third, the "issue of Satanism" was hardly thoroughly explored during jury selection. At most, the jurors serving on Davis's jury were asked in the most general of ways

if they believed in one's right to the freedom of religion, and whether that right included someone practicing Satanism (ROA.14646, 14071, 14193, 14424-25, 14498, 14553, 14579, 15506, 14325, 14681). One juror had never heard of "freedom of religion" (ROA.14924). Another expressed the belief that someone adhering to the tenets of the Church of Satan was "wrong and crazy" (ROA.14,553). In any event, jurors' general views on "freedom of religion" are hardly the same as their views on the type of evidence presented by the State about Davis's religious affiliation, the latter of which was never explored during jury selection.

Finally, the Director fails to address the district court's finding that any error was harmless because the jury could conclude Davis was a future danger based on the facts of the crime "alone" (ROA.2947). Reasonable jurists would certainly debate this conclusion, as it ignores the nature of Texas's capital sentencing scheme, which requires the jury to make a "moral judgement" and not simply "find facts supporting a legislatively defined aggravating circumstance." *Blystone v. Pennsylvania*, 494 U.S. 299, 322 (1990) (Brennan, J., dissenting).

## ARGUMENT II: REASONABLE JURISTS COULD DEBATE WHETHER DAVIS'S RESENTENCING COUNSEL WERE INEFFECTIVE

It is well-established that, "[i]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . .requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting

the penalty of death." *Lockett v. Ohio*, 438 U.S. 536, 604 (1978) (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). "Events that result in a person succumbing to the passions or frailties inherent in the human condition necessarily constitute valid mitigation under the Constitution and must be considered by the sentencing court." *Lockett v. Ohio*, 438 U.S. 586 (1978).

In this claim, Davis alleged that the jurors sentencing him to death at his resentencing trial had a grossly incomplete picture of his life history. They never knew the horrifying depths of the physical and sexual abuse he suffered at his father's hands. The jurors were never given a clear picture of how young Irving Davis was failed time and again by the adults responsible for protecting him from the horrors he suffered. Nor did they hear how the trauma he suffered impacted his mental health and damaged his brain.

Throughout the discussion of Davis's ineffective assistance of counsel claim, the Directors relies on the standard for assessing the *merits* of the claim under AEDPA, not the COA standard (Resp. at 37-38). The Director's responses to Davis's arguments read more like a brief on the merits, and if anything, only further demonstrate that the district court's decision is reasonably debatable.

## A. Deficient performance

Mirroring the district court's reasoning, the Director's arguments conflate *Strickland*'s[6] deficient performance and prejudice prongs. For example, the Director argues the district court did not rely unreasonably on Davis's decision to testify in finding no deficient performance, because Davis's decision "has bearing on the credibility of his current claims and how it impacted counsel's trial strategy" (Resp. at 46). The Director then regurgitates the state court's findings, arguing that counsel's investigation was not deficient because the new mitigating evidence presented at Davis's evidentiary hearing "was cumulative of the testimony at trial or found to be overstated, untrue, or incredible[.]" (Resp. at 46-47).

By focusing on the credibility of the new mitigating evidence presented in state court—which goes to *Strickland*'s prejudice prong—the Director overlooks key undisputed facts relevant to the deficient performance prong. Namely, it is undisputed that (1) counsel did not hire a mitigation investigator, and the only fact investigator they had was not hired until the time of jury selection and about a month before the presentation of evidence (ROA.1714-15; 1766-67); (2) no investigation was done in between the first trial and resentencing trial (ROA.1796-98); in fact, no one from the defense team even kept in touch with Davis during that time; and (3) counsel were apprised of numerous red flags (which the Director does not bother to address) regarding potential areas of investigation prior to the resentencing trial

---

[6] *Strickland v. Washington,* 466 U.S. 668 (1984).

(Davis Br. at 36-38). The Director fails to explain how trial counsel's omissions, including the failure follow up on known red flags, were reasonable in light of these circumstances. Instead, the Director baldly declares that trial counsel "conducted another investigation for the retrial" (Resp. at 46-47). Nothing could be further from the truth.

The Director also asserts that "the district court [did not] suggest that Davis's decision to testify relieved counsel of the responsibility to investigate"; at the same time, the Director argues that the district court appropriately relied on Davis's decision because it "impacted trial counsel's strategy," and because "trial counsel were forced to shape a trial strategy around Davis's testimony,[.]" (Resp. at 46). The problem with this "logic" is that it ignores the well-established principle that no strategy can be reasonable without a constitutionally adequate investigation to inform the strategy. *Strickland*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Here, the district court expressly found that Davis's claim "is undermined by the fact that he testified in his behalf and had free rein to go in the direction he wanted" (ROA.2932). The district court made this finding without assessing the reasonableness of trial counsel's investigation. Contrary to the Director's argument, reasonable jurists could debate whether the district court improperly assumed that Davis's decision to testify absolved trial counsel of their duty to conduct a constitutionally adequate mitigation investigation.

The Director next argues that "the state habeas court noted that Davis tried to limit or hinder what mitigation evidence the defense could present." (Resp. at 47). The district court did not consider this factor in rejecting Davis's claim, so it is irrelevant at this stage of the proceedings. *Miller-El*, 537 U.S. at 327 (COA standard asks whether "jurists of reason could disagree with the *district court's resolution* of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.") (emphasis added).

In any event, the Director is wrong to suggest that if a defendant makes *any attempt* to limit the mitigation presentation, this *per se* defeats an ineffective assistance of counsel claim, per se. The cases cited by the Director stand for no such rule. In *Schriro v. Landrigan*, 550 U.S. 465 (2007), Landrigan affirmed in an on-the-record colloquy that he had instructed counsel not to offer *any* mitigating evidence. 550 U.S. at 475-476. There is no such evidence in Davis's case. Similarly, in *Ramirez v. Davis*, 780 F. App'x 110, 111 (5th Cir. 2019), an unpublished case with no precedential value, Ramirez instructed defense counsel not to present any further mitigation witnesses after the testimony witness. In *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984), trial counsel testified in an evidentiary hearing that Autry refused to permit his mother to testify, so no witnesses were presented at the sentencing phase. Davis did not impose any such limitations in his case; in fact,

he personally participated in the presentation of mitigating evidence by testifying at the resentencing trial.

At the state court evidentiary hearing, resentencing counsel embraced the State's suggestion that their penalty phase strategy was "personal accountability" (ROA.6957, 7019). But counsel was in no position to formulate a reasonable strategy because their investigation was so slapdash. *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Counsel had no idea what records were available or what they contained. They had little idea what the available mitigation witnesses knew. When they obtained critical mitigation leads, they did not work the develop and corroborate them through credible witnesses and contemporaneous records. Attorney Macias admitted that "the mother told us that CPS had intervened in the Carolinas," but they never obtained the records (ROA.7001-02). Macias admitted that "people in the Carolinas told us" that "his father had been very, very strict" – Macias "knew [Buddy] had beat him [Irving] with a belt and he made him stand like in a corner or something, and I know he made him take his pants down for a beating," – but they chose not to investigate it further: "we took a different strategy in trying to show what [Irving] was like" (ROA.7000, 7014). Different indeed. Ignorant about their client's life and the available mitigation evidence, counsel decided that Davis would

testify and he would explain everything on his own (ROA.6958) ("I guess the strategy at that point was to just try to humanize him as much as possible to the jury and have them kind of understand who he was and what he thought, through his testimony . . . . "); ROA.7014 ("I think most of our strategy was based on working with this young man and going in front of the jury and explaining himself.").

Macias was asked at the evidentiary hearing if he had "any reason to believe that Davis had been sexually assaulted," and he answered "no" (ROA.7017). But before the resentencing hearing, the court-appointed competency expert wrote in his report that Davis said "he was sexually abused periodically from the ages of five through age 18," by a friend, a neighbor, and a family member (ROA.1521). Macias apparently was unaware of this. Deficient performance does not get much clearer.

Counsel's failure to investigate and present mitigation was unreasonable and fell far short of prevailing professional norms. And "[t]he mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." *Stevens v. Zant*, 968 F.2d 1076, 1083 (11th Cir. 1992). No tactical motive can be ascribed to an attorney whose omissions are based on ignorance of the law, *Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991), and no tactical motive can be ascribed to an attorney whose omissions are based on the failure to properly investigate or prepare,

*see Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991); *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

## B.  Prejudice

The Director argues that the district court's decision regarding prejudice is not debatable "given the horrific nature of the crime and Davis's request for a death sentence" (Resp. at 48). Relying on *Luna v. Lumpkin*, 832 F. App'x 849, 853 (5th Cir. 2020), the Director suggests that "Davis's request for a death sentence is a powerful factor" that, standing alone, is likely enough to require deference to the state court's decision. (Resp. at 49-50).

In fact, *Luna* supports the issuance of a COA in Davis's case. The Director neglects to mention that this Court granted a COA in *Luna*, despite the fact that Luna testified in the penalty phase that there was no mitigation evidence "whatsoever," that he could not "rehabilitate" in prison, and that future incarceration would only make him "worse." *Luna*, 832 F. App'x at 851. *See also Luna v. Davis*, 793 F. App'x 229, 232–33 (5th Cir. 2019) (finding "reasonable jurists could debate the outcome" of Luna's ineffective assistance of counsel claim).

Moreover, while this Court is prohibited from assessing the merits of Davis's claim at the COA stage, this case is distinguishable from *Luna* in significant respects. First, Davis did not tell the jury that there was "no mitigation" and that incarceration would make him "worse"; rather, he testified, albeit in limited fashion, about some

of the mitigating circumstances from his childhood. Second, while Luna argued that trial counsel was ineffective for failing to present mitigating evidence regarding two categories of evidence, Davis has identified at least seven categories of evidence that trial counsel neglected to investigate and present—evidence that would have likely made a difference to at least one juror. Thus, Davis has even stronger arguments for the issuance of a COA than were present in *Lunda*.

The Director next argues that the district court did not apply an unconstitutional nexus test when it found no prejudice because Davis did not "blame" his family circumstances for his behavior. (Resp. at 50). The Director asserts that the district court "just recognized" that Davis did not blame his background and circumstances, but it is clear from the structure and language of the decision below that this was an "important" factor for the district court (ROA.2932) (noting, in assessing prejudice, that "*Perhaps more importantly*, when Davis went before the jury he did not blame his family circumstances for his behavior.") (emphasis added).

To the extent the Director argues that the state court's credibility findings preclude the issuance of a COA, that argument must fail. *See Miller-El*, 537 U.S. at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."). Although unnecessary

for the issuance of a COA, Davis detailed in his brief why the state court's credibility findings are unreasonable under 2254(d)(2) (Davis Br.at 51-52). The Director fails to meaningfully address these arguments, instead simply repeating in conclusory fashion that the state court found Davis's evidence "not credible." (Resp. at 49, 53).

Finally, it goes without saying that the facts of the crime alone cannot defeat a *Strickland* prejudice argument. The Director, however, repeatedly emphasizes the "horrific nature of the crime" in arguing that Davis is not entitled to a COA. While the facts of the crime may come into play after the issuance of a COA, consistent with binding precedent, they cannot preclude full appellate review when Davis has clearly demonstrated that "jurists of reason could disagree with the district court's resolution" and that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. *See also Escamilla v. Stephens*, 749 F.3d 380, 393 (5th Cir. 2014) ("disturbing facts of the crime alone do not defeat [a *Strickland*] prejudice argument").

## CONCLUSION

This Court should grant a COA and certify the above claims for appeal.

Respectfully submitted,

*/s/ Todd G. Scher*
TODD G. SCHER
Florida Bar No. 0899741
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
Fax: (754) 263-4147
Email: *TScher@msn.com*

*/s/ Joe A. Spencer, Jr.*
JOE A. SPENCER, JR.
Attorney at Law
1009 Montana
El Paso, TX 79902

*/s/ Richard D. Esper*
RICHARD D. ESPER
Attorney at Law
801 North El Paso Street, Ste. 225
El Paso, TX 79902

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today, May 21, 2025, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notification for this case, including all opposing counsel.

By:    */s/ Todd G. Scher*
       TODD G. SCHER

## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this document is 6161 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

By:    */s/ Todd G. Scher*
       TODD G. SCHER