No. 24-70008

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**IRVING ALVIN DAVIS**
*Petitioner-Appellant,*

v.

**ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,**
*Respondent-Appellee*

---

On Appeal from the United States District Court, Western District of Texas, El
Paso Division, Case No. 3:14-cv-00121-KC

---

**BRIEF FOR APPELLANT IRVING ALVIN DAVIS**

---

**TODD G. SCHER**
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
*TScher@msn.com*

**JOE A. SPENCER, JR.**
Attorney at Law
1009 Montana Avenue
El Paso, TX 79902
Tel: (915) 532-5562
*joe@joespencerlaw.com*

**RICHARD D. ESPER**
Attorney at Law
801 North El Paso St., Ste. 225
El Paso, TX 79902
Tel: (915) 544-3132
*Richardesperlaw@yahoo.com*

# CERTIFICATE OF INTERESTED PERSONS

## *Davis v. Guerrero,* No. 24-70008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioner-Appellant:**

Irving Alvin Davis

**Counsel for Petitioner-Appellant:**

Todd G. Scher, Hollywood FL
Richard D. Esper, El Paso TX
Joe A. Spencer, Jr., El Paso TX

**Respondent-Appellee:**

Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division

**Counsel for Respondent-Appellee:**

Craig Cosper, Office of the Attorney General, Austin TX

By:    */s/ Todd G. Scher*
      TODD G. SCHER

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 5th Cir. Rule 28.2.3 and Fed. R. App. P. 34(a)(1), Petitioner requests oral argument. This appeal presents complex factual and legal arguments as to why Davis's constitutional rights were violated and why § 2254(d) does not bar relief on Davis's claim that his First, Eighth, and Fourteenth Amendment rights were violated by the state's introduction of evidence of his religious beliefs and association with the Church of Satan, as well as his claim that his counsel at the resentencing trial rendered ineffective assistance of counsel in violation of the Sixth Amendment. For these reasons and, Davis believes that oral argument would be helpful to the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................. i

STATEMENT REGARDING ORAL ARGUMENT ....................................................... ii

TABLE OF CONTENTS ............................................................................................... iii

TABLE OF AUTHORITIES .......................................................................................... v

JURISDICTIONAL STATEMENT ................................................................................ 1

STATEMENT OF THE CASE ........................................................................................ 2

    A.   Procedural History ......................................................................................... 2

    B.   Satanism Claim ............................................................................................... 3

        1.   Pretrial/Trial Objections and Evidence ............................................ 3

        2.   Direct Appeal/Federal Habeas/COA Stage .................................... 12

    C.   Ineffective Assistance of Counsel Claim ..................................................... 15

        1.   State Court Evidentiary Hearing ...................................................... 15

        2.   Subsequent Litigation. ..................................................................... 20

STANDARDS OF REVIEW ......................................................................................... 20

SUMMARY OF ARGUMENTS ................................................................................... 22

ARGUMENT ................................................................................................................. 24

I.    DAVIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY ADMISSION OF EVIDENCE OF RELIGIOUS AFFILIATION .................................................. 24

    A.   First Amendment ......................................................................................... 24

    B.   Due Process and Eighth Amendment ........................................................ 26

    C.   28 U.S.C. § 2254(d) Analysis ..................................................................... 27

        1.   § 2254(d)(1) Does Not Bar Relief. .................................................. 27

        2.   2254(d)(2) Does Not Bar Relief. ..................................................... 32

    D.   Prejudice ....................................................................................................... 35

        1.   The Brecht Standard ......................................................................... 35

        2.   Highly Inflammatory Nature of Satanism Evidence ...................... 35

        3.   Geography Matters ........................................................................... 37

        4.   Davis Was Prejudiced. ..................................................................... 39

II.   DAVIS'S RESENTENCING COUNSEL WERE INEFFECTIVE. ...................... 46

    A.   Deficient Performance ................................................................................. 47

        1.   Tardy, Torpid and Truncated Investigation ................................... 48

**B.**    **Prejudice** ................................................................................. 53

**C.**    **28 U.S.C. § 2254(d) Analysis** ..................................................... 59

**CONCLUSION** ....................................................................................... 63

**CERTIFICATE OF SERVICE** ................................................................. 64

# TABLE OF AUTHORITIES

**Cases**

*Andrew v. White*, 145 S. Ct. 75 (2025)..........................................................22, 28, 33

*Andrus v. Texas*, 590 U.S. 806 (2020)..................................................53, 58, 63, 65

*Boring v. State*, 289 Ga. 429 (Ga. 2011) .....................................................39

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ....................................................15, 37

*Brown v. Davenport*, 596 U.S. 118 (2022)...............................................................38

*Brumfield v. Cain*, 576 U.S. 305 (2015)..........................................................37, 68

*Buck v. Davis,* 580 U.S. 100 (2017) ...........................................................43, 44, 45

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) ......................................64

*Davis v. Guerrero*, 2025 WL 1766785 (5th Cir. June 26, 2025) ....................passim

*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010)................................passim

*Davis v. State*, No. AP-74393, 2007 WL 1704071
(Tex. Crim. App. June 13, 2007) .................................................................2

*Davis v. Texas*, 565 U.S. 830 (2011)........................................................................2

*Dawson v. Delaware*, 503 U.S. 159 (1992)......................................................passim

*Dawson v. State*, 608 A.2d 1201 (Del. 1992)....................................................33, 45

*De Jonge v. State of Oregon*, 299 U.S. 353 (1937)................................................34

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014)............................................62

*Ex Parte Davis*, Nos. WR-61, 445-0, WR-61, 445-02
(Tex. Crim. App. March 12, 2014) .................................................................3

*Flanagan v. State*, 109 Nev. 50, 846 P.2d 1053 (1993) .........................................46

*Gray v. Mississippi*, 481 U.S. 648 (1987) ................................................46

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................21, 45

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018)..............36

*Miller-El v. Cockrell*, 537 U.S. 332 (2003)..................................22, 37, 68

*N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ..........................34

*O'Neal v. McAninch*, 513 U.S. 432 (1995) ........................................38

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ...................................22

*Payne v. Tennessee*, 501 U.S. 808 (1991) .......................................28

*People v. Ayala*, 101 Cal.App.5th 62 (2024)........................................40

*People v. Young*, 7 Cal. 5th 905, 445 P.3d 591 (2019) ...........................45

*Porter v. McCollum*, 558 U.S. 30 (2009) .........................................52

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ........................................27

*Rompilla v. Beard*, 545 U.S. 374 (2005).................................52, 53, 61

*Scales v. United States*, 367 U.S. 203 (1961) ......................................34

*Schware v. Board of Bar Examiners of N.M.*, 353 U.S. 232 (1957) ....................33

*Sears v. Upton*, 561 U.S. 945 (2010)........................................52, 61

*Smith v. Dretke,* 422 F.3d 269 (5th Cir. 2005) ....................................62

*State v. Kimbrell*, 320 N.C. 762 (1987) ...........................................39

*State v. Leitner*, 272 Kan. 398 (2001) ............................................39

*State v. Lovell*, 2024 UT 25 (2025) ............................................40, 41

*State v. Stensrud*, 134 Wash.App. 1031 (2006)....................................40

*State v. Wyatt*, 198 W.Va. 530 (W.Va. 1996) ........................................................39

*Strickland v. Washington*, 466 U.S. 668 (1984) ..............................................51, 65

*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................................65

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981) ....................36

*Tumey v. Ohio*, 273 U.S. 510 (1927) ..................................................................46

*United States v. Houston*, 481 F. App'x 188 (5th Cir. 2012) ...............................64

*United States v. Irvin*, 87 F.3d 860 (7th Cir. 1996) ............................................39

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ............................................................46

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006 .....................................................21

*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009) ..........................53, 61

*Wall v. State*, 184 S.W.3d 730 (Tex. Crim. App. 2006) ......................................35

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................passim

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................................passim

*Witmer v. United States*, 348 U.S. 375 (1955) ...................................................37

*Zant v. Stephens*, 462 U.S. 862 (1983) ..........................................23, 27, 45, 46

## Statutes

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 2241 ....................................................................................................1

28 U.S.C. § 2253 ....................................................................................................1

28 U.S.C. § 2254(d) ..............................................................................................21

28 U.S.C. § 2254(d)(2) .........................................................................................35

**Other Authorities**

Guideline 11.4.1, American Bar Association Guidelines for the Appointment and
Performance of Counsel in Death Penalty Cases (1989) ..............................52

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 2241. On September 13, 2023, the district court denied relief and a Certificate of Appealability (COA). ROA.2838-2971. On September 23, 2024, it denied a timely motion to alter or amend. ROA.3020-28. Davis timely filed his Notice of Appeal on October 22, 2024. ROA.3029-30.

This Court has jurisdiction under 28 U.S.C. § § 1291 and 2253.

## ISSUES PRESENTED

Whether the state's introduction of Satanism evidence at his resentencing trial violated the First, Eighth, and Fourteenth Amendments to the United States Constitution and warrants a new resentencing trial.

Whether Davis's counsel at his resentencing trial rendered constitutionally deficient performance in violation of the Sixth Amendment.

## STATEMENT OF THE CASE

### A.     Procedural History

Davis was tried in 2002 in El Paso, Texas, for murder in the course of aggravated sexual assault when he was barely 18 years old. Davis was found guilty and sentenced to death. The Texas Court of Criminal Appeals (CCA) affirmed his conviction but remanded for resentencing. *Davis v. State*, No. AP-74393, 2007 WL 1704071 (Tex. Crim. App. June 13, 2007).

At a 2002 resentencing, Davis was again sentenced to death. The CCA affirmed. *Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010), *cert. denied*, 565 U.S. 830 (2011).

Davis filed a state habeas application in 2004 after his trial and first sentencing, ROA.5179-5213, and a second petition in 2010 following resentencing. ROA.3487-90, 3499-3582. In 2013, the state court held a 1-day evidentiary hearing and denied relief, adopting the state's proposed findings without alteration. ROA.3222-71. The CCA denied habeas relief. *Ex Parte Davis*, Nos. WR-61, 445-0, WR-61, 445-02 (Tex. Crim. App. March 12, 2014) (per curiam).

Davis timely filed a habeas petition in the United States District Court, ROA.65-208, a petition later corrected and/or amended. ROA.210-40, 506-80, 1197-1276, 1867-1966. He was granted a stay to exhaust certain claims, ROA.2164-77, 2224-29, and filed a new petition in state court, ROA.3636-79, which

the CCA dismissed. ROA.2238-40. The CCA denied reconsideration, over dissent. ROA.2246.

The district court lifted its stay, ROA.2262-63, and Davis filed his final consolidated petition. ROA.2300-2426. After the state answered and Davis replied, the district court denied relief, a COA, and a motion to alter or amend. ROA.2838-2970-89, 3020-28. A timely Notice of Appeal followed. ROA.3029-30.

This Court granted Davis a COA on 2 issues: "(1) Evidence of Davis's conversion to Satanism admitted at his punishment retrial violated the Constitution; and (2) Davis's retrial counsel rendered constitutionally deficient performance." *Davis v. Guerrero*, 2025 WL 1766785 at *1 (5th Cir. June 26, 2025).

**B.     Satanism Claim**

**1.     Pretrial/Trial Objections and Evidence**

A cornerstone of the state's case for death was that Davis's religious affiliation and association with the Church of Satan showed he would be a future danger because "evidence of [his] belief system and philosophies concerning the study and practice of Satanism go directly to the issue of his character." ROA.5951. According to the state, Davis's religion was relevant and admissible because "satanists and people who hold those belief systems are indeed violent," "have no moral compass," and "could go out and commit further murders, further acts of violence." ROA.13835. Due to the "violent nature of the belief system," Satanists "present

3

themselves to be a future danger to society." ROA.13835. The state insisted it could demonstrate, under *Dawson v. Delaware*, 503 U.S. 159 (1992), that Davis's religious group—the Church of Satan—had engaged in or approved of violence, and that Davis was a member or associate thereof,[1] through the testimony of an expert who would "testify about Satanism to explain how satanists are violent and have committed violent acts." ROA.5952, 15196.

The defense contended that the prejudicial nature of the Satanism evidence required its preclusion from voir dire, especially given the religious demographic of El Paso. ROA.13837. Recognizing the "highly inflammatory" nature of evidence about "Satan worshipping," the trial judge largely prohibited the state from voir diring jurors about it, and from including the topic in opening statements. ROA.13835-40, 15196.

The defense also argued the "freedom of religion problem" and that the state could not satisfy *Dawson*:

> . . . I assume they're going to bring in testimony regarding what various satanic groups have done; maybe they've been violent in the past, but I don't think they'll be able to tie that up to what my client believes or professes to believe or anything along those lines. There's no evidence that they have my client doing anything that would create

---

[1] Davis first affiliated or associated with the Church of Satan in 2005, long after the crime for which he was convicted. *Davis*, 2025 WL 1766785 at *3. He is no longer a believer in Satanism. In 2015, he changed his designated affiliation back to Buddhism. ROA.2398.

any dangerous situation or has created a dangerous situation or anything along those lines.

In fact, it's my understanding that the type of satanic beliefs that my client does profess are, in fact, nonviolent and do not involve any violence at all. And that's just their different, I guess, churches or ways to practice this satanism. And so unless they can tie my client to, you know, I guess these bad acts that they're going to attempt to produce, I don't think there's any relevance here.

\*\*\*

The only implication is going to be that he's a satanist and the negative connotations that carries, not from anything that he's done, not from anything that's been done from when he practices, but for the simple fact that that's what he is. That would be improper. That's not allowed, I think, essentially, what this *Dawson v. Delaware* case talks about.

\*\*\*

I believe, based on my argument as to the various different, I guess, sections of satanism that you might have, I think that's exactly the problem they're going to run into in this case, that they're not going to—you know, they're going to basically try—they're going to be trying to say that the mere fact that he's a satanist is a bad act in its own right, and that's not appropriate pursuant to *Dawson*[.]

ROA.15194-95.

At a hearing outside the jury's presence, the state presented Donald Haley to satisfy the court's skepticism. Haley, a former employee of the Virginia corrections system and various law enforcement offices, was, at the time of Davis's trial, a community college teacher. ROA.15365-66. He supplemented his income by

"teaching" policemen, firemen, and constables in El Paso about Satanism. ROA.15366. He possessed no degree in religion or psychology and took no courses in Satanic practices. ROA.15369. He had neither testified as an expert nor written publications on religion or Satanism. ROA.15367.

At the hearing, Haley testified that:

- "members of the satanic religion" advocate violence. ROA.15367-68;

- based on his literalist reading of THE SATANIC BIBLE, Satanists may perform human sacrifice in specific circumstances, including to "get[] rid of an undesirable individual, undesirable, obnoxious individual." ROA.15368;[2]

- there were, in his estimation, "over 10" cases in which "Satanists" either killed or mutilated an individual "in the name of Satan or Lucifer, which are synonymous." ROA.15371. However, none of the culprits invoked the actual name of the "satanic church from what I recall." ROA.15374.

- he was unfamiliar with the specific San Francisco or California sects of "Satanism;" in fact the court acknowledged that "[h]e said he didn't know anything about the San Francisco religion." ROA.15374.[3]

---

[2] Haley embraced a similar literalist reading of the Christian Bible. ROA.15462.

[3] One of the letters written by Davis that the state introduced into evidence concerned his application to the San Francisco branch of the Church of Satan. ROA.15375, 16359.

While Haley claimed the culprits in other cases committed violence "in the name of Satan," there was no evidence any were members of the Church of Satan, nor that the Church had endorsed their acts. Indeed, Haley acknowledged that in none of his examples did the individuals ever invoke the "satanic church." ROA.15374. When defense counsel asked if Haley knew any "examples of situations where people of other religions besides satanists have done atrocities in the name of God," the state successfully objected. ROA.15373. When defense counsel attempted to ask whether the Church of Satan had "sanctioned" any of the killings, the state again successfully objected, and the court admonished defense counsel. ROA.15374-75. Over defense objection, ROA.15375, 5963-64, the trial court qualified Haley as an expert "in the area of the satanic religion and to its religious philosophies." ROA.15374, 15459.

Before the jury, and over defense objection, ROA.15418, the state introduced items found in Davis's cell including books related to Satanism, such as THE SATANIC BIBLE, and various writings and drawings, none of which constituted contraband. ROA.15419-22. The court also made Davis display a tattoo of a pentagram on his chest. ROA.15427.

The State called forensic psychiatrist Dr. Gripon to provide a future dangerousness assessment of a hypothetical defendant who "marks his body with a pentagram, becomes a satanist." ROA.15441. Gripon testified that although

7

adherence to Satanism did not have "predictive value, per se" for future dangerousness, Satanism is "extreme" and "you would always worry . . . about people who end up kind of on the periphery of something that extreme." ROA.15456-57.

Haley testified before the jury that THE SATANIC BIBLE is "demonstrative" of "some of the philosophies" of "people who follow the satanic religion" and that the book allows Satanists to perform "human sacrifice" in certain circumstances. ROA.15460. These circumstances include "disposal" of "a totally obnoxious and deserving individual," along with "[a]nyone who has unjustly wronged you or who has gone out of his way to hurt you to deliberately cause trouble and hardship for you or those dear to you." *Id*.

On cross-examination, Haley admitted he was "reading these things literally" and that the references to destroying people were meant to be symbolic. ROA.15462. Despite no connection between Davis's affiliation with the Church of Satan and his crime, Haley improperly connected the two: when asked what it meant to "destroy a person" based on his "literalist" reading of THE SATANIC BIBLE, he answered, among other things, "*You can cut their fingertips out.*" ROA.15462-63 (emphasis added).[4]

---

[4] The victim in this case had her fingertips cut off. *Davis*, 2007 WL 1704071 at *1.

Defense expert Dr. Gordon Melton, a religious historian with a Ph.D. in the history of religious literature and an ordained Methodist minister, ROA.15467, 15469, testified that the term "Satanism" covers various phenomena in American religion. ROA.15467. One includes unaffiliated individuals who claim to communicate with Satan and have "the-devil-made-me-do-it syndrome." ROA.15469. On the opposite end of the spectrum is the organized form of Satanism established post-World War II by Anton LaVey and his Church of Satan, and other formalized groups that splintered off from LaVey, such as the Temple of Set. ROA.15467-68.

As Dr. Melton explained, the Church of Satan blends "secular humanism and what we call western esotericism, or the occult," promoting symbolic rituals that invoke a cathartic response. ROA.15468-69. For example, instead of literally harming anyone (as Haley opined), THE SATANIC BIBLE instructs that a ritual may be performed to curse someone symbolically, by focusing one's "emotional energy" in a "cathartic release" of anger. ROA.15469. This symbolic ritual "does "[n]ot physically or directly" hurt anyone and "explicitly forbids taking blood[.]" ROA.15469-70.

Dr. Melton explained that passages from THE SATANIC BIBLE on human sacrifice "should not be taken literally." ROA.15473. There was "nothing" violent in THE SATANIC BIBLE or any texts associated with the Church of Satan,

ROA.15477-78, 15542; followers of the Church do not actually believe Satan exists; they do not pray or call out to Satan as a deity. ROA.15471-72. While others claiming to be Satanists may "think of Satan [as a] bad, evil, destructive power" such as rogue serial killers who claim to act "[i]n the name of satanism," that belief system does not exist "as any kind of stable ongoing organization." ROA.15472.[5]

Davis himself addressed his religious affiliation as well as the books and paperwork from his cell.[6] In the years after his conviction, Davis turned away from Buddhism and eventually began exploring the Church of Satan. ROA.15538, 15546, 15555. His main motivation was the loss of his nephew, who died within hours of being born. Feeling God had inflicted pain on his twin brother and the rest of his family, Davis turned away from God in search of something else. ROA.15546. After

---

[5] This fleeting testimony was what the CCA and the district court characterized as Dr. Melton's "admission" that people have been killed "in the name of Satanism." *Davis*, 2025 WL 1766785 at *3 (citing *Davis*, 329 S.W.2d at 805).

[6] The state introduced five publications seized from Davis's cell, ROA.15419, 16299-303 (Exhs. 285-89); a letter written to the Church of Satan about membership, ROA.15422, 16359 (Exh. 300); a change of religious preference at TDCJ from Buddhism to Satanism and Thaumaturgy; a written request that authorities furnish him with items for performing satanic rituals in his cell, ROA.16018-20 (Exh. 247); a glimpse of the pentagram on his chest, ROA.15427; and various personal writings and sketches he authored in prison. ROA.15420-22 (Exhs. 276/ROA.16285, 290/ROA.16304, 291/ROA.16319, 292/ROA.16349, 293/ROA.16351, 294/ROA.16352-53, 295/ROA.16354, 296/ROA.16355, Exhs. 297-99, 301/ROA.16360-61).

someone lent him a copy of THE SATANIC BIBLE, Davis embraced its symbolic themes, ROA.15540, 15546, finding a pathway to a new spiritual journey. ROA.15542. He stressed that the Church of Satan "advocates against violence," and "Satan" is not a deity but only a symbol of rebellion against philosophers who posited that the earth was the center of the universe, not the sun. ROA.15542-43.

Because the state had been allowed to introduce his drawings, writings and books,[7] Davis was asked to explain them, and his testimony was extensive, detailed, and unrefuted. ROA.15541-15564.

In closing, the prosecution argued that Davis's religion reflected negatively on his character and supported a finding of future dangerousness. It belittled Davis's change of religion to Satanism, ROA15593, arguing that Davis "has finally found a religion, a philosophy, a way of life that makes [what he did to the victim] all okay," ROA. 15609. And ultimately, the jury should sentence Davis to death because "satanism was extreme," and "[i]f satanism is enough for you, so be it." ROA.15607, 15610.

The harangue continued:

> This journal says every satanist has a right – the right of self-preservation. That's what it says in there. There's no life-for-a-life stuff in any of this satanism stuff. It's not

---

[7] In renewing objections to the admission of this evidence, defense counsel noted that the court's ruling "forced" Davis to address the state's exhibits. ROA.15576.

there. It's not there. But he got up there and told you, well, satanism is nothing. You know, it's not real. It's just symbolic, right. **Four hours of explanations and excuses and he doesn't believe in Satan? He doesn't worship Satan?**

Well, here's The Satanic Bible, Satanic Rituals. Let me get The Satanic Bible because that's got the part where he dedicates his life to Satan and his soul. **"I, Irving Davis, pledge my life and soul to Satan forever." That sound like somebody who doesn't believe in Satan? That sound like somebody who doesn't worship Satan? That sounds like somebody who carves a pentagram into their chest but he's going to turn around and leave it tomorrow? Come one.** That he was a Buddhist before and now he's a satanist and this somehow makes him more educated. **I don't know about you, Buddhists, I think, are real peaceful people. Pretty sure. They don't go around raping and killing little girls**. Okay. He's a con man. And he lied to you.

ROA.15607 (emphasis added).

You know what? I don't need to get into a debate with you all about satanism and what it is and what it isn't. **Look at his writings.** It will tell you the nine satanic rules of the earth. **It's horrible. They advocate vengeance. They advocate destruction of an enemy.** And Ladies and Gentlemen, I'm not talking, oh, I ignore you, you're destroyed. Please. **It all speaks for itself and it's all in there**. It's there with his writings. It's there with his disturbing artwork.

ROA.15610 (emphasis added).

## 2.    Direct Appeal/Federal Habeas/COA Stage

On direct appeal, the CCA applied *Dawson*, 503 U.S. 159, holding that

"evidence concerning one's beliefs and associations . . . may be admissible if it is

12

shown to be relevant to the issues involved in the case." *Davis,* 329 S.W.3d at 805 (citing *Mason v. State*, 905 S.W.2d 570, 576-77 (Tex. Crim. App. 1995)). The CCA held that "a defendant's membership in an organization or group" is sufficiently relevant to the issue of future dangerousness if the state shows "(1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Id.* (citing *Mason*, 905 S.W.2d at 577; *Dawson*, 503 U.S. at 163-67).

The CCA determined that Davis had identified himself in prison documents as a Satanist since 2005, satisfying *Dawson*'s second prong. *Davis*, 2025 WL 1766785 at *3. The CCA found *Dawson*'s first prong satisfied by Haley's testimony that (1) "some members of the Satanic religion advocate violence," (2) Satanic literature discusses "rituals of destruction" for performing "human sacrifice" on "undesirable" and "obnoxious" individuals, and (3) various people had committed violence "in the name of Satan." *Id.* (citing *Davis*, 329 S.W.3d at 805). Although defense expert Dr. Melton disagreed with Haley's description of Satanic philosophy, the CCA offered that "Melton acknowledged that in some instances people had been killed in the name of Satanism." *Id.* "On that basis," and applying the Texas abuse-of-discretion standard of review for the admission of evidence, the CCA determined that it was "within the zone of reasonable disagreement" for the trial court to decide that the Satanism evidence was relevant to the issue of future dangerousness and

outside the protection of the First Amendment. *Id*. at *2 (citing *Davis*, 329 S.W.3d at 805-06).

As to Davis's federal habeas claim, the district court concluded that the CCA reasonably rejected Davis's claim that the admission of the Satanism evidence violated his constitutional rights. *Davis*, 2025 WL 1766785 at *4 (quoting from ROA.2947). It also rejected Davis's prejudice claim under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Davis*, 2025 WL 1766785 at *4.

In granting a COA, this Court observed that "[t]he CCA's reasoning could permit associational guilt . . . as long as 'various'—i.e. an undefined fraction—of group members are violent," "while the vast majority of members denounce those actions." *Id*. As to prejudice, this Court found that (1) "the evidence of Satanic affiliation might have been so inflammatory and odious to the jury that it drove the conclusion on future dangerousness"; (2) "[t]he prosecution arguably suggested to the jury that it could rely on Davis's Satanism if that is "enough for you"; and (3) "[a]t least as importantly, the jury also might have been influenced by the inflammatory evidence in considering other issues, such as whether mitigating circumstances were present." *Id*. at *6.

14

C.     **Ineffective Assistance of Counsel Claim**

1.     **State Court Evidentiary Hearing**

The Texas court held an evidentiary hearing on Davis's ineffectiveness claim at which both of Davis's counsel testified. ROA.6927-7029. Davis submitted affidavits containing extensive information about his upbringing as well as counsel's lackluster investigation from: (1)Vince Gonzales, an expert mitigation specialist, ROA.6782-91; (2) Davis's mother, Carol Davis, ROA.6792-6800; (3) Davis's twin brother, Oscar O. Davis IV, ROA.6801-6807; (4) Davis's sister Veronica Christine Davis, ROA.6808-12; (5) Davis's half-brother Carl Fuller, ROA.6814-21; and (6) Dr. James Schutte, a psychologist who testified at Davis's resentencing trial solely on the dangerousness issue, ROA.6822-25. The state did not object to the introduction of the sworn affidavits. ROA.1700.

The evidence established that what attorneys Macias and Morales presented to the jury barely scratched the surface of Davis's torturous life circumstances. Although counsel did present various witnesses to the jury, a review of their testimony reveals that, with the exception of Davis's mother and Davis's own testimony, the remaining witnesses were merely asked, in a perfunctory manner, whether Davis was peaceful, had ever been aggressive, and/or whether Davis posed a future danger; each of these witnesses' exceedingly brief testimony comprised just a few pages of transcript. *See* ROA.15497-15508. Even the testimony of Davis's

mother, who provided more information about her son's background than did the other witnesses, comprised less than 20 transcript pages. ROA.15533-37.

### a.     Lay Witness Evidence

The jury did not get a complete picture of Irving Davis's life circumstances. To summarize briefly:[8] from birth, Davis was shuttled from state to state; born in North Carolina,[9] he was uprooted by his father, Oscar (Buddy), who was in the military, and the family moved first to Texas, then Virginia, then California, back to Texas, back to North Carolina, and then again to Texas shortly before the crime occurred (when Irving was barely 18-years old). ROA.2339-53, 6794-98. At some of these locations, Irving's mother, Carol, would abandon her children, leaving them in Buddy's care. Once, when Carol had left her children with Buddy, Buddy began seeing another woman who later accused him of sexually assaulting her; he was acquitted of rape at a court-martial but found guilty of indecency and demoted. ROA.2348, 6795-96.

---

[8] The sworn declarations submitted by Davis's state court counsel were voluminous and detailed; this Brief can only summarize the information. The true circumstances of Davis's life, however, is best understood by reviewing those declarations in their entirety.

[9] The same night that Carol Davis was giving birth to Irving and his twin brother Oscar, Davis's father, Oscar O. Davis, was home raping Davis's half-brother, Carl Fuller. ROA.6818.

As the family shuttled from place to place, Irving's life worsened as Buddy's drunken rages became more frequent and more severe. While they were in Virginia, Buddy became increasingly violent towards Irving and his siblings due to uncontrolled alcoholism, ROA.6795,6819, and he soon recommenced sexually abusing Irving's half-brother Carl, ROA.6819. When the family moved to California (Irving was entering second grade), the violence and chaos intensified as Buddy's abuse continued unabated. Buddy regularly forced Irving and Oscar, just second-graders at the time, to spend hours on their knees picking pieces of lint from the rug with tweezers while screaming at them and calling them "fucking pukes." ROA.2346, 6803, 6810. Buddy also mercilessly beat Irving, sometimes with a belt with a silver buckle, until Buddy tired out, ROA.6803; if Irving tried to disassociate from the beatings by not displaying emotion, Buddy's beatings only worsened until his son broke down in tears. ROA.2347, 1521.

The physical abuse wrought on Irving and his siblings by his father did not go unnoticed by the authorities or by law enforcement. Child Protective Services in both California and North Carolina, ROA.2349-56, 6788-89, received reports of physical abuse involving the children. Carol later obtained several restraining orders against Buddy. ROA.2349, 2363, 6797.

### b.    Medical/Expert Evidence

Davis has openly acknowledged his history of sexual abuse, mental illness, and suicidality to various medical and mental health professionals over the years.

In 2008, he disclosed this information to Dr. Arthur Ramirez during a court-ordered competency evaluation:

> [T]he examinee stated he was sexually abused periodically from the age of five through age eighteen. The examinee stated he was sexually abused by a "family member,"[10] "a neighbor," and a "friend." The examinee did not disclose the details of the sexual abuse.

ROA.1521. He also reported to Dr. Ramirez an instance where, after an argument with his brother, he "began to cut his arm with a knife." ROA.1520.

Davis also reported "a history of childhood sexual abuse" and a "history of depression and visual hallucinations" to defense expert Dr. James Schutte. ROA.6823. At the time of Davis's resentencing, however, counsel had not provided any documentation to Dr. Schutte, such as family member declarations "which reveal a history of childhood abuse and neglect," "parental alcoholism," and "self-mutilation." *Id*. While his "evaluation did yield psychologically significant information, it was limited in scope by the lack of access I had to the Defendant."

---

[10] Not only did Davis's father, Buddy, sexually abuse his stepson Carl, but, in 2006, more than a year and a half before Davis's resentencing, Buddy was convicted in North Carolina of sexually abusing his niece's 7-year-old son. ROA.2369, 6799.

*Id*. Dr. Schutte was never able to complete his evaluation because counsel waited so long to seek his appointment and "there was insufficient time for subsequent sessions prior to trial." ROA.3625. Accordingly, counsel severely curtailed Dr. Schutte's testimony at the resentencing trial, limiting it to hypothetical future dangerousness issues, and directed him to say nothing about the ample mitigation that existed; indeed, counsel instructed Dr. Schutte not to even admit he had personally evaluated Davis. ROA.6823-24. As a result, Dr. Schutte was unable to provide the jury with "expert psychological testimony about the impact of Mr. Davis's history of childhood abuse and mental illness on his behavior in the matter for which he was charged . . . ." ROA.6824.

Davis also candidly reported his mental health history to jail medical personnel. For example, shortly after his arrest in 2002, he disclosed to jail personnel that he had attempted suicide by hanging no less than four times before the age of 12. ROA.16143. Other prison medical records noted, *inter alia*, that Davis (1) reported "paranoia" and needed to "talk to a psychiatrist," ROA.15978; (2) reported being "very depressed," ROA.15974; (3) was on suicide prevention at the jail and reported past suicide attempts due to "family problems," ROA.15960, 15940; and (4) was brought into the clinic by an officer "crying, verbalizing 'I want to kill myself.'"

## 2.    Subsequent Litigation.

The state court adopted the state's proposed findings of fact and conclusions of law without alteration. ROA.7849-98. The federal district court rejected his ineffective assistance of counsel claim, ROA.2493-2536, and this Court granted a COA. *Davis*, 2025 WL 1766785 at *7-*10.

## STANDARDS OF REVIEW

This Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). This Court reviews "the federal district court's factual findings for clear error and its conclusions of law *de novo*." *Virgil v. Dretke*, 446 F.3d 598, 604-05 (5th Cir. 2006).

This Court reviews the state decisions in Davis's case under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(d) applies where the state court adjudicated the merits of the federal claim. When the Supreme Court "'relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purposes of AEDPA." *Andrew v. White*, 145 S. Ct. 75, 81 (2025) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)). The "unreasonable application" prong of § 2254(d)(1) "does not require . . . some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (internal quotation marks and citation omitted). "Nor does AEDPA

prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Id.* (citing *Lockyer*, 538 U.S. at 76).

A court may also address the merits of a federal constitutional claim under § 2254(d)(2) where the state court decision resulted from an unreasonable determination of the facts, meaning that the factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 332, 340 (2003).

## SUMMARY OF ARGUMENTS

### I.

The state's introduction of testimony and evidence that Davis was a "Satanist" to establish his future dangerousness and his bad character violated Davis's constitutional rights under the First, Eighth, and Fourteenth Amendments. *See Dawson*, 503 U.S. 159; *Zant v. Stephens*, 462 U.S. 862, 885 (1983).

Admission of Davis's post-crime membership in the Church of Satan violated his First Amendment rights to freedom of religion and association in violation of *Dawson* for a number of reasons. First, the evidence was irrelevant because the state failed to establish (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. Both the state court and the federal district court found no First Amendment violation based solely on state "expert" Haley's literalist reading of the Satanic Bible and his testimony that "some" people had committed violence in the name of Satan. However, the State presented no evidence that the Church of Satan—the actual group Davis associated with and attempted to join[11]—committed or endorsed any violent or illegal activities. The

---

[11] The State presented no evidence that Davis had actually been admitted as a member of the Church of Satan. In fact, the official website of the Church of Satan indicates states: "We do not allow Active Membership to convicted felons[.]" *See* https://churchofsatan.com/faq-prisoner-issues/ (last visited September 4, 2025).

absence of this evidence is fatal under *Dawson* and the First Amendment jurisprudence underpinning the Court's decision. The state court's decision is contrary to and/or an unreasonable application of *Dawson*, and its decision is also based on an unreasonable determination of the facts based on the state court record. On the merits, Davis has established a First Amendment violation, and relief is warranted because the error had a substantial and injurious effect or influence on the jury's verdict.

## II.

Davis's resentencing counsel were ineffective, in violation of the Sixth Amendment. Despite having a second opportunity to build a case for life, counsel did little to nothing to prepare for the resentencing trial. They never hired a mitigation specialist, and the "fact" investigator they did hire was not appointed until the eve of trial. Counsel spent scant time investigating Davis's horrific background, ignoring obvious red flags of (1) parental neglect, (2) parental alcoholism, (3) dysfunction, (4) physical, emotional, and sexual abuse, and (5) mental illness including documented history of depression, paranoia, suicidality, and self-mutilation. The jury did not receive an accurate picture of his background and life circumstances, and had counsel performed effectively, there is reasonable probability that at least one juror, having heard all the available mitigating information, "would have struck a different balance." *Wiggins v. Smith*, 539 U.S.

510, 537 (2003). AEDPA does not bar this Court from reaching the merits, and relief should be granted.

**ARGUMENT**

## I. DAVIS'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY ADMISSION OF EVIDENCE OF RELIGIOUS AFFILIATION.

### A. First Amendment

The First Amendment protects "an individual's right to join groups and associate with others holding similar beliefs." *Dawson*, 503 U.S. at 163–64 (citations omitted). *Dawson* held that admission of evidence of David Dawson's membership in the Aryan Brotherhood during his capital sentencing violated his First Amendment rights "[b]ecause the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, [and] the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Id.* at 166. The Court found it significant that while there were "differences among the various offshoots of the Aryan Brotherhood," the state's evidence pertained only to the California chapter of the Aryan Brotherhood and not the Delaware chapter to which Dawson belonged. *Id.* at 164-165. The Court noted that "the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id.* at 166. Because Dawson's membership in the Aryan Brotherhood had no other relevance to the sentencing proceeding, the Court was "left with the feeling that the Aryan

24

Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." *Id.* at 167.

Admission of Davis's post-crime membership in the Church of Satan violated his First Amendment rights to freedom of religion and association. Under *Dawson*, "to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Davis*, <u>329 S.W.3d at 805</u>. Similar to *Dawson*—where evidence of violence by the Aryan Brotherhood's California chapter was insufficient to establish the Delaware chapter's activities—both the state court and the federal district court found no First Amendment violation based solely on Haley's literalist reading of the Satanic Bible and his testimony that "some" people had committed violence in the name of Satan. However, the state presented no evidence that the Church of Satan committed or even endorsed any violent or illegal activities. In fact, the only evidence in the record regarding the Church's position on violence is that it prohibits taking blood from another person, <u>ROA.15469-70</u>, and advocates *against* violence. <u>ROA.15542</u>.

By painting Satanism with a broad brush, the CCA decision paves the way for absurd results, permitting adherents of every major world religion to be branded as

dangerous or having "bad character" based on violent acts by adherents of similar-*sounding* beliefs, loosely- related religions, or extremist versions of the religion.[12]

## B.    Due Process and Eighth Amendment

Davis's constitutional rights to due process and to be free from cruel and unusual punishment were also violated by the admission of the Satanism evidence. An individual may not be sentenced to death based on "conduct that is constitutionally protected." *Zant*, 462 U.S. at 885; *Romano v. Oklahoma*, 512 U.S. 1, 10–11 (1994). This principle flows from the Supreme Court's Eighth and Fourteenth Amendment capital jurisprudence. *Zant*, at 884-45 (citing cases). The Supreme Court has also held that if a death sentence is based on evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). *Accord Andrew*, 145 S.Ct. at 81. Because Davis was sentenced to death on the basis of constitutionally-protected religious beliefs, practices, and associations, his sentence violates the Eighth and Fourteenth Amendments. *Davis*, 2025 WL 1766785 at *7 n.13 (noting that Davis's Eighth and Fourteenth Amendment claims are essentially "encompassed within his *Dawson* claim").

---

[12] As Davis previously argued, history abounds with examples of violence committed in the name of major religions. COA Br. at 18 n.7.

### C.    28 U.S.C. § 2254(d) Analysis

#### 1.    § 2254(d)(1) Does Not Bar Relief.

*Dawson* clearly establishes that "evidence of beliefs or association must be relevant to the issues in the case for its admission to be permissible," and even the CCA interpreted *Dawson* as requiring "proof of the group's violent and illegal activities." *Davis*, 2025 WL 1766785 at *4 (quoting *Davis*, 329 S.W.3d at 805). In response to Davis's COA Brief, however, the state argued that *Dawson* does not require that the group itself has committed or endorsed violence. *Davis*, 2025 WL at *4; Resp. COA Br. at 25.

Although Davis does not agree with the state's reading of *Dawson*, he submits that it is not necessary for the Court to address whether *Dawson* requires the state to prove that the *particular group* the defendant belongs to "itself" commits or endorses violence. Even if *Dawson* requires only a showing that a defendant's membership in a group is relevant—without establishing the precise contours of what makes such evidence relevant—the CCA's decision was still contrary to or involved an unreasonable application of *Dawson* because the facts of his case are "materially indistinguishable" from those in *Dawson*.[13]

---

[13] *See Williams v. Taylor*, 529 U.S. 362, 412-413 (2000) (state court ruling "contrary to" clearly established federal law "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.").

The *Dawson* Court relied on three essential factual circumstances: (1) while the prosecution argued prior to sentencing that it would present evidence of the Aryan Brotherhood's association with violence and illegal activities, it ultimately did not present any evidence that the specific chapter Dawson belonged to "committed any unlawful or violent acts, or had even endorsed such acts"; (2) the stipulation read to the jury regarding the Aryan Brotherhood "invited the jury to infer that the beliefs of the Delaware chapter are identical to those of the California chapter"; and (3) "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim." *Dawson*, 503 U.S. at 166. On these facts, the Supreme Court concluded that the Aryan Brotherhood evidence was not relevant to any issue at sentencing and "tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id*. The Court held that the evidence was also not relevant to rebut Dawson's "good" character evidence, because "the Aryan Brotherhood evidence presented in this case cannot be viewed as relevant 'bad' character evidence in its own right." *Id*., at 168.

Here, as in *Dawson*, the prosecution argued that it would present evidence that Davis belonged to a "violent" group.[14] However, the state presented no evidence that

---

[14] *See* ROA.13841 (COURT: "And I take it from your representation that you will have an expert who will be able to meet the first [requirement of *Dawson*], which is proof of the group's -- or rather, testimony of the group's violent and illegal activities. Is that correct?" MS. HAMILTON: "Yes, Your Honor. I should say, Your Honor, I have an expert who will testify to the group's

the specific offshoot of Satanism Davis subscribed to—the Church of Satan—committed or endorsed violence or any illegal activity. And, as in *Dawson*, the jury heard evidence that "invited [it] to infer that the beliefs" of a few self-proclaimed Satanists who allegedly killed in "the name of Satan" were identical to the beliefs of the Church of Satan, despite the absence of any evidence supporting this inference. As in *Dawson*, there was also no evidence that Davis's association with the Church of Satan had any connection to the crime; in fact, he did not attempt to join the Church until 2005, years after the crime occurred. On these facts, the evidence tended to show nothing more than Davis's abstract beliefs and had no relevance to any issue in the sentencing proceeding. Moreover, the evidence was not relevant to rebut any good character evidence presented by the defense; the defense had yet to put on any evidence when the state presented the Satanism evidence, and, as in *Dawson*, the Satanism evidence was not "'bad' character evidence in its own right," *Dawson*, at 168, because there was no evidence whatsoever that Davis associated with or subscribed to any belief system that advocated violence or breaking the law.[15]

---

violent ideations. Those issues that would go to character evidence, that that's what the State would be able to provide[.]").

[15] On the contrary, Davis testified that the Church of Satan "advocates against violence," ROA.15542, and requires adherents to follow the law. ROA.15565.

These facts are "materially indistinguishable" from the relevant facts in *Dawson*, yet the CCA reached a decision in Davis's case that is "diametrically different," "opposite in character or nature," and "mutually opposed" to *Dawson*. *Williams*, 529 U.S. at 362. Accordingly, the CCA decision was "contrary to" *Dawson* within the meaning of 2254(d)(1). *Id*. Alternatively, for the same reasons set forth above, the CCA decision involved an unreasonable application of *Dawson* because it identified the correct governing legal principle but unreasonably applied the principle to Davis's case. *Williams*, 529 U.S. at 413.

Should the Court address the issue, Davis submits that *Dawson* **does** clearly establish that for evidence of a defendant's group membership to be admissible without violating the First Amendment, there must, at a minimum, be "proof of the group's violent and illegal activities." *Davis*, 329 S.W.3d at 805. Indeed, this was identified by the CCA as a requirement under *Dawson*. *See id.* The State's argument that "*Dawson* only held that this element was missing in Dawson's case, not that it is required," ignores one of the primary holdings of *Dawson*: that the association evidence was not relevant "[b]ecause the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts." *Dawson*, 503 U.S. at 166. This was a holding and not merely dicta, as demonstrated by the Court's rationale:

> Before the penalty hearing, the prosecution claimed that
> its expert witness would show that the Aryan Brotherhood

is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates. *If credible and otherwise admissible evidence to that effect had been presented, we would have a much different case.*

*Dawson*, at 165 (emphasis added). *See also Dawson v. State*, 608 A.2d 1201, 1203 (Del. 1992) (finding the above sentences to be part of the "*ratio decidendi* of *Dawson's* holding"). The absence of any evidence that the Aryan Brotherhood branch Dawson belonged to "had committed any unlawful or violent act, or had even endorsed such acts," *Dawson*, 503 U.S. at 166, "was therefore *indispensable* to the decision in [*Dawson*]. That means it was a holding of this Court for purposes of AEDPA." *Andrew*, 145 S. Ct. at 81 (emphasis added).[16]

---

[16] *Dawson* drew from cases involving other First Amendment protections. *Dawson*, 503 U.S. at 168 (citing *Schware v. Board of Bar Examiners of N.M.*, 353 U.S. 232 (1957); *Bates v. Little Rock*, 361 U.S. 516 (1960); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). These cases are instructive, particularly given this Court's concern that the CCA's reasoning "could permit associational guilt." *Davis*, 2025 WL 1766785 at *5. For example, in *Schware,* the Court held that a state could not deny bar admission to a previous member of the Communist Party "when there is no connection between that membership and the 'good moral character' required by the State to practice law." *Dawson*, 503 U.S. at 168. The *Schware* Court observed that "[a]ssuming that some members of the Communist Party . . . had illegal aims and engaged in illegal activities, *it cannot automatically be inferred that all members shared their evil purposes or participated in their illegal conduct.*" *Schware*, 353 U.S. at 244-447 (emphasis added).
Consistent with *Schware*, Supreme Court precedent clearly establishes that an individual cannot be penalized for membership in a group if "some" members of the group engage in unlawful activities, absent proof that the individual specifically engaged in or intended to support the unlawful activities. *See*, *e.g.*, *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937) (holding that an individual cannot be penalized for assisting in the lawful meeting of an organization, even

Finally, this Court noted that the CCA reviewed Davis's Satanism claim under an abuse-of-discretion standard for the admission of evidence. *Davis*, 2025 WL 1766785 at *3. The CCA did not independently determine whether Davis's religious beliefs and associations fell within the protections of the First Amendment; it simply deferred to the trial court's evidentiary ruling that they did not, which it then reviewed for abuse of discretion. This departs from well-settled precedent that rulings on constitutional questions are reviewed *de novo*. *See*, *e.g.*, *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006) ("we review a constitutional legal ruling, *i.e.* whether a statement is testimonial or non-testimonial, *de novo*. . . . By contrast, appellate courts review a trial court's determination of whether evidence is admissible . . . only for an abuse of discretion.").

## 2.    2254(d)(2) Does Not Bar Relief.

Davis also submits that the CCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

"[i]f the persons assembling have committed crimes elsewhere[.]"); *Scales v. United States*, 367 U.S. 203, 229 (1961) (individual cannot be punished for association with a group that has both legal and illegal aims unless there is "clear proof that a defendant specifically intend[s] to accomplish [the aims of the organization] by resort to violence." (Internal quotations and citations omitted)); *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982) ("Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence."). *Dawson* must be understood in the context of this jurisprudence.

proceeding." 28 U.S.C. § 2254(d)(2). It unreasonably determined that the state proved Davis belonged to a group that engages in or advocates "violent and illegal activities" based on Haley's testimony "that *some members* of the Satanic religion advocate violence, that Satanic religious publications like the ones found in appellant's cell discussed 'rituals of destruction' for performing 'human sacrifice' on 'undesirable [and] obnoxious individual[s],' and that various people had committed murder and mutilation 'in the name of Satan.'" *Davis*, 329 S.W.3d at 805-06 (emphasis added).

Evidence about the activities of "some members of the Satanic religion" does not prove that Davis belongs to a group that engages in or endorses violent and illegal activities. The state has never disputed Dr. Melton's testimony that Satanism encompasses "very different phenomena" ROA.15467; it is undisputed that Davis subscribed to the type of Satanism practiced by the Church of Satan; and despite the diversity among Satanists and the different forms of Satanism, the State vociferously objected when the defense attempted to ask Haley whether the Church of Satan sanctioned violence, and the trial court precluded that line of questioning. ROA.15374.

The CCA's reliance on Haley's "literal interpretation" of certain texts that referenced human sacrifice and "rituals of destruction" was also objectively unreasonable in light of testimony from Dr. Melton and Davis himself that those

references are symbolic, and that the Church of Satan prohibits violence and illegal activities. ROA.15477-78, 15542-43.[17] The CCA's finding that it was "within the zone of reasonable disagreement" for the trial court to decide the Satanism evidence was relevant does not insulate the state court's determination from review or preclude a finding that the determination was unreasonable in light of the totality of the evidence. *See Brumfield v. Cain*, 576 U.S. 305, 323 (2015) (state court's assessment of expert evidence was unreasonable when there was "ample evidence" supporting petitioner's claim); *Miller-El*, 537 U.S. at 340 ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review" and "does not by definition preclude relief.").

---

[17] Haley's qualifications as a Satanism "expert" are, at best, highly questionable. *See Davis*, 2025 WL 1766785 at *5 n.7. The only qualified theologian who testified (Dr. Melton) was unequivocal that the texts of the Church of Satan should not be taken literally, but symbolically. Moreover, in religious freedom cases, the focus is not on an objective or literal reading of religious texts, or even on the predominant views of a religion, but on an individual's "sincere religious beliefs and conviction." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 625, (2018). Thus, in assessing whether a defendant's religious beliefs are relevant to sentencing, the focus must be on the defendant's own subjective beliefs. *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981) ("Intrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses."); *Witmer v. United States*, 348 U.S. 375, 381 (1955) (in religious freedom cases, "objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, *purely a subjective question*.") (emphasis added).

### D.     Prejudice

#### 1.     The *Brecht* Standard

A federal court may not grant relief unless constitutional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* <u>507 U.S. at 627</u>. This standard is met when the federal court "harbor[s] 'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome." *Brown v. Davenport*, <u>596 U.S. 118, 135-36</u> (2022). Proof of a causal connection between the constitutional error and the jury's verdict is not necessary, *O'Neal v. McAninch,* <u>513 U.S. 432, 444</u> (1995), and, most importantly, *Brecht* does not operate as a sufficiency-of-the evidence test. *O'Neal,* <u>513 U.S. at 438</u>; *Davis,* <u>2025 WL 1766785</u> at *6. In applying *Brecht*, "a federal habeas court may consult and draw on the whole body of law," and is not limited to Supreme Court precedents as of "the time the state court renders its decision." *Davenport*, <u>596 U.S. at 136</u> (quoting *Cullen v. Pinholster*, <u>563 U.S. 170, 182</u> (2011)).

#### 2.     Highly Inflammatory Nature of Satanism Evidence

This Court acknowledged that the Satanism evidence might have been so inflammatory that it "drove the conclusion on future dangerousness." *Davis*, <u>2025 WL 1766785</u> at *6. The trial court, too, observed the exceedingly inflammatory nature of the evidence it admitted. <u>ROA.13835-40</u>, <u>15196</u>. While *Brecht* does not require Davis to prove that the inflammatory Satanism evidence had a causal

35

connection to the jury's verdict, this Court should, at the very least, harbor a grave doubt about whether the error affected the verdict.

Several courts have acknowledged that evidence related to Satanism is highly prejudicial.[18] "A favorable view of the biblical figure of Satan is generally understood as a symbolic rejection of the values of love and compassion, and as indicating acceptance of the contrary values of hatred and violence, with a consequent rejection of all moral restrictions on crimes such as murder." *People v. Ayala*, 101 Cal.App.5th 62, 72, (2024) (citation omitted) (finding error in admission of evidence of the defendant's "Satan worshipping," and that "the potential for unfair

---

[18] *See State v. Kimbrell*, 320 N.C. 762 (1987) (harmful error found when "[t]he real effect of questions about devil worship, satanic bibles, graveyard seances, and the like, which in this particular case had little or no probative value, can only have been to arouse the passion and prejudice of the jury"); *State v. Wyatt*, 198 W.Va. 530, 544 (W.Va. 1996) (reversible plain error occurred when state introduced evidence of defendant's "past participation in satanic rituals"; evidence was "facially irrelevant and highly prejudicial in the absence of probative evidence that the central issues in the case were related to any such rituals"); *United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996) (finding heightened potential for prejudice resulting from introduction of "clearly inflammatory" evidence of defendant's gang membership because evidence included "tattoos and clothing containing devil's heads and demonic insignia" and because the name of the gang meant "devils" in Spanish); *State v. Leitner*, 272 Kan. 398, 415-16 (2001) ("[O]ur culture associates witchcraft with Satanic worship and other evil practices," and mention of these practices is "highly prejudicial."); *Boring v. State*, 289 Ga. 429, 434-35 (Ga. 2011) (where there was no connection between the defendant's religious beliefs and the crime itself, the Georgia Supreme Court was left "with the feeling that the [evidence of Satanism and "gothic" beliefs"] was employed simply because the jury would find these beliefs morally reprehensible.") (quoting *Dawson*, 503 U.S. at 167).

prejudice is patent"). "Satanism is essentially synonymous with evil character," and there is no "evidence that carries a greater danger of unfair prejudice than evidence of a person's association with Satanism, especially where, as here, there is no evidence that a defendant ever acted on his Satanic beliefs to cause harm in the past." *State v. Stensrud*, 134 Wash.App. 1031, 2006 WL 2329474 at *14 (2006).

The danger of unfair prejudice is even greater in a capital sentencing trial where Satanism evidence is introduced as evidence of the defendant's bad character and future dangerousness, and particularly where, as here, there is no connection between the Satanism evidence and the crime.

### 3. Geography Matters.

In assessing the prejudicial impact of improper religious testimony, courts have considered the religious demographic of the jurisdiction where the case was tried. In *State v. Lovell*, 2024 UT 25 (2025), defense counsel were found ineffective for failing to object to testimony about the defendant's excommunication from the Mormon Church at his capital sentencing trial. The prosecution elicited testimony that Lovell would have to repent to be readmitted to the Church and that he had not been readmitted, suggesting he was not remorseful for the crime. *Lovell*, 2024 UT ¶¶ 81-85, 565 P.3d at 513-514. The Court found that the prejudicial nature of the testimony was "even more acute considering our State's religious demographics," noting that the majority of Utahns are members of the Mormon Church. 2024 UT ¶¶

37

131-132, 565 P.3d at 521. The Court emphasized that "[i]n some instances, general demographic information on its own might be sufficient to undermine our confidence in the proceedings because there is a reasonable probability that at least one juror would be swayed by improper religious testimony." 2024 UT ¶ 134, 565 P.3d at 522.

In Davis's case, the common perception that Satan is synonymous with evil was even more likely to prejudice the jury because of the religious demographic of El Paso County and the jurors themselves. Historical data shows that at the time of Davis's resentencing, the residents of El Paso County were predominantly Catholic, with Evangelical Protestantism as the second largest denomination.[19] Indeed, the majority of the sitting jurors in Davis's case considered themselves either Catholic or Christian.[20] Both the trial judge and Davis's counsel acknowledged the prejudicial impact of the Satanism evidence on a largely Catholic and Christian jury pool. ROA.13835-37. Based on the State's repeated assurances that it would present

---

[19] *See* The Association of Religion Data Archives, El Paso County, Texas - County Membership Report (2020), Religious Traditions (1980 - 2020), Percent of Population, available at *https://www.thearda.com/us-religion/census/congregational-membership?y=2020&y2=0&t=0&c=48141* (last visited September 4, 2025).

[20] ROA.13881(Irma Medina), ROA.14069-70 (Victor Reveles), ROA.14325 (Veronica Collier), ROA.14434 (Nydia Estrada), ROA.14497(Robert Sanchez), ROA.14553 (Karrie Rubendale), ROA.14646 (Maria Cordova), ROA.14680 (Norman Roberts), ROA.14923 (John Almanzar), ROA.15056 (Jessica Portillo).

expert testimony that Davis belonged to a "violent group," the trial court allowed limited voir dire on the topic of Satanism but cautioned that "[w]e cannot voir dire on something as highly inflammatory as Satan worshipping if you don't have the proof" because "it is so highly prejudicial and inflammatory that if you do not have what you say you are going to have, it could be harm." ROA.13838, 13840.

### 4.    Davis Was Prejudiced.

The Satanism evidence in Davis's case was particularly potent and prejudicial considering the nature of the specific evidence that was presented and the State's arguments about the evidence. This included testimony from a medical expert that directly tied the Satanism evidence to the future dangerousness issue, and the State's reliance on the expert testimony to argue that the Satanism evidence could be "enough" to sentence Davis to death.

Similar concerns arose in *Buck v. Davis,* 580 U.S. 100 (2017). There, the defense called a psychologist who testified that Buck was more likely to be violent because he is black. 580 U.S. at 107-108. In closing, the state emphasized the defense expert's testimony as supporting a finding of future dangerousness. *Id*. In concluding that counsel's performance was prejudicially deficient for presenting this testimony, the Supreme Court found it significant that the expert's testimony on the "key point" of future dangerousness appealed to "a powerful racial stereotype" and, in combination with the nature of the jury's inquiry into future dangerousness, "this

created something of a perfect storm." *Id.* at 121. The prejudicial effect "was heightened due to the source of the testimony"—a medical expert. *Id.* Accordingly, the Supreme Court rejected the argument that the references to race were "*de minimis*" because there were only "two references to race in Dr. Quijano's testimony." *Id.* As the Supreme Court explained: "when a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much airtime it received at trial or how many pages it occupies in the record. **Some toxins can be deadly in small doses**." *Id.* at 122 (emphasis added).

Here, similar to *Buck*, the Satanism evidence appealed to inaccurate stereotypes of Satanists and Satanism, and the state relied on this evidence to argue the "key point at issue"—whether Davis was likely to be a future danger. As in *Buck*, some of the testimony about Satanism came from the mouth of a medical expert who directly tied Davis's interest in Satanism to the issue of future dangerousness. Dr. Gripon testified that in his expert opinion, a hypothetical defendant who "marks his body with a pentagram, becomes a satanist" "would be likely to continue to pose a continued threat." ROA.15441-44. He further testified that Satanism was an "extreme" religion and "you would always worry . . . about people who end up kind of on the periphery of something that extreme." ROA.15456-57. In closing argument, the state capitalized on Dr. Gripon's testimony, arguing that "in his

professional opinion, satanism was extreme … Maybe that's enough for you." ROA.15607. The State later reiterated, "If satanism is enough for you, so be it." ROA.15610. The amount of testimony and argument devoted to Satanism was in fact much greater than the two references to race in *Buck*. In contrast to *Buck*, the Satanism evidence was not handed out in small doses but was an important part of the state's case. Given that the Supreme Court in *Buck* assessed prejudice under the higher "reasonable probability" standard, a finding of harm in Davis's case under the lower *Brecht* standard is inescapable. *See Kyles*, 514 U.S. at 435–36 (*Strickland* requires a higher showing of prejudice than is required under *Brecht*).

In Davis's case, the state "repeatedly and openly invited the jury to do precisely what the law does not allow"—to rely on Davis's constitutionally protected religious beliefs to impose a death sentence. *People v. Young*, 7 Cal. 5th 905, 954, 445 P.3d 591 (2019) (admission of the defendant's white supremacist beliefs in the penalty phase violated the First Amendment and was not harmless where prosecution repeatedly invited the jury to rely on Young's protected beliefs to impose the death penalty). *See also Dawson v. State*, 608 A.2d 1201, 1205 (Del. 1992) (after Supreme Court remand, finding it "impossible to conclude that the admission of the Aryan Brotherhood evidence was harmless when the State candidly acknowledged that it relied on the evidence to support the "central theme that Dawson had an incorrigible character."); *Buck*, 580 U.S. at 119 ("It would be

patently unconstitutional for a State to argue that a defendant is liable to be a future danger because of his race."); *Zant*, 462 U.S. at 885 (identifying religion as a factor that is "constitutionally impermissible or totally irrelevant to the sentencing process[.]"). Given the nature of the state's arguments and the evidence presented, it is impossible to conclude that the admission of the evidence was harmless.[21]

Additionally, this Court expressed concern that "the jury also might have been influenced by the inflammatory evidence in considering other issues, such as whether mitigating circumstances were present." *Davis*, 2025 WL 1766785, at *6.

---

[21] Indeed, some jurisdictions have determined that where a death sentence is based on the improper use of constitutionally-protected activities, the error is not subject to harmless error analysis. *See Flanagan v. State*, 109 Nev. 50, 57, 846 P.2d 1053, 1058 (1993) (where the prosecution "submitted evidence of appellants' religious beliefs in violation of the Constitution" and "used this evidence as a nonstatutory aggravating factor," "due process of law requires that the jury's decision to impose death be set aside," and "leaves no room for a harmless-error analysis."). The *Dawson* Court reserved this question, 503 U.S. at 168-169, though Justice Blackmun, in his concurrence, opined that harmless error review was inappropriate. *Id.* at 169. *Zant* supports this principle as well: "If, under the instructions to the jury, one way of committing the offense charged is to perform an act protected by the Constitution, the rule ... requires that a general verdict of guilt be set aside even if the defendant's unprotected conduct, considered separately, would support the verdict." 462 U.S. at 883. It may also be that this fundamental constitutional error implicates the right to an impartial adjudicator, rendering it structural, *Gray v. Mississippi*, 481 U.S. 648, 668 (1987), just as when racial bias is injected into a criminal trial. And the perversion of protected First Amendment activity to prejudice jurors against an accused – and send him to death row – effectively denies the right to an impartial adjudicator. Such an error is thus structural, just as when racial bias is injected into a criminal trial. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986).

The record bears out the Court's concern. For example, the defense argued in closing that one of the primary mitigating factors was Davis's remorse. ROA.15595-96, 15600-05. Relying on the Satanism evidence, the state argued in response that Davis was simply a "con man" and that his show of remorse was incredible. ROA.15591-93, 15606-07. Thus, the state directly tied the Satanism evidence to Davis's alleged lack of remorse.

The Satanism evidence also impacted the jury's consideration of penalty phase evidence in other ways. For example, jurors may have attached more weight to the aggravating circumstances of the crime based on Haley's improper testimony that attempted to connect Satanic literature to the facts of the crime. ROA.15462-63 (Haley testifying that to "destroy a person" according to the Satanic Bible could mean "[y]ou can cut their fingertips out."). The state compounded the prejudicial effect of this testimony by drawing a throughline between the facts of the crime and Davis's later interest in Satanism:

> God, he cuts her fingers off and he hides them. Does everything he can to not get caught. He's not getting anything. Then he goes to prison and he says, "I didn't do it." And then once he gets to prison he becomes a satanist. And all that stuff is there.

ROA.15609. The State also tried to connect the crime to Satanism when it argued that Buddhists (in contrast to Satanists) "don't go around raping and killing little girls." ROA.15607. Considering Haley's testimony in combination with the state's

arguments, it is likely the Satanism evidence caused jurors to attach more weight to the aggravating facts of the crime than they otherwise would have.

The Satanism evidence also impacted the jury's assessment of Davis's drawings and the evidence that when he was around 15 or 16 years old, he was involved in a BDSM or bondage relationship with a woman in her late thirties. ROA.15550, 15568. While Davis's "relationship" with an older woman had mitigating value in that it demonstrated he was a victim of statutory rape, the state argued it was aggravating because it showed Davis was a "sexual deviant," and that this was further reason to sentence him to death. ROA.15591-92.

The state also referred to Davis's "sexually suggestive artwork," including several drawings of women in bondage gear. ROA.15593. The state argued that Davis had "six years to have a good explanation" for his drawings, but that his explanations were incredible considering his previous BDSM relationship with an older woman. ROA.15593. The state later returned to the theme that Davis was a "con man," again referring to his "explanations for all of these pictures, commissioned art and all that." ROA.15607.

It is important to note that the state did not present any evidence that Davis's drawings of women were related to his beliefs in Satanism.[22] Moreover, any

---

[22] This Court suggested that Davis's drawings could be relevant to the harmless error analysis. *Davis*, 2025 WL 1766785 at *6 n.9. However, the state presented no evidence that Davis's drawings of women in bondage gear had any

characterization of the drawings as "violent" is questionable at best. Davis indicated that some of the drawings were for a friend who was involved in a *consensual* BDSM relationship with his girlfriend (ROA.15557-60); another drawing was based on an album cover depicting the female lead singer of a death metal band (ROA.15557); and another drawing was based on a photograph of the actress Penelope Cruz published in *Vanity Fair* (ROA.15557). These drawings reflected nothing more than Davis's interest in an alternative sexual lifestyle (involving *consensual* sexual activity), they did not depict any illegal activity, and none were considered contraband by the jail. ROA.15422. Nevertheless, the state relied on the drawings to label Davis a "sexual deviant," which magnified the prejudicial impact and shock value of the Satanism evidence. The state's argument comparing Davis to a pedophile preying on neighborhood children made the Satanism evidence all the more inflammatory. ROA. 15591-92.[23] Labeling Davis as both a "sexual deviant"

---

connection to his beliefs in Satanism or even depicted any illegal activity. The drawings did not make Davis's interest in Satanism relevant under *Dawson*, as they did not establish that Davis associated with a violent branch of Satanism; in fact, the drawings did not have any connection to Satanism at all.

[23] The prosecutor argued, "Just think if somebody like this moved in next door to you and you knew this, a sexual deviant moved in next door. Would you think you'd want him to get the heck out of there? Why would you think that? If your kid was near him, you'd be terrified. Yeah."

and a Satanist had a compounding effect and appealed to the jurors' fears and prejudices.

## II.   DAVIS'S RESENTENCING COUNSEL WERE INEFFECTIVE.

Despite having a rare "second bite" at convincing a jury to sentence Davis to life, counsel—one of whom was also involved in the original trial where Davis received a death sentence—failed to take advantage of this second chance. Lead counsel Macias was appointed in August 2007 yet, without any reasonable tactic or strategy, waited *months*—until the night before voir dire in January 2008—to seek the appointment of an investigator (not even a mitigation specialist). Without any reasonable tactical or strategic reason, counsel also waited until the eve of voir dire to begin speaking with Mr. Davis's family members and to seek the appointment of a mental health expert, leaving the expert insufficient time to evaluate the powerful mental health aspects of Davis's life. Without a reasonable tactical or strategic reason, counsel failed to follow up on numerous red flags that would have caused competent counsel to investigate further.

Counsel's lackluster preparation is even more unreasonable because they knew that the state's case was not going to be a "do-over" of the first proceeding; it was now armed with Satanism evidence it did not have the first time around. In contrast to the defense, the prosecution continued to investigate its case, notifying the defense of an ever-growing list of extraneous offenses it intended to present.

ROA.5910-16. In other words, while the state changed its tactics to accommodate new information, the defense remained frozen in time and made at best a torpid attempt to formulate a mitigation case that was different from the unsuccessful first trial.

The jury that sentenced Irving Davis hardly knew him due to his trial counsel's prejudicially deficient performance in failing to investigate and present a wealth of compelling and documented mitigation, including mental health mitigation. *See Strickland v. Washington*, 466 U.S. 668 (1984).

### A.    Deficient Performance

Capital defense counsel have an "obligation to conduct a thorough investigation of the defendant's background." *See Williams v. Taylor,* 529 U.S. 362, 391-99 (2000). The Supreme Court has reaffirmed this duty several times. *See, e.g. Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009); *Sears v. Upton*, 561 U.S. 945 (2010). "In assessing the reasonableness of an attorney's investigation, the Court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. An attorney who obtains only "rudimentary knowledge from a narrow set of sources," despite awareness that other mitigating evidence is reasonably available, is deficient. *Id*. at 524; *see Rompilla*, 545 U.S. at 377. Counsel

may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40. Fulfilling the duty to investigate[24] is the predicate for all subsequent decisions, and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Walbey v. Quarterman*, 309 Fed. Appx. 795, 800 (5th Cir. 2009) (quoting *Wiggins*, 539 U.S. at 521).

## 1.    Tardy, Torpid and Truncated Investigation

Counsel's conduct in Davis's case must be viewed through the lens of Texas's capital sentencing procedures: "In Texas, a jury cannot recommend a death sentence without unanimously finding that a defendant presents a future danger to society, and "[only after a jury makes a finding of future dangerousness can it consider any mitigating evidence . . ." *Andrus v. Texas*, 590 U.S. 806, 821 (2020). Thus, when Texas capital attorneys fail to conduct even a marginally adequate investigation, they not only "seriously compromise" the opportunity to respond to a case for aggravation, *Rompilla*, 545 U.S. at 835, they also "relinquish[] the first of only two procedural pathways for opposing the State's pursuit of the death penalty." *Andrus*, 590 U.S. at 821

---

[24] *See also* American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), Guideline 11.4.1—Investigation.

Counsel never hired a mitigation expert or mitigation investigator; rather, they sought the appointment of Sam Streep, who was the fact investigator for the first trial. Streep was appointed on or around January 8, 2008, ROA.1714-15, 1766-67, at the time of voir dire. Counsel undertook no investigation of any sort in Davis's case between 2002, when Davis was originally tried, and 2007, when the resentencing was ordered. ROA.1796-97. Nor did Streep. ROA.1798. Attorney Morales, the self-described point person with Davis's local family members, ROA.1716-17, acknowledged that his first billing entry for talking to family was on January 8, 2008, the day before voir dire commenced. ROA.1717.

Because of their lapses, counsel overlooked or ignored numerous red flags, many of which were contained in documentation provided to the defense by the prosecution or in reports submitted by the appointed mental health experts. For example, counsel knew that:

- Davis had attempted suicide on numerous occasions and was a "cutter," that is, someone who engaged in self-mutilation. ROA.1520,1776;

- CPS intervened in the family more than once. ROA.1776-77;

- Before trial, Davis reported childhood physical and sexual abuse by multiple individuals to a defense expert, ROA.3625-26 (Dr. Schutte) and to a court-appointed competency expert, ROA.1521-22, 2371-72 (Dr. Ramirez); Davis specified to Dr. Ramirez that "he was sexually abused periodically from the ages of five through age eighteen" by a "family member," a "neighbor," and a "friend." ROA.1521. He also related that "his father was extremely physically abusive" as well as "extremely emotionally abusive." ROA.1521.

49

- An older women sexually abused Davis for several years starting around when he was around 15 and up until he turned 18 and was "too old for her." Counsel acknowledged at the state habeas evidentiary hearing that this "relationship" could be "termed sexual abuse." ROA.1737;

- Davis reported to medical correctional staff in 2006—years before his resentencing—that "I want to die, the sooner the better, I am looking forward to it," and staff reported that Davis "looks/acts very depressed" and that a "psych visit will be made today." ROA.5401; this document was part of a larger discovery disclosure by the state on December 5, 2007. ROA.5398;

- Davis was diagnosed on May 13, 2005, with "major depressive disorder, recurrent," which was first observed as early as 2004. ROA.5417; this document was part of the State's pre-trial discovery disclosure; documents note the same diagnosis on November 11, 2005, ROA.5403, and on March 5, 2006, ROA.5473;

- On July 15, 2002, prison officials noted that Davis was suicidal, on 15-minute watch, suffering from depression, and was pending a special mental health clinic appointment. ROA.5493;

- Davis had been prescribed Pamelor, an anti-depressant, in early 2003, as noted in documents provided to defense counsel by the state. ROA.5413;

- Davis had been diagnosed with "major depressive disorder, recurrent" on May 13, 2005, again noted in documents provided to defense counsel by the state. ROA.5417;

- Davis had been prescribed the anti-depressant Wellbutrin in 2004 and remained on it for years, also noted in state-provided documents. ROA.5349, 5442;

- Davis reported to mental health services on December 22, 2003, that he felt "unhappy," was pondering waiving his appeals, and described "two suicide attempts from before he came to prison . . ." ROA.5499;

- Davis reported to mental health services on August 15, 2002, that he requested counseling because of depression and that he had lost 10 pounds in 2 weeks. ROA.5560;

- Davis reported to mental health officials on July 19, 2002, a history of suicide attempts including in the 6th grade, and also that he has burned himself with cigarettes to "punish self." ROA.5571;

- Davis reported to mental health officials on July 19, 2002, that he had been beaten by his father until he left at around 13 years old. ROA.5571;

- Davis reported to mental health officials on July 18, 2002, a history of mental illness and that he was a Buddhist. ROA.5590; on that same day he also reported treatment for mental illness in June 2000, and that he was presently taking medications including Doxepin and Prozac. ROA.5591;

- Davis reported to corrections personnel a history of 4 suicide attempts, one at age 12 by hanging, at age 15 by cutting his wrists, and at ages 17 and 18 by overdosing on sleeping pills. ROA.5271;

- Correctional personnel note, in a July 18, 2002, report, that Davis has "cigarette burns and knife cuts on left forearm." ROA.5727.

Counsel's professed strategy was to humanize Davis and "talk[] about his background and his upbringing, obviously," ROA.1747-48. However, the state court record undisputedly establishes that (1) counsel did not hire a mitigation investigator, and the only investigator they had was not hired until the time of jury selection and about a month before the presentation of evidence, (2) no investigation was done in between the first trial and resentencing trial; in fact, no one from the defense team even kept in touch with Davis during that time, (3) red flags abounded to put counsel on notice of potential areas of investigation, and (4) counsel waited

too long to seek a mental health evaluation of Davis, leaving the expert insufficient time to arrive at any conclusions.

Furthermore, counsel's decision to limit their investigation was not strategic. Counsel testified at the state habeas hearing that they "didn't always know whether [Davis] was going to get up on the stand," and that he didn't decide until the "particular day" of his testimony or "the night before." ROA.1733, 1754. Thus, Davis's decision to testify was not part of a "long-standing-well-developed defensive strategy" that counsel considered "all long" as a justification for limiting the scope of their investigation. ROA.1754-55. Even if Davis's last-minute decision to testify made the defense presentation of mitigating evidence more difficult, this does not excuse the failure to reasonably investigate in the first place. *See Williams*, 529 U.S. at 396 (failure to uncover and present voluminous mitigating evidence not justified as a "tactical decision" to focus on Williams' voluntary confessions because "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."). Relying on Davis's decision to testify is "more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-27. Counsel offered no other justifications for failing to investigate red flags or to follow up on mitigating information available to them. *See Andrus*, 590 U.S. at 816-17 (finding deficient performance where "counsel never offered, and no evidence supports, any tactical

rationale for the pervasive oversights and lapses here"). That counsels' decision to limit their investigation was not strategic is further supported by the fact that counsel did in fact "put on a halfhearted mitigation case." *Wiggins*, 5239 U.S. at 512.

### B.    Prejudice

A wealth of available mitigating evidence was never presented to Davis's jury, and there is more than a reasonable probability of a different outcome had the jury been apprised of it. The extensive list of categories of mitigation that Davis presented in his state habeas application included detailed evidence of: (1) a history of mental, physical, and sexual abuse, at the hands of his father and family "friends," (2) a history of suicide attempts, cutting, and other self-mutilation, such as extinguishing lit cigarettes on his forearm, (3) a history of depression for which he was medicated in jail following his initial conviction, (4) a history of sexual abuse of his brother by their father, (5) parental neglect, abandonment, and alcoholism, (6) a history of child protective service/law enforcement involvement with the family, and (7) his father's criminal history, including his court-martial for raping a woman.

The declaration of mitigation specialist Vince Gonzales, submitted with Davis's state habeas proceeding, provides further detail about the mitigating information Davis's jury did not hear. Gonzales conducted multiple interviews with members of Davis's family, spoke with investigator Streep, and reviewed a wealth of documents. ROA.3587. His conclusions comport with the other information

presented in habeas, namely, that Davis is "the product of a profoundly dysfunctional family" where both parents were alcoholics and never lived long in one place. ROA.3590. Davis's "mental and emotional disconnection from normalcy" began with a difficult birth but was "mainly brought about by the brutality of his childhood." ROA.3590. His adolescent and teen years were marked by periods of "uninterrupted instability," "intermittent absences of his father," and "regular physical, sexual, and emotional abuse to which he was subjected when his father was present, and neglect by an exhausted, abused, and clinically depressed mother when his father was away." ROA.3590. Gonzales recounted two instances (one in North Carolina and one in California) where child protective services was called and investigations conducted. ROA.3590. The pressures of his circumstances "led Irving to engage in acts of self-mutilation as a teenager, cutting his body with razor blades, and in turn to multiple suicide attempts by the same means." ROA.3590. Gonzales also recounted Buddy's criminal history, which included the court-martial for the rape of a neighbor and a 2006 conviction for "indecent liberty on a minor" for which he served prison time and had to register as a sex offender. ROA.3590-91.

Moreover, counsel offered no justification for failing to present any mitigating evidence from the chosen mental health expert, Dr. Schutte. Of course, the reason why Dr. Schutte did not testify was that counsel sought his appointment too late, and, as Dr. Schutte's declaration establishes, he would have been able to provide the

jury with "expert psychological testimony about the impact of Mr. Davis's history of childhood abuse and mental illness on his behavior in the matter for which he was charged . . . ." ROA.6824.

The unpresented mitigating evidence could have convinced a single juror to vote for life. The jury deliberated on Davis's sentence for approximately two days; during deliberations, the jury asked multiple times for a transcript of Davis's testimony and specifically asked to see his testimony regarding "[t]he relationship with his father." ROA.5974. Given the jury's interest in Davis's relationship with his father, there is more than a reasonable probability that at least one juror would have been persuaded by evidence that the "whoopings" Davis testified to were only the tip of the iceberg, and that his father subjected him to tortuous physical and sexual abuse for years.

While it is true that Davis's mother and Davis himself testified to some areas of Davis's background, the state's closing argument eviscerated the credibility of that testimony, labeling Davis a "liar," a "con man," a "junkie," and a devil-worshipping "sexual deviant" who "wasn't honest with you [jurors]." ROA.15591, 15593, 15606-07. With no independent corroborating evidence amassed by counsel, Davis's testimony, and that of his mother, were left vulnerable to such attacks. In any event, that Davis's counsel presented *some* mitigation evidence does not preclude a finding of prejudice. *Sears*, 561 U.S. at 955 ("We certainly have never

held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."); *Walbey*, 309 Fed. Appx. at 800-03 (ineffectiveness found where counsel presented testimony of defendant's grandmother, foster parents, and two psychologists); *Rompilla*, 545 U.S. at 382 (ineffectiveness found where counsel interviewed several family members and utilized a "cadre of three mental health witnesses"); *Williams*, 562 U.S. at 369 (finding prejudice where defense counsel presented the testimony of Williams' mother, two neighbors, and psychiatric evidence).

Importantly, had counsel performed effectively, the state's case in aggravation would have been significantly undermined. For example, the prosecution argued that Davis was a future danger in part because he was a "sexual deviant" due to a sexual relationship with an older woman when he was a minor. ROA.15591, 15592, 15609. Had counsel conducted an adequate mitigation investigation, they would easily have discovered that this "relationship" was part of a pattern in which Davis was victimized and sexually abused by multiple adults since childhood—hardly a reason to sentence him to death. There is a reasonable probability that this information would have made a difference to at least one juror, especially given the sexual nature of the crime for which Davis was convicted.

In addition, Dr. Gripon's future dangerousness testimony was predicated in part on a "hypothetical" defendant who "does not ever attempt suicide." ROA.15443. Reasonable counsel would have followed up on the numerous consistent reports of Davis's multiple suicide attempts throughout his life and presented this information in mitigation, and/or challenged Dr. Gripon's opinion on this basis.

Considering the totality of the record, including the aggravating evidence, there is a reasonable probability that at least one juror would have struck a different balance and voted for life. Importantly, aggravated crime facts do not, on their own, defeat a prejudice argument. *See Escamilla v. Stephens*, 749 F.3d 380, 393 (5th Cir. 2014) ("disturbing facts of the crime alone do not defeat [a *Strickland*] prejudice argument"); *Smith v. Dretke,* 422 F.3d 269, 271-72 (5th Cir. 2005) (detailing the petitioner's "week-long crime spree" and ultimately granting a COA on his ineffective-assistance-of-trial-counsel claim). *See also Andrus*, 590 U.S at 824, n. 7 (noting that while the dissent "train[ed] its attention on the aggravating evidence," "[a] proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence ..., along with the mitigation evidence introduced during [the] penalty phase trial") (quoting *Sears*, 561 U.S. 956)).

Other than the improperly admitted Satanism evidence and the facts of the crime, the remaining aggravating evidence consisted primarily of minor incidents of

prior "bad" acts when Davis was a teenager. Moreover, as previously argued, it is likely that the erroneous admission of the Satanism evidence had an improper compounding effect on the aggravating evidence that was properly admitted. As this Court recognized, the state court expressly relied on the Satanism evidence in finding that Davis failed to demonstrate prejudice under *Strickland*. *Davis*, 2025 WL 1766785 at *9 n.16. However, because the Satanism evidence was erroneously admitted, it cannot be considered in assessing whether there is a reasonable probability of a different result.

Indeed, the prejudice flowing from the wrongful admission of the Satanism evidence and the prejudice flowing from counsel's failure to adequately investigate and present compelling mitigation evidence had a "synergistic effect." *See United States v. Houston*, 481 F. App'x 188, 194–95 (5th Cir. 2012) (granting relief where the "synergistic effect" of multiple trial errors "as a whole severely prejudiced Houston and warrants a new trial"). Together, these errors deprived the jury of an accurate picture of Davis's background and life circumstances and presented him in a more aggravating light than would have been presented absent the errors. Accordingly, should the Court have any doubt that Davis has established *Strickland* prejudice, it should find, based on the cumulative impact of these errors, that Davis was severely prejudiced and deprived of a fair sentencing trial. *See*, *e.g.*, *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (granting habeas relief based on the

cumulative   prejudice   related   to ineffective   assistance   of   counsel,
associated/alternative *Brady* error, and prosecutorial misconduct).

**C.     28 U.S.C. § 2254(d) Analysis**

AEDPA does not bar merits review of Davis's claim of deficient performance
and prejudice. First, as previously argued, the state court decision involved an
unreasonable application of *Strickland* because it is predicated on the legally
erroneous assumption that a capital defendant's decision to testify absolves counsel
of the duty to conduct a constitutionally adequate investigation prior to forming any
decisions about what mitigating evidence to present to the jury. However, *Strickland*
and its progeny indisputably require counsel to conduct a reasonable investigation
*before* making any tactical decisions about what mitigating evidence to present.
*Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 523. *See* COA Br. at 39, 49-50.
Additionally, the state court decision unreasonably applied *Strickland* to preclude a
prejudice finding based on the aggravating facts of the crime alone, but "[a] proper
analysis of prejudice under *Strickland*" should not "train its attention on the
aggravating evidence" and instead should take "into account the newly uncovered
evidence ..., along with the mitigation evidence.") *Andrus*, 590 U.S at 824, n. 7
(quoting *Sears*, 561 U.S. 956).

The state court also applied an unconstitutional causal-nexus test, finding the
new mitigating evidence concerning Davis's background would not have made a

difference because he "did not blame" his background for his behavior. ROA.2932. The state court decision was thus contrary to and/or involved an unreasonable application of Supreme Court precedents clearly establishing that such a causal-nexus test is unconstitutional. *See*, *e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (invalidating the Fifth Circuit's test requiring a nexus between mitigation and the crime).

Additionally, the state court decision was based on an unreasonable determination of the facts in the state court record. First, the state court found Davis's claims of suicide attempts, self-mutilation, sexual abuse, and parental neglect were either overstated or not credible.[25] ROA.2931-32. *Davis*, 2025 WL 1766785 at *8.[26] These determinations are objectively unreasonable in light of trial counsel's undisputed testimony at the state habeas evidentiary hearing that: (1) they were aware of Davis's suicide attempts and self-mutilation (yet neglected to investigate

---

[25] In fact, the state court rejected on sweeping credibility grounds each and every declaration submitted by Davis, and each and every allegation of abuse, neglect, or mental health issue contained therein, without providing any reasoning whatsoever. See ROA.7067, 7069, 7077-82.

[26] *Compare* ROA.7079, ¶273 ("This Court finds not credible any allegation by the applicant that he had previously attempted to commit suicide"); *with* ROA.7072 ¶214 ("Attorney Macias's credible testimony at the writ evidentiary hearing establishes that during his pretrial investigation, he learned that the applicant had previously engaged in the practice of self-mutilation ('cutting') and had attempted suicide").

or develop this information), ROA.1776; (2) they were aware that when he was a minor, Davis was in a sexual relationship with an older woman which counsel acknowledged could be "termed sexual abuse," ROA.1737; (3) had they been aware that Davis's father had been convicted of raping a 7 year-old-boy prior to the resentencing trial, and that Davis's half-brother Carl had been sexually abused by their father for years, they would have conducted further investigation regarding whether Davis was sexually abused, ROA.1779; and (4) they were aware that CPS had investigated the family at least once but did not investigate the CPS involvement. ROA.1777. In addition, there was uncontradicted evidence that Davis told both Dr. Schutte and Dr. Ramirez that he had been sexually abused by multiple individuals. ROA.3625-26, 1521. Given this record, the state habeas court's factual findings that Davis's mental health and suicide allegations were not credible were objectively unreasonable.

Second, the state court found that although trial counsel did not hire a mitigation investigator, the fact investigator from the first trial, Sam Streep, had been the investigator on the case "for a number of years." ROA.3236. The state court relied on this finding to reject Davis's argument that counsel did not begin their penalty phase investigation in a timely manner. ROA.3236-37. However, trial counsel expressly testified at the state habeas evidentiary hearing that neither Streep nor any other member of the defense team had been in contact with Davis or

investigated the case at all between the first trial and the resentencing trial, and that Streep was not hired until January 8, one day before the beginning of voir dire and approximately one month before the presentation of evidence. ROA.1766, 1797.[27]

The state court's factual findings regarding prejudice were also unreasonable. For example, the state court's determination that Davis's suicide attempts and self-mutilation allegations were incredible was integral to its finding of no prejudice. *Davis*, 2025 WL 1766785 at *9. It thus did not consider how the *credible* evidence of Davis's suicide attempts and self-harm could have impacted the jury's assessment of the evidence. Indeed, as this Court recognized, the jury might have been given the impression that Davis had not attempted suicide "because the state's future-dangerousness expert was asked to opine on a hypothetical person with Davis's characteristics who, among other things, 'does not ever attempt suicide.'" *Id.* at n.18. The state court determination of prejudice was unreasonable because it ignored the plethora of credible evidence corroborating Davis's suicide attempts and self-harm. *Miller-El*, 537 U.S. at 346 (fact-finding unreasonable where state court ignored relevant evidence); *Brumfield v. Cain*, 576 U.S. 305, 322 (2015) (unreasonable determination where "the state trial court should have taken into account" certain facts).

---

[27] In actuality, counsel did not move for Streep's appointment until January 14, 2008, and the court appointed Streep that same day. ROA.5907.

## CONCLUSION

For the foregoing reasons, Davis requests that this Court reverse the district court's denial of habeas relief and order a new resentencing trial and/or other relief as deemed just and proper.

Respectfully submitted,

*/s/ Todd G. Scher*
TODD G. SCHER
Florida Bar No. 0899741
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
Fax: (754) 263-4147
Email: *TScher@msn.com*

*/s/ Joe A. Spencer, Jr.*
JOE A. SPENCER, JR.
Attorney at Law
1009 Montana
El Paso, TX 79902

*/s/ Richard D. Esper*
RICHARD D. ESPER
Attorney at Law
801 North El Paso Street, Ste. 225
El Paso, TX 79902

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today, September 11, 2025, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notification for this case, including all opposing counsel.

By:    */s/ Todd G. Scher*
       TODD G. SCHER

## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this document is 14,814 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

By:    */s/ Todd G. Scher*
       TODD G. SCHER