No. 24-70008

---

In the United States Court of Appeals
for the Fifth Circuit

IRVING ALVIN DAVIS,

*Petitioner-Appellant*,

vs.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent-Appellee*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION
No.   3:14-CV-00121-KC
(Death Penalty Case)

---

**BRIEF OF
THE INNOCENCE PROJECT OF TEXAS, STEPHEN BRAGA,
AND MICHAEL SNEDEKER AND DEBBIE NATHAN,
AUTHORS OF *SATAN'S SILENCE: RITUAL ABUSE AND THE
MAKING OF A MODERN AMERICAN WITCH HUNT* (1995),
AS *AMICI CURIAE* IN SUPPORT OF APPELLANT
AND THE VACATION OF HIS DEATH SENTENCE**

---

Keith S. Hampton
Attorney at Law
SBN. 08873230
P.O. Box 66488
Austin, Texas 78766
(512) 476-8484 (office)
(512) 762-6170 (cell)
keithshampton@gmail.com

Stacie B. Lieberman
Capital Area
Private Defender Service
State Bar No. 24114481
910 Lavaca Street
Austin, Texas 78701
Phone: (512) 774-4567
stacie@capds.org

## CERTIFICATE OF INTERESTED PERSONS

### *Davis v. Guerrero,* No. 24-70008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioner-Appellant:**
Irving Alvin Davis

**Counsel for Petitioner-Appellant:**
Todd G. Scher, Hollywood FL
Richard D. Esper, El Paso TX
Joe A. Spencer, Jr., El Paso TX

**Respondent-Appellee:**
Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division

**Counsel for Respondent-Appellee:**
Craig Cosper, Office of the Attorney General, Austin TX

**Amici Curiae**
The Innocence Project of Texas
Stephen Braga
Michael Snedeker
Debbie Nathan

**Counsel for Amici Curiae**
Keith S. Hampton
Stacie B. Lieberman

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………iii-viii

INTEREST OF AMICI CURIAE .................................................................1

ARGUMENT

    Introduction ....................................................................... 3

    The prosecution expert regarding the Church of Satan .....................5

    Appellant's writings, artwork and pentagram.................................. 8

    Appellant's future dangerousness expert ...........................................9

    The prosecution sought to inject satanism into this capital punishment trial for good reason: it works…………………………..9

    El Paso's experience with satanism....................................................... 20

    The truth about the Church of Satan came too late and could not counter the potent prejudice this evidence was meant to evoke ...................................................................................... 25

    Conclusion.................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ........................................................ 30

*Davis v. Guerrero*, No. 24-70008, 2025 U.S. App. LEXIS 15976 (5th Cir. June 26, 2025) ...................................................................................................... 3

*Dove v. State*, 768 S.W.2d 465 (Tex.App. – Amarillo 1989, *pet. ref'd*)....21

*Hobbs v. Pasdar*, 682 F.Supp.2d 909 (E.D. Ark. 2009) .............................. 15

## Other Authorities

Anthony G. Volini & Farzana Ahmed, *Strategies to Deter Child Pornography in the Absence of an Encryption Back Door: Tipster Programs, a Licensed Researcher System, Compelled Password Production, & Private Surveillance*, 32 DePaul J. Art Tech. & Intell. Prop. L. 1 (Spring 2022)........................................................................................................ 19

Aja Romano, *Why Satanic Panic never really ended*, Vox (March 31,2021)………………………………………………………...11, 19, 27

Alan Yuhas, *It's Time to Revisit the Satanic Panic*, The New York Times (Mar. 31, 2021)………………………………..……12, 14, 28

Berta Rodriguez, *Dove appeals her 2nd child-molestation conviction*, El Paso Times (Sept. 18, 1988) ..................................................................... 21

Brief of Amicus Curiae, American Psychiatric Association, *Barefoot v. Estelle*, 463 U.S. 880 (1983) ...................................................................... 30

*Charges dropped against men wrongfully convicted in 1992 "Satanic" killing*, CBS News (Feb. 27, 2018)……………………………….16

Christy Lamire, *Remake of The Omen Isn't Terrible, Just Pointless*, EL PASO TIMES (June 9, 2006)......................................................................22

John Felipe Acevedo, *Crime Fantasies*, 46 AM. J. CRIM. L. 193 (2019)…9

Daniel Borunda, *Game Warden speculates 'Satanic ritual' after dead goats found in Northeast El Paso desert*, EL PASO TIMES (May 12, 2021). . . . . 21

Daniel Borunda, *El Paso man arrested in satanic vandalism, burglary of Catholic church*, EL PASO TIMES (July 28, 2023) ........................................ 21

Daniel Goleman, *Proof Lacking for Ritual Abuse by Satanists*, THE NEW YORK TIMES (Oct. 31, 1994)........................................................................ 27

Debbie Nathan and Michael Snedeker, SATAN'S SILENCE: RITUAL ABUSE AND THE MAKING OF A MODERN AMERICAN WITCH HUNT (iUniverse 1995) ……………………………………………………………………..2, 10, 11

Debbie Nathan, *Inside the 'Satan Scare' Industry – The Devil Makes Them Do It – While the nation's cops chase demons, taxpayers get burned,* IN THESE TIMES 15.29 (1991) ........................................................................ 20

Debbie Nathan, *The Making of a Modern Witch Trial*, WOMEN AND OTHER ALIENS (Cinco Puntos Press 1991)……………..………………..21

Diana Washington Valdez, *Hopeful young women perish in city of broken dreams*, EL PASO TIMES (June 23, 2002)...................................................... 24

Emily Battersby & Wolfgang G. Robinson, *Paradise Lost: Media in Injustice and Injustice in Media*, 22 SETON HALL J. SPORTS & ENT. L. 29 (2012) ........................................................................................................ 15

*Frontline: The Child Terror* (PBS)................................................................ 12

*'Hell to pay: Church of Satan mourns arson at New York 'Halloween House,'* THE GUARDIAN (Jan. 16, 2021)........................................................ 19

J.E. Pfeifer, *Perceptual Biases and Mock Juror Decision-Making*, SOCIAL JUSTICE RESEARCH 12(4) (1999) ....................................................................... 10

Jeffrey S. Victor, SATANIC PANIC: THE CREATION OF A CONTEMPORARY LEGEND (Open Court 1993) .............................................................................. 10

Jenny Reichert, & James T. Richardson, *Decline of a Moral Panic: A Social Psychological and Socio-Legal Examination of the Current Status of Satanism*, NOVA RELIGIO: THE JOURNAL OF ALTERNATIVE AND EMERGENT RELIGIONS, 16(2) (2012) ..................................................................... 15, 20

John Cook, *NBC thriller 'Revelations' explores issues of faith, science*, EL PASO TIMES (April 10, 2005) .................................................................... 23

John F. Edens, Jacqueline K. Buffington-Vollum, Andrea Keilen, Phillip Roskamp, and Christine Anthony, *Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel"?*, 29 LAW HUM. BEHAV. 55 (2005) ..................................................................................... 30

Joseph P. Laycock and Eric Harrelson, *The Exorcist Effect*, (Oxford University Press 2024) .............................................................................. 11

Josh Wood, *Louisville to pay $20.5M to men imprisoned for decades in wrongful conviction*, LOUISVILLE COURIER-JOURNAL (Sep. 8, 2023)… 16-17

*Kellers to get $3.4M in 'satanic day care' case*, AUSTIN AMERICAN-STATESMAN (August 23, 2017) ............................................................... 13

Louie Gilot, *Confession in Juarez Slayings Questioned*, EL PASO TIMES (October 1, 2006)……………………………………………………23-24

Mark D. Cunningham, Jon R. Sorenson, Mark P. Vigen, and S.O. Woods, *Life and Death in the Lone Star State: Three Decades of Violence Predictions by Capital Juries* (hereinafter "*Life and Death in the Lone Star State*"), 29 BEHAV. SCI. LAW 1 (2011) .......................................................... 30

Mary de Young, *One Face of the Devil: The Satanic Ritual Abuse Crusade and the Law*, 12 BEHAV. SCI. & L. 389 (1994)…………………………10-11

Mary de Young, *The Devil Goes to Day Care: McMartin and the Making of a Moral Panic*, 20 J. AM. CULTURE (Spring 1997).......................................... 13

*Member of the San Antonio Four shares how Satanic Panic played into her False Conviction*, www.ksat.com (Feb. 16, 2024)......................................... 17

*Mexico: Justice fails in Ciudad Juarez and the City of Chihuahua*, Amnesty International (Feb. 28, 2005)........................................................ 23

Mike McPadden, *6.66 Hot Points Of The '80s Heavy Metal Satanic Panic*, vh1.com (Feb. 11, 2015) ...................................................................... 14

Maggie McNeill, *Mind-Witness Testimony: the Unreliability of First-Person Accounts in Sex Trafficking Discourse*, 7 ALB. GOV'T L. REV. 56 (2014) ..................................................................................................... 22

*Paradise Lost*, Episodes 1-3 (HBO 1996-2012) ........................................... 15

*Parents afraid to believe children's tales of ritual abuse*, AUSTIN AMERICAN STATESMAN (Dec. 13, 1992) ........................................................... 13

Paul Flahive, *After 30 years, a father is exonerated in 'satanic panic' case*, Texas Public Radio (Apr. 11, 2023)……………………………………17

Peter J. Boyer, *Program on Satan Worship Spurs Controversy at NBC*, THE NEW YORK TIMES (Oct. 26, 1988).......................................................... 14

Reichert, J; Richardson, J and Lykes, *Satanism in America: An Update*, SOCIAL COMPASS (2009) ........................................................................ 10

S. A. Wright, *Satanic Cults, Ritual Abuse, and Moral Panic: Deconstructing a Modern Witch-Hunt*, WITCHCRAFT AND MAGIC: CONTEMPORARY NORTH AMERICA (University of Pennsylvania Press 2011)………………………. 18

Skip Hollandsworth, *Possessed by the Devil*, TEXAS MONTHLY (July 1992) ..................................................................................................... 18

*Southwest of Salem* (Motto Pictures, Naked Edge Films 2016)…….12, 17

vii

Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* (2004)…………29

Tonya L. Brito, *Paranoid Parents, Phantom Menaces, and the Culture of Fear*, 2000 WIS. L. REV. 519 (2000) ................................................................ 14

Vania Castillo and Aylin Herrera, *Suspected murderer accused in the slaying of a prominent El Paso lawyer claims the park near the murder scene was a place where satanic rituals took place,* KFOX-14 (October 18, 2023) ................................................................................................................ 21

*West of Memphis* (Sony Classic Pictures 2012) ........................................... 15

## INTEREST OF AMICI CURIAE[1]

The Innocence Project of Texas ("IPTX") is a nonprofit legal organization dedicated to investigating and litigating claims of actual innocence in Texas. Since its founding in 2006, IPTX has secured the exoneration and release of dozens of wrongfully convicted individuals, including some of the most significant non-DNA exonerations in the nation. IPTX also advocates for systemic reform in Texas's criminal justice system, including legislation addressing eyewitness misidentification, forensic science reliability, and prosecutorial misconduct. Courts and legislatures across the country have recognized IPTX's leadership in correcting and preventing miscarriages of justice.

IPTX's work is also informed by the experience of exonerees who now contribute to its mission. Anna Vasquez, one of the "San Antonio Four" who were wrongfully convicted during the height of the Satanic Panic and later fully exonerated, now serves as IPTX's Exoneree Outreach Director. Her lived experience as a victim of panic-fueled injustice underscores IPTX's interest in ensuring courts recognize the dangers posed by inflammatory and irrelevant evidence like that admitted in Mr. Davis'

---

[1] Pursuant to F.R.A.P. Rule 29(a)(4)(E), Amici affirm that no counsel for any party authored this brief in whole or in part, and no person or entity other than Amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Amici file this brief with the consent of all parties.

1

case.

Stephen Braga is lead counsel for Damien Echols, one of the wrongfully convicted defendants in the notorious "West Memphis 3" case, in which the prosecution alleged the murders were committed as part of a satanic ritual. After securing an *Alford* plea resulting in Echols' release in 2011, Braga continues to represent Echols in efforts to prove his innocence. Braga's interest in this case stems from his experience representing Echols and seeing, first-hand, how the introduction of satanism evidence can have long-lasting prejudicial impacts on the criminal justice system.

Michael Snedeker and Debbie Nathan, co-authors of *Satan's Silence: Ritual Abuse and the Making of a Modern American Witch Hunt* (1995), also join as amici curiae to provide historical and scholarly expertise on the "Satanic Panic." Their work has been widely cited for its pioneering analysis of how moral panic, pseudo-expert testimony, and cultural fear fueled wrongful convictions in the 1980s and 1990s. Together with IPTX and Stephen Braga, they bring a unique perspective on how satanism allegations have prejudiced juries and produced multiple wrongful convictions.

This case raises issues that directly implicate amici's missions and expertise. The admission of unreliable "satanism" testimony mirrors the dynamics that have contributed both to wrongful convictions in Texas and to a broader pattern of miscarriages of justice nationwide. Amici believe their combined experience – spanning litigation, scholarship, and lived experience – can assist the Court in evaluating the grave dangers posed by such evidence here.

**ARGUMENT**

**<u>Introduction</u>**

This Court granted a certificate of appealability because reasonable jurists could debate whether Mr. Davis was prejudiced by the prosecution's introduction of satanism. It observed that "the evidence of Satanic affiliation might have been so inflammatory and odious to the jury that it drove the conclusion on future dangerousness. The prosecution arguably suggested to the jury that it could rely on Davis's Satanism if that is 'enough for you.'" *Davis v. Guerrero*, No. 24-70008, 2025 U.S. App. LEXIS 15976, at *14-15 (5th Cir. June 26, 2025). As this brief will make clear, the evidence of satanism was misleading, powerfully provocative and incendiary, and could not be offset by any defensive or mitigating proof.

3

This brief provides this Court with the historical context of the highly prejudicial nature of the satanic-themed evidence by summarizing the Satanic Panic scare of the 1980s and 1990s and highlighting its continued manifestations throughout Texas and El Paso in particular during the time of Mr. Davis' trial. As will be shown, it is powerful enough to win convictions of innocent persons with mere allegations of satanism.

The prosecution introduced Mr. Davis' membership and adherence to the Church of Satan and evidence of its influence on him, none of which was relevant to his background or the "circumstances of the offense." The State introduced irrelevant evidence under the specific theory that satanism proved Mr. Davis' future dangerousness. In doing so, the State prejudicially conflated religious beliefs held by followers of the Church of Satan and the common perception of anti-Christian "satanism." It did so through expert testimony regarding the Church of Satan; Mr. Davis' books, artwork, and writings; and the pentagram embedded in his chest. The prosecution pursued this strategy because the injection of "satanism" into criminal cases is extremely effective. It not only wins convictions of innocent people but just as effectively wins death sentences.

4

**The prosecution expert regarding the Church of Satan**

The State called its star expert in satanism, Donald Vaugn Haley, the criminal justice director at Tidewater Community College in Virginia Beach, Virginia. ROA.15458-59. Two junior colleges awarded Haley associate degrees; he later obtained a bachelor's degree in criminology and ultimately a master's degree from a satellite campus of Troy State University. ROA.15463. As a criminal justice Tidewater professor, he devoted an estimated two to three hours a year teaching students about satanism. ROA.15463. He had also lectured law enforcement personnel. ROA.15459.

While Haley had never before testified in court and had not published books or any scholarly articles, he did produce a 50-page "booklet" he used to "teach off from." ROA.15460, 15463. He also once consulted with an FBI agent and an El Paso detective about symbols during a ten-minute classroom break. ROA.15465.

The prosecution directed Haley to read specific pages from the Satanic Bible, written by the founder of the Church of Satan Anton LaVey. This included a passage that a satanist would perform a human sacrifice "to dispose of a totally obnoxious and deserving individual," such as "[a]nyone who has unjustly wronged you or who has gone out of his way

to hurt you – to deliberately cause trouble and hardship for you or those dear to you." ROA.15460-61.

Haley also testified about the meaning of the Eleven Satanic Rules of the Earth and the Nine Satanic Statements, including that they: "represent pretty much the canon or the standard by which a satanist lives his life", promote "indulgence instead of abstinence", and indicate that if a "sin" "feels good, do it." ROA.15461. He further testified that, according to the text, "if an individual bothers you," you can "destroy them." ROA.15461.

Haley agreed that the "destroy" reference was symbolic, not literal. ROA.15462. Nevertheless, he invoked and applied facts of this case to inform his expert understanding of the meaning of "destroy," a term he interpreted to be not symbolic, but literal:

> Q. How are you supposed to destroy a person? Would you explain it to the Ladies and Gentlemen of the Jury?
>
> A. Well, you could turn around, hit them in the heart so much that it ruptures it. You could bash their head against a pole till they bleed out. You can cut their fingertips out. I think that would be an adequate description of being destroyed.

ROA.15462-63. Equating "destroy" with actual physical violence, Haley interpreted the Satanic Bible in the same way as he read the "Christian Bible," *i.e.*, literally:

Q. Now, do you – are you under the impression that the Bible, the Christian Bible, is supposed to be read literally?

A. If I look at the Christian Bible from a historical standpoint, it is extremely accurate.

Q. Okay. It's your opinion, and you're telling these Ladies and Gentlemen of the Jury, that God created the heavens and the earth in seven days and rested on the seventh, correct?

MS. HAMILTON [PROSECUTION]: I'm going to object. He's not been offered as an expert in the Bible.

THE COURT: Overruled. Answer the question, please.
THE WITNESS [HALEY]: In my study of apologetics, I do believe that, yes.

ROA.15462.

The State introduced Haley's testimony to convey that Mr. Davis only believed as a matter of religious faith that actual human sacrifice and the physical destruction of others were morally justifiable, but that he might practice these tenets in the future against other inmates. Haley's testimony was not offered to establish the facts of Mr. Davis' beliefs, but to perpetuate myths and urban legends about satanism and further the conflation between the beliefs of adherents of the Church of Satan and the public's fear of anti-Christian devil-worshipping cults.

**Appellant's writings, artwork and pentagram**

The State introduced 17 exhibits of Mr. Davis' writings and artwork as well as the books he owned. ROA.16285, 16299-16361. He wrote: "My name is Irving Davis and I am 24 years old. I'm writing this as a supplement to an application to the Church of Satan." ROA.15422. Among his writings, he wrote "Heil Satan," "Ave Santas," and "Namu Seiten" with a drawing of some horns. ROA.15420-21. He also wrote, "Do what thou wilt shall be the whole of the law." ROA.15421. His books included *Satan Speaks!*, *The Satanic Bible*, and *The Satanic Rituals*. ROA.15419.

Among his drawings was a depiction of two women, one of whom has a dagger in her hand and is bound by ropes. ROA.15420. He also had a drawing of a woman bound, gagged and with tape over her nipples, and another of a woman holding a wine glass and the words "slashed throat." ROA.15421-22. Appellant also drew a skull and a razor blade, various pentagrams, and an upside-down pentagram with a goat's head. ROA.15421.

The trial court ordered Mr. Davis to bare his chest to the jury. On his chest was a "representation of a pentagram" which the prosecution characterized as a satanic symbol. After removing his shirt, he was made

8

to stand before the jurors as the prosecution told jurors:

> Let the record reflect that what we're seeing appears to be a star-shaped, sometimes referred to as a pentagram, and it's inverted. It's on his chest. It is approximately four, four-and-a-half inches in diameter. Appears to be a scar –

ROA.15427-28. After this dramatic display, the prosecution called its next expert witness.

## The State's future dangerousness expert

The State called psychiatrist Edward Brown Gripon, who gave his opinion regarding the prosecution's "hypothetical person" and his future dangerousness. This "hypothetical person," among other things, "marks his body with a pentagram, becomes a satanist, and begins creating graphic, violent pictures." ROA.15443. Dr. Gripon testified, "It would be my opinion that the person would be likely to continue to pose a continued threat." ROA.15444.

## The prosecution sought to inject satanism into this capital punishment trial for good reason: it works.

The prejudicial effect of accusations of satanism and its grip on the minds of jurors should not be underestimated. John Felipe Acevedo, *Crime Fantasies*, 46 AM. J. CRIM. L. 193 (2019)(reviewing the "distinct but related typologies: witch-hunts and crime panics."). Research on jury bias

found that participants rated defendants as significantly guiltier of both homicide and child sexual assault if they were associated (allegedly or admittedly) with satanism, regardless of jury instructions. J.E. Pfeifer, *Perceptual Biases and Mock Juror Decision-Making*, SOCIAL JUSTICE RESEARCH 12(4) (1999). In 2009, scholars analyzed contemporary perceptions of the existence of Satanic Ritual Abuse and widespread criminal Satanic networks. Reichert, Richardson, and Lykes, *Satanism in America: An Update*, SOCIAL COMPASS (2009). They found that the legacy of the Satanic Scare continued throughout and after Mr. Davis' trial, in part because the mass media continues to employ sensational stories of satanists to attract viewers. *Id*.

The Satanic Panic that began in the 1980s was still particularly acute in the 1990s. Jeffrey S. Victor, SATANIC PANIC: THE CREATION OF A CONTEMPORARY LEGEND (Open Court 1993). *See also* Debbie Nathan and Michael Snedeker, SATAN'S SILENCE: RITUAL ABUSE AND THE MAKING OF A MODERN AMERICAN WITCH HUNT (iUniverse 1995). The Satanic Panic arguably began with the 1980 publication of *Michelle Remembers*, a book in which Michelle Smith allegedly recalled her childhood abuse that included human sacrifice as well as the implantation of devil horns and a devil tail into her body. Mary deYoung, *One Face of the Devil: The Satanic*

10

*Ritual Abuse Moral Crusade and the Law*, 12 BEHAV. SCI. & L. 389, 391-392; 403 (1994). These "memories" were allegedly recovered by her psychiatrist and lover, who employed hypnosis and other means to extricate them.[2]  *Michelle Remembers* legitimized accusations of Satanic Ritual Abuse ("SRA") and brought recovered memories into the mainstream. It also legitimized urban legends about satanic cults preying on young children. *Conviction: American Panic*, Season 2, Episode 2 (Spotify Feb. 25, 2020).

The rise of the legitimacy of this social phobia coincided with changes in the traditional American family. Aja Romano, *Why Satanic Panic never really ended*, VOX (Mar. 31, 2021). The 1970s saw an increase in divorce rates, it was becoming more difficult to sustain a family on one income, more women were working outside of the home, and more families were trusting people outside the home to care for their children and did not know how their teenagers spent their time after school. Joseph P. Laycock and Eric Harrelson, *The Exorcist Effect*, (Oxford University Press

---

[2] *Michelle Remembers* has been discredited. Investigation by Nathan and Snedeker revealed that Michelle's claims of being held captive by a satanic cult were contradicted by records and photographs showing she attended school during the time she asserted she was a prisoner. *See* SATAN'S SILENCE, *supra.* A 2023 documentary titled *Satan Wants You!* asserts that Dr. Pazder was inspired by the TV movie *Sybil*, that Michelle was in love with Dr. Pazder and went to great lengths to get his attention, and that the Catholic church subsidized the writing of the book. *Satan Wants You!* (Tubi, Oct. 20, 2023).

2024) at p. 167; Alan Yuhas, *It's Time to Revisit the Satanic Panic*, THE NEW YORK TIMES (Mar. 31, 2021); *Frontline: The Child Terror*, PBS, available at: https://www.pbs.org/wgbh/pages/frontline/shows/terror/ meaning/ (last checked 8/19/25). Between 1982 and 1985, the number of families utilizing daycare outside of the home increased from 17% to 25%. *Frontline: The Child Terror*, *supra*. Anxiety about protecting the traditional family unit from unknown dangers was elevated: societies undergoing rapid social change tend to focus anxieties on myths of children being harmed by unseen horrific foes. *Id*. In this light, the Panic is not surprising.

> In the United States, starting in the early 80s until the early 90s, the country was convulsed with this idea that…there was some kind of international satanic cult that had infiltrated daycare centers and preschools and that their mission was to sexually abuse children in order to destroy their minds. And later on when the kids would be adults, somebody would snap their fingers and all of a sudden these kids would line up and join the cult. And as completely insane as this sounds, this belief got into child protection services, it got into police departments, it got into psychotherapy. It got into DA's offices. Scores of people were convicted who were just working in daycare centers and preschools on the basis of no conventional evidence whatsoever.

*Southwest of Salem* (Motto Pictures, Naked Edge Films 2016)(Interview of Debbie Nathan). Notorious satanic-themed prosecutions only served to inflame the hysteria.

The 1990 McMartin Day Care prosecution confirmed the worst of widespread fears. It became the longest trial in American history and included stories of imaginary animal sacrifice and satanic abuse. Mary deYoung, *The Devil Goes to Day Care: McMartin and the Making of a Moral Panic*, 20 J. AM. CULTURE, pp. 19-23 (Spring 1997). Similar prosecutions followed. In Texas, Fran Keller and her husband Dan were convicted in Austin for leading children into satanic rituals at various cemeteries, among other groundless and later debunked claims. *See, e.g., Parents afraid to believe children's tales of ritual abuse*, AUSTIN AMERICAN STATESMAN (Dec. 13, 1992)(detailing "horror stories" including satanic baptisms of babies in blood); *Kellers to get $3.4M in 'satanic day care' case*, AUSTIN AMERICAN STATESMAN (Aug. 23, 2017). Satanic abuse of children was perceived to be everywhere:

> Day care molestation and mass sexual abuse cases were declared to be an epidemic in the mid-1980s as heavily publicized cases sprang up across the nation. In 1983, twenty-five residents of Jordan, Minnesota, were charged with sexually abusing children at "bizarre sex parties." The operators of the Gingerbread Preschool in Brockton, Massachusetts were charged, in 1985, with the sexual abuse and neglect of ten former students. In 1988, after a sixteen-month investigation and a ten-month trial, Margaret Kelly Michaels, a twenty-six-year-old child care aide at the Wee Care Nursery School in Maplewood, New Jersey, was convicted of 114 counts of assault and sexual abuse involving twenty children. The claims made against Michaels were incredible; that she "raped [the] children with silverware, wooden spoons, Legos and

light bulbs, that she played 'Jingle Bells' on the piano while naked, taken [sic] their temperature rectally and forced them to eat excrement off the floor." The owner of the Mother Goose and Kids Stop day care centers in suburban Chicago was indicted in 1997 for molesting four girls under her care. Preschool sexual abuse cases also were brought in Maryland (thirteen children allegedly abused), Florida (day care owners convicted in 1985 of systematic and ritualistic sexual abuse at the Country Walk Day Care in Dade County), and many other states.

Tonya L. Brito, *Paranoid Parents, Phantom Menaces, and the Culture of Fear*, 2000 WIS. L. REV. 519 (2000)(citations omitted). By 1988, at least 20 million people tuned in to a two-hour special on NBC called *Devil Worship: Exposing Satan's Underground.* Host Geraldo Rivera asserted that a highly organized secret cabal of more than one million people throughout the United States were engaging in satanic practices including ritual child abuse, child pornography, murders and sending satanic messages in heavy metal music. Alan Yuhas, *It's Time to Revisit the Satanic Panic*, *supra*; Mike McPadden, *6.66 Hot Points Of The '80s Heavy Metal Satanic Panic*, vh1.com (Feb. 11, 2015); Peter J. Boyer, *Program on Satan Worship Spurs Controversy at NBC*, THE NEW YORK TIMES (Oct. 26, 1988).

Satanists were generally likened to agents who chose an alternative lifestyle seeking to disrupt a Christian society. Alarmed communities became fearful that Satan-worshippers were judged as morally unfit or

even embodiments of pure evil as belief spread that they were coordinating ritual sexual abuse and sacrifice. Reichert and Richardson, *Decline of a Moral Panic: A Social Psychological and Socio- Legal Examination of the Current Status of Satanism*, NOVA RELIGIO: THE JOURNAL OF ALTERNATIVE AND EMERGENT RELIGIONS, 16(2), pp. 47–63 (2012).

The shocking case of the "West Memphis 3" reinforced the perception of widespread satanic violence. Teenagers Damien Echols, Jason Baldwin, and Jessie Misskelley were prosecuted for the 1993 murders of three eight-year-old boys in West Memphis, Arkansas. Misskelley was sentenced to life plus 40 years, Baldwin was sentenced to life without parole, and Echols was sentenced to death. *Hobbs v. Pasdar*, 682 F.Supp.2d 909, 911 (E.D. Ark. 2009); *Paradise Lost*, Episodes 1-3 (HBO 1996-2012). The prosecution's theory was that the murders were part of a satanic ritual that included child sexual mutilation. Emily Battersby & Wolfgang G. Robinson, *Paradise Lost: Media in Injustice and Injustice in Media*, 22 SETON HALL J. SPORTS & ENT. L. 29 (2012); *Paradise Lost, supra*; *West of Memphis* (Sony Classic Pictures 2012). In 2011, after new evidence supporting their innocence, each entered *Alford* pleas and were sentenced to time served (18 years). The fact that the exonerating

evidence took another decade to emerge underscores the potency and endurance of the mythology of satanic violence. The case also serves as a stark example of how the simplistic invocation of a satanic motivation for a crime can divert authorities from a more thorough and probing investigation. In the sentencing context, jurors can be similarly diverted and overwhelmed by the introduction of satanism evidence, such that they are unable to conduct a proper sentencing determination free from the undue influence of the evidence.

In Kentucky, Garr Keith Hardin and Jeffrey Dwayne Clark were convicted in 1995 for murder and sentenced to life in prison. The State claimed that the killing was part of a satanic sacrifice; Hardin's mother told police that she believed the victim and the two men were involved in Satanism. Prosecutors told the jury that a bloody cloth and broken glass recovered from Hardin's home were stained during an animal sacrifice and that the glass was a "chalice" used to drink the blood of animals. A police officer testified that Hardin told him he killed animals as a form of satanic ritual and wanted to move on to humans because he was bored. Hardin and Clark were exonerated in 2018. *Charges dropped against men wrongfully convicted in 1992 "Satanic" killing*, CBS NEWS (Feb. 27, 2018); 2018); Josh Wood, *Louisville to pay $20.5M to men imprisoned for decades*

*in wrongful conviction*, LOUISVILLE COURIER-JOURNAL (Sep. 8, 2023).

In Texas, Melvin Quinney was sentenced to 20 years in prison for indecency with a child and for allegedly leading a satanic cult that murdered children, a conviction for which he was later exonerated. Paul Flahive, "Texas continues to exonerate people who were wrongly convicted during 'satanic panic,'" NPR (Apr. 18, 2023); Paul Flahive, *After 30 years, a father is exonerated in 'satanic panic' case*, Texas Public Radio (Apr. 11, 2023). The most well-known Satanic Panic exonerations in Texas were those of the San Antonio Four, a group of friends who were accused of satanic, wiccan and occult rituals with two little girls in the 1990s and convicted of aggravated sexual assault and indecency with a child. The women were exonerated after spending approximately 15 years in prison. *Member of the San Antonio Four shares how Satanic Panic played into her False Conviction*, www.ksat.com (Feb. 16, 2024); *Southwest of Salem*, *supra*.

While the Satanic Panic swept across the United States during the 1980s and early 1990s, Texas emerged as one of its epicenters. The state's unique confluence of evangelical Christian influence, conservative politics and tough-on-crime law enforcement fostered an especially receptive environment for moral panic. During the 1980s, Texas, much like the rest

of the country, experienced cultural anxiety over changing social values, with satanism often portrayed as the symbolic enemy of Christian order. S. A. Wright, *Satanic Cults, Ritual Abuse, and Moral Panic: Deconstructing a Modern Witch-Hunt*, WITCHCRAFT AND MAGIC: CONTEMPORARY NORTH AMERICA (University of Pennsylvania Press 2011). Churches hosted seminars on recognizing signs of occult influence in children, police received training from self-proclaimed "cult experts," and community fears spiraled into aggressive state action. *Id*. Urban legends, such as rumors of ritualistic animal sacrifice in Houston suburbs or occult graffiti found near San Antonio high schools, proliferated and were often treated as evidence of genuine satanic threats. *Id*. The deaths of a brother and sister in Childress ignited a widespread belief that a satanic cult was operating in town. Skip Hollandsworth, *Possessed by the Devil*, TEXAS MONTHLY (July 1992).

The embers of the Satanic Panic linger and its use in prosecutions continues, as this case illustrates:

> Law enforcement and mass media have also perpetuated conspiracy theories and fears arguably for their own purposes. One such conspiracy issue is the Satanic Panic. The societal fear of satanic cults began in the 1980s and persists today; the Satanic Panic is an abusive fear mongering mechanism that is the same as those of previous periods of mass hysteria, from witch hunts to McCarthyism. This fear mongering is why some individuals are still in jail after persecution without evidence

by biased law enforcement feeding off the social concern. Recently, Satanic Panic has been used to accuse [Rapper] Lil Nas X of being a corrupting influence. Law enforcement and legal entities have thoroughly proven that this panic is an irrational fear that has only resulted in other injustices[.]

Anthony G. Volini & Farzana Ahmed, *Strategies to Deter Child Pornography in the Absence of an Encryption Back Door: Tipster Programs, a Licensed Researcher System, Compelled Password Production, & Private Surveillance*, 32 DEPAUL J. ART TECH. & INTELL. PROP. L. 1 (Spring 2022)(citing Aja Romano, *Why Satanic Panic never really ended*, VOX (March 31,2021)).

In January 2021, a gathering place affiliated with the Church of Satan in the so-called "Witchcraft District" of New York was deliberately set on fire. *'Hell to pay: Church of Satan mourns arson at New York 'Halloween House,'* THE GUARDIAN (Jan. 16, 2021). The arson attack reflects the persistent social stigma and hostility directed at the Church of Satan, even in regions where conservative Christian values do not predominate. The incident suggests that public perceptions of the Church of Satan remain heavily influenced by the lingering residue of the Satanic Panic era, with the Church still viewed through a lens of fear and suspicion, largely due to its association with countercultural values that challenge mainstream norms.

19

While the Satanic Panic persists, courts have become increasingly cautious of the prejudicial weight satanism carries in the courtroom, as detailed in *Decline of a Moral Panic*, *supra*. While media coverage and public hysteria have diminished since the 1990s, *Decline of a Moral Panic* notes that such claims still occasionally surface and may continue to influence jurors and the judicial system overall. *Id*.

## El Paso's experience with satanism

El Paso has its own longstanding history with Satanic Panic. El Paso police started investigating claims of satanic abuse in the early 1980s. Debbie Nathan, *Inside the 'Satan Scare' Industry – The Devil Makes Them Do It – While the nation's cops chase demons, taxpayers get burned,* IN THESE TIMES 15.29 (1991). A local evangelical group spread rumors that El Paso was a "national mecca" for Satanists because "if you poked a stick through Jesus's birthplace in Bethlehem, it would come out in Texas." *Id*. The group reported to police that people in robes were committing ritualistic murder in the Rio Grande River marshes; credulous El Paso policemen set up surveillance there. *Id*. The El Paso police spent time at local high schools "trying to ferret out covens," and "investigated reports from teenagers and where they'd seen babies sacrificed or had

themselves mauled and raped by Luciferians." *Id*. For people in El Paso, the Satanic Panic did not end. *See, e.g.,* Daniel Borunda, *Game Warden speculates 'Satanic ritual' after dead goats found in Northeast El Paso desert*, EL PASO TIMES (May 12, 2021); Daniel Borunda, *El Paso man arrested in satanic vandalism, burglary of Catholic church*, EL PASO TIMES (July 28, 2023); Vania Castillo and Aylin Herrera, *Suspected murderer accused in the slaying of a prominent El Paso lawyer claims the park near the murder scene was a place where satanic rituals took place,* KFOX-14 (October 18, 2023).

El Paso also experienced its own high-profile satanic daycare prosecution that played out over five years beginning in 1985. Two preschool teachers, Gayle Dove and Michelle Noble, were accused of sexually abusing children in satanic rituals with various other adults. Debbie Nathan, *The Making of a Modern Witch Trial*, WOMEN AND OTHER ALIENS (Cinco Puntos Press 1991), 122-148; Berta Rodriguez, *Dove appeals her 2nd child-molestation conviction*, EL PASO TIMES (Sept. 18, 1988). Noble was later acquitted, and Dove's case was appealed and ultimately dismissed. *Dove v. State*, 768 S.W.2d 465 (Tex.App. – Amarillo 1989, *pet. ref'd*).

21

Popular horror movies both before and after Mr. Davis' trial highlight the prejudicial nature of evidence – or even suggestion – of satanism in any form. The jurors who decided Mr. Davis' fate "were products of their time; people in their late twenties and early thirties in the 1980s would have been children or young teenagers during the satanic movie craze of the early 1970s, which produced such films as *The Exorcist*, *The Omen*, and *Rosemary's Baby*" with lasting "imagery and thematic content of those films." *Mind-Witness Testimony: the Unreliability of First-Person Accounts in Sex Trafficking Discourse*, 7 ALB. GOV'T L. REV. 56, 82-83 (2014). *See also* Christy Lamire, *Remake of The Omen Isn't Terrible, Just Pointless*, EL PASO TIMES (June 9, 2006)(noting the actress Mia Farrow's reprisal of her character from *Rosemary's Baby*). These horror films portrayed some sort of deity vaguely identified as either the Anti-Christ and/or Satan supernaturally influencing or outright possessing people to carry out acts of violence, often murder.

In *The Exorcist*, a demonic force occupies the mind and body of a 12-year-old girl who floats in the air, masturbates with a crucifix, spins her head, vomits, exhibits a lack of hygiene, and profanely cusses a Catholic priest who was trying to save her soul from Satan. *Rosemary's Baby* centers on the Anti-Christ's rape and impregnation of a woman who gives

22

birth with the help of Satan worshippers. Any hope that the child might have matured into a positive role model was dashed by *The Omen* which makes it clear that the son of Satan is, like his dad, an evil and malevolent deity.

*Rosemary's Baby* was featured in 1968; *The Exorcist* was a 1973 film. Both left lasting legacies. In 2005, a new limited series debuted featuring satanic themes, written by the same author of *The Omen*. *See, e.g.*, John Cook, *NBC thriller 'Revelations' explores issues of faith, science*, EL PASO TIMES (Apr. 10, 2005). It featured a "determined nun" and a Harvard astrophysicist whose 12-year-old daughter was murdered by a satanic cult leader. Together, they investigate whether it is Satan who is responsible for evil events around the world (spoiler: he is). *Id*. *The Omen* was remade in 2006 from its original feature in 1976. These themes identifying Satan and its converts as the centerpiece of horror films persisted at the time of Mr. Davis' trial, stoked by real-life murders well known to the El Paso community.

For El Pasoans, these themes of satanic violence were reinforced by a local anxiety based on actual events like the well publicized murders of more than 370 women just across the border between 1993 and 2011. *Mexico: Justice fails in Ciudad Juarez and the City of Chihuahua*,

Amnesty International (Feb. 28, 2005).  Among the local explanations for these murders was that they were the result of satanic rituals. *See, e.g.*, Louie Gilot, *Confession in Juarez Slayings Questioned*, EL PASO TIMES (Oct. 1, 2006)(covering the murders of many women in Juarez with attribution that the murders were "satanic offerings"); Diana Washington Valdez, *Hopeful young women perish in city of broken dreams*, EL PASO TIMES (June 23, 2002)(detailing the high level of fear and recognizing the rumors that the women were killed in satanic rituals).  In the case of a defendant found guilty of murdering a woman, it was not difficult to suggest that Mr. Davis' crime had something to do with the same satanism responsible for the slaughter of hundreds of other women in a Mexican city literally within walking distance from El Paso itself.

Throughout the jury selection process, the prosecution equated the religion of the Church of Satan with a generalized anti-Christian satanic religion, a conflation jurors ultimately endorsed by their verdict. Juror John Almanzar, a practicing Catholic, likened satanists to "devil worshippers" and hesitated before stating he could be fair to a satanist. ROA.14924. Juror Robert Sanchez similarly associated satanism with a belief in the devil as a supernatural deity. ROA.14492. Veronica Collier viewed satanism as a religion opposite to Christianity.  ROA.14336.

24

Maria Cordova also believed that satanism was a religion and wanted non-Christians "to pick our Lord Jesus Christ as their savior." ROA.14646-47.

Satanic motifs continue to feature in modern pop culture. Movies like *The Devil's Advocate* (1997), *Fallen* (1998), *The Ninth Gate* (1999), *End of Days* (1999), *Constantine* (2005), *Hereditary* (2018), and *Longlegs* (2024) reflect the unabated American appetite for devilish content. Television shows *The X-Files* (1993-2018), *American Horror Story* (2011-present), *True Detective* (2014), *Supernatural* (2005-2020), *Grimm* (2011-2017), *Evil* (2019-2024), and *Lucifer* (2016-2021) likewise touch on aspects of satanism and the occult with stories of violence, gore and horror. As detailed next, the reality is that the Church of Satan in no way resembles this long-standing and wide-spread portrayal of satanism.

**The truth about the Church of Satan came too late and could not counter the potent prejudice this evidence was meant to evoke.**

The defense expert, John Gordon Melton, did an admirable job at exposing the irrationality and confusion regarding satanism and contrasting it with the actual tenets of the Church of Satan. During his testimony, he read the Church's basic rules:

The Eleven Satanic Rules.  These are – these would turn out to be advice for a member of the church to follow.

> "Do not give opinions or advice unless you are asked."

> "When in another's lair, show some respect, or else do not go there."

> "If a guest in your lair annoys you, treat them cruelly and without mercy."

> "Do not make sexual advances unless you are given the mating signal."

> "Do not take that which does not belong to you unless it is a burden to the other person and he cries out to be relieved."

> "Acknowledge the power of magic if you have employed it successfully to obtain your desires. If you deny the power of magic after having called upon it with success, you will lose all you have obtained."

> "Do not complain about anything to which you need not subject yourself."

> "Do not harm little children."

> "Do not kill nonhuman animals unless attacked or for any food."

And, "when walking in open territory, bother no one. If someone bothers you, ask him to stop.  If he does not stop, destroy him."

ROA.15477.

As Melton pointed out, the Church of Satan's founder "was basically an atheist humanist" who founded his "church" with the idea "to put forth this occult atheist kind of philosophy, and the other was to, at the same time, kind of knock Christianity." ROA.15468. But Melton's testimony had no chance of redirecting the jury to the reality of the Church of Satan from its prosecution-directed fixation on satanism in general.

The State's aim was not to convince the jury that Mr. Davis subscribed to a faith that embraced violence.  It could not because the Church of Satan neither worships "Satan" as an entity, much less as an Anti-Christ deity. Satan himself doesn't exist. Instead, by raising the issue, it reignited all the negative violent connotations the jurors were raised on by film and experience, reaffirmed by horrific murders and child sexual abuse throughout Texas, the nation, and El Paso in particular.

The jury did not know that as early as 1992, the Department of Justice "thoroughly debunked the myth of the satanic ritual abuse cult." Aja Romano, *Why Satanic Panic never really ended*, Vox (Mar. 31, 2021). In 1994, the New York Times reported that of the more than 12,000 documented accusations of organized cult abuse, investigating police were unable to substantiate any of them.  Daniel Goleman, *Proof Lacking for*

27

*Ritual Abuse by Satanists*, THE NEW YORK TIMES (Oct. 31, 1994). A former FBI agent who worked on hundreds of abuse cases with the behavioral science unit told the New York Times that "[t]he evidence wasn't there, but the allegations of satanic ritual abuse never really went away…When people get emotionally involved in an issue, common sense and reason go out the window. People believe what they want and need to believe." Alan Yuhas, *It's Time to Revisit the Satanic Panic*, THE NEW YORK TIMES (Mar. 31, 2021). This observation is as true today as it was at the time of Mr. Davis' trial.

## Conclusion

As this Court considers the admission of evidence of satanism in this case, it should include in its analysis the unreliability of future dangerousness determinations that proof of Mr. Davis' membership in the Church of Satan was meant to influence. As a review of the United States' era of Satanic Panic demonstrates, there is a need for recognition that the jury was likely not measuring the relevance of the State's evidence against anything factual; instead the jury was asked by the State to estimate the impact of evidence intended to invoke moral panic on a guess

28

known to be wrong almost all of the time.

Beginning with its expert witness, the prosecution conflated the belief system of the Church of Satan specifically with the myths and urban legends surrounding satanism and the occult that are known to evoke moral panic. This conflation was not an accident. By 2008, it was known and accepted that accusations of satanism led juries to find against defendants no matter how weak the evidence.

Future dangerousness is an inherently speculative question and produces demonstrably false predictions. It is a question that arises intuitively and is routinely answered in the abstract, often with a high degree of confidence. It is human nature to suppose a hypothetical person will be dangerous at some point in the future. But such predictions fail wholly as a practical matter when applied to a specific human being. This is particularly true when the finding of future dangerousness is premised upon irrelevant evidence that has been found to reflect the basis for a widespread decades-long moral panic.

In a review of the behavior of 155 inmates sentenced to death based on a finding of future dangerousness, the Texas Defender Service found that juries got it wrong 95% of the time. Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of*

29

*Future Dangerousness*, pp. 21-24 (2004).  20% of inmates predicted to be dangerous in prison had no disciplinary violations at all, while another 75% had only minor infractions. *Id*.  Just 5% exhibited serious assaultive behavior. *Id*.  Remarking on psychiatric expert testimony in death penalty cases, the American Psychiatric Association ("APA") observed that "the unreliability of psychiatric predictions of long term future dangerousness is by now an established fact within the profession." Brief of *Amicus Curiae* APA, *Barefoot v. Estelle*, 463 U.S. 880 (1983). More recent studies confirm the APA's conclusion made decades ago. John F. Edens, Jacqueline K. Buffington-Vollum, Andrea Keilen, Phillip Roskamp, and Christine Anthony, *Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel"?*, 29 LAW HUM. BEHAV. 55 (2005); Mark D. Cunningham, Jon R. Sorenson, Mark P. Vigen, and S.O. Woods, *Life and Death in the Lone Star State: Three Decades of Violence Predictions by Capital Juries* (hereinafter "*Life and Death in the Lone Star State*"), 29 BEHAV. SCI. LAW 1 (2011)(review of 30 years' worth of evidence, including behavior in general population found "only a small minority of the former death-sentenced inmates engaged in serious assaultive conduct on death row (3.6%) or in prison post-relief (4.5%)").

30

The prosecution played on the myths of satanism in general, conflating the Church of Satan with the falsity that members of the Church are violent devil-worshippers. The State kindled the same themes that gave rise to the Satanic Panic to win an illegitimate affirmative answer to the question of Mr. Davis' future dangerousness. This brief substantiates this Court's concern with the death sentence and demonstrates the clear prejudicial impact of the Satanism evidence in Mr. Davis' case. Accordingly, this Court should reverse the death sentence in this case and remand to the state district court for a new punishment trial free from this irrelevant inflammatory evidence.

Respectfully submitted,

_____

Keith S. Hampton
Attorney at Law
P.O. Box 66488
Austin, Texas 78766
512-476-8484  (office)
512-762-6170 (cell)
State Bar No. 08873230
keithshampton@gmail.com


Stacie B. Lieberman
Capital Area Private Defender Service
910 Lavaca Street
Austin, Texas 78701
Phone: (512) 774-4567
Fax: (512) 717-6077
State Bar No. 24114481
stacie@capds.org

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 6,496 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


/s/ Keith S. Hampton
Keith S. Hampton
Attorney for *Amici Curiae*


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on September 10, 2025, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Keith S. Hampton
Keith S. Hampton
Attorney for *Amici Curiae*