No. 24-70008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

IRVING ALVIN DAVIS,

*Petitioner-Appellant,*

v.

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

On Appeal from the United States District Court, Western District of Texas,
El Paso Division, Case No. 3:14-cv-00121-KC

**BRIEF *AMICUS CURIAE* OF THE FREEDOM FROM RELIGION
FOUNDATION IN SUPPORT OF PETITIONER-APPELLANT**

SAMUEL T. GROVER
*Counsel of Record*
SAMANTHA F. LAWRENCE
HIRSH M. JOSHI

FREEDOM FROM RELIGION
FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin 53701
(608) 256-8900
sam@ffrf.org

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed person and entity as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amicus Curiae**
Freedom From Religion Foundation

**Attorney for *Amicus Curiae***
Samuel T. Grover
Attorney for Amicus Curiae
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53701
608-256-8900
sam@ffrf.org

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES............................................................................ iii

CORPORATE DISCLOSURE STATEMENT .......................................................1

INTEREST OF AMICUS ...............................................................................2

INTRODUCTION..........................................................................................3

ARGUMENT ..............................................................................................4

I.  State-Adduced Evidence Stereotyping the Defendant Violates the Religion Clauses ...........................................................................................5

    A.  Texas's Proffered Religious Affiliation Evidence Stereotyped Davis, Constituting Forbidden Religious Hostility .......................................6

    B.  Inviting a Jury to Determine a Religion's Doctrine Violates the Establishment Clause .................................................................16

CONCLUSION ..........................................................................................20

CERTIFICATE OF COMPLIANCE ................................................................21

CERTIFICATE OF SERVICE........................................................................22

# TABLE OF AUTHORITIES

**Cases**　　　　　　　　　　　　　　　　　　　　　　　　　　**Page(s)**

*Batson v. Kentucky*,
　476 U.S. 79 (1986) ................................................................14

*Catholic Charities Bureau Inc. v. Wisc. Labor & Indus. Review Comm'n*,
　605 U.S. ___ (2025) ...........................................................16, 17

*Church of Lukumi Babalu Aye v. City of Hialeah*,
　508 U.S. 520 (1993) .................................................................7

*Davis v. Lumpkin*,
　2023 WL 5986474 *13 (W.D. Tex. 2023) ...........................................9

*Davis v. State*,
　329 S.W.3d 798 (Tex. Crim. App. 2010) ....................................passim

*Davis v. State*,
　AP-74393 (Tex Crim. App. 2010) ........................................9, 11, 18

*Dawson v. Delaware*,
　503 U.S. 159 (1992) ..............................................................6, 13

*Employ. Div. v. Smith*,
　494 U.S. 872 (1990) .................................................................7

*Epperson v. Arkansas*,
　393 U. S. 97 (1968) ............................................................16, 17

*Flanagan v. Nevada*,
　503 U.S. 931 (1992) ................................................................14

*Flanagan v. State*,
　109 Nev. 50 (1993) ...........................................................13, 14

*Flanagan v. State*,
　112 Nev. 1409 (1996) .............................................................15

*Jones v. Wolf*,
　443 U.S. 595 (1979) ..........................................................17, 19

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)................................................................................11

*Larson v. Valente*,
  456 U. S. 228 (1982)...............................................................................16

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*,
  584 U.S. 617 (2018)...........................................................................passim

*Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*,
  396 U.S. 367 (1970)................................................................................17

*Mid Vermont Christian Sch. v. Saunders*,
  No. 24-1704 *13 (2d. Cir. Sept. 9, 2025) ...............................................11

*Moore v. Gittere*,
  2025 WL 2444654 (D. Nev.) (Aug. 25, 2025).........................................15

*People v. Shatner*,
  174 Ill.2d 133 (Ill. 1996).........................................................................13

*People v. Young*,
  7 Cal.5th 905 (2019) ...............................................................................13

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*,
  393 U.S. 440 (1969).................................................................................18

*State v. Leitner*,
  272 Kan. 398 (2001) ...............................................................................13

*State v. Whitaker*,
  402 Wis.2d 735 (2022) ............................................................................13

*U.S. v. Ballard*,
  322 U.S. 78 (1944)..........................................................................2, 16, 18

*U.S. v. Brown*,
  352 F.3d 654 (2d. Cir. 2003)...................................................................14

*U.S. v. DeJesus*,
  347 F.3d 500 (3rd Cir. 2003) ............................................................14, 15

*U.S. v. Girouard*,
521 F.3d 110 (1st Cir. 2008) ................................................................................14

*U.S. v. Martinez*,
88 F.4th 1310 (10th Cir. 2023) .............................................................................13

*U.S. v. Stafford*,
136 F.3d 1109 (7th Cir. 1998) .........................................................................14, 15

*Watson v. Jones*,
80 U.S. 679 (1871) ...............................................................................................17

*Zorach v. Clauson*,
343 U. S. 306 (1952) .............................................................................................16


**Other Authorities**

*Christian Nationalism and Violence Against Religious Minorities in the United States: A Quantitative Analysis*, 64 J. OF THE SCIENTIFIC STUDY OF RELIGION 6 (2025) ....................................................................................................8

Dan Barker, *God: The Most Unpleasant Character in All of Fiction* (2018) .........10

*Fields of Blood: Religion and the History of Violence* (1st. ed. 2014) .....................8

Morgan & Sulong, *Islam and Violence: A Study of The Relevant Verses in The Quran*, 11 INT'L J. OF ACADEMIC RESEARCH & SOCIAL SCIENCES iss. 12, pg. 5 (2021) ....................................................................................................................10

*Satanism wrongly used at trial, death row inmate argues*, Austin American-Statesman, Sept. 1, 2012, https://tinyurl.com/ytm6rpks .......................................3

## CORPORATE DISCLOSURE STATEMENT

The Freedom From Religion Foundation, Inc. ("FFRF") is a nationally recognized 501(c)(3) educational nonprofit incorporated in 1978. FFRF has no parent corporation and issues no stock.

**INTEREST OF AMICUS[1]**

FFRF's purposes are to educate the public about nontheism and to preserve the cherished constitutional principle of separation between religion and government. FFRF works as an umbrella for those who are free from religion (freethinkers, atheists, agnostics, and nonbelievers). FFRF currently has over 42,000 U.S. members, including more than 1,800 members and a chapter in Texas.

Government-sponsored hostility toward a religion, or those without religion, undermines the constitutional guarantee that church and state be separate. Our judicial system cannot mistreat parties simply because they are members of a minority religion, viewed unfavorably by the majoritarian religion. FFRF does not support or endorse the Church of Satan. But its adherents are afforded the same constitutional protections under the First Amendment as everyone else. "Heresy trials are foreign to our Constitution," and FFRF wants to keep it that way. *U.S. v. Ballard*, 322 U.S. 78, 86 (1944).

---

[1] All parties have consented to the filing of this brief. No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than Amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

**INTRODUCTION**

"I mean, come on…the Church of Satan?" Chuck Lindell, *Satanism wrongly used at trial, death row inmate argues*, Austin American-Statesman, Sept. 1, 2012, https://tinyurl.com/ytm6rpks. "You've got to be kidding me as to how that's good." *Id.* "Satan…as far as Christian doctrine is concerned, is the epitome of [ ] evil[.]" *Id.* "If somebody chooses to align themselves with [ ] that, it certainly would seem relevant." *Id.* These are the words of Texas Court of Criminal Appeals Judge Michael Keasler, during oral argument in this case.

His statements are both remarkable and unremarkable. Remarkable because they disrobe one judge's hostility toward Satanism and its adherents. And religious hostility by an "adjudicatory body deciding a particular case" must result in its judgment being "set aside," even if it's just one judge or commissioner. *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 636 (2018).

But Judge Keasler's statements are also unremarkable, since almost every Texas employee showed hostility toward Satanism too. From Texas's decision to use religious affiliation evidence for Satanism, but not when Petitioner was Buddhist, to the trial court accepting Texas's expert; or from Texas grouping Petitioner with violent Satanists not with his church to the state's closing argument greenlighting a death sentence "[i]f satanism was good enough for" the jury. Pet.Br. at 11 (citing ROA.15607). The record shows hostility toward Satanism.

3

The change between the first sentencing hearing and second is Petitioner's religious identity. That direct religious discrimination aside, Texas introduced doctrinal controversy to the jury, and asked them to pick which side is more likely. Two competing views of the Church of Satan's religious doctrine were presented to the jury, and the jury was tasked with, among other things, deciding which view is Petitioner's. Both the hostility and inquiry into religious doctrine violate the First Amendment's religion clauses.

## ARGUMENT

Like all defendants, Petitioner Irving Alvin Davis was entitled to a sentencing hearing free of bias and prejudice. But Texas fell short of that guarantee. Texas introduced evidence that Davis, while in prison, read Satanic literature, jotted notes and drawings, and briefly joined the Church of Satan. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Texas even had Davis lift his shirt to show a tattoo. *Id.* at 803. Texas then introduced generic evidence "that **some** members of the Satanic religion advocate violence" "and that **various** people had committed murder and mutilation 'in the name of Satan.'" *Id.* at 805 (emphasis added). Texas did not introduce evidence that members of the Church of Satan committed acts of violence, but rather that *some* Satanists had committed crimes at *some* point.

That state-proffered stereotyping violates the First Amendment in several ways. *First*, introduction of religious materials, and broad statements about those

4

materials, to show bad character constitutes impermissible hostility toward religion in violation of the Free Exercise Clause. *Second*, inviting a jury to determine core tenets of a religion excessively entangles the government with that religion, violating the Establishment Clause. And *third*, the state's evidence adduced here is true of nearly any religion, and was introduced for shock value instead of its probative value. Those three errors in sum cast serious doubt on the fairness of Davis's sentencing. The judgment below should be reversed and the writ issued.

## I. State-Adduced Evidence Stereotyping the Defendant Violates the Religion Clauses

The State of Texas's invitation to draw negative inferences against Davis based on his status of belonging to a minority religion violates the Religion Clauses. Texas introduced evidence of Petitioner's abstract beliefs and religious affiliation with the Church of Satan. Texas then introduced evidence that some Satanists—not necessarily affiliated with the Church of Satan—committed crimes in Satan's name. Texas did not tie the Petitioner's conviction with those beliefs, or introduce evidence that Petitioner committed his crimes in furtherance of the Church of Satan's goals. Davis did not join the Church of Satan or read Satanic material before his trial, so his crime could not have been in furtherance of the Church of Satan's mission. Texas knew this too.

Instead, Texas introduced evidence of Davis's beliefs, and then argued that he should die, rather than spend life in prison. Texas's introduction of Davis's loose

connection to Satanism violates the First Amendment's Free Exercise Clause. Introducing a doctrinal conflict to a jury violates the Establishment Clause.

### A. Texas's Proffered Religious Affiliation Evidence Stereotyped Davis, Constituting Forbidden Religious Hostility

Mere introduction of "evidence prov[ing] nothing more than [] abstract beliefs" to denigrate a defendant's character, without additional evidence tying those beliefs to a conviction, violates the First Amendment's protection for association. *Dawson v. Delaware*, 503 U.S. 159, 167 (1992).

In *Dawson*, Delaware read a stipulation about a criminal defendant's affiliation with the Aryan Brotherhood, referring to it as a California-originated "white racist prison gang" that "now exist[s] in many state prisons including Delaware." 503 U.S. at 162. Delaware introduced "nothing about the beliefs of the Aryan Brotherhood [ ] in [ ] Delaware" despite "acknowledg[ing] that there are differences among [ ] various offshoots…." *Id.* at 165. That disconnect between the California and Delaware Aryan Brotherhood chapters "invited the jury to infer that" the Delaware chapter was also a "white racist prison gang." *Id.* at 165–66.

That invitation violated the First Amendment. 503 U.S. at 166. "[T]he prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts," so the court reasoned that evidence was "employed simply because the jury would find th[o]se beliefs morally reprehensible." *Id.* at 167. Delaware's invitation was one to stereotype the Aryan Brotherhood and Dawson.

6

Texas does at least the same. Texas proffered an expert witness that testified "that *some* members of the Satanic religion advocate violence" "and that *various* people had committed murder and mutilation 'in the name of Satan.'" *Davis v. State*, 329 S.W.3d at 805 (emphasis added). That expert did not confirm that members of *the Church of Satan* "committed murder and mutilation" in that church's name. Texas thus invited the jury to infer that Church of Satan members have a propensity for violence based on what some Satanists have done.

But religious affiliation is doubly protected under the Free Exercise Clause. When state action substantially burdens religious exercise and is not neutral toward religion, that action must survive strict scrutiny. *See Employ. Div. v. Smith*, 494 U.S. 872 (1990). "The Free Exercise Clause protects against governmental hostility which is masked as well as overt." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). And in the adjudicative context, hostility toward religion "cast[s] doubt on the fairness and impartiality" of the proceeding. *Masterpiece Cakeshop*, 584 U.S. at 636. The only correction is to "set aside" the tainted proceeding. *Id.* at 636.

Introducing evidence that *some* Satanists have "committed murder and mutilation," then bringing up Davis's affiliation with the Church of Satan, invites serious stereotyping—and thus hostility—running afoul of the Religion Clauses. Every religion has had some members commit acts of violence in their name. *See*

7

*generally* Karen Armstrong, *Fields of Blood: Religion and the History of Violence* (1st. ed. 2014). Christianity and Islam boast over a billion adherents each and have had countless acts of violence committed in furtherance of those faiths. *See generally*, *id.* For thousands of years people have committed acts of violence in the name of religion.

It would be inappropriate for any prosecution to bring up those acts of violence and a Muslim or Christian's affiliation with a specific church or masjid to conclude that members of that house of worship are likely to be dangerous in the future. Almost every criminal defendant could have their religious affiliation used against them during their penalty phase to justify a harsher sentence, all for someone else's actions. Practically, such evidence would only ever be used against minority religious adherents. And states bringing up religion for some defendants but not others are likely to run into an Equal Protection Clause problem.

In Texas's world, every Muslim defendant would face affiliation evidence for the Fort Hood attack; every Sikh for the Air India bombing; or every Christian would have to answer for the "dozens of instances of 'lone-wolf' Christian vigilante violence." Nilay Saiya & Stuti Manchanda, *Christian Nationalism and Violence Against Religious Minorities in the United States: A Quantitative Analysis*, 64 J. OF THE SCIENTIFIC STUDY OF RELIGION 6 (2025). All of these acts of violence were committed in furtherance of religion; but confronting an individual Muslim, Sikh, or

8

Christian with any of these to tarnish their character is an irrational invitation to align them with those that perpetrated those acts. Permitting religious affiliation evidence, coupled with generic information about acts of violence by members of the religion generally, "cast[s] doubt on the fairness and impartiality" of the sentencing. *Masterpiece Cakeshop*, 584 U.S. at 636.

And yet, Texas was not even this specific. Texas's expert witness did not even *recount* a notable instance of violence done by a member of the Church of Satan. Pet.Br. at 6 (citing ROA.15374) Instead, he made a sweeping statement: "***some*** members of the Satanic religion advocate violence" "and [ ] ***various*** people had committed murder and mutilation 'in the name of Satan.'" *Davis v. State*, 329 S.W.3d at 805 (emphasis added). These statements could apply to almost any religion, having Satanism join their ranks. As far as Texas's evidence goes, it still is not as specific as the harrowing stereotypes above.

Underscoring that state-induced stereotyping is its expert witness's bare qualifications, which the Texas Court of Criminal Appeals called "at best, borderline." *Davis v. State*, AP-74393 (Tex Crim. App. 2010) (Or. Arg. at 21:00–21:10).[2] Donald Haley only "interviewed three witnesses" and "never published in the area of Satanism." *Davis v. Lumpkin*, 2023 WL 5986474 *13 (W.D. Tex. 2023).

---

[2] Recording of the Texas Court of Criminal Appeals's oral argument in *Davis v. State* can be found at http://ffrf.us/davis.

Worse, Haley admitted to reading *The Satanic Bible* "literally." *Id.* at 13 (citing ROA.15462)).

Almost *any* religious text read literally could injure a defendant's character. Christianity is replete with references to murder, death, rape, infanticide, and other horrific acts. *See generally* Dan Barker, *God: The Most Unpleasant Character in All of Fiction* (2018). Islam is similar. *See* Morgan & Sulong, *Islam and Violence: A Study of The Relevant Verses in The Quran*, 11 INT'L J. OF ACADEMIC RESEARCH & SOCIAL SCIENCES iss. 12, pg. 5 (2021) (discussing various interpretations of "jihad" in the Koran). But to tie those references to a defendant's individual character, and then reason that they are prone to commit crimes is a leap too far. Haley's expert testimony on Satanism was doomed to stereotype Davis as well as all Church of Satan members.

Besides stereotyping, Davis's case is replete with hostility. Perhaps the most obvious hostility came from the Texas Court of Criminal Appeals. The TCCA reasoned that "the evidence that appellant became a Satanist while in prison helped to rebut" Davis's evidence that "he had no documented incidents of violence in prison." *Davis v. State*, 329 S.W.3d at 806. In other words, merely *being* a Satanist rebuts concrete evidence that Davis did not commit crimes in prison and did not pose a future danger. That rebuttal evidence pins his good conduct against his religious affiliation. He didn't commit any other crimes; bringing up his religious affiliation

10

does not negate that. Yet the TCCA actually writes that his religious affiliation cancels out his good behavior. The hostility is bare.

One TCCA justice even questioned whether Satanism was "even a religion" following another justice's example about "the Church of Cannibalism." *Davis v. State*, No. AP-74393 (Tex Crim. App. 2010) (Or. Arg. at 11:50–14:30). Despite both experts testifying that Satanism was a religion, the TCCA questioned Satanism's place as a religion, comparing it to "worship[ping] a rock." *Id.* (Or. Arg. at 14:30–15:30). To conclude her argument, Texas's appellate counsel referred to the Church of Satan as an "evil organization." *Davis v. State*, No. AP-74393 (Or. Arg. at 38:00). That's more hostile than one of two hostile statements from *Masterpiece Cakeshop*. 584 U.S. at 635 (Discriminatory religious beliefs were called "one of the most despicable pieces of rhetoric that people can use."). When "official expressions of hostility to religion accompany actions taken by the government to enforce its laws" then "courts may set aside the adverse results of tainted enforcement proceedings 'without further inquiry.'" *Mid Vermont Christian Sch. v. Saunders*, No. 24-1704 *13 (2d. Cir. Sept. 9, 2025) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022)) (citations modified).

To defend its use of religious affiliation evidence, Texas argued that it "need not prove that [Davis] himself engaged in all of those illegal violent acts, only that the group is ***known to do that***, and that [Davis] is a member of that group." *Davis v.*

11

*State*, 329 S.W.3d at 803 (internal quotations omitted) (emphasis added). But then Texas admitted that Davis's "***belief in satanism*** is being offered as ***evidence of his character***…." *Davis v. State*, 329 S.W.3d at 803 (citation modified) (emphasis added). After deliberation, the trial court granted Davis's motion in limine until Haley could "establish outside the hearing of the Jury that [ ] there is a propensity in this organization or this faith or this religion…for illegal activities or an [sic] engaging in violent activities." *Id.* at 803 (internal quotations omitted).

Texas's closing argument ties the hostility together. Texas called "satanism [ ] extreme" and argued that if "satanism was good enough for" the jury to sentence Davis to death, "then so be it." Pet.Br. at 11 (citing ROA.15607, 15610). Texas told the jury that "Buddhists…are real peaceful people. Pretty sure. They don't go around raping and killing little girls. [Davis] is a con man. And he lied to you." Pet.Br. at 12 (citing ROA.15607).

Here we have a comparison involving two religious stereotypes. One about Buddhists being peaceful, and the other implying Satanists are not. The uncontroverted evidence showed that Davis was a Buddhist when he committed his crime, and turned to Satanism *post-conviction*. So, Texas distorted the evidence and turned to stereotyping precisely because it understood the effect that saying "satanist" over and again would have on a jury.

12

While there is no "*per se* barrier to the admission of evidence concerning one's beliefs and associations," *Dawson*, 503 U.S. at 165, other courts reviewing religious affiliation statements permit such statements only when offered for reasons beyond character evidence. *See, e.g.*, *People v. Shatner*, 174 Ill.2d 133, 158 (Ill. 1996) ("the testimony concerning the religious rituals defendant practiced and [ ] materials he read was not introduced as mere character evidence; rather, it was 'tied' to the murder of his victim."); *State v. Leitner*, 272 Kan. 398 (2001) (State introduction of "witchcraft" evidence was error); *State v. Whitaker*, 402 Wis.2d 735 (2022); *Flanagan v. State*, 109 Nev. 50 (1993) (remanded after *Dawson*); *People v. Young*, 7 Cal.5th 905 (2019) (new penalty hearing after prosecution relied on evidence of abstract beliefs of "Odinism" in closing argument); *U.S. v. Martinez*, 88 F.4th 1310 (10th Cir. 2023).

But those cases permitting such evidence did not involve stereotyping a defendant. For instance, in *Martinez*, the State found and introduced the defendant's "shrine to Santa Muerte," "a saint that drug traffickers pray to for protection." *Martinez*, 88 F.4th at 1312. In *Whitaker*, the trial court "took care" to understand "that Amish religious principles did not tolerate sexual assault of sisters, as the secretive nature of Whitaker's childhood community had done." *Whitaker*, 402 Wis.2d at 752 (Roggensack, J., concurring).

*Flanagan* is more on point to the instant case. 109 Nev. 50. After *Dawson*, the Supreme Court summarily disposed of *Flanagan*'s certiorari petition, sometimes called a "GVR." *Flanagan v. Nevada*, 503 U.S. 931 (1992). Nevada introduced evidence, in its case-in-chief, that the defendants "controlled [ ] supernatural powers, and [ ] worshipped the devil." *Flanagan v. State*, 109 Nev. at 54. "[T]he prosecution did not present evidence that the 'coven' engaged in violent acts, or endorsed violent acts." *Id.* at 55. This time, the Nevada Supreme Court concluded that the state "invited the jury to try [defendants] for heresy" vacating the sentences, and remanding for a new hearing. *Id.* at 57.

The *Batson* progeny, as applied to religion-based strikes, is informative. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting race-based peremptory juror strikes). The Circuits agree that broad religion-based strikes are prohibited. *See U.S. v. Girouard*, 521 F.3d 110 (1st Cir. 2008); *U.S. v. Brown*, 352 F.3d 654 (2d. Cir. 2003); *U.S. v. DeJesus*, 347 F.3d 500 (3rd Cir. 2003); *U.S. v. Stafford*, 136 F.3d 1109 (7th Cir. 1998). It is well accepted that "parties cannot [ ] strike a juror simply based on [ ] religion" and "if a prosecutor" "said that he had stricken a juror because she was Muslim, or Catholic, or evangelical," then "upholding such a strike would be error." *Brown*, 352 F.3d at 669.

However, "faced with a prospective juror whose answers to neutral questions" include their "religious beliefs, it is rational for a prosecutor to act upon [a] concern."

14

*DeJesus*, 347 F.3d at 510. After all, "[i]t would be proper to strike [a juror] on the basis of a belief that would prevent him from basing his decisions on the evidence and instructions, even if the belief had a religious backing…." *Stafford*, 136 F.3d at 1113–14.

Neutral questions that invite a juror to share their *specific* beliefs are permitted. And a juror's answer being based in religion doesn't invalidate a strike, since an attorney can pick up on characteristics from any answer. But striking "a juror simply based on religion" does not allow an attorney the chance to actually inquire into beliefs; rather, to "strike a juror simply based on religion" is to *presume* that juror's belief and character, and then to act on that presumption. That level of stereotyping, the Circuit courts agree, is not permitted when it comes to religious affiliation. The logic carries to the sentencing context.

The best way to ensure fairness is to not bring up religion as character evidence. Prosecutors who introduce religious affiliation evidence without a nexus to the crime committed risk lengthy appeals and lack of finality for long periods of time. *See Flanagan v. State*, 112 Nev. 1409 (1996) ("*Flanagan* IV"). A case the Supreme Court GVR'ed in 1992 alongside *Flanagan* had its first federal habeas petition decided last month. *Moore v. Gittere*, 2025 WL 2444654 (D. Nev.) (Aug. 25, 2025) (slip opinion). The sentencing in that case alone has gone on over thirty-

15

five years and counting. This Court can avoid the same result over the same set of issues by reversing the decision below with instructions to issue the writ.

**B. Inviting a Jury to Determine a Religion's Doctrine Violates the Establishment Clause**

Two Establishment Clause guarantees are relevant to the instant case. First, "'[t]he clearest command of the Establishment Clause' is that the government may not 'officially prefe[r]' one religious denomination over another." *Catholic Charities Bureau Inc. v. Wisc. Labor & Indus. Review Comm'n*, 605 U.S. ___ *8 (2025) (slip opinion) (quoting *Larson v. Valente*, 456 U. S. 228, 244 (1982)). "This principle of denominational neutrality bars [state actions] that 'aid or oppose' particular religions," *id.* at 8 (quoting *Epperson v. Arkansas*, 393 U. S. 97, 106 (1968)), "or interfere in the 'competition between sects.'" *Id.* at 8 (quoting *Zorach v. Clauson*, 343 U. S. 306, 314 (1952)).

And second, "[t]he First Amendment precludes" "the truth or verity of [ ] religious doctrines or beliefs [ ] be[ing] submitted to [a] jury." *U.S. v. Ballard*, 322 U.S. 78, 86 (1944). "[The First Amendment] embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths." *Id.* at 88. "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *Id.* at 86.

Texas violated both of these principles. During his first sentencing hearing, Texas understood Davis to be Buddhist, so it did not bring up his religious affiliation.

16

When Texas discovered that Davis was a Satanist, it made his religious affiliation a key point of his second sentencing hearing. Texas treated the same person differently based on his stated religion. Thus, Texas directly "aid[ed]" one religion while "oppos[ing]" Satanism. *Catholic Charities*, 605 U.S. *8 (slip opinion) (quoting *Epperson*, 393 U.S. at 106).

But Texas also invited a jury to fact-find about the Church of Satan's core principles. Texas did not ask a fact-finder to tie Davis's crime to those principles, nor did Texas invite a fact-finder to rationally relate those principles as shared among all Satanists. Instead, Texas introduced a doctrinal conflict, disguised as character evidence, to sentence a person belonging to a minority religion to a harsher penalty because of their religious affiliation.

Courts cannot make an "inquiry into religious doctrine." *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970); *Jones v. Wolf*, 443 U.S. 595, 603 (1979). In fact, prohibiting such an inquiry is a foundational principle of the Establishment Clause. *See Watson v. Jones*, 80 U.S. 679, 727 (1871) ("the doctrine of ***English courts***…in such cases [is] to inquire and decide…what is the true standard of faith in the church organization.") (emphasis added). So, inquiring into religious doctrine or "the true standard of faith" is a judicial practice pre-dating the Constitution—and today, is prohibited by the First Amendment. *Id.* at 727.

Texas invited a jury to determine key doctrinal points about the Church of Satan's belief system, and then make findings of fact about Satanists generally. The most obvious example occurred when Haley eagerly pointed out a passage from *The Satanic Bible* referring to "destroying" someone. Haley told the jury that destroying someone meant to kill them. *Davis v. State*, No. AP-74393 (Or. Arg. at 9:12–9:30). Davis refuted that literalist interpretation. *Id.* (Or. Arg. at 9:30–9:38). And even Dr. Melton, Davis's expert, testified that many passages "should not be taken literally." Pet.Br. at 9 (quoting ROA.15473).

Those warring interpretations of religious text cannot be submitted to a jury as that submits "the truth or verity of [ ] religious doctrines or beliefs," constituting doctrinal controversy. *Ballard*, 322 U.S. at 86. The First Amendment requires courts to decide cases "without resolving underlying controversies over religious doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 449 (1969). "If [ ] courts undertake to resolve [doctrinal] controversies [ ] to adjudicate [ ] dispute[s], the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." *Id.* at 449.

Instead of focusing on any one church or religion's beliefs and doctrine, Texas and its courts should have focused on Davis's motive for committing his acts. That "neutral-principle approach" would have "free[d] [the] courts completely from

18

entanglement in questions of religious doctrine, polity, and practice." *Jones*, 443 U.S. at 603. It also would have resolved the future dangerousness inquiry with better precision than relying on religion, which is a self-declared demographic that Davis has changed twice during incarceration. Pet.Br. at 4 fn 1 (citing ROA.2398).

*    *    *

Texas did not introduce evidence of Davis's Buddhist affiliation during his first penalty phase, because "Buddhists…are real peaceful people….They don't go around raping and killing little girls." Pet.Br. at 12. But Texas changed up after Davis converted, admonishing the jury that "[i]f satanism was good enough for [them]" to sentence Davis to death, "then so be it." Pet.Br. at 11. To demonstrate that all Satanists posed a future danger, Texas started a doctrinal conflict between an "at best, borderline" expert's reading of *The Satanic Bible*, Davis's expert, and Davis's sincere beliefs. Submitting those warring doctrinal interpretations to a jury entangled Texas courts with the Church of Satan, and transformed Davis's penalty hearing into a heresy trial. The First Amendment forbids such trials.

Texas stereotyped Satanists in a manner inconsistent with constitutional safeguards. Worse, Texas entangled itself with doctrinal matters, commanding a jury to define the Church of Satan's doctrine and then apply it to one member. Both violations led to Davis's death sentence. Because each independently "cast[s] doubt

19

on the fairness and impartiality" of the second penalty hearing, the death sentence should be "set aside." *Masterpiece Cakeshop*, 584 U.S. at 636.

## CONCLUSION

The judgment of the court below should be reversed and the writ issued.

Dated: September 11, 2025

Respectfully Submitted,
*/s/ Samuel T. Grover*
Samuel T. Grover
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53703
(608) 256-8900
sam@ffrf.org

*Counsel for Amicus Curiae*

20

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the page limitation of Fed. R. App. P. 29(a)(5) and Circuit R. 29 because it consists of 4,294 words and does not exceed 6,500 words.

This amicus brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: September 11, 2025

*/s/ Samuel T. Grover*
Samuel T. Grover
*Counsel for Amicus Curiae*

21

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2025, the foregoing amicus brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 11, 2025

*/s/ Samuel T. Grover*
Samuel T. Grover
*Counsel for Amicus Curiae*