No. 24-70008

IN THE

# United States Court of Appeals for the Fifth Circuit

IRVING ALVIN DAVIS,

*Petitioner–Appellant,*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent–Appellee.*

On Appeal from the United States District Court
for the Western District of Texas, El Paso Division,
USDC No. 3:14-CV-121

## BRIEF OF RESPONDENT-APPELLEE

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

CRAIG W. COSPER
Assistant Attorney General
  *Counsel of Record*
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
craig.cosper@oag.texas.gov

*Counsel for Respondent–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Respondent–Appellee*
    Eric Guerrero, Director
    TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent–Appellee*
    Craig Cosper, Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
    Irving Alvin Davis

*Counsel for Petitioner–Appellant*
    Todd G. Scher
    Richard Dennis Esper
    Joe A. Spencer, Jr.

<u>s/ Craig W. Cosper</u>
CRAIG W. COSPER
Assistant Attorney General

i

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2)(C), oral argument should be denied because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS…………….…….……….…..i

STATEMENT REGARDING ORAL ARGUMENT…………….….……….ii

TABLE OF CONTENTS……………….……….…….…….….……….iii

TABLE OF AUTHORITIES………………….……….…….…….…...v

INTRODUCTION……………….……….…….…….….……….......1

STATEMENT OF THE ISSUES……………….……….…….…….…1

STATEMENT OF THE CASE……………….……….…….……….....2

I. Procedural History ……………………………………………..2

II. Statement of Facts ……………………………………………. 4

A. Evidence at guilt-innocence……………………………...4

B. Evidence at punishment ……………………………………. 4

SUMMARY OF THE ARGUMENT……………….……….…….……10

ARGUMENT

I. Standards of Review……………………………………………..11

A. Appellate standard of review …………………………………11

B. AEDPA's "highly deferential" standard in § 2254 cases………12

II. The CCA's Rejection of Davis's Satanism Claim Was
Reasonable ………………………………………………………15

A. Background …………………………………………………15

B. Clearly established Supreme Court precedent when the CCA denied relief ...................................................................18

C. Fairminded jurists applying Supreme Court precedent could deny relief on Davis's Satanism claim ....................................21

D. Admission of the Satanism evidence did not violate the Eighth Amendment or due process ...........................................34

E. Any error did not have a substantial and injurious effect on the verdict given the other evidence ...................................36

III. The CCA's Denial of Davis's IATC Claim Was Not Unreasonable ..................................................................41

A. Standard of review...................................................................41

B. Background and state court determination ...........................42

C. The CCA's rejection of this claim was reasonable...................49

CONCLUSION .......................................................................................59

CERTIFICATE OF SERVICE...............................................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................61

CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS...........................................................................................61

# TABLE OF AUTHORITIES

**Cases**

*Anaya v. Lumpkin*, 976 F.3d 545 (5th Cir. 2020)..................................11

*Andrus v. Texas*, 590 U.S. 806 (2020) .................................................55

*Autry v. McKaskle,* 727 F.2d 358 (5th Cir. 1984) .................................54

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ...........................11

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996)......................................21

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)..........................................36

*Brown v. Davenport*, 596 U.S. 118 (2022) .............................................18

*Buck v. Davis,* 580 U.S. 100 (2017)........................................................38

*Burt v. Titlow*, 571 U.S. 12 (2013) ........................................................42

*Campbell v. United States*, No. 3:20-CV-1326-M-BH, 2023 WL 3395135
    (N.D. Tex. Apr. 12, 2023) ................................................................29

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) .......................................52

*Casarez v. State*, 913 S.W.2d 468 (Tex. Crim. App. 1994) .....................15

*Cullen v. Pinholster*, 563 U.S. 170 (2011)..........................................14, 42

*Dawson v. Delaware*, 503 U.S. 159 (1992).......................................passim

*Dunn v. Reeves*, 594 U.S. 731 (2021) ....................................................42

*Ford v. Davis*, 910 F.3d 232 (5th Cir. 2018) .....................................14, 58

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997) .............................20, 21

*Gilday v. Callahan*, 59 F.3d 257 (1st Cir. 1995) ...................................40

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997)...............................14

*Harrington v. Richter*, 562 U.S. 86 (2011).........................12, 13, 32, 41

*Kinsel v. Cain*, 647 F.3d 265(5th Cir. 2011) ...........................................50

*Kotteakos v. United States*, 328 U.S. 750 (1946) ....................................36

*Luna v. Lumpkin*, 832 F. App'x 849 (5th Cir. 2020) ..............................56

*Mason v. State*, 905 S.W.2d 570 (Tex. Crim. App. 1995) ..................15, 16

*Nelson v. Lumpkin*, 72 F.4th 649 (5th Cir. 2023) ...................................12

*O'Brien v. Dretke*, 156 F. App'x 724 (5th Cir. 2005)...............................36

*Ortiz v. Quarterman*, 509 F.3d 214 (5th Cir. 2007) ...............................59

*Payne v. Tennessee*, 501 U.S. 808 (1991) ................................................35

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..................................................57

*Ramirez v. Davis*, 780 F. App'x 110 (5th Cir. 2019)...............................54

*Ramirez v. Dretke*, 396 F.3d 646 (5th Cir. 2005)....................................11

*Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007) .............................11

*Roberts v. Dretke*, 356 F.3d 632 (5th Cir. 2004) ....................................54

*Robertson v. Cain*, 324 F.3d 297 (5th Cir. 2003)....................................11

*Schriro v. Landrigan*, 550 U.S. 465(2007) ........................................53, 56

*Simmons v. Epps*, 654 F.3d 526 (5th Cir.2011)........................................59

*State v. Brumwell*, 249 P.3d 965(Or. 2011) .............................................30

*Strickland v. Washington*, 466 U.S. 668 (1984) .....................................41

*Tennard v. Dretke*, 542 U.S. 274 (2004)..................................................57

*United States v. Cannon*, 750 F.3d 492 (5th Cir. 2014) .....................27, 28

*United States v. Dominguez Benitez,* 542 U.S. 74 (2004).......................40

*United States v. Hudak*, No. 24-4313, 2025 WL 2835756 (4th Cir. Oct. 7,
    2025)...................................................................................................27

*United States v. Simkanin*, 420 F.3d 397 (5th Cir. 2005)........................29

*United States v. Tampico*, 297 F.3d 396 (5th Cir. 2002)...................28, 29

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001)........................14, 33, 58

*Virginia v. LeBlanc*, 582 U.S. 91 (2017) .................................................13

*Williams v. Taylor*, 529 U.S. 362 (2000)...........................................12, 41

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ...........................................20

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ..............................................13

*Yarborough v. Alvarado*, 541 U.S. 652 (2004)........................................13

*Zant v. Stephens*, 462 U.S. 862 (1983)...................................................35

**Statutes**

28 U.S.C. § 2254(d) ...............................................................11, 12, 14

28 U.S.C. § 2254(e)(1) ...............................................................14, 40

28 U.S.C. § 2254(e)(2) .....................................................................14

**Constitutional Provisions**

U.S. Const. amend. I....................................................................... passim

U.S. Const. amend. VIII .......................................................................35

## INTRODUCTION

Petitioner–Appellant Irving Alvin Davis was convicted of capital murder and sentenced to death for the rape and murder of 15-year-old Melissa Medina. After his state direct appeal and a comprehensive state habeas proceeding, Davis filed a federal habeas petition that raised numerous claims challenging his conviction and sentence. In a detailed and thorough 133-page opinion, the lower court addressed and denied each of his claims for relief. This Court should now affirm the denial of relief.

## STATEMENT OF THE ISSUES

1.    Did the Texas Court of Criminal Appeals (CCA) reasonably apply *Dawson v. Delaware*, 503 U.S. 159 (1992), when it denied Davis's claim that the admission of evidence of his affiliation with Satanism violated his constitutional rights? If not, did the admission of the Satanism evidence have a substantial and injurious effect on the verdict?

2.    Was the CCA's rejection of Davis's claims of ineffective assistance of trial counsel (IATC) during the punishment retrial unreasonable?

1

## STATEMENT OF THE CASE

### I.   Procedural History

Davis was convicted and sentenced to death for capital murder. ROA.4689-90, 4993, 5015-21. The CCA affirmed Davis's conviction but reversed his sentence. ROA.4587-606. Davis was retried on punishment in 2008 and again sentenced to death. ROA.5971-72, 5979-80. The CCA affirmed Davis's sentence. ROA.4607-47. The Supreme Court denied Davis a writ of certiorari. ROA.4674.

Davis filed a state habeas application pertaining to his first trial, followed by a second habeas application after his punishment retrial. ROA.6046-62, 6082-120, 6697-780, 7159-62. The trial court held an evidentiary hearing on the second state habeas application and issued findings of fact and conclusions of law recommending that Davis be denied relief on both applications. ROA.6213-30, 6236, 7049-98. The CCA denied habeas relief based on the trial court's findings and conclusions and its own review. ROA.6023-25.

In 2015, Davis filed an initial federal habeas petition, followed by multiple amended petitions. ROA.354-84, 506-80, 1197-275, 1867-965. In 2018, Davis then filed a motion to stay and abate his federal habeas

proceedings so he could exhaust certain claims in state court. ROA.2164-78. The court granted the motion. ROA.2224-29.

Davis then filed a subsequent state habeas application in the CCA, ROA.3275-319, 3636-80, but the CCA dismissed the application as an abuse of the writ without considering the merits of the claims. ROA.3339-41. The district court subsequently lifted the stay and reopened the case. ROA.2262-63.

Upon return to federal court, Davis filed an amended petition for federal habeas relief. ROA.2300-426. The district court denied relief, holding many of Davis's claims were procedurally barred from federal review and meritless, while the remainder were reasonably rejected by the CCA. ROA.2838-971. Davis timely filed a motion to alter or amend the judgment, ROA.2972-89, which was denied. ROA.3020-28.

Turning to this Court, Davis filed a COA application claiming the admission of evidence concerning Satanism violated his constitutional rights and that he received IATC during the punishment retrial. *See generally* Pet'r's Mot. for COA & Br. in Support, ECF Nos. 32, 59-61. The Court granted a COA for those claims. *Davis v. Guerrero*, No. 24-70008,

3

2025 WL 1766785, at *10 (5th Cir. June 26, 2025). Davis filed his Appellant's brief (Br.), and the Director's brief now follows.

## II.    Statement of Facts

### A.    Evidence at guilt-innocence

In its first opinion on direct appeal, the CCA summarized the facts of the case. ROA.4589-90. The Director provided those facts at the COA stage and will not repeat them here.

### B.    Evidence at punishment

The federal district court summarized the punishment phase evidence from Davis's retrial as follows:

> Carlos Ramirez—who was present at the Romero's party on the evening of June 3, 2001—testified that Davis had "clotheslined" him by abruptly putting his arm around his chest to stop him. [ROA.15241-42]. And later—after Ramirez told Davis he did not appreciate unwanted roughhousing—Davis held his head down while he was tying his shoes. [ROA.15242, 15244].

> Megan Ryan—a former schoolmate from Jacksonville, North Carolina—said that on January 24, 1996, she saw Davis chase his twin brother, Oscar, around the house with a big kitchen knife and pin him on the ground with that knife. [ROA.15349].

> Michelle Marinelli—another person who knew Davis in North Carolina—said he saw Davis throw a bar stool in anger at a dance club and later called her a "bitch." [ROA.15350-51].

4

Mary Cramer Segovia—a prior acquaintance from North Carolina—said she once observed a knife on the floor—which Davis picked up and claimed as his—while she was dancing with friends at a nightclub. [ROA.15388-89, 15392].

Patricia Ann Trott—a former neighbor from North Carolina—testified she saw a law-enforcement officer speaking with Davis at his house and afterwards, when Davis was talking to a friend on his porch, Davis pointedly looked at Trott and said, "But I'll take care of her." [ROA.15393-94]. On another occasion, when Trott was driving up the street, Davis, who appeared angry, began to cross the street very slowly in front of her, as if deliberately trying to stop her from passing, and leaned down and said something to her as she passed. [ROA.15393-95].

The State next presented evidence that Davis was on probation for theft in North Carolina when he sexually assaulted and killed Medina. [ROA.15386-87, 15569, 15844-49]. It established that Officer Nelson Negron, a former school-resource officer at Jacksonville High School, arrested Davis for criminal trespass in 1997 because Davis—who had previously been suspended from school—was not permitted to be on school grounds. [ROA.15398-99]. It showed that Officer Negron assisted when his partner, Officer Clifton McQueen, arrested Davis for possession of marijuana in 1998. [ROA.15397-98]. It presented evidence establishing that Officer McQueen, also a former school-resource officer, was present when Davis was suspended from school later that year. [ROA.15400-02].

The State then offered evidence—including books, writings, and drawings—found in Davis's death-row prison cell which suggested Davis was involved with Satanism. [ROA.15419-22, 16299-349, 16356-59]. It also submitted violent drawings by Davis of women with slashed throats, bound and gagged, and covered in blood. [ROA.15420-22, 15425, 16285, 16352–55, 16360-61].

5

Dr. Edward Gripon—the State's expert witness in the field of forensic psychiatry—testified he reviewed "collateral information" on Davis—including his offense report, prior testimony at his suppression hearing, school record, artwork, and telephone conversations. [ROA.15431-32]. Dr. Gripon then listened as the prosecutor outlined a hypothetical question which summarized the evidence against Davis in this case. [ROA.15440-44]. Dr. Gripon opined on the issue of future-dangerousness that the hypothetical person described by the prosecutor "would be likely to continue to pose a continued threat." [ROA.15444]. Dr. Gripon explained he mostly based his opinion on Davis's history of antisocial behavior and escalating violence. . . . [ROA.15444].

Donald Vaughn Haley—the Director of Criminal Justice at Tidewater Community College in Virginia Beach, Virginia—testified he had studied Satanism for nineteen years and had consulted with law enforcement agencies—including the Federal Bureau of Investigations on one occasion—about the subject. [ROA.15458-59, 15463, 15465]. Although he had never testified in court as an expert on Satanism, he was allowed by the trial court—over the objection of Davis's counsel—"to testify as an expert in the area of satanism" in this case. [ROA.15460]. He read a passage from *The Satanic Bible* by Anton LaVey—the founder of the Church of Satan—which suggested human sacrifice could be used "to dispose of a totally obnoxious and deserving individual," meaning "[a]nyone who had unjustly wronged you or has gone out of his way to hurt you." [ROA.15460]. He said *The Satanic Bible* commands that when a person, by his "reprehensible" behavior, "cries out to be destroyed, it is truly your moral obligation to indulge [ ] their wish." [ROA.15460]. He claimed Rule Eleven of LaVey's Eleven Satanic Rules of the Earth—"When walking in open territory, bother no one. If someone bothers you, ask him to stop. If he does not stop, destroy him"—shows that if a person "annoys you, [you may] treat him cruelly." [ROA.15461]. And if the person does not

6

stop his annoying behavior, you may "destroy" him. [ROA.15461]. On cross-examination, Haley asserted the brutal way Davis murdered Medina was consistent with the term "destroy," and that "destroy" meant "to die." [ROA.15462-63].

. . . .

Davis's counsel deftly cross-examined Haley. [ROA.15461-66]. They obtained Haley's admission that he was reading Rule Eleven of LaVey's Eleven Satanic Rules of the Earth "literally." [ROA.15462]. They established that Haley had never published in the area of Satanism, had interviewed only three Satanists, and was, at best, minimally qualified to give opinions on Satanism or the Church of Satan. [ROA.15463-66].

## 1. The Defense's Evidence

The defense called a witness to counter Haley's testimony on Satanism.

John Gordon Melton—the director for the Institute for the Study of American Religion in Santa Barbara, California, an expert in religious studies, and a religious historian with training on cults and new religions—was qualified as an expert on American religions including Satanism. [ROA.15467]. He testified about the origin of the Church of Satan in the United States with its founder—a former circus performer named Anton LaVey—and its nature and rituals. [ROA.15467-71].

. . . .

[ROA.15469]. He explained LaVey formed the Church of Satan to counter Christianity and Catholicism, which he deemed hypocritical. [ROA.15469]. He further claimed followers of Satanism should not take the passages in *The*

*Satanic Bible* literally, and opined LaVey's Eleven Satanic Rules of the Earth and Nine Satanic Statements were non-violent in nature. [ROA.15473, 15477-78]. But he conceded an individual reading *The Satanic Bible* could take the words literally. [ROA.15473]. He also conceded people had been killed "[i]n the name of satanism." [ROA.15473].

The defense provided character testimony from twelve lay witnesses—including childhood and adult friends, a schoolteacher, and family members. [ROA.15491-508]. These witnesses opined Davis was peaceful, non-violent, not aggressive, and would not pose a future danger to society. [ROA.15491-508].

Dr. James William Schutte—a licensed psychologist—testified that clinical method risk assessments—such as the one provided by Dr. Gripon—were highly inaccurate. [ROA.15520-21, 15524].

. . . .

Dr. Schutte opined that "there is *not* a probability" a hypothetical individual like Davis—who had attained the age of twenty-five and did not have any factors added to his base rate—"would commit acts of violence in prison." [ROA.15524]. Dr. Schulte also reported that in a "study of 136 capital murderers in Texas prisons [in the early 2000s], none of that group of 136 committed a murder while in prison." [ROA.15532].

. . . .

Davis was the last to testify. He explained he grew up a Baptist but switched to Buddhism in 1999. [ROA.15539, 15555]. He claimed two events led him to Satanism: the first was his anger over the way Buddhists were treated by the Chinese in Tibet and the second was his desire to look into the myth of the war in heaven. [ROA.15555]. He maintained he

8

did not believe in Satan as a deity . . . . He claimed Satanism did not advocate violence. [ROA.15542]. He explained *The Satanic Bible* lays out various spells: compassion spells, destruction spells, and lust spells. [ROA.15563]. He maintained he used his "spells for compassion." [ROA.15563]. He said Rule Eleven of the Satanic Rules of the Earth provided "[w]hen walking into open territory, bother no one. If someone bothers you, ask him to stop. If he does not stop, destroy him." [ROA.15563]. He said "destroy" in this context did not mean you actually hurt another, but you could defend yourself "through your words." [ROA.15564]. He also discussed his artwork, poetry, and life philosophy at length. [ROA.15538-65].

Davis testified about his childhood, home life, and his father's abuse. [ROA.15565-69]. He described how his father gave Davis and his twin brother, Oscar Davis, "whoopings." [ROA.15565]. He said they would "have to strip down and he'd hit us on our bare bottoms with a belt. Other times he would just be cruel." [ROA.15565]. He claimed they were always punished together, especially when their father was drunk, because he could not tell them apart. [ROA.15566]. He alleged his father also kicked his older brother—Carl Fuller—out of the house when he was sixteen years old because Carl Fuller threatened his father after he hit his mother. [ROA.15566]. He claimed his father would hit his mother "only when he was drunk." [ROA.15566]. He said his father first started drinking periodically and then "more and more." [ROA.15566]. He maintained his father hit him "like a grown man." [ROA.15567].

. . . .

At the end of his testimony, Davis said it "killed him" to know he was a part of the Medina family's horror; "it was eating [him] up" that no one talks about her anymore; "to remember her is to remember everything I did"; and he stole

from their family by taking their daughter. [ROA.15573]. He then said:

> I would ask you all to please, please remember her. I mean, I'm a piece of crap. I understand that. I'm not asking — I didn't come here looking for salvation. I came here looking for an execution. I'm not asking you all to spare my life. I'm asking you all to allow me to give up my life in spite of hers, based on the laws I live by. It's life for life. I took a life, mine should be taken in return."

[ROA.15573]. Davis added he could do nothing to make this right except give up his right to live. [ROA.15573-74].

ROA.2858-72.

## SUMMARY OF THE ARGUMENT

The state courts and the federal district court properly concluded Davis's claims were meritless. The CCA's rejection of Davis's claims was not unreasonable. First, the CCA properly held that the First Amendment did not prohibit the admission of evidence concerning Davis's association with Satanism, and even if it did, any error was harmless. Second, Davis's IATC claims fail because Davis has not shown deficient performance, prejudice, or an unreasonable state court decision.

10

## ARGUMENT

## I.     Standards of Review

### A.     Appellate standard of review

When a federal district court denies a habeas petition that is governed by 28 U.S.C. § 2254(d), this Court reviews "the district court's findings of fact for clear error and its conclusions of law de novo, 'applying the same standard of review to the state court's decision as the district court.'" *Anaya v. Lumpkin*, 976 F.3d 545, 550 (5th Cir. 2020) (quoting *Robertson v. Cain*, 324 F.3d 297, 301 (5th Cir. 2003)). In a federal habeas appeal, when examining mixed questions of law and fact, the Court employs a de novo standard of review for legal conclusions "by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous." *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005) (citing *Barrientes v. Johnson*, 221 F.3d 741, 750 (5th Cir. 2000)). "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole." *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2007). This Court may also affirm on any ground supported by the record,

and it is not bound by observations in the COA opinion. *Nelson v. Lumpkin*, 72 F.4th 649, 656 (5th Cir. 2023).

## B.  AEDPA's "highly deferential" standard in § 2254 cases[1]

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "involved an unreasonable application of" clearly established Supreme Court precedent, or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d). A state court's decision is "contrary" to established federal law when it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. *Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly

---

[1]  AEDPA is the Antiterrorism and Effective Death Penalty Act of 1996.

identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09.

To determine whether Supreme Court precedent has been unreasonably applied, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 101. Further, the challenged state court decision must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quotation omitted). State courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Indeed, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Additionally, the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the

13

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Ford v. Davis*, 910 F.3d 232, 234 (5th Cir. 2018). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). In other words, "as long as there is 'some indication of the legal basis for the state court's denial of relief,' [a federal] court may infer the state court's factual findings even if they were not expressly made." *Ford*, 910 F.3d at 235 (quoting *Goodwin v. Johnson*, 132 F.3d 162, 184 (5th Cir. 1997).

Further still, except for the narrow exceptions contained in 28 U.S.C. § 2254(e)(2), in reviewing the state court's decision for reasonableness, a federal court must consider only evidence that was presented to the state court. The Supreme Court has held that review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011). And because a federal habeas court is prohibited from granting relief under § 2254(d)(2) unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented

14

in the state court proceeding," it follows that demonstrating the incorrectness of a state court's factual finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.

## II. The CCA's Rejection of Davis's Satanism Claim Was Reasonable.

Davis alleges that his First Amendment rights were violated by the admission of evidence of his association with Satanism. *Davis*, 2025 WL 1766785, at *2–7. But the CCA's decision was not unreasonable under AEDPA. Therefore, this Court should affirm the district court's decision.

### A. Background

Davis raised his claim concerning Satanism on direct appeal, and the CCA rejected the claim as follows:

> We first address [Davis's] constitutional claim. The First Amendment guarantees the freedoms of religion and association. *See Casarez v. State*, 913 S.W.2d 468, 476–78 (Tex. Crim. App. 1994); *Mason v. State*, 905 S.W.2d 570, 576 (Tex. Crim. App. 1995). It protects an individual's right to join groups and to associate with others holding similar beliefs. *Mason*, 905 S.W.2d at 576 (citing [*Dawson*, 503 U.S. at 161]). However, the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because those beliefs and associations are protected by the First Amendment. *Id.* Such evidence may be admissible if it is shown to be relevant to the issues involved in the case. *Id.* at 576–77. Future dangerousness is an issue that is relevant to the sentencing stage of a capital-murder trial. *Id.* at 577.

15

> In order to prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. *Mason*, 905 S.W.2d at 577 (citing *Dawson*, 503 U.S. at 163–67). The [S]tate introduced TDCJ records showing that [Davis] had identified himself as a Satanist since 2005. Haley testified that some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in [Davis] cell discussed "rituals of destruction" for performing "human sacrifice" on "undesirable [and] obnoxious individual[s]," and that various people had committed murder and mutilation "in the name of Satan." Although Melton disagreed with Haley's definition of the term "destroy" and his description of Satanic philosophy, Melton acknowledged that in some instances people had been killed in the name of Satanism. It was within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness and outside the protection of the First Amendment.

ROA.4612-13 (footnote omitted).

During state habeas review, the trial court issued findings and conclusions again rejecting the claim. ROA.7058-61, 7095. Notably, the state habeas court found that the outcome of the proceeding would not have been different absent the Satanism evidence, which was only a small fraction of the total evidence presented at Davis's punishment retrial. ROA.7060-61, 7095. It concluded "it is more likely than not that

the outcome of [Davis's] punishment phase would have been the same without the complained-of evidence." ROA.7095.

Indeed, the evidence of future dangerousness was "overwhelming." ROA.7061. Davis was also able to explore the issue of Satanism with the jurors during voir dire, and a majority of those who served on the jury were either ambivalent about the subject or could set aside their opinions. ROA.7060. Additionally, Melton countered Haley's testimony by explaining that the practice of Satanism was mostly symbolic and did not advocate violence. ROA.7061. Further, the court found that Davis's writings and drawings showing "his allegiance to Satan," along with related literature and his pentagram tattoo "had probative value apart from any religious connotation" and would have admissible. ROA.7061. The State told the jury that it need not decide whether Satanism was good or evil but need only consider the violent and morally reprehensible content of Davis's writings and artwork. ROA.7061. His writings and drawings exhibited "a preoccupation with rape, violence (particularly towards women), and death." ROA.7061.

The trial court concluded that the claim was not cognizable in a habeas proceeding because it was raised and rejected on direct appeal.

17

ROA.7095. But, in the alternative, the court concluded the claim was meritless and that any error was harmless because "it is more likely than not that the outcome of [Davis's] punishment phase would have been the same without the complained-of evidence." ROA.7095. The CCA adopted the trial court's findings and conclusions when it denied relief. ROA.6024-25.

The district court found the Satanism evidence was relevant to Davis's future dangerousness and the CCA's application of *Dawson* was reasonable. ROA.2497-98. But even if there were error, the district court concluded the evidence was harmless because Davis was able to combat the evidence and he "faced an insurmountable sum of aggravating evidence." ROA.2497-98. Thus, Davis could not show that no fairminded jurist could conclude the error was harmless, as required by *Brown v. Davenport*, 596 U.S. 118, 122, 134–37 (2022). ROA.2498.

**B.    Clearly established Supreme Court precedent when the CCA denied relief.**

In *Dawson*, during the punishment phase of a death penalty case, the prosecution introduced evidence of Dawson's association in the Aryan Brotherhood, including tattoos on his body that demonstrated his affiliation with that group. *Dawson*, 503 U.S. at 161–63. The Supreme

18

Court held that the admission of evidence of Dawson's membership in the Aryan Brotherhood violated his First Amendment rights. *Id.* at 167. The Court concluded that "the Constitution does not erect a per se barrier" to evidence of beliefs and associations protected by the First Amendment. *Id.* at 165. But because the evidence presented did not show that the Aryan Brotherhood had actually been involved in criminal activity, such as drugs and violent behavior, or that the evidence was tied to the murder of Dawson's victim, it was not relevant to demonstrate any aggravating factors. *Id.* at 165–67. No experts were presented, and there was only a narrow stipulation concerning the Aryan Brotherhood's white racist beliefs. *Id.* at 165. Nonetheless, the Court made it clear that "[i]f credible and otherwise admissible evidence to that effect had been presented, we would have a much different case." *Id.* Indeed, the Court stated that "[i]n many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.* at 166.

The Supreme Court later affirmed that evidence of a defendant's racial animus was admissible at sentencing despite the First Amendment when relevant to the case, such as to show racial motive for a crime that

19

enhanced the penalty. *Wisconsin v. Mitchell*, 508 U.S. 476, 485–90 (1993). The First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. *Id.* at 489. The Court reiterated that *Dawson* only prevented evidence of a defendant's abstract beliefs, however obnoxious, and *Dawson*'s prohibition did not apply even in capital sentencing when the defendant's beliefs were relevant to a sentencing issue. *Id.* at 485–86.

Subsequently, in *Fuller v. Johnson*, this Circuit faced a similar set of facts as the *Dawson* Court. 114 F.3d 491 (5th Cir. 1997). Fuller was found guilty of capital murder and, at the punishment phase of the trial, the prosecution introduced evidence that Fuller belonged to the Aryan Brotherhood. *Id.* at 495. But as this Court recognized, the evidence was more than a narrow, irrelevant stipulation, the State put on actual testimony connecting Fuller to the gang, its beliefs, and criminal activities. *Id.* at 497–98. Relying on *Dawson*, the Fifth Circuit found that Fuller's association with the Aryan Brotherhood was relevant because the State also introduced evidence "that Fuller was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Id.* at 498.

20

Because the admission of the evidence was relevant to future dangerousness, Fuller's First Amendment rights were not violated. *Id.*

Consequently, during punishment proceedings in a capital trial, the admission of evidence that otherwise is protected under the First Amendment is not unconstitutional if the evidence is relevant to punishment. It is enough if a defendant's beliefs and associations are "sufficiently related to the issues at sentencing." *Boyle v. Johnson*, 93 F.3d 180, 183–84 (5th Cir. 1996) (holding that testimony about Boyle's sexual habits and Boyle's sexual drawings were admissible and relevant to future dangerousness because they showed his sexual obsession and the crime had a sexual component).

### C. Fairminded jurists applying Supreme Court precedent could deny relief on Davis's Satanism claim.

Davis has failed to show any clearly established Supreme Court precedent that prohibits the Satanism evidence in this case. The CCA's decision was reasonable.[2] Here, the evidence in question was relevant to

---

[2]    Davis asserts the CCA used the wrong standard by applying an abuse-of-discretion standard. Br.32. But whether the evidence was relevant controlled whether the evidence was outside the protection of First Amendment. ROA.4613. The CCA simply took into consideration the trial court's relevancy ruling in reaching its decision. Further, on state habeas review, the CCA reiterated that Davis's First Amendment rights were not violated by admission of the evidence. ROA.7095.

21

future dangerousness. Davis's writings contained Satanic imagery and references, including lists of Satanic rules, statements and sins; one drawing from Davis showed a woman bound and gagged, and another showed a woman with a slashed throat; other writings revealed Davis pledging his allegiance to the Church of Satan and that he was a "blood sorcerer" who had taken up "vampirism"; Davis had an inverted pentagram on his chest;[3] per Haley, *The Satanic Bible* in Davis's possession instructed that a person who had "unjustly wronged" a Satanist was an appropriate subject for human sacrifice; and Haley said that the "Eleven Satanic Rules of the Earth" permits a Satanist to treat an annoying person cruelly and potentially "destroy" that individual, which means to cause the person's death. ROA.7058–59. Also, defense expert Melton conceded that some forms of Satanism engage in destruction and that some people have been killed "in the name of [S]atanism." ROA.7060, 15472-73. Considering this evidence and the fact that Davis's crime involved a brutal murder of a young woman, the evidence was relevant to his alleged rehabilitation and future

---

[3]    The Court's COA grant acknowledged Davis's writings and drawings were likely admissible on their own. *Davis*, 2025 WL 1766785, at *6.

22

dangerousness. The state court reasonably found that there was no First Amendment violation.

Indeed, *Dawson* contains no requirement that the prosecution was required to show the Church of Satan or some sect *itself* had committed or officially endorsed violent or illegal acts. In *Dawson*, such evidence could have provided a basis for ascribing certain beliefs or actions to Dawson, but the stipulation was insufficient to do so. *Dawson*, 503 U.S. at 165–66. Here, Davis had Satanic books in his cell, so the jury could safely ascribe certain beliefs from those texts to Davis and find they indicated future dangerousness. ROA.4610. Haley's testimony offered one way to show how those texts could be interpreted. And even Melton acknowledged that while the Church of Satan itself was small, there could be other followers of Satanism not officially connected to the church and some of them could read the texts literally. ROA.15473-74. The evidence showed followers of Satanism and its associated texts had engaged in violence. ROA.4610, 4612-13, 15368, 15371-74, 15473.

Prior to the penalty phase in *Dawson*, the prosecution claimed it would present evidence tying Dawson to a gang associated with drugs, violence, and murder. 503 U.S. at 165. But when the evidence was finally

23

presented, the prosecution only showed that "an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood." *Id.* The Court concluded that "the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id.* The Court also pointed out that "the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim," and racism was irrelevant because Dawson's victim was white. *Id.* at 166. But the Court clearly left open the door to such evidence, stating:

> In many cases . . . associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that *endorses* the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. *Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances.* . . . Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on Dawson's part, but on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible.

*Id.* at 166–67 (emphases added). *Dawson* does not hold that the group to which a defendant belongs must itself be tied to both violence generally

24

and to violence in the case. *Dawson* only held that this element was missing in Dawson's case, not that it is required. To the contrary, the Court clarified that "[o]ther evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances." *Id.* at 166.

The State presented concrete evidence of Davis's preoccupation with violent imagery of women—particularly relevant here given what he did to Medina—and the evidence of the association between Satanism and violence that arguably amounts to an "endorsement" is hardly "abstract." Such specific aggravating evidence was missing in *Dawson*, which is why the Supreme Court found a constitutional violation. The *Dawson* Court also found that the Aryan-Brotherhood evidence was not used to rebut any mitigating evidence Dawson offered, *id.* at 167–68, whereas the CCA found that the State's evidence was relevant to rebut the defense's case that Davis had changed while in prison. ROA.4614-15. For all these reasons, the state court reasonably rejected Davis's claim.

This Court granted COA on the Satanism issue because reasonable jurists could debate that the CCA's reasoning would permit associational guilt by holding defendants liable for their group's minority views or

25

actions. *Davis*, 2025 WL 1766785, at *4; *see also* Br.25–26. However, as the CCA held, *Dawson* allows associational evidence when an associated group either 'commit[s]" or "endorse[s]" "unlawful or violent acts." *Dawson*, 503 U.S. at 166. *Dawson* also explained that if expert evidence had been admitted in that case—much as it was through Haley—the Supreme Court would have had "a much different case." *Id.* at 165. The *Dawson* Court did not require that the prosecution show that a certain number of a group's members share beliefs or commit reprehensible actions before associational evidence becomes admissible, and the CCA did not violate clearly established federal law by failing to demand such a showing. Unlike the barebones stipulation in *Dawson*, Davis's prosecution precisely followed *Dawson*'s instructions by offering expert testimony and other credible and admissible evidence of Davis's affiliation with Satanism, including his writings, his possession of text, his drawings, and his tattoo. The evaluation suggested in the Court's COA grant—establishing the precise contours of the defendant's beliefs, the group's tenets, and the group's history or endorsement of violence— properly occurs by the jury after hearing all the evidence once antecedent *Dawson* admissibility is established.

26

Requiring a showing that all members of a group share the same beliefs would foreclose admission of such evidence in almost every case, as every defendant could try to distance themselves from their associations by arguing they or others had different opinions. The ultimate issue is what the defendant believed. As this court and others have recognized, when the evidence is open to different interpretations, what the defendant actually believes is an issue for the jury.

Recently, in *United States v. Hudak*, No. 24-4313, 2025 WL 2835756 (4th Cir. Oct. 7, 2025), the Fourth Circuit recognized that although the First Amendment protected Hudak's right to possess Nazi memorabilia in his home, such evidence was admissible in his criminal case to prove whether the assault was a hate crime. Hudak argued he was just a military collector, but the Court held that "[how] much meaning to assign the Nazi memorabilia was ultimately a question of weight, not admissibility." *Id.* at *5–6.

In *United States v. Cannon*, 750 F.3d 492, 508–09 (5th Cir. 2014), this Court, including Judge Graves, held that the First Amendment did not prohibit the use of evidence showing the defendants harbored white-supremacist views even where the defendant's claimed the evidence was

27

insufficient to show an assault was motivated by race. The defendants offered various arguments to discount the evidence, including a gang expert who testified that not all individuals who had certain tattoos were affiliated with a gang or organization, and not all members of these groups share a common set of beliefs. *Id.* at 508. Nonetheless, this court explicitly noted the evidence of defendants' racial animus was not prohibited by the First Amendment and that the jury could conclude the defendants attacked the victim due to race. *Id.* at 508–09. Although *Hudak* and *Cannon* are hate-crime cases where racial animus is motive, both cases recognize that the meaning of evidence to a defendant, when the evidence is relevant, is a jury question.

Further, although the Court's judgment was later vacated on other grounds, this Court previously held that evidence of a defendant's involvement in the North American Man Boy Love Association (NAMBLA) was admissible at sentencing despite the defendant's First Amendment claim. *United States v. Tampico*, 297 F.3d 396, 402–03 (5th Cir. 2002). There, Tampico argued NAMBLA's purpose was simply to advocate abolition of age of consent laws, but the Court noted the literature found in his possession advocated "Man/Boy sexual

28

relationships." *Id.* Thus, the Court held that "[b]ecause Tampico's membership in NAMBLA *may* indicate the increased likelihood of recidivism or a lack of recognition of the gravity of the wrong, Tampico's association with NAMBLA is relevant to his intentions and his conduct." *Id.* at 403 (emphasis added). In other words, despite different interpretations of the meaning of Tampico's association with NAMBLA, the Court found the evidence admissible.[4]

The Supreme Court of Oregon held evidence of a defendant's interest in Satanism and death metal music admissible during sentencing in a death penalty case despite the defendant's First Amendment claim and his argument that the evidence was irrelevant because the prosecution introduced no evidence that Satanists or death

---

[4]    Despite the judgment being vacated and the original opinion being unpublished, the Court later found the reasoning in *Tampico* persuasive in a published case. *United States v. Simkanin*, 420 F.3d 397, 417 n.22 (5th Cir. 2005) (holding Simkanin's beliefs that the tax laws were invalid and his association with an organization that believed free persons are not required to pay income taxes on wages were admissible because they directly related to the crimes in question and demonstrated a likelihood of recidivism). Another judge now on this Court also cited *Tampico* fairly recently to reject a First Amendment claim concerning the defendant's rap videos, lyrics, social media posts, and interviews where the evidence was relevant to his history, characteristics, and potential future dangerousness. *Campbell v. United States*, No. 3:20-CV-1326-M-BH, 2023 WL 3395135, at *4 (N.D. Tex. Apr. 12, 2023) (magistrate report rejecting defendant's First Amendment claim despite defendant's arguments that the rap videos and lyrics were just artistic expression and the author of some lyrics was unknown.).

29

metal fans either advocate or commit violent acts. *State v. Brumwell*, 249 P.3d 965, 971–75 (Or. 2011). Although the defendant argued there was no evidence connecting Satanism and death metal to his prior crimes, the court found "there was evidence from which a reasonable juror could find that defendant's (and the group's) interest in [S]atanism and death metal music was not merely coincidental with the crimes that occurred." *Id.* at 972–73. The court held that the First Amendment challenge failed because the evidence concerning Satanism and death metal showed motive for his prior crimes and was relevant to future dangerousness. *Id.* at 975.

Here, Davis offered a competing interpretation of the Satanism evidence by asserting that he and other Satanists did not take language in Satanic texts concerning violence literally. ROA.4612-13. But as established above, whether Melton's interpretation of the Church of Satan's texts and beliefs was more plausible than Haley's is a fact issue for the jury, not judges.

Moreover, Davis's interest in Satanism showed a preoccupation with violence and violence against women that was relevant to his remorse, rehabilitation, and future dangerousness. Here, Davis chose to

use his limited cell space to store books like *The Satanic Bible* that could be read to endorse violence, had a pentagram carved into his chest, and had writings and drawings that concerned Satanism and depicted violence. ROA.4610-11. In *Dawson*, there was no evidence a jury could consider on violence, only racial animus that was irrelevant to the case. 503 U.S. at 165–68. Here, a jury had ample evidence to conclude that Davis had a preoccupation with violence that made him a future danger. The evidence in this case also touched on recidivism, remorse, and rehabilitation, particularly where Davis would focus on such things after being convicted for the violent and gruesome murder of Medina.

This Court's COA grant also found "it is debatable whether the CCA's reliance on disputed testimony about Satanic texts renders the evidence relevant" because the CCA did not find that Satanic literature endorsed violence. *Davis*, 2025 WL 1766785, at *5; *see also* Br.25. As shown above, where there are multiple possibilities and meanings for evidence, that should be left to the jury decide. As the CCA found, "Haley testified that some members of the Satanic religion advocate violence, that Satanic religious publications like the ones found in [Davis] cell discussed 'rituals of destruction' for performing 'human sacrifice' on

31

'undesirable [and] obnoxious individual[s],'" and that some people had committed crimes for Satan. ROA.4613.

Similarly, what sect or branch Davis belonged to and its official position on violence is not determinative of how Davis viewed the texts he kept in his cell. In *Dawson*, connecting the defendant to a particular branch or sect of the group could have established Dawson might share their beliefs. Here, Davis had Satanic texts in his cell, so those texts and testimony about them could be used to establish the beliefs Davis held. Although the CCA utilized *Dawson* as a guidepost, this case is different. Accordingly, like *Hudak*, *Cannon*, *Tampico*, and *Brumwell*, conclusively linking Davis to some official position or interpretation of a particular group was not required under *Dawson* for evidence to be admissible. At the very least, those cases show fairminded jurists could disagree whether *Dawson* requires all members of a particular group (or some particular percentage) to hold the same beliefs or endorse the same actions before the evidence is admissible. *Richter*, 562 U.S. at 101. Likewise, *Dawson* does not clearly show beyond the possibility for fairminded disagreement that a defendant must be conclusively linked to a particular branch or sect before evidence of an association is admissible.

32

*Id.* Nonetheless, the State did present evidence linking Satanism to violence. ROA.4613.

Relatedly, Davis argues that the CCA made an unreasonable fact finding by concluding Davis belonged to a group that engages in or endorses violent and illegal activities where the evidence only pertained to some members of the group. Br.32–34. But the CCA never stated all members of the group had done so, and, for the reasons already discussed, there is no requirement that the State make such a showing.

This Court also suggested in the COA grant that it could not rely on Davis's drawings because the CCA did not rely on them to reach its constitutional holding. *Davis*, 2025 WL 1766785, at *5 n.8. Yet in its direct appeal opinion, the CCA outlined all the evidence, noted that counsel challenged it First Amendment grounds, and ultimately held that all the evidence was admissible and outside the protection of the First Amendment. ROA.4608-13. The mere fact the CCA did not explicitly mention Davis's drawings when rejecting the claim, does not show they were not relied on given all the background prior to its legal reasoning. The CCA could have implicitly found the drawings supported its analysis. *See Valdez*, 274 F.3d at 948 n.11. Further, the drawings

33

taken from his cell could be considered "TDCJ records" that showed Davis identified as a Satanist. *See* ROA.4613. In fact, the CCA noted Davis's claim was multifarious, but it was reviewing it in the interest of justice, so it may have been briefer than usual. ROA.4608. Moreover, the state habeas court found that Davis's writings and drawings showing "his allegiance to Satan," along with related literature and his pentagram tattoo "had probative value apart from any religious connotation" and would have admissible. ROA.7061. Given that those were admissible anyway, the Court had less reason to relist them in its analysis. In the end, excluding the drawings from the CCA's reasoning relies on an overly restrictive reading of the CCA's opinion, but for the reasons already addressed, Davis does not show the CCA's rejection of his claim was unreasonable beyond the possibility for fairminded disagreement even without reliance on the drawings. Davis also fails to show that he is entitled to relief under de novo review.

**D.    Admission of the Satanism evidence did not violate the Eighth Amendment or due process.**

As shown above, the Constitution allows for the evidence of otherwise protected religious beliefs and practices in criminal cases. *See supra*, Section II.B, C. Indeed, in *Dawson*, the Supreme Court rejected

34

Dawson's argument, *see* Br.26, based on *Zant v. Stephens*, 462 U.S. 862 (1983), that the Constitution forbids evidence of beliefs or activities protected by the First Amendment. *Dawson*, 503 U.S. at 164–65. By meeting the *Dawson* test, evidence of Davis's involvement with Satanism was not constitutionally foreclosed, so his Eighth Amendment claim also fails.

Davis also raises a due process claim. Br.26. Davis's due process claim also fails because he does not show the admission of the Satanism evidence was so unduly prejudicial it rendered his trial fundamentally unfair. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (noting sentencing evidence may be so unduly prejudicial it renders the trial fundamentally unfair). As explained below, even if there was constitutional error, any error in this case was harmless and did not render Davis's trial fundamentally unfair. *See infra*, Section II.E. If Davis's *Dawson* claims fails, so do his others. *See Davis*, 2025 WL 1766785 at *7 n.13 (suggesting that Davis's Eighth and Fourteenth Amendment claims are "encompassed within his *Dawson* claim").

### E.    Any error did not have a substantial and injurious effect on the verdict given the other evidence.

Even if there was error, it was harmless. Davis must meet the test from *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38 (1993). Under *Brecht*, federal habeas relief may not be granted for trial error that, although of constitutional magnitude, did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also O'Brien v. Dretke*, 156 F. App'x 724, 737–38 (5th Cir. 2005) (applying *Brecht* to a *Dawson* claim).[5]

To begin with, during jury selection the defense was able to question jurors on Satanism and majority of jurors who sat on the jury were ambivalent or could set aside their opinions on Satanism.[6] ROA.7060. During trial, the State did not emphasize the issue to any great extent. The prosecution made no reference to Satanism in its opening argument. ROA.7060. During closing arguments, the first prosecutor to argue, Mr. Locke, mentioned Satanism only once,

---

[5]    Davis argues harmless error is not applicable here. Br.42 n.21. But *Dawson* and *O'Brien* say otherwise. *Dawson*, 503 U.S. at 168–69; *O'Brien*, 156 F. App'x at 737–38.

[6]    Davis assets that geography matters, Br.37–39, but adequate voir dire compensates for that.

ROA.15593, and the second prosecutor, Ms. Hamilton, discussed it more but told the jury she would not ask it to answer the future-dangerousness special issue "yes" based on Davis's artwork or Satanism but on all the evidence presented. ROA.15605. The portions of argument mentioning Satanism amount to a small fraction of the thirty-five pages of argument. ROA.15589-93, 15605-10. Moreover, as the CCA found, the evidence itself was a small part of the overall proceedings in which there were 30 witnesses. ROA.7060-61. Under § 2254(e)(1), the CCA's factual findings are presumed correct and can only be overcome with clear and convincing evidence.

Additionally, as the district court noted, defense counsel "deftly cross-examined Haley," highlighted that he read texts literally, and "established that Haley had never published in the area of Satanism, had interviewed only three Satanists, and was, at best, minimally qualified to give opinions on Satanism or the Church of Satan." ROA.2864. And right after Haley testified, the defense presented its expert, Melton, who countered Haley's testimony by stating the passages in *The Satanic Bible* are not to be taken literally, and the Satanic Rules are non-violent in nature. ROA.7060-61.

37

Further, when Davis testified at the end of the punishment phase, he was given the opportunity to explain his view of Satanism. He said the Church of Satan advocates against violence, Satan is not involved or worshipped as a deity, and the rituals and practices are symbolic. ROA.15542-43, 15545, 15563.

Davis cites to *Buck v. Davis,* 580 U.S. 100 (2017), as support for showing harm. Br.39–41. But *Buck* is distinguishable because it involved expert testimony from Buck's own expert that he was more likely to be violent due to his race. 580 U.S. at 107–108. This case does not involve an impermissible reliance on race in deciding future dangerousness.

In contrast to the limited Satanism evidence, the CCA found that the other evidence of future dangerousness was "overwhelming" and that the facts of the case were brutal. ROA.7061. The prosecution presented multiple acts of past misconduct and violence. ROA.7055-56 ,7061.

Given those facts, and the defense's ability to undermine the negative aspects of Satanism, Davis has not shown show he suffered any harm, let alone an unfair trial by the admission of the evidence. When considering Davis's rebuttal to the Satanism evidence, combined with the horrific nature of the crime, the "overwhelming" evidence of future

dangerousness, and all the other reasons cited by the state habeas court, the Satanism evidence had no substantial and injurious effect on the verdict.[7] *See supra*, Section II.A; ROA.7060-61. This was also the second time a jury had sentenced Davis to death, ROA.2838-39, so the State's case absent the Satanism evidence was strong.

Moreover, absent the testimony on Satanism, Davis's drawings depicting violence and his writings would have still been admissible. ROA.7058, 7061. The CCA also held his Satanic literature and pentagram tattoo had value apart from the religious connotation and would have been admissible. ROA.7061. The CCA found that his drawings included graphic and violent drawings involving women with their throats slashed and covered in blood. ROA.7057-58. Although Davis offers a different interpretation of the drawings to argue they are not relevant to Satanism, Br.44–46, that was another issue for the jury. If anything, the testimony from Melton and Davis about Satanism helped explain Davis's drawings depicting violence against women as only symbolic.

---

[7]    It is also inconsistent to argue the evidence showed Satanists did not commit or endorse violence for the purposes of *Dawson*, and then argue he was prejudiced by the evidence.

Finally, the CCA determined that it was "more likely than not" the outcome of the punishment phase would have been the same absent the Satanism evidence. ROA.7060, 7095. Under § 2254(e)(1), that finding is presumed correct. And although the CCA's wording of the harmless error standard is different than *Brecht*, other courts have referred to the *Brecht* standard in similar ways. *See Gilday v. Callahan*, 59 F.3d 257, 269 (1st Cir. 1995) ("to find harmlessness, reviewing court must conclude that error more likely than not had no effect on the verdict"). As Justice Scalia once noted when arguing there should only be two standards of harm, beyond a reasonable doubt and more likely than not, differences between the various judicial standards are minor. *United States v. Dominguez Benitez,* 542 U.S. 74, 86–87 (2004) (Scalia, J., concurring). "Such ineffable gradations of probability seem to me quite beyond the ability of the judicial mind (or any mind) to grasp, and thus harmful rather than helpful to the consistency and rationality of judicial decision making." Thus, the CCA's finding of harmless error should still be considered under AEDPA.[8]

---

[8]   The district court also made a separate *Brecht* finding that any error was harmless. ROA.2947.

## III. The CCA's Denial of Davis's IATC Claim Was Not Unreasonable.

Davis claims that trial counsel rendered ineffective assistance during his resentencing by failing to properly investigate and present mitigating evidence. Br.46–62. But the CCA's rejection of this claim was not unreasonable. Accordingly, federal habeas relief should be denied.

### A. Standard of review

Claims of ineffective assistance of counsel are analyzed under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Davis's claim that he was denied constitutionally effective assistance requires him to affirmatively prove counsel performed deficiently and their actions resulted in actual prejudice. *Id.* A failure to prove either deficient performance or prejudice will defeat an ineffectiveness claim. *Id.*

In applying AEDPA deference to an ineffectiveness claim, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard[,]" because "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Satisfying *Strickland*'s

highly deferential standard is no small task, and "[e]stablishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C.] § 2254(d) is all the more difficult." *Id.* at 105. Indeed, this Court "owe[s] deference to both [Davis's] counsel *and* the state court[,]" and may only grant relief if counsel "took an approach that no competent lawyer would have chosen." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (citing *Burt v. Titlow*, 571 U.S. 12, 23–24 (2013)). "Or, in more concrete terms, a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision." *Id.* at 739–40 (cleaned up). Further, state court decisions should be examined based on the record before the state court at the time a decision was made under *Pinholster*, 563 U.S. at 182.

### B.   Background and state court determination

Davis raised his ineffective assistance claim during his state habeas proceedings, and the trial court rejected it with extensive findings and conclusions after conducting a hearing. These findings include that:

- The record does not "affirmatively demonstrate" that trial counsel failed to investigate and present mitigating evidence, "including evidence of a seriously abusive and dysfunctional family life."

● The record does not "affirmatively demonstrate" that counsel were ineffective for not retaining the services of a mitigation specialist.

● Trial counsel interviewed other potential investigators but chose Sam Streep as the investigator because he had been the investigator for Davis's first trial in 2002, and Macias considered Streep to be an "excellent investigator . . . on par with any mitigation specialist." Further, Davis's claim that counsel failed to select an investigator until just after jury selection was incorrect because Streep had been on the case for a number of years.

● Davis did not attest in any affidavit or at the hearing that trial counsel failed to adequately interview family members, necessary witnesses, or consult with Davis, and any assertion to the contrary is not credible.

● The court found credible [trial counsel Ruben] Morales's testimony that he had a lot of contact with Davis prior to the trial, that he interviewed local family members, including Davis's mother, and that [trial counsel Francisco] Macias interviewed out-of-town witnesses. Also, Morales interviewed Carol Davis five to fifteen times—although he could not recall the specifics of the conversations—and also spoke to Davis's twin brother Oscar.

● Macias interviewed Davis's grandmother, mother, brother, and cousin as part of the investigation.

● Morales learned that Davis's father had been a "mean drunk," and Davis testified at trial that his father became abusive when he was drunk. Counsel also learned that Davis's father had been verbally and "severely" physically abusive toward him, his siblings, and his mother. For instance, counsel learned that Davis's father had beaten Davis with a belt while he stood in the corner with his pants down. And the record reflects this evidence was presented at trial.

43

● The record reflects that Davis testified his father was physically abusive, particularly when he drank; that his father would force him and his siblings to strip down and receive "whoopings" on their "bare bottoms with a belt"; that his father "would just be cruel" and slam Davis's and his brother's heads together; that his father once stripped Carl of his clothes and beat him until he was screaming; and that his father once fought him "like a grown man" at age twelve following a wrestling incident.

● TDCJ records admitted at trial documented Davis's home stability to be poor due to the separation of his parents at an early age, and evidence that the family frequently moved was presented.

● There was not credible evidence that Davis was sexually abused by his father. Counsel questioned Davis and his family members "two or three times"—including his mother, grandmother, and uncle—about possible sexual abuse by his father. Although evidence showed the father had been strict, they denied any sexual abuse. Counsel also questioned Carol Davis about whether their father's requirement to strip for beatings constituted a form a sexual abuse, and Carol said that the purpose was that the beatings would hurt more. Also, Davis testified at trial in lengthy narrative form and had the opportunity to say his father sexually abused him, but he did not. Davis did not provide an affidavit or testify at the evidentiary hearing that his father sexually abused him.

● Dr. Schutte's affidavit stated that Davis previously reported a history of sexual abuse as a child but did not identify the abuser or elaborate on the nature of the abuse, which does not establish that his father sexually abused him.

● Trial counsel were not ineffective for not investigating whether Davis's father had sexually assaulted a female neighbor; Davis never provided any testimony about this

44

matter, and there was no evidence Davis was "fueled" to rape and murder Medina by knowledge of the allegation leveled against his father.

● The record does not affirmatively demonstrate that trial counsel were ineffective for failing to investigate and present evidence that CPS opened an investigation in California and North Carolina because Davis failed to present any evidence about the matter, let alone beneficial evidence.

● Counsel learned during the pretrial investigation that Davis had engaged in the practice of self-mutilation and had attempted suicide.

● Given the family's repeated denials that Davis had been sexually abused by his father, it was reasonable for trial counsel not to pursue an investigation into the father's alleged sexual abuse of Carl.

● Counsel were not ineffective for failing to investigate and present evidence that Davis's father had been supposedly convicted of indecent liberty with a child—not his own child––in North Carolina in 2006. Davis failed to show how evidence of an indecency crime by his father committed long after Davis had been incarcerated for capital murder would have been admissible at retrial or would have benefitted his mitigation defense.

● The record reflects that counsel's mitigation strategy was to focus on humanizing Davis to the jury so that it would be more difficult to impose a death sentence. But counsel knew there was a strong likelihood Davis would take the stand and ask the jury to impose a death sentence because he expressed his intent to do so, and in fact did say that to the jury. Because Davis vacillated on whether he would do this, counsel had a number of contingency plans in place if Davis followed through with his request. Nonetheless, Davis's

45

decision affected counsel's trial strategy of personal accountability and humanizing Davis.

● Counsel deemed their strategy to be legitimate and consulted with Davis about mitigation strategy. Counsel implored Davis not to take the stand and ask for a death sentence.

● Although counsel Macias stated that he usually takes the defendant's wishes into account when advising on mitigation strategy, he would not decline to conduct a mitigation investigation simply because the defendant dictated it. Macias agreed that an attorney has an obligation to conduct an investigation despite the defendant's wishes. And, Davis's dictates to the contrary, trial counsel conducted an independent investigation here.

● In jail-recorded telephone conversations while Davis was awaiting retrial, Davis said he grew up "spoiled," "didn't really want for anything," lived in nice homes, and went to good schools, which undercuts his allegation that he grew up in a seriously abusive and dysfunctional home. These same conversations indicate Davis hindered or attempted to hinder trial counsel's attempts to locate witnesses by instructing counsel not to contact witnesses and threatening to file ineffective-assistance claims if they did not abide by his wishes. Thus, Davis may have been reluctant or uncooperative in pursuing a defense that did not focus on or was inconsistent with personal accountability.

● Consistent with counsel's theory, counsel stated during final argument that Davis's life should be spared because he accepted responsibility for his actions, "whereas most people make excuses, blame other people, disclaim responsibility, blame drugs or alcohol, or blame their upbringing." This was a legitimate trial strategy to pursue.

46

● Evidence mitigation specialist Vince Gonzales claims counsel failed to investigate and present—contact information for other witnesses, CPS records, and school records—was not provided to the habeas court. Thus, there was no way to determine if this evidence would have been beneficial.

● Carol Davis's affidavit is not credible, namely her attestations that she and Davis suffered extreme physical abuse; that she never learned the outcome of Davis's father's court-martial proceedings for alleged sexual assault of a neighbor; that she had little contact with counsel or the defense investigator; and that counsel failed to ask her about Davis's social, family, medical, or psychological history and failed to ask her about verbal, physical and sexual abuse.

● Oscar Davis's affidavit is not credible, specifically his attestations of detailed physical abuse, Davis's suicide attempts, the brevity of counsel's contact with him, that the defense never "delved" into their family history, and that his mother neglected him and Davis due to her alcoholism.

● Any allegation by Davis that his mother neglected him due to alcoholism is not credible.

● Veronica Davis's affidavit is not credible, specifically her attestations that counsel failed to investigate the family history or any history of domestic violence and failed to request various evidence from the family; that her father physically abused Davis; that Davis's twin brother Oscar had attempted suicide; and that aside from a fifteen to twenty-minute meeting with Macias, she did not speak to a member of the defense during their investigation.

● Carl Fuller's affidavit is not credible, specifically his attestations that his father abused his mother in the manner stated; that his father sexually abused him; that members of the defense team only met with him for a total of ten minutes

47

before the first trial; and that he was never questioned about any history of abuse. Further, Carl did not state in his affidavit that he was willing and available to testify about any sexual abuse, and Davis failed to show how evidence that his father sexually abused Carl would have proven his father also sexually abused him or that such evidence would have benefitted his defense.

● After being appointed different attorneys on direct appeal, Davis specifically requested that Morales and Macias continue to represent him on direct appeal, which supports the finding that he was not dissatisfied with their defense strategy regarding mitigation.

● Trial counsel adequately investigated Davis's case prior to retrial, and Davis failed to prove deficient performance.

● "The record reflects that the [S]tate presented extensive evidence in aggravation of death, specifically, the brutal facts of the offense, [Davis's] disciplinary and criminal history, his writings and drawings exhibiting a preoccupation with rape, violence (particularly towards women), and death, and his conversion to Satanism while incarcerated."

● "In his confession and at trial, [Davis] attempted to blame Melissa for her own murder by claiming that she threatened to falsely accuse him of rape."

● "The record reflects that evidence of [Davis's] abusive childhood was admitted before (and rejected by) the jury."

● "This Court finds that the omitted mitigation evidence, if believed, was not that strong."

● "The record does not affirmatively demonstrate a reasonable probability that the complained-of omitted mitigation evidence would have tipped the scale in [Davis's] favor."

48

ROA.7062-81. The state court then concluded that trial counsel were not ineffective. ROA.7095-96.

After finding that twenty-five of Davis's exhibits were barred because they not considered by the state courts, the district court ruled that the CCA's rejection of the claim was not unreasonable. ROA.2929-34. It reasoned that the CCA reasonably found that portions of the offered evidence were untrue, not credible, overstated, or already known to the jury. ROA.2931-32. The court noted that Davis testified and could have expanded on his allegations, but doing so would have created an inconsistency with the trial strategy of taking personal responsibility. ROA.2932. Further, Davis asked the jury for a death sentence. ROA.2932-33. Given the horrific facts of the crime, the additional evidence was unlikely to make a difference. ROA.2933-34. Ultimately, Davis failed to meet his burden under AEDPA. ROA.2934.

### C.    The CCA's rejection of this claim was reasonable.

In granting COA, this Court heavily focused on whether the CCA's findings that allegations of Davis's suicide attempts and self-mutilation were not credible were clearly erroneous. *Davis*, 2025 WL 1766785, at *8–9. The Court notes that other evidence and findings indicated there

had been allegations suicide attempts and self-mutilation. *Id.* at *8. This was not an erroneous fact finding. The CCA was focused on Davis's new evidence in his state habeas application, much of which was from his family, and which the court found not credible. ROA.7077-80, 7082-83. The CCA also pointed out that the allegations in the records came from Davis, who failed to offer an affidavit or testimony to support them. ROA.7082-83. Further, Davis had even admitted at one point he would lie to manipulate his psychiatric diagnosis. ROA.7083. Thus, the CCA acknowledged there were allegations of suicide attempts and self-mutilation in the records, but it found Davis and his family's allegations in his habeas application were not credible and Davis had failed to present any credible and objective evidence supporting his claims. "A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts." *Kinsel v. Cain*, 647 F.3d 265, 270 n.17 (5th Cir. 2011) (quotation marks and citation omitted). Thus, there was no inconsistency that would support a claim that the CCA's rejection of those allegations as not credible was unreasonable.

Trial counsel could also not be deficient for failing to obtain and present the additional evidence from Davis's state habeas application that the CCA found was not credible, especially where such its findings indicate the allegations were not true and provided by family after trial for the purposes of obtaining relief. Here, trial counsel were forced to shape a trial strategy around Davis's testimony, including the possibility that he would ask for the death penalty, which he did. ROA.7074-76. The state habeas findings make clear that despite Davis's dictates to the contrary, counsel conducted an independent mitigation investigation, and trial counsel would not decline to do one merely because those were the client's wishes. ROA.7074-76. In fact, his attorney stated that although he represented Davis at his original trial, he conducted another investigation for the retrial because some of Davis's circumstances had changed. ROA.7065. Thus, counsel did not abandon a mitigation investigation based on Davis's decision to testify about the aggravating evidence. Further, that Davis now presents evidence that was cumulative of the testimony at trial or found to be overstated, untrue, or incredible does not show his counsel's investigation was deficient. ROA.2931-32.

51

Also, failing to present cumulative evidence is neither deficient or prejudicial. *Carty v. Thaler*, 583 F.3d 244, 264–65 (5th Cir. 2009).

Just because counsel was aware of particular allegations or facts in the records does not establish that the allegations he later presented in his state habeas application were accurate or credible. For one, the state court considered conflicting affidavits and testimony when making its credibility determinations and found counsel was credible, while members of Davis's family were not. ROA.7062, 7064-80. Indeed, the state habeas court found counsel had asked Davis and his family members about sexual abuse and only the relationship with an older woman was shared with him. ROA.7069-70, 7072-73. Meanwhile, affidavits from Davis's family offered during the state habeas proceedings were found not credible. ROA.7077-80. Further, although Davis offered speculative statements of how alleged evidence may have benefited him, he did not actually provide any evidence to the state court. ROA.7077. And, as the district noted, even though Davis had previously mentioned sexual abuse when interviewed, that does not establish it actually occurred. ROA.7070-71. Accordingly, the CCA found counsel adequately investigated the case prior to the punishment retrial.

ROA.7080. Davis fails to prove that the state court's factual findings were unreasonable based on the state court record, or that there is clear and convincing evidence that overcomes the presumption of correctness under § 2254(e)(1).

In addition to rejecting Davis's claim that counsel failed to conduct an adequate investigation, ROA.7062-80, 7095, the state habeas court noted that Davis tried to limit or hinder what mitigation evidence the defense could present. ROA.7076. Indeed, in jail phone calls, Davis indicated he wanted a new death sentence over life in prison without parole, so he instructed counsel not to contact witnesses and even threatened to file an ineffective assistance claim. ROA.6587, 6601, 6612-13, 6615. The limits Davis imposed preclude a finding of deficiency because a criminal defendant cannot instruct an attorney to act according to his wishes and then later claim that action was constitutionally deficient. *Schriro v. Landrigan*, 550 U.S. 465, 476–78 (2007) (not objectively unreasonable to find counsel not ineffective for failing to present mitigating evidence because the defendant informed the trial court that he instructed his lawyer not to present mitigating evidence from his mother and the defendant repeatedly interrupted his trial

counsel when counsel attempted to offer mitigating evidence); *Ramirez v. Davis*, 780 F. App'x 110, 120 (5th Cir. 2019) ("[O]ur caselaw makes clear 'that when a defendant blocks his attorney's efforts to defend him . . . he cannot later claim ineffective assistance of counsel.'") (quoting *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004)); *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can Autry block his lawyer's efforts and later claim the resulting performance was constitutionally deficient.").

And while some could believe that mitigating evidence of abuse and suicidality might not be inconsistent with a defense of personal responsibility, the defense could also reasonably believe that focusing on such evidence and offering more than they did would undercut Davis taking responsibility for his actions. And bringing unproven claims could backfire by causing the jury to think Davis was lying to avoid responsibility. Trial counsel had to strike a delicate balance to not come across as asking the jury to feel sorry for Davis or offering too many excuses to achieve their strategic goal.

In any event, the CCA found Davis's allegations, even if believed, did not show prejudice. ROA.7081. In assessing prejudice, "the reviewing

54

court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation." *Andrus v. Texas*, 590 U.S. 806, 821 (2020). Given the horrific nature of the crime and Davis's request for a death sentence, none of the evidence he offers shows the CCA's rejection of his claim was unreasonable under AEDPA's deferential standard. Davis points to the fact that the jury deliberated for two days and once asked for Davis's testimony concerning his relationship with his father. Br.55. There mere fact the jury took a few days to consider a life-and-death decision does not show a reasonable probability Davis's that new evidence would have made a difference. Rather, it shows it the jury was careful and took its time. As the district court noted, the allegations on sexual abuse were found to be untrue, and the jury was aware of physical abuse by Davis's father. ROA.2931-32. Further, much of his other evidence was found to be overstated, unsupported by the record, and not credible. ROA.2922-25.

The COA order notes that cases involving a defendant's request for a death sentence might be distinguishable. *Davis*, 2025 WL 1766785, at *10. The fact remains Davis's request for a death sentence is also a

powerful factor here, especially when combined with the other circumstances of the case, including the brutal facts of the crime. *See Luna v. Lumpkin*, 832 F. App'x 849, 853 (5th Cir. 2020) (finding petitioner not prejudiced by counsel's failure to present mitigating evidence where petitioner testified and "told the jury he could not rehabilitate, that the death penalty was appropriate, and that no mitigating evidence existed to compel a contrary conclusion"); *Landrigan*, 550 U.S. at 475–481 (rejecting an ineffective assistance claim where the defendant testified no mitigating evidence existed, instructed his attorney to present none, and told the sentencing court, "I think if you want to give me the death penalty, just bring it right on. I'm ready for it."); ROA.2932–34. Indeed, in *Luna*, this Court stated: "That unusual feature of this case alone is likely enough to require us to defer to the state court's 'no prejudice' determination." 832 F. App'x at 853. Although some mitigation evidence was offered here, the CCA's no prejudice determination was reasonable given Davis's testimony. And where mitigation evidence was offered and the jury still voted in favor of a death sentence, a defendant's request for a death sentence makes the *Luna*

56

reasoning more applicable. A defendant's request for a death sentence does not save only cases where no mitigation evidence existed.

Davis asserts that the CCA applied a causal-nexus test to his mitigating evidence that contradicted Supreme Court precedent. Br.59. But the lower court opinion in this case he cites was not the state court opinion, and it did not apply such a test, it just recognized that when Davis testified, he did blame his circumstances on his family background and he himself asked for a death sentence. ROA.2932. Considering those facts in adjudicating Davis's ineffective sentence claims was not improper. Davis's reliance on *Tennard v. Dretke*, 542 U.S. 274 (2004), Br.59, is also misplaced because that case involves error in the jury instructions and error under *Penry v. Lynaugh*, 492 U.S. 302 (1989), not an IATC claim. *Tennard*, 542 U.S. at 278.

Davis also appears to make the argument that the state court unreasonably found the defense's investigator had been on the case for years because there was no investigation between the first trial and the punishment retrial. Br.61. Davis complains about the timing and tardiness of counsel's investigation. Br.46, 51–52, 54–55; *Davis*, 2025 WL 1766785, at *7. Davis fails to show how investigation efforts during the

57

first trial should not be considered when examining whether counsel provided ineffective assistance during the retrial mitigation investigation.

The Court's COA grant also notes how the CCA only explicitly applied certain aggravating factors to one of the claims. *Davis*, 2025 WL 1766785, at *9–10 ("Perhaps more importantly, Davis's suicide and mental health allegations combine arguments from two claims in state court, and the state court cited those aggravating factors only as to *one* of the claims."). It defies the spirit of AEDPA to not consider the aggravating factors with respect to both claims just because the CCA did not bother to repeat them. unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *See Valdez*, 274 F.3d at 948 n.11 (giving deference to unarticulated findings. Again, "as long as there is 'some indication of the legal basis for the state court's denial of relief,' [a federal] court may infer the state court's factual findings even if they were not expressly made." *Ford*, 910 F.3d at 235.

Ultimately, because Davis failed to overcome the doubly deferential standard afforded to trial counsel's strategic decisions and the state court's rejection of this claim. He has not shown all fairminded jurists

would disagree with the CCA's decision. Thus, Davis fails to the CCA's rejection of his claim was unreasonable. And he further fails to show that he is entitled to relief under de novo review.[9]

## CONCLUSION

Giving proper deference to the state court's decision, the lower court thoroughly analyzed and denied relief on Davis's claims. This Court should now do the same and affirm the denial of federal habeas relief.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General
Texas Bar No. 24067554
*Counsel of Record*

---

[9]   Davis makes a case for cumulative error. Br.58. Davis did not raise the claim in his COA brief, so it is waived. *See Simmons v. Epps*, 654 F.3d 526, 535 (5th Cir.2011); *Ortiz v. Quarterman*, 509 F.3d 214, 215 (5th Cir. 2007).

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: craig.cosper@oag.texas.gov

*Attorneys for Respondent–Appellee*

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing pleading has been served electronically to the following counsel for Petitioner-Appellant, on this the 5th day of November, 2025:

Todd G. Scher
1722 Sheridan Street, Suite 346
Hollywood, FL 33020

Richard Dennis Esper
801 N. El Paso Street
El Paso, TX 79902

Joe A. Spencer, Jr.
Law Office of Joe A. Spencer
1009 Montana Avenue
El Paso, TX 79902

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General

60

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,816 words; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General

**CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS**

I do hereby certify that: (1) all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ Craig W. Cosper
CRAIG W. COSPER
Assistant Attorney General