**No. 24-70008**

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**Irving Alvin Davis,**
***Petitioner-Appellant***

**v.**

**Eric Guerrero, Texas Department of Criminal Justice,**
**Correctional Institutions Division,**
***Respondent-Appellee***

---

On Appeal from the United States District Court, Western District of Texas,
El Paso Division, Case No. 3:14-cv-00121-KC

---

# PETITION FOR REHEARING EN BANC

TODD G. SCHER
Florida Bar No. 0899741
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
TScher@msn.com

RICHARD D. ESPER
Attorney at Law
801 North El Paso Street, Ste. 225
El Paso, TX 79902
Richardesperlaw@yahoo.com

JOE A. SPENCER, JR.
Attorney at Law
1009 Montana
El Paso, TX 79902
joe@joespencerlaw.com

*Counsel for Irving Alvin Davis*

**CAPITAL CASE**

## CERTIFICATE OF INTERESTED PERSONS

### *Davis v. Guerrero*, No. 24-70008

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Petitioner-Appellant:**

Irving Alvin Davis

**Counsel for Petitioner-Appellant:**

Todd G. Scher, Hollywood, FL

Joe A. Spencer, El Paso, TX

Richard D. Esper, El Paso, TX

**Respondent-Appellee:**

Eric Guerrero, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

**Counsel for Respondent-Appellee:**

Katie Abell, Office of the Attorney General, Austin TX

## RULE 40(b)(2) STATEMENT

En banc reconsideration is necessary because the Panel's opinion in *Davis v. Guerrero*, 179 F.4th 377 (5th Cir. 2026) contravenes Supreme Court precedent and involves an issue of exceptional importance.

In determining that the use of Davis's religion at his capital resentencing did not violate his First Amendment rights, the Panel adopted a rule that directly contravenes *Dawson v. Delaware*, 503 U.S. 159 (1992): that evidence of religious affiliation is admissible to prove future dangerousness so long as violence has been committed by "some" adherents of loosely-related religions or extremist versions of the religion. Under the Panel's interpretation, believers of any mainstream religion who unequivocally denounce violence may be lumped together with violent extremists who claim to follow the same "general" religion, and the specter of those extremists' actions may be admitted as evidence in support of a death sentence. Such a broad rule permits religious-association evidence in nearly every case involving a religious defendant, regardless of his faith, eviscerating the freedoms of association and religion, and causing the exact prejudice *Dawson* intended to prohibit.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ........ i
**RULE 40(b)(2) STATEMENT** ........ ii
**TABLE OF CONTENTS** ........ iii
**TABLE OF AUTHORITIES** ........ iv
**STATEMENT OF THE ISSUE** ........ 1
**FACTS AND PROCEDURAL HISTORY** ........ 1
**I. THE PANEL OPINION CONTRAVENES DAWSON.** ........ 10
**A. The Panel Misconstrued Dawson's Holding.** ........ 11
**B. The Panel's Broad Interpretation of "Religious Group" Leads to Absurd Results and Eviscerates the Freedoms of Association and Religion for Individuals of All Faiths.** ........ 12
**CONCLUSION** ........ 15

**CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS** ........ 16

**CERTIFICATE OF COMPLIANCE** ........ 16

## TABLE OF AUTHORITIES

**<u>Cases</u>**


***Andrew v. White*, 604 U.S. 86, 93 (2025) ........................................... 12**

***Davis v. Guerrero*, 179 F.4th 377, 385 (5th Cir. 2026) ........................ 9, 10**

***Davis v. Guerrero*, 2025 WL 1766785 (5th Cir. June 26, 2025).................. 10**

***Davis v. State*, No. AP-74393, 2007 WL 1704071,
(Tex. Crim. App. June 13, 2007).................................................... 1**

***Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).....................5, 9**

***Dawson v. Delaware*, 503 U.S. 159 (1992) .......................................... 1, 3**

***Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997)............................... 11**

***Schware v. Board of Bar Examiners*, 353 U.S. 232, 244-47 (1957)................15**

***United States v. Ballard*, 322 U.S. 78, 87-88 (1944) ................................ 15**

## STATEMENT OF THE ISSUE

Did the Panel contravene *Dawson v. Delaware*, 503 U.S. 159 (1992), by holding that a defendant's religion is admissible to prove his future dangerousness in the sentencing phase of a capital trial, so long as violence has been committed by "some" adherents of loosely related religions or extremist versions of the religion?

## FACTS AND PROCEDURAL HISTORY

Irving Davis was convicted of capital murder and sentenced to death in 2002 in El Paso, Texas, for a crime he committed at age 18. The Texas Court of Criminal Appeals ("TCCA") affirmed his conviction but remanded for resentencing. *Davis v. State*, No. AP-74393, 2007 WL 1704071 (Tex. Crim. App. June 13, 2007). In 2008, Davis was again sentenced to death.

As a young man in prison, Davis sought solace in religion and philosophy. Following his incarceration in 2001 for this offense, he practiced Buddhism through acts of service like writing letters for individuals who couldn't read and write and creating art for others. ROA.15540. He also began reading books on philosophy as part of a spiritual quest to become a better person. ROA.15541.

In his early twenties, Davis explored the philosophies of the Church of Satan ("CoS") after an inmate lent him a copy of THE SATANIC BIBLE. ROA.15546, 16018. CoS was established in 1966 in San Francsico by Anton LaVey, a circus performer

and organist with a penchant for attracting media attention.[1] ROA.15467-15469. LaVey blended secular humanism and Western esotericism into a philosophical framework of symbolic rituals meant to invoke a cathartic response. ROA.15468-69. Despite its name, CoS does not believe Satan literally exists, ROA.15471-15472; rather, it views Satan as a symbol of self-determination and personal responsibility. Brief of Religious Studies Scholars. *See* ECF:104-2 at 16. In contrast to popular misconceptions and sensational media portrayals of Satanism, CoS is a "law and order" organization that is pro-police and explicitly forbids violence. *See* ECF:104-3 at 24, ROA.15470.

Davis was drawn to CoS at a time when he was grappling with the death of his nephew and had become disillusioned by the mistreatment of Buddhists in Tibet. ROA.15546, 15555. Davis was particularly attracted to LaVey's teachings on taking responsibility for one's actions and the therapeutic effects of the symbolic rituals. ROA.15542, 15563. Davis applied for membership but was never formally admitted into CoS. ROA.15561. In fact, CoS does not grant membership to convicted felons. *See* ECF:104-2 at 24.[2] In 2006, the prison permitted Davis to change his religion

---

[1] CoS "should not be confused with other Satanic groups such as the Temple of Set, The Order of Nine Angles, and The Satanic Temple[.]" *See* ECF:104-2 at 6. Nor should it "be confused with numerous individuals who are practicing ad hoc forms of idiosyncratic Satanism." *Id.*

[2] The official website of CoS states: "Satanism is a law and order philosophy. […] We do not allow Active Membership to convicted felons, particularly if the

from Buddhism to Satanism.[3] ROA.16419. By the time of the resentencing, he had acquired several books and other writings by LaVey, all of which were allowed by prison regulations and were not contraband. ROA.15419-15422

Before resentencing, the State noticed its intent to introduce evidence that Davis had become a "Satanist." ROA.5843. The State argued this was relevant to future dangerousness and insisted it could demonstrate, under *Dawson v. Delaware*, 503 U.S. 159 (1992), that Davis's religious group engaged in or approved of violence. ROA.5951.

At a hearing outside the jury's presence, the State called Donald Haley, a former law enforcement officer/community college teacher, to satisfy *Dawson*. ROA.15365-66. Haley had no academic training in religious studies, and had neither taken any courses on Satanism nor ever testified as a Satanism expert. ROA.15367-69. When asked if he had experience evaluating evidence in a criminal case, Haley referenced a case involving Dungeons and Dragons, a fantasy role-playing game with no connection to LaVey or CoS. ROA.15367. Haley was unfamiliar with the various forms of Satanism; when asked by defense counsel about the Satanic church in San Francisco, he did not know what the attorney was talking about. ROA.15374.

---

crime shows a violation of Satanic principles for social behavior. https://churchofsatan.com/faq-prisoner-issues/ (last visited August 28, 2026).

[3] Davis no longer follows CoS and has returned to Buddhism.

Nevertheless, he testified there was "evidence" that "members of the satanic religion" advocate violence. ROA.15368. This "evidence" was Haley's literalist reading of THE SATANIC BIBLE, which he claimed permitted human sacrifice and killing during "rituals of destruction." ROA.15368.

Haley further testified that some "satanists," including the infamous serial killer Richard Ramirez, had committed illegal or violent acts. ROA.15368. However, Haley did not testify, nor did the State present any evidence, that CoS had endorsed violent or illegal acts.[4] When defense counsel asked Haley whether CoS had "sanctioned" any killings, the trial court prohibited that line of questioning. ROA.15374-75. Over defense objection, the trial court qualified Haley as a Satanism expert. ROA.15374-15375, 15459.

Haley testified before the jury that THE SATANIC BIBLE allows Satanists to perform "human sacrifice" and to "destroy" others: "if an individual annoys you . . . treat him cruelly. And . . . if an individual bothers you, it says in there, to ask him to stop, and if they don't stop, it says -- it used the word destroy them. It says destroy." ROA.15460-15461. On cross-examination, Haley admitted he was "reading these things literally" and that the references to destroying people were

---

[4] Quite the contrary, LaVey vigorously condemned murderers and was an ardent supporter of law enforcement. He denounced the 1969 Charles Manson murders as "damned sickening" and refused membership to self-described Satanists who seemed mentally ill or dangerous, or who claimed to communicate with the devil. *See* ECF:104-2 at 11, 23.

symbolic. ROA.15462.[5] However, when asked how a Satanist was supposed to destroy someone, Haley answered: "Well, you could turn around, hit them in the heart so much that it ruptures it. You could bash their head against a pole till they bleed out. You can cut their fingertips out. I think that would be an adequate description of being destroyed."[6] ROA.15462-63. Defense counsel asked whether a Satanist could ignore the individual or symbolically curse them instead of physically harming them, and Haley answered, "[n]ot in the world of reality, no." ROA.15463.

Before the jury, and over defense objection, the State introduced items found in Davis's cell, including the THE SATANIC BIBLE and other books published by CoS, and various writings and drawings by Davis, none of which constituted contraband. ROA.15418-22. The court also made Davis display a tattoo of a pentagram on his chest. ROA.15427.

The State called a forensic psychiatrist, Dr. Edward Gripon, to opine on the future dangerousness of a hypothetical defendant who "marks his body with a pentagram, becomes a satanist." ROA.15441. Dr. Gripon testified that Satanism is

---

[5] Haley read from pages 88 to 90 of THE SATANIC BIBLE, but conveniently omitted the following sentence which makes clear that "destroy" is symbolic: "you have every right to (symbolically) destroy them[.]" *See* ECF:104-2 at 20-21.

[6] This testimony was particularly egregious and prejudicial because the victim in this case had her fingertips cut off. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Thus, although the crime occurred years before Davis became interested in CoS, the State improperly tried to connect Davis's religious beliefs to the crime, when it is undisputed there was no such connection.

"extreme" and "you would always worry . . . about people who end up kind of on the periphery of something that extreme." ROA.15456-57. Dr. Gripon did not distinguish the different forms of Satanism or mention CoS in his testimony.

Defense expert Dr. Gordon Melton, a religious historian with a Ph.D. in the history of religious literature and an ordained Methodist minister, ROA.15467-15469, testified that "Satanism" covers a wide spectrum of phenomena in American religion. ROA.15467. One end includes unaffiliated individuals who claim to communicate with Satan and have "the-devil-made-me-do-it syndrome," ROA.15469, while on the other end is LaVey's CoS and other groups that splintered off from LaVey, such as the Temple of Set. ROA.15467-68.

Dr. Melton testified THE SATANIC BIBLE does not allow physically harming anyone and "should not be taken literally," ROA.15473; instead, symbolic rituals are performed by focusing one's "emotional energy" in a "cathartic release." ROA.15469. While some rogue, self-proclaimed Satan-worshippers may claim to act "[i]n the name of satanism," those so-called Satanists do not exist "as any kind of stable ongoing organization," and their actions directly contradict the non-violent teachings of CoS. ROA.15472.

On cross-examination, the State pointed out that because "[m]ost people are not historians of religion," they could read the Christian Bible and "get it wrong" or "misinterpret" Christian doctrine. ROA.15473. Dr. Melton agreed this could happen,

and that some Christians could adopt "a different interpretation from that which is the dominant one." ROA.15473.

Davis also testified about his association with CoS, and the books and paperwork from his cell. He testified that LaVey advocated *against* violence and instructed followers to "take responsibility for everything that you've done." ROA.15542. He further testified he didn't believe Satan exists, nor did magic. ROA.15543, 15563. As to the "rituals of destruction" discussed in THE SATANIC BIBLE, Davis subscribed to a "symbolic interpretation" of "destroy." ROA.15563. He explained, "it does not mean you actually hurt them, but you can defend yourself by standing up for yourself and . . . [d]estroying them through your words, not actions." ROA.15563-15564. Asked about the "key rules" of CoS, Davis testified, "[y]ou have to follow the law and not hurt anybody" because "Anton LaVey says harm no one," and "if you break the laws . . . then you're automatically going to be kicked out[.]" ROA.15565.

Because the State had been allowed to introduce his drawings and writings, Davis was asked to explain them, and his testimony was detailed and unrefuted. ROA.15541-15564. Most of Davis's drawings had no connection to his religious beliefs or CoS. While the State argued his artwork was "sexually suggestive,"

ROA.15593, the most provocative examples were commissioned by a friend,[7] others were based on the album cover of a female-fronted death metal band, and another on a *Vanity Fair* photograph of the actress Penelope Cruz. ROA.15557-15560. Importantly, none of the drawings demonstrated Davis subscribed to a religious view that encouraged or justified violence (and none were contraband). ROA.15422.

Although some of his writings included quotes from THE SATANIC BIBLE, in the same notebook Davis had copied quotations from other unrelated sources including *Hamlet*, the writings of Leonardo Da Vinci, and Japanese novelist Haruki Murakami. ROA.16319-16349. Nothing in these writings demonstrated Davis or CoS endorses violence, and none were contraband.

In closing, the prosecutor argued Davis's religion supported a finding of future dangerousness. She argued Davis had pledged his "life and soul" to Satan, questioned his testimony that he didn't believe in the literal existence of Satan, and contrasted Satanism with Buddhism. ROA.15607. She argued "Buddhists . . . are real peaceful people . . . [who] don't go around raping and killing little girls." ROA.15607. She argued that Davis's writings and artwork reflected a violent form

[7] While these included drawings of women in bondage gear, ROA.16353, 16355, Davis's testimony made clear that they depicted consensual activity. ROA.15558 (counsel: "When you say that's what him and her were into, what do you mean by that?" Davis: "That's the relationship -- they explore their sexuality, and they're both talking about bondage, so *they* wanted me to draw something about it.") (Emphasis added)).

of Satanism,[8] ROA.15610, emphasized Dr. Gripon's testimony that Satanism is "extreme," ROA.15607, and argued that the jury could sentence Davis to death based solely on his religious association. ROA.15610 ("If satanism is enough for you, so be it."). After hearing this argument, the jury sentenced Davis to death.

On direct appeal, Davis argued that admitting the Satanism evidence violated his rights to the freedom of association and religion under the First Amendment, and his right to due process under the Fourteenth Amendment. ROA.4114-15. The TCCA acknowledged that under *Dawson*, associational evidence is relevant to future dangerousness if the state shows "(1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010) (citing *Dawson*, at 163-67). The TCCA found Davis's self-identification as a "Satanist" satisfied *Dawson*'s second requirement, and that the State satisfied the first requirement with Haley's literalist reading of THE SATANIC BIBLE and his testimony that "various people had committed murder and mutilation 'in the name of Satan[.]'" *Davis*, at 805-806. The TCCA

[8] As discussed *supra*, the State failed to demonstrate that Davis's papers reflected adherence to any violent form of Satanism. However, the Panel adopted the State's inaccurate narrative, noting "there were multiple writings and drawings from Davis that demonstrated that his affiliation with Satanism was relevant to future dangerousness." *Davis v. Guerrero*, 179 F.4th 377, 385 (5th Cir. 2026). But the Panel did not identify a single piece of writing or drawing by Davis in support.

found no First Amendment violation but did not address Davis's due process arguments.

In his federal habeas petition, Davis argued the admission of the Satanism evidence violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. ROA.2397-2410. The federal district court denied relief, ROA.2838-2971, and a panel of this Court granted a Certificate of Appealability on the Satanism evidence claim and Davis's penalty-phase ineffective-assistance-of-counsel claim. *Davis v. Guerrero*, 2025 WL 1766785 (5th Cir. June 26, 2025). The Panel then affirmed the district court's decision in a published opinion. *Davis v. Guerrero*, 179 F.4th 377 (5th Cir. 2026).

## I. THE PANEL OPINION CONTRAVENES *DAWSON*.

The Panel adopted an interpretation of *Dawson* that fairminded jurists would reject. First, although the Panel acknowledged the TCCA understood *Dawson* as requiring (1) proof of the group's violent and illegal activities and (2) the defendant's membership in the group, the Panel held this two-part test was not clearly established, even though the TCCA cited it as the "on-point rule." *Davis*, 179 F.4th at 386. Second, the Panel held that even if *Dawson* requires proof of a group's "unlawful tendencies," this could be satisfied by evidence that "some" members of the group have committed violence, with the contours of the "group" defined at "a high level of generality." *Id.* Under the Panel's interpretation, mainstream

Christians, Muslims, Hindus, or Buddhists who unequivocally denounce violence and illegal activity could be included in the same "group" as violent religious extremists who claim to follow the same "general" religion. The Panel's holding squarely conflicts with *Dawson* and permits the admission of religious association evidence in nearly every case involving a religious defendant, regardless of his faith.

**A. The Panel Misconstrued *Dawson*'s Holding.**

The prosecution,[9] the trial court,[10] and the TCCA all interpreted *Dawson* as holding that for associational evidence to be relevant and admissible, there must be "(1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Davis*, 329 S.W.3d at 805. And as the Panel acknowledged in a footnote, this Court has previously interpreted *Dawson* the same way. 179 F.4th at 387 n. 10 (citing *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (reasoning that the state satisfied *Dawson* because it introduced evidence of membership in a violent gang)). Nevertheless, the Panel erroneously found this two-part test was not clearly established, and that *Dawson* instead (and only) requires

[9] State's Pretrial Brief on Admissibility, at ROA.5952.

[10] ROA.13837 ("In order for you to show that it is relevant, you need to show to me -- and it says right here in the words of the Court of Criminal Appeals -- proof of the group's violent and illegal activities, and the defendant's membership in the organization.").

that evidence demonstrate "something more than the defendant's abstract beliefs." 179 F.4th at 387.

*Dawson* expressly held the introduction of membership in the Aryan Brotherhood violated the First Amendment "[b]ecause the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, [and] the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Dawson*, at 166. The Court found it significant that there were "differences among the various offshoots of the Aryan Brotherhood," and the evidence in the record pertained only to the California chapter, not Dawson's Delaware chapter. *Id.* at 164-165. The absence of any evidence that the *specific* Aryan Brotherhood branch Dawson belonged to "had committed any unlawful or violent act, or had even endorsed such acts," *Dawson*, at 166, "was therefore *indispensable* to the decision in [*Dawson*]. That means it was a holding of this Court for purposes of AEDPA." *Andrew v. White*, 604 U.S. 86, 93 (2025) (emphasis added). The Panel's opposite conclusion would be rejected by any fairminded jurist.

### B. The Panel's Broad Interpretation of "Religious Group" Leads to Absurd Results and Eviscerates the Freedoms of Association and Religion for Individuals of All Faiths.

Regardless of the precise contours of *Dawson*, the Panel's conclusion that a defendant's "religious group" can be defined at a "high level of generality" creates

a dangerous precedent for future enforcement of religious and associational freedom. This unbounded interpretation permitted the State to lump Davis into the same "group" as self-ascribed Satanists who were not CoS followers[11] and whose extremist claims were directly at odds with Davis's clear CoS-based belief system. These included infamous serial killers who claimed to communicate with or kill in Satan's name, despite unrefuted evidence that Davis and CoS affirmatively refute the literal existence of Satan and denounce all violence. This problematic, overinclusive view of a religion's doctrine and endorsement allowed evidence of religious-extremists' fringe behaviors to prejudice Davis's jury against him, and sentence him to death.

Under the Panel's interpretation, a prosecutor could easily introduce evidence that another defendant is Christian and argue this makes him a future danger because "some" Christians have committed violence related to extreme/fringe Christian practices. Indeed, not only have Christians historically committed horrific violence,[12] in more recent times, extremist Christian offshoots have made headlines

---

[11] The Panel remarked it was "not undisputed" that Davis was an adherent of CoS and its nonviolent ideals. 179 F.4th at 387. This statement is contradicted by the record; even the State's expert Haley based his testimony on CoS's publications and his interpretations of those texts. Moreover, the State did not present a single piece of evidence demonstrating that Davis adhered to any different branch of Satanism (such as one that advocates violence).

[12] *See* A. James Rudin, *Onward, Christian Soldiers: The complicated legacy of the Crusades*, RELIGION NEWS SERVICE, February 19, 2015, available at

for their radical and violent ideologies,[13] and some criminals (*i.e.* Charles Manson) have famously mis-used the Christian Bible to recruit followers.[14] To allow the use of an unrelated defendant's Christianity to secure a death sentence, because of the violent acts of fringe Christian extremists, would be patently absurd. But the Panel opinion would allow it.

Further unpersuasive is the Panel's reliance on the CoS/LaVey books in Davis's cell to lump him in with a "general" group of individuals practicing very different, violent forms of self-ascribed "Satanism." 179 F.4th at 387. These books distinguished Davis from those extremists, not the other way around; but in any event, the meaning of religious texts should not have been a question for the jury at all. As the State pointed out at trial, religious texts may be misinterpreted; some Christians may read the Bible and "get it wrong." ROA.15473. The Bible contains

---

https://religionnews.com/2015/02/19/onward-christian-soldiers-complicated-legacy-crusades-commentary/ (last visited September 1, 2026).

[13] *See*, *e.g.*, J. Oliver Conroy, *An apocalyptic cult, 900 dead: remembering the Jonestown massacre, 40 years on*, THE GUARDIAN, November 17, 2018, available at https://www.theguardian.com/world/2018/nov/17/an-apocalyptic-cult-900-dead-remembering-the-jonestown-massacre-40-years-on (last visited September 1, 2026).

[14] Justin Averette, *Charles Manson and the Bible*, THE SELMA TIMES, August 20, 2015, available at https://www.selmatimesjournal.com/opinion/charles-manson-and-the-bible-258073 (last visited September 1, 2026).

many passages that could be misinterpreted as advocating violence.[15] That "some" individuals may misguidedly take a violent message from religious texts does not mean another person with the same text takes the same violent interpretation. Concluding otherwise directly contravenes *Dawson*'s concern with associational guilt[16] and requires courts (and jurors) to determine whether one man's interpretation of a religion is more legitimate than another's.[17]

Unless the Court is prepared to hold that a defendant's Christianity is relevant to his future dangerousness because (1) "some" Christians have committed violence and (2) "some" Christians have misinterpreted the Bible in a violent manner, the Court should reconsider the Panel's opinion and find that the constitutional freedoms of association and religion require much more.

## CONCLUSION

---

[15] *See*, *e.g.*, Deuteronomy 20:16–17 (NIV) (". . . [D]o not leave alive anything that breathes. Completely destroy them—the Hittites, Amorites, Canaanites, Perizzites, Hivites and Jebusites—as the LORD your God has commanded you."); Judges 19:29 (NIV) (". . . [H]e took a knife and cut up his concubine, limb by limb, into twelve parts and sent them into all the areas of Israel.").

[16] *Dawson*, 503 U.S. at 168 (citing *Schware v. Board of Bar Examiners*, 353 U.S. 232, 244-47 (1957) ("[a]ssuming that some members of the Communist Party . . . had illegal aims and engaged in illegal activities, it cannot automatically be inferred that all members shared their evil purposes or participated in their illegal conduct.")).

[17] *See United States v. Ballard*, 322 U.S. 78, 87-88 (1944) ("[I]f those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect.").

For the foregoing reasons, the Court should grant rehearing en banc and issue judgment in Davis's favor.

Respectfully submitted,

***/s/ Todd G. Scher***
TODD G. SCHER
Florida Bar No. 0899741
Law Office of Todd G. Scher, P.L.
1722 Sheridan Street #346
Hollywood, FL 33020
Tel: (754) 263-2349
Fax: (754) 263-4147
Email: TScher@msn.com

*Counsel for Mr. Davis*

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH ECF FILING STANDARDS

I certify that, on September 9, 2026, the foregoing Petition for Rehearing En Banc was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, in full compliance with ECF filing standards. All participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Todd G. Scher*

## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point New Times Roman font using Microsoft Word software, (2) this document is 3,777 words, excluding

portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

/s/ *Todd G. Scher*

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 25, 2026

Lyle W. Cayce
Clerk

No. 24-70008

Irving Alvin Davis,

*Petitioner—Appellant*,

*versus*

Eric Guerrero, *Director,*
*Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:14-CV-121

Before Smith, Graves, and Engelhardt, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Irving Davis raped and murdered 15-year-old Melissa Medina, cutting off her fingertips to prevent discovery of DNA evidence. In 2002, he was convicted of capital murder and sentenced to death before the Texas Court of Criminal Appeals ("CCA") granted him a retrial for the sentencing phase. At resentencing, the state introduced evidence of Davis's affiliation with Satanism, alongside personal writings and drawings, to assert that Davis was a future danger. Davis was again sentenced to death. His claim of a First Amendment violation for introducing evidence of his affiliation with Satan-

ism was denied on direct appeal by the CCA, and his claims of ineffective assistance of counsel ("IAC") were rejected by the state habeas corpus court. The federal district court denied relief. We granted a certificate of appealability ("COA"). Because none of Davis's claims can overcome AEDPA's deferential standard of review, we affirm.

## I.

In 2001, Medina and her friends gathered at Benjamin Romero's house to drink and socialize; Davis was present as a friend of Romero's. Davis told Romero he wanted to "hit up on Melissa" and tried to "dirty dance" behind Medina without her knowledge, attempting to place his genitals against her behind and rub them against her. Medina displayed indifference or distaste for Davis and tried to move away when he engaged in the aforementioned "dirty dancing." The group at Romero's house left to walk Medina home, but when she approached an elementary school yard that she normally cut across, she said she could make it home on her own. As the group dispersed, Davis said he wanted to walk Medina the rest of the way and ran after her.

A woman living across the street from the schoolyard went outside when her dogs became agitated and stated she heard low growls followed by thumping noises and moaning. When Davis returned to Romero's house, he had fresh scratches, which he claimed occurred as a byproduct of an altercation with his mother. Davis left Romero's house and walked toward the school, in the opposite direction of his home. Medina's dead and naked body was found in the elementary school parking lot the following morning, wearing only an open bra.

According to the autopsy, Medina was severely beaten and had suffered blunt-force trauma throughout her body, severe internal head injuries, and a ruptured pulmonary artery. She was strangled and suffered serious

injuries to her vaginal area consistent with penile penetration. The medical examiner found that she had been sexually assaulted at the time of death and that her vaginal injuries were inconsistent with consensual sex. Medina's fingertips had been cut off, and she had a gaping, cutting wound on her left wrist where Davis had made multiple attempts to sever her hand from her wrist.

Davis originally lied to police about how he received the scratches on his neck and where he last saw Medina before admitting to killing her by strangulation. Davis claimed that they began having consensual sex and that he became surprised when she asked him to stop and told him that she would state that he had raped her if he told anyone that they had had sex. Davis then said that he became worried about going to jail and began choking her, continuing to strangle her with his belt, even after she passed out; he stated that he "blacked out."

Davis was convicted of capital murder and sentenced to death in 2002. He appealed the conviction, and the CCA affirmed his conviction but ordered a retrial for the punishment phase. Davis was again sentenced to death, and the CCA affirmed on direct appeal.

At his resentencing trial, the state put on evidence that supported the claim that Davis was involved with Satanism, including books, personal writings, and drawings found in his prison cell. The state also called Donald Haley as an expert on Satanism, who testified that various satanic texts advocated for destroying or sacrificing humans, which meant causing their death.

The defense put on an expert, Joseph Melton, who claimed that Satanism as understood by the Church of Satan should not be taken literally. Davis also testified as to how he viewed his belief in Satanism, stating that his belief in Satan was symbolic and that Satanism advocated for non-violence. Davis's defense largely focused on accountability while seeking to humanize Davis.

After his second sentencing, Davis filed a postconviction habeas corpus petition; the state habeas trial court ruled against him on all counts. In 2014, the CCA adopted the state habeas trial court's findings of facts and conclusions of law.

After multiple amended federal habeas petitions and an abatement of federal habeas proceedings to file state law claims that were summarily dismissed by the CCA, the federal habeas court denied Davis's request for relief, finding that the claims were either procedurally defaulted or reasonably rejected by the state court. Davis received a COA from this panel on his assertion that his First Amendment rights were violated by the state's admission of evidence concerning his affiliation with Satanism and his IAC claims.[1]

II.

Title 28 U.S.C. § 2254(d) provides that a habeas application "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "This standard . . . is difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citation modified). "A state-court decision is 'contrary to' clearly established federal law only if it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if' it resolves 'a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir.

[1] *See generally Davis v. Guerrero*, No. 24-70008, 2025 WL 1766785 (5th Cir. June 26, 2025) (per curiam) (unpublished).

2019) (en banc) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). The unreasonable-application prong asks "whether it is 'beyond the realm of possibility that a fairminded jurist could' agree with the state court." *Id.* at 156 (quoting *Woods v. Etherton*, 578 U.S. 113, 118 (2016)).

To succeed, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woodall*, 572 U.S. at 419–20. "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Id.* at 426 (citation modified).

"We may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance. Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (citation modified). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.'" *Id.* at 314 (citation modified). "Overcoming AEDPA's relitigation bar is necessary but not sufficient to win habeas relief . . . . [T]he prisoner still must show, on de novo review, that he is in custody in violation of the Constitution or laws or treaties of the United States." *Langley*, 926 F.3d at 156 (citation modified).

## III.

To succeed on his First Amendment claim, Davis must first demonstrate that the CCA's decision was contrary to or involved an unreasonable application of clearly established law or was based on an unreasonable factual determination. Davis fails to clear AEDPA's bar under all three approaches.

A.

Regarding the requirements of AEDPA, Davis and the *amici* say much about freedom of religion. But neither Davis nor the *amici* point to clearly established law (and research has not revealed any) that addresses the relevance and admissibility of evidence as it relates to the First Amendment's protection of religious liberty, especially not in the criminal context.

Davis cites only *Dawson v. Delaware*, 503 U.S. 159 (1992), a First Amendment freedom-of-association case. The best that *amici* can muster is a series of Establishment Clause cases about courts' resolving disputes concerning religious doctrine. Those cases are not analogous, as they do not speak to the criminal context, do not deal with the admissibility of evidence (as distinguished from general protection under the Constitution), and do not elucidate the issue in this case, which is not the orthodoxy of the Church of Satan, but whether Davis's affiliation with Satanism is relevant such that it prevents the state's evidence from running afoul of the First Amendment. [2]

Because the Supreme Court has no clearly established law on the issue, the religious aspect of this case does not alter the analysis under AEDPA. [3]

---

[2] Davis claims that *Dawson* must be understood in the context of Supreme Court precedent that clearly establishes that an individual cannot be penalized for membership in a group if some members of the group engage in unlawful activities, absent proof that he specifically engaged in or intended to support the unlawful activities. Davis is incorrect because he is conflating the scope of protected conduct with the scope of evidence that a court may permissibly admit. As we explain, *Dawson* rejected the claim that the scope of admissibility is coextensive with the scope of constitutionally protected conduct.

[3] That is not to say that there are no ways in which those issues could otherwise be implicated. For example, both Federal Rule of Evidence 403 and Texas Rule of Evidence 403 permit judges to exclude evidence if, *inter alia*, it results in unfair prejudice or misleads the jury. Those rules could come into play when dealing with a religious issue, and Davis asserted them on direct appeal, but the CCA rejected that argument, and it is not before this court. *Davis v. State*, 329 S.W.3d 798, 805–06 (Tex. Crim. App. 2010).

B.

Davis focuses on *Dawson* as his source of clearly established law from the Supreme Court. In *Dawson*, the prosecution originally sought to introduce

> (1) expert testimony regarding the origin and nature of the Aryan Brotherhood, as well as the fact that Dawson had the words "Aryan Brotherhood" tattooed on the back of his right hand, (2) testimony that Dawson referred to himself as "Abaddon" and had the name "Abaddon" tattooed in red letters across his stomach, and (3) photographs of multiple swastika tattoos on Dawson's back and a picture of a swastika he had painted on the wall of his prison cell.

*Id.* at 161–62. But before the penalty phase, the parties agreed to introduce only this stipulation regarding the origin and nature of the Aryan Brotherhood: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.* at 162. In exchange for the stipulation, the state did not call an expert witness on the Aryan Brotherhood.

The Supreme Court began by rejecting, as too broad, Dawson's proposed rule that the Constitution forbids the consideration of evidence protected by the First Amendment when making sentencing decisions. *Id.* at 164. The Court recognized that sentencing courts have broad discretion in what they consider so long as that material is relevant. *Id.* The Court nevertheless found that Dawson's First Amendment rights had been violated, particularly with respect to his membership in the Aryan Brotherhood. *Id.* at 165. The Court stated that if the prosecution had introduced the expert testimony that it had originally proposed, it would be a "much different case"; but because the stipulation spoke only to on the racist beliefs of the Brotherhood and did not even tie such beliefs to the Delaware gang, the

Aryan Brotherhood evidence was irrelevant. *Id.* at 166.

More specifically, the Court reasoned that because "the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance." *Id.* at 166. By way of caveat, however, the Court stated that the reason introducing evidence of Dawson's membership in the Aryan Brotherhood violated the First Amendment is that it "tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id.* But the Court clarified that in many cases, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. *Id.* In *Dawson*, however, his First Amendment rights were violated "by the admission of the Aryan Brotherhood evidence . . . because the evidence proved nothing more than Dawson's abstract beliefs." *Id.* at 167.

In rejecting Davis's First Amendment claim, the CCA explained that to demonstrate the relevance of evidence concerning a defendant's membership in a group, the state must show "(1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Davis v. State*, 329 S.W.3d 798, 805 (Tex. Crim. App. 2010). The CCA noted that the state had introduced prison records showing that Davis had identified himself as a Satanist since 2005 and had owned various Satanic religious publications that discussed rituals of destruction and human sacrifice and that various people "had committed murder and mutilation in the name of Satan." *Id.* (citation modified). The court further found that though the defense expert, Melton, had debated what it meant to destroy someone in Satanism, he acknowledged that some people had been killed in the name of Satanism. The CCA concluded, therefore, that it was "within the zone of reasonable disagreement for the trial court to decide that the evidence of Satanism was relevant to the issue of future dangerousness. *Id.* at 805–06.

C.

Davis begins by asserting that his case is materially indistinguishable from the facts of *Dawson* and that the CCA's decision was thus contrary to clearly established law. Davis identifies *Dawson*'s key points as (1) the prosecution's failure to present evidence that this specific chapter of the Aryan Brotherhood committed illegal activities; (2) that the State invited the jury to infer that Delaware and California chapters held the same beliefs; and (3) that the Aryan Brotherhood evidence was not tied to the murder of Dawson's victim. Davis's representation of the key factual predicates of *Dawson* is inaccurate and does not permit this court to displace the CCA's decision under AEDPA. The failure of the prosecution to connect the Delaware and California chapters was important in *Dawson*, but the Court's First Amendment holding does not rest on it; instead, that fact is highlighted by the Court to indicate another reason why the stipulation itself amounted to no evidence at all. The First Amendment violation at base in *Dawson* lay in the lack of relevance of the asserted information and the fact that it "tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Dawson*, 503 U.S. at 166. The factual overlay here is substantially different.

In *Dawson*, the bare fact of associational membership was at issue. This case is materially distinguishable from *Dawson* because the prosecution adduced substantial evidence that Davis, by way of his brand of Satanism, harbored views that were relevant to future dangerousness. Here, there were multiple writings and drawings from Davis that demonstrated that his affiliation with Satanism was relevant to future dangerousness. For the situation in *Dawson* to be factually analogous, Delaware would have needed to try proving that Dawson was a future danger because he was a violent white supremacist, with reference to his collection of white supremacist literature and writings that advocated for violence. As is made apparent by the example, the factual scenario differs in material ways between this case and *Dawson*; Davis

cannot demonstrate that the state court decision was contrary to clearly established law.[4]

D.

Davis asserts that *Dawson* clearly establishes that for evidence of a defendant's group affiliation to be admissible without violating the First Amendment, there must, at a minimum, be "proof of the group's violent and illegal activities." As to the question of upholding the CCA's decision under AEDPA, the CCA cites this as the on-point rule for deciding relevance inquiries with regard to aggravating circumstances under the First Amendment. Our AEDPA deference to the CCA's ruling will stand or fall based on the reasonableness of its application of that rule here.

The CCA's application of *Dawson* was not objectively unreasonable. It was not even clear error.[5] Even if *Dawson* establishes that there must be proof of violence or illegal activity on the part of the group in question, it does not clearly establish what the quality or quantity of that evidence must be or how such groups must be conceptualized; instead, *Dawson* establishes only that the individual must be a part of that group.

*Dawson* does not define what it means for a group to commit or endorse "unlawful or violent acts." As a result, a fairminded jurist could conclude that *Dawson* is satisfied where a court finds that some individuals who

---

[4] This is a non-exhaustive list of distinctions between the cases. For example, the state in *Dawson* did not just fail to provide evidence of the Delaware chapter; it provided no evidence whatsoever of the violent practice or endorsement of violent practices by any Aryan Brotherhood group, much less the Delaware group. *Dawson*, 503 U.S. at 162. Texas here provided evidence of the group's violent tendencies.

[5] *See Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.").

are a part of the group endorsed violations of the law, as distinguished from its being an official organizational position. *Dawson*, 503 U.S. at 165–66. Though it is true that this permits "associational guilt" in some broad sense, *Dawson* does not even clearly establish that such a concern is relevant when it comes to admissibility.[6]

In finding that evidence of some Satanists committing violence was sufficient, the CCA construed the group at a high level of generality, consistent with the state's approach at trial, and in a way that was not forbidden by clearly established law in *Dawson* or any other case Davis points to.[7] Importantly, that evidence does, in fact, do more than demonstrate the abstract beliefs of Satanists, as it is and was used as evidence that Davis represents a future danger owing to the substance of the beliefs and what they mean for Davis as an actor in the world. Unlike in *Dawson*, the evidence was not adduced just because the jury could think that Satanism is unpalatable in and of itself, but to indicate that Davis's adherence to Satanist views increased the likelihood that he would be a danger to society. Likewise, the prosecution's expert's literalist reading of the Satanic Bible did not, as in *Dawson*,

---

[6] For example, if the Aryan Brotherhood endorsed or committed violent acts, and Dawson claimed he was a member of that organization (not because he believed such acts were good or because he even committed such acts but because he was seeking protection in prison), the fact of his membership would remain admissible as evidence of aggravating circumstances under *Dawson* because he was a member of a group that engaged in and advocated for violence.

[7] Davis points again to First Amendment caselaw, some of which *Dawson* cites and some of which it does not, for the proposition that an individual cannot be penalized for membership in a group if some members of the group engaged in or intended to support unlawful activities. But under AEDPA, those cases clearly establish very little as it relates to Davis because *Dawson* explicitly rejects the contention that an activity's being constitutionally protected categorically precludes its admissibility. *See Dawson*, 503 U.S. at 165 ("We therefore conclude that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment.").

invite the jury to infer the abstract beliefs of Satanists but asserted that Satanist literature that Davis owned endorsed violence, as highlighted by his conclusion that "to destroy" someone means to kill him. That is sufficient under *Dawson* and is enough to satisfy AEDPA's deferential standard.[8]

The permissibility of the CCA's reasoning is also apparent on the face of *Dawson* itself. In the same paragraph where the Court castigates Delaware for failing to prove that the Aryan Brotherhood had done anything unlawful or even endorsed such acts, it states the following:

> Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on Dawson's part, but on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible. Because Delaware failed to do more, we cannot find the evidence was properly admitted as relevant character evidence.

*Dawson*, 503 U.S. at 167. Far from clearly establishing the boundaries of the relevance inquiry in the First Amendment context, *Dawson* left open the possibility that Delaware *could* have avoided the constitutional violation if the evidence had demonstrated something more than the defendant's abstract beliefs. Under AEDPA, such a statement is sufficient to grant state courts broader latitude in how they apply the law.[9]

The CCA's finding that the state's producing plausible evidence is

---

[8] *See Dawson*, 503 U.S. at 166 (stating that proving the Aryan Brotherhood had endorsed violent acts could be sufficient to permit admission of the contested evidence).

[9] *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."); *Woodall*, 572 U.S. at 422–23 (discussing how the Court's reservation of a legal point in *Mitchell v. United States* was sufficient to indicate that a state court decision was not objectively unreasonable.).

sufficient was also reasonable under relevant law because, as even Davis acknowledges, *Dawson* can be reasonably interpreted as requiring only that the prosecution provide proof of an association's unlawful tendencies.[10] The state provided such proof when its expert testified that people had committed violence in the name of Satan.

Davis's suggestion that the decision concerning relevancy must lie with the judge, not the jury, does nothing to change the preceding analysis. Neither the state nor this court asserts that the issue of relevancy must lie with the jury. Instead, all we suggest is that once evidence is relevant, the meaning of that relevant evidence as it pertains to the defendant is a question for the jury in the context of *Dawson*.[11] With *Fuller* in mind, it becomes apparent that though the judge must make the relevance determination, the jury is still significant to the inquiry and a fair-minded jurist applying *Dawson* could conclude as the CCA concluded.

E.

Davis asserts that the CCA made an unreasonable finding of fact when it determined that Davis belongs to a group that engages in or advocates for violent and illegal activities based on Haley's testimony that some members of the religion advocate for violence. Davis claims it is undisputed that he was an adherent of the Church of Satan and its non-violent ideals, but as previously highlighted that is not the case. Because the actual nature of Davis's relationship with Satanism was not undisputed or established as a fact, it was

---

[10] *See Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (reasoning that the state satisfied *Dawson* because it introduced evidence of gang membership and the gang's violent track record).

[11] *See Fuller*, 114 F.3d at 498 (finding no *Dawson* violation because "[a] reasonable juror could conclude that membership in such a gang is relevant to future dangerousness.").

reasonable for the CCA to conclude that Davis belonged to a group that endorsed or encouraged violence. Likewise, it was not unreasonable for the CCA to rely on Haley's interpretation merely because another expert and Davis himself testified that the language in the Satanic texts were symbolic. Davis's assertions are a straightforward attempt to relitigate the case, and AEDPA forbids us from taking that step on this record. Consequently, Davis cannot be granted relief under any of his asserted standards.[12]

F.

Even if, *arguendo*, Davis had overcome AEDPA's bar, any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). A habeas petitioner can prevail only if the error had "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637.

At the COA stage, we concluded that at least Davis's drawings and writings would be admissible, and the issue of *Brecht* is resolved by the admissibility of Davis's writings and drawings alone. *Davis*, 2025 WL 1766785, at *6. His writings show a frequent preoccupation and antipathy toward humanity in general, including several instances in which he wishes to enact some level of physical violence on others. The discussion of Satanism is also invariably comingled with other content, and among his writings are handwritten reproductions of the Satanic Rules, which include the noted issue of "destroying someone." Some of his drawings display violent and sexually

[12] Davis claims that his Eighth Amendment and Fourteenth Amendment rights were violated by being sentenced to death on the basis of constitutionally protected religious beliefs. At the COA stage, Davis suggested that his Eighth and Fourteenth Amendment claims were never addressed by any court; we declined to remand because he "does not make any developed argument that those claims are not encompassed within his *Dawson* claim." *Davis*, 2025 WL 1766785, at *7 n.13. Even assuming *arguendo* that his Eighth and Fourteenth Amendment challenges were proper because we reject his *Dawson* claim, we also reject those assertions.

explicit content, such as a drawing of a crying woman who is bound, gagged, and nearly naked and a drawing of woman with a slashed throat.

As the COA panel stated, the drawings and writings "exhibit[ed] a preoccupation with rape, violence (particularly towards women), and death." *Id.* Because those materials were admissible on their own, the bare fact of Davis's association with Satanism—the thing that *Dawson* purportedly protects—would likely be beneficial, not prejudicial, to Davis, providing him an opportunity to explain the metaphorical nature of his writings.

The previous point alone should suffice, but when paired with the evidence of the crime itself, the series of testimonies concerning Davis's past violent actions, Davis's thorough cross-examination of Haley, Davis's testimony concerning his views on Satanism, and the state habeas court's finding that the jurors had been thoroughly questioned about their ability to rule fairly on Satanism, it becomes certain that Davis cannot satisfy *Brecht*.

IV.

Davis alleges that his defense counsel was deficient in violation of the Sixth Amendment. More specifically, he alleges that the state habeas court's treatment of his claim under *Strickland v. Washington*, 466 U.S. 668 (1984), was an unreasonable application of clearly established law because it was predicated on an incorrect assumption that a capital defendant's testimony absolves counsel of the duty to investigate adequately and because it precluded a finding of prejudice based on aggravating facts alone. Davis also asserts that the state habeas court relied on an unconstitutional causal-nexus test and made an unreasonable determination of the facts in the state court record.

A.

In order to prevail on a *Washington* claim of IAC, "a petitioner has the

burden of showing (1) deficient performance, that is, that his trial counsel's performance 'fell below an objective standard of reasonableness'; and (2) resulting prejudice, that is, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Neal v. Vannoy*, 78 F.4th 775, 789 (5th Cir. 2023) (quoting *Washington*, 466 U.S. at 688, 694). "An attorney's actions are deficient only if 'no competent attorney' would have taken the action counsel did." *Id.* at 790 (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011)). When *Washington* is asserted under AEDPA's deferential standard, the question is not whether counsel's actions were reasonable but "whether there is any reasonable argument that counsel satisfied" *Washington*'s deferential standard. *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

There is a reasonable argument that Davis's counsel's conduct satisfied the *Washington* standard, so Davis's IAC claim fails. Davis's description of the state court's decision as predicated on the assumption that a capital defendant's decision to testify absolves counsel of the duty to perform a constitutionally adequate investigation is incorrect. In reality, the state habeas court found that Davis's counsel adequately investigated the case before the 2008 retrial on punishment. Davis appears to be highlighting the fact that the state habeas court found that his decision to testify, and his occasional refusal to cooperate, influenced counsel's trial strategy, even though, by trial counsel's own admission, Davis did not agree to take the stand definitively until the day of (or shortly before that). That finding is a far cry from stating that the counsel had no mitigation responsibility.

Davis spends very little time directly challenging the state habeas court's findings of fact and even less time establishing what Supreme Court law clearly establishes. Instead, he made assertions as though the case were being reviewed *de novo* instead of under AEDPA's deferential standard. None of the cases relied on makes it so clear that there was a dereliction of

professional duty that no reasonable argument could be made that *Washington* was satisfied.

Davis's strongest authority is *Wiggins v. Smith*, 539 U.S. 510 (2003), which held the following:

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming Schlaich and Nethercott limited the scope of their investigation for strategic reasons, [*Washington*] does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

*Id.* at 527. Davis focuses on the "further investigation" language to suggest that his counsel's mitigation investigation was deficient because there were "red flags" that should have prompted further investigation. In *Wiggins*, however, the Court did not state that failure to investigate further red flags is a *per se* example of IAC; instead, the Court grounded any analysis in the "reasonableness of the investigation said to support that strategy." *Id.* Additionally, the facts of *Wiggins* itself are a far cry from this case. In *Wiggins*, counsel did not prepare *any* social history on the defendant, even though the state gave him the funds to do so, because counsel sought instead to focus on re-contesting the factual case.

That is just not the factual situation here. The state habeas court found that Davis's counsel did the following:

1. Conducted extensive investigation during the first trial before deciding to do further investigations because of changing circumstances.
2. Hired an investigator who they believed to be capable and competent enough to serve both as a fact investigator and a

mitigation expert.

3. Had a large amount of client contact before the retrial and interviewed local family members including Davis's mother between five and fifteen times.
4. Traveled to North Carolina for five days to interview witnesses.
5. Actively sought to find Davis's father for an interview but could not recall interviewing him.
6. Discovered and presented evidence at trial that Davis's father was abusive and provided Davis with an opportunity to develop those facts further.
7. Asked Davis about any sexual abuse he experienced in the past and presented that evidence at trial.
8. Asked Davis's mother, grandmother, and uncle whether Davis's father sexually abused any of his children and was given no indication that such abuse had occurred.
9. Developed a series of contingency plans based on whether Davis took the stand and asked for the death penalty.
10. Learned about Davis's alleged suicide attempt, something the jury was privy to.
11. Took into consideration Davis's wishes when developing his mitigation defense.
12. Started with information revealed by Davis for the basis of their mitigation investigation before then conducting an independent mitigation investigation.
13. Pursued a strategy focused on personal accountability and humanizing Davis, impacting the material they put on at trial.

Contrary to the facts of *Wiggins* and the facts of the other cases Davis cited, Davis's counsel did a thorough investigation in advance of his second trial, wholly separate from the fact that they had built up a large body of knowledge from having done an investigation for the first trial. Moreover, many of the points that Davis suggests that his counsel did not discover—such as his father's alleged sexual abuse—were points that the state

habeas court rejected as false or unreliable.

As to the actual presentation of the discovered evidence, the state habeas court found that, with the exception of alleged febrile seizures and self-mutilation, the jury was privy to evidence of Davis's abusive childhood, depression, and alleged suicide attempts; Davis does little to contest that finding. The state habeas court also found that Davis's counsel pursued a mitigation case focused on personal accountability and humanizing Davis and that such a strategy was legitimate. To that end, the state habeas court found, for example, that limiting the scope of an expert witness's examination and presentation of evidence was consistent with that strategy.

Far from being cursory or summary, Davis's counsel did a thorough job researching Davis's background and making sure the jury had access to that information while trying to balance how much evidence they put on that would undercut Davis's assertion of personal responsibility. Davis failed to prove that his counsel had performed deficiently, especially under the doubly deferential standard that is applied in *Washington*-AEDPA cases. In short, there is at least a "reasonable argument" that counsel satisfied *Washington*'s deferential standard, so Davis fails to prove his *Washington* claim under AEDPA. *Richter*, 562 U.S. at 105.

Davis also posits that the state habeas court misapplied *Washington* by precluding a finding of prejudice based on the aggravating facts of the crime alone. Once again, assuming *arguendo* that this is the status of clearly established law, the state habeas court did not do what Davis supposes. As previously stated, the state habeas court specifically found that much of the purported mitigating evidence was unreliable or already presented to the jury. Davis's claim fails.

## B.

Davis maintains that the state habeas court applied an unconstitu-

tional causal-nexus test, citing *Tennard v. Dretke*, 542 U.S. 274, 285 (2004), as the clearly established law that the court violated. For that proposition, Davis cites only the opinion of the federal district court *à quo*. But neither the district court nor Davis points to anything in the state habeas opinion saying what Davis says it says. Furthermore, *Tennard* is irrelevant, even assuming *arguendo* that it says exactly what Davis claims it says. According to Davis, *Tennard* invalidated a Fifth Circuit test requiring a nexus between mitigation and the crime. But the district court did not require a nexus between mitigating evidence and the crime as a matter of law; instead, it was stating that this was additional evidence when deciding whether to defer to the state habeas court's finding of no prejudice.

C.

Davis asserts that the state habeas court made three unreasonable fact determinations (two of which will be addressed here, as the third falls with the first). First, it found that "Davis's claims of suicide attempts, self-mutilation, sexual abuse, and parental neglect were either overstated or not credible." Second, it found that Sam Streep had been the investigator on the case "for a number of years."

Davis's first claim of an unreasonable factfinding fails because the record evidence he cites is insufficient to displace the state habeas court's conclusion. His claim that the factfinding was unreasonable relies on five pieces of evidence: first, the state habeas court's crediting testimony that Davis's counsel learned that Davis had engaged in self-mutilation and had attempted suicide; second, counsel's awareness that Davis was in a sexual relationship with an adult when he was a minor; third, the statement from counsel that he would have probed claims of the father's sexual abuse further if he had known that Davis's father was convicted of a child sex crime; fourth, counsel was aware that CPS was involved but did not investigate said involve-

ment; and fifth, Davis's telling multiple psychiatrists about being sexually abused by multiple people. Of those facts, only one—the court's crediting of counsel's testimony that he learned about Davis's self-mutilation and suicide attempts—could even raise a suspicion that the state court's factfinding was unreasonable, but it is ultimately insufficient.

Most of the facts cited are largely peripheral or irrelevant. Davis cites no point in the record where the state court denied that he was in a sexually abusive relationship with an adult when he was a minor; instead, the state habeas court rejected any claim that Davis's father had sexually abused him. The mere fact that counsel would have asked additional probing questions had they been aware of the father's other bad conduct or that CPS previously had visited the Davises before is likewise insufficient to demonstrate that a reasonable factfinder could not reach the state court's conclusion because none of those points demonstrate or prove Davis's claims.

The medical records also do not put it beyond dispute that the state habeas court's factual findings were unreasonable because the state habeas court also found that a recorded telephone conversation indicated that Davis would say whatever he had to say to manipulate his psychiatric diagnosis. Though Davis goes to some pains to suggest that this is ridiculous, he does not directly challenge the state habeas court's factual finding with relation to that phone call. Because it had been demonstrated that Davis was willing to manipulate psychiatric professionals, a reasonable factfinder could conclude, as the state habeas court did, that there was insufficient credible evidence of his history of self-harm or suicide attempts.[13]

[13] Additionally, the medical records indicate his suicidal ideations and his reporting of previous suicide attempts, not any suicide attempts that the medical professionals themselves witnessed, treated, or were able to attest to.

The single piece of evidence that presents a closer call is the court's crediting of the testimony of Davis's counsel that he had learned that Davis had "previously engaged in the practice of self-mutilation ('cutting') and had attempted suicide." That claim, on its face, seems to be at odds with the court's conclusion that Davis "has failed to present objective and credible evidence" showing that he had previously attempted to commit suicide or self-harm. But those two claims need not be in conflict, and reasonable minds could disagree about the meaning of the finding. Finding it credible that a party had become aware of certain information need not be, and was not necessarily, a passing of judgment on the validity of the underlying information. For example, a judge could credit testimony that Davis's counsel learned that Davis claimed that he was sexually abused by his father in the context of assessing the thoroughness of counsel's investigation while still rejecting, as false, that such abuse had occurred. The credited portion of the testimony is that counsel was apprised of such information or claims, not that such claims were true. Such an understanding is within the bounds of reason, and a reasonable factfinder could so conclude, as the state habeas court did, with both statements remaining true.[14]

Davis's second challenge is flawed by an overly literalistic reading of the court's factual findings. The state habeas court found that "[t]he record reflects that prior to applicant's retrial in 2008, Streep had been the investigator in applicant's case for a number of years." On Davis's reading, the state habeas court found that Streep had been investigating the case actively in that period of time. Much like the previous example, that reading is weak, at best.

---

[14] Because Davis's first claim fails, his third claim that the state habeas court's rejection of the suicide attempts and self-mutilation claims meant it did not consider how credible evidence would have impacted the jury's assessment of the issues also fails.

The state habeas court cites pages 93–94 of counsel's testimony, which includes the following exchange:

> Q: So is it fair to say that by the time Sam Streep was appointed as an investigator of the retrial that he had already been on the case for quite some time.
>
> A. Yes.

A contextual reading makes it clear that the state habeas court was not asserting, as Davis suggests, that Streep had been actively investigating the case in the period between trials, but instead, that Streep had significant familiarity with the case and had worked on it well before jury selection, countering the claim of Davis's expert witness.

This reading is also supported by numerous other factual findings that the state habeas court made. For example, the state habeas court found that Davis's counsel had requested that Streep be appointed as early as 2001 during the prior trial and that it was misleading to claim that counsel did not retain Streep until after jury selection in 2008.

* * * * *

Because Davis cannot clear AEDPA's deferential standard on either claim, the judgment is AFFIRMED.